## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NECEC TRANSMISSION LLC,<br><br>                Plaintiff,<br><br>    v.<br><br>CAMPOS EPC, LLC, and H.D.D.<br>COMPANY, INC.,<br><br>                Defendants. | CASE NO:<br><br>ECF |

## **COMPLAINT FOR DAMAGES**

Dated: June 27, 2025

Judson Brown, P.C. (*pro hac vice* forthcoming)
Emily M. Snoddon (*pro hac vice* forthcoming)
Hanna Eddy (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202-389-5000
judson.brown@kirkland.com
emily.snoddon@kirkland.com
hanna.eddy@kirkland.com

Victoria Ryan
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: 212-446-4800
victoria.ryan@kirkland.com
*Attorneys for Plaintiff*

Plaintiff NECEC Transmission LLC ("NECEC") brings this Complaint against Campos Companies ("Campos") and HDD. Co. Inc. ("HDD"), (collectively "Defendants") and state as follows:

## NATURE OF THE ACTION

1.      Campos and HDD engaged in coordinated, repeated, tortious, and illegal efforts to bilk NECEC out of tens of millions of dollars in connection with a project to drill and construct a transmission line underneath the Kennebec River in Maine.

2.      As Campos and HDD were well aware, this Kennebec River Crossing ("KRC") project was one of the last major hurdles in NECEC's decade-long effort to construct a 145-mile-long transmission line to connect the New England electrical grid to much-needed, low-cost clean power from Hydro-Québec in Canada.

3.      Through their efforts, Campos and HDD turned this $6 million KRC project into a $35 million windfall, all at NECEC's expense.

4.      In February 2021, HDD agreed to perform the KRC project—including drilling the bore path, installing conduits, and using Campos as its subcontractor for engineering work—for $9.6 million for two bore holes or an option for $6 million for a single bore hole.

5.      The parties ultimately decided a single bore hole was necessary.  In May 2021, after signing the contract, HDD promptly jacked up the price over 50%—from $6 million to $9.3 million for a single bore hole.  Not wanting to rebid the project, NECEC agreed to these terms through a bore price adjustment.

6.      When a state-wide referendum in 2021 led to an unexpected, lengthy pause in construction activities, HDD and Campos devised a scheme to make even more money—multiples more for each of them.

7.    When the project restarted, HDD informed NECEC that it would no longer perform the work for $9.3 million—raising the price, once again, up to $13.7 million, supposedly due to "market escalation."

8.    Soon after that demand, HDD changed its mind yet again—refusing to perform the work for any flat-fee price.  Instead, HDD informed NECEC that they would only perform the work under a "time and materials" contract.

9.    NECEC refused this demand, unwilling to give up the fixed price assurance it had contracted for.

10.    On February 1, 2024, HDD terminated its contract with NECEC for the KRC project.

11.    Rather than assert that HDD's termination was wrongful and press HDD to complete the work, NECEC instead decided to rebid the KRC project in the hopes that another contractor would complete the work promptly—at a similar price—so NECEC could finally deliver on its commitment to provide lower-cost, clean electricity to the New England region.

12.    Campos and HDD had other ideas.

13.    Even before HDD's termination was public and before NECEC put the project out for rebid, Campos (HDD's engineering subcontractor) reached out to NECEC asking to take over the project.

14.    Campos then submitted its own bid to be the primary contractor for the KRC project.  To complete the exact same scope of work as HDD originally contracted to perform, Campos bid $20 million for the project—over triple HDD's original amount for a single bore.

15.    HDD did not rebid at all.  It would play a different role in the project this time around.

16.    Soon after securing the contract for the KRC project, at its bid price of $20 million, Campos subcontracted with HDD to perform the actual construction work, namely, drilling the bore path and installing conduits for the transmission lines under the Kennebec River.

17.    In a classic case of bid-rigging, HDD went from prime contractor to sub-contractor, with Campos switching from sub to prime, all to increase their fees on the project.  In just six months, Campos and HDD had abandoned their over $9 million project, flipped prime- and sub-contractor positions, and more than doubled their revenue to $20 million for the same scope of work.

18.    But Campos and HDD were not done.

19.    After repeatedly delaying work, Campos held the KRC project hostage unless NECEC agreed to pay even more.  When NECEC refused those demands, Campos turned to threats—to stop work, to demobilize the project, and to destroy the work already completed, including much of the drilling—unless NECEC agreed within 24 hours to pay an additional $14.5 million.

20.    Campos's threat was wrongful and without any legal basis.

21.    Campos's threat to demobilize and destroy the drilled bore path would have made it virtually impossible to complete the KRC project—at least based on the design and approach that had received regulatory approvals and permits.

22.    NECEC had no choice but to acquiesce to Campos's demand and agree to pay the $14.5 million ransom so Campos would continue the work it had already contracted to do.

23.    By now, Campos and HDD had coerced NECEC to pay nearly $35 million for the same work—over five times what HDD originally agreed to do for $6 million.

3

24.     But they still could not complete the work NECEC had contracted for.  The contract unambiguously obligates Campos to install seven conduits under the Kennebec River.  Campos, however, admittedly installed only six conduits.  And now no one—not Campos or HDD or anyone else—can install the seventh conduit in the same bore path that HDD drilled.

25.     When it became clear that Campos did not—and could not—complete the work it was obligated to provide, NECEC promptly sent a notice detailing its contractual failures and rescinding the change order it agreed to under threats and duress.

26.     Plaintiff brings this lawsuit to recover for Defendants' anticompetitive behavior, breaches of contract, and tortious conduct.

## PARTIES

27.     Plaintiff NECEC Transmission LLC is a Delaware limited liability company with its principal place of business in Portland, Maine.  NECEC Transmission LLC is a clean energy development company that owns the New England Clean Energy Connect Project ("NECEC Project"), a portion of which is at issue in this dispute.

28.     Plaintiff NECEC is wholly owned by Avangrid Networks, Inc., a Delaware limited liability company with its principal place of business in Portland, Maine.  Avangrid Networks, Inc. is wholly owned by Avangrid, Inc., a New York corporation with its principal place of business in Orange, Connecticut.

29.     Defendant Campos is a limited liability company organized under the laws of the State of Colorado.  Campos's operations are headquartered in Denver, Colorado.

30.     Defendant HDD is an Oregon corporation.  HDD's operations are headquartered in Casa Grande, Arizona.

## JURISDICTION AND VENUE

31.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this is a civil action arising under U.S. federal law, including federal antitrust statutes.  The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

32.    Because, upon information and belief, all Defendants are citizens of different states than the Plaintiff, and the amount in controversy exceeds $75,000, federal jurisdiction is also proper pursuant to 28 U.S.C. § 1332.

33.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391.  Venue is also proper because NECEC and Campos expressly consented to venue "in the federal courts of the United States sitting in the Southern District of New York (in the Borough of Manhattan)" in the parties' Agreement.   (Ex. 1, May 21, 2024 Agreement for Engineering, Procurement and Construction of the New England Clean Energy Connect HVDC Underground Transmission Line ("Campos Agreement") § 10.5(c).)

## FACTUAL ALLEGATIONS

I.    **CLEAN ENERGY INNOVATORS & NEW ENGLAND'S ENERGY CRISIS.**

A.    **Avangrid is a Leading Sustainable Energy Innovator.**

34.    Avangrid is a leading sustainable energy company in the United States.  Through its Networks subsidiary, Avangrid owns and operates eight electric and natural gas utilities, serving more than 3.3 million customers in New York and New England.  That subsidiary also develops, constructs, and operates electrical transmission facilities like the NECEC Project.  Through its Power subsidiary, Avangrid owns and operates more than 75 energy generation facilities across the United States producing 10.5 GW of power for over 3.1 million customers.  Avangrid's

businesses are critical to meeting the growing energy demand from homes and businesses across the nation.

35.    Avangrid has received numerous awards for its leadership in energy and business, its ethics, and its exemplary corporate citizenship.  Just this year, the American Business Awards—the country's premier business awards program—recognized Avangrid for its commitment to strengthening the electric grid and "shepherding the U.S. economy into a strong energy future." Similarly, JUST Capitol—the only independent nonprofit that tracks, analyzes, and engages with corporations on how they perform on the public's priorities—has named Avangrid one of America's best corporate citizens for five consecutive years.

36.    Avangrid's focus on sustainability is at the core of its decision-making processes, as evidenced by the numerous accolades it has received in this space.  The company appeared on the Newsweek List of America's Greenest Companies of 2025, and last year was named "Most Sustainable Company in the Clean Energy Industry" by World Finance based on the company's commitment to cutting emissions across its entire value chain.

37.    Avangrid has consistently demonstrated a commitment to operating with the highest ethical standards and continues to uphold principles of integrity, transparency, and accountability as a global industry leader.  Indeed, the Ethisphere Institute—a company that defines and measures corporate ethical standards—has recognized Avangrid as one of the world's most ethical companies for seven consecutive years.  Consistent with these accolades (among others), Avangrid brings this spirit of integrity to all its endeavors and business relationships.

**B.    Avangrid Provides a Solution to New England's Energy Crisis.**

1.    <u>The NECEC Project.</u>

38.    Avangrid's work is of considerable, growing importance, as New England struggles with fuel security.  "More than any other region of the country, New England households are

dependent upon expensive delivered fuels."[1]  About half of the region's electricity is supplied by natural gas-power; when temperatures drop, demand for natural gas goes up and prices follow.  In recent winters, price peaks for natural gas have made it difficult for New England's gas generators to secure fuel, prompting the region to turn to oil-fired generation—a less sustainable, high-cost option with a much larger carbon footprint.

39.     Avangrid strives to provide the region with much-needed clean energy and—together with Hydro-Québec, a Canadian clean energy company—initiated the NECEC Project.

40.     In 2016, the Massachusetts legislature solicited bids for a project to bring clean electricity to Massachusetts, as part of a breakthrough clean energy law that required the Commonwealth's electric distribution companies to procure 1,200 megawatts of hydropower or other land-based clean energy.  A Request for Proposal was sent to approximately 600 potential bidders.  A total of 46 bids, with 53 distinct proposals, were received.  NECEC—the brainchild of Avangrid—won the competition in 2018.

41.     The NECEC Project constructs a new transmission line that, when complete, will be capable of providing hydroelectric power sufficient to meet the demand of 1.2 million homes across six New England states.  The transmission line—which will run high-voltage direct current ("HVDC")—will span from the Canadian border to Lewiston, Maine and will connect Hydro-Québec's clean power to the New England electrical grid.  The NECEC Project also includes necessary network upgrades, including AC transmission lines, required to interconnect the NECEC Project to the New England electric grid.

---

[1] Stephen Singer, *Up to $1B in heating help for low-income residents in works*, The Hartford Courant (Sept. 29, 2022), at A2.

42.    The NECEC Project will bring substantial environmental and other benefits to New England, will significantly lower the cost of electricity across the region, and will remove upwards of 3.6 million metric tons of carbon emissions annually from the atmosphere (the equivalent of removing approximately 700,000 cars from the road) by decreasing New England's reliance on fossil fuels for the region's electricity needs.

43.    Once built, the NECEC Project will be New England's largest renewable energy source, saving customers $190 million per year.  It is expected to be completed in late 2025.

2.    The Kennebec River Crossing is a Critical Portion of the NECEC Project, Requiring Specialized Horizontal Directional Drilling.

44.    The NECEC Project is an enormous undertaking, requiring numerous and extensive construction contracts for building and completing the different segments of the 145-mile HVDC transmission line.

45.    This case concerns a construction contract for a critical portion of the transmission line crossing under the Kennebec River, a Maine watershed that supports habitats for wildlife and outdoor recreation.

46.    This under-river construction project is known as the Kennebec River Crossing. Because the HVDC transmission line must pass safely under the Kennebec River, the KRC project required horizontal directional drilling.

47.    Horizontal directional drilling is a style of underground drilling used when traditional trenching is impractical, hazardous, or environmentally damaging, such as in congested urban areas and under waterways.  Often referred to as "trenchless drilling," horizontal directional drilling technology uses surface-launched equipment to drill underground horizontally and install pipes, conduits, and cables.  The technique is utilized under rivers because traditional vertical

excavations are considered too hazardous and potentially disruptive to sensitive watershed ecosystems.

48. Horizontal directional drilling involves drilling bore holes—or underground tunnels and paths—to provide a subsurface route for installing underground infrastructure such as pipelines, conduits, or cables, without the need for extensive surface excavation.

49. Horizontal directional drilling begins by drilling a small diameter pilot hole, along a predetermined path, from an entry point to an exit point using computer technology. Once the pilot hole is established, the drilling process continues by using larger rotary cutting tools known as reamers to gradually enlarge the bore hole. The reaming process continues until the larger bore hole can accommodate the pipe, conduit, or cable for installation. Thereafter, the installed pipe, conduit, or cable is pulled through the widened bore hole. This was the process planned for the KRC project.

3.    The Insular Horizontal Directional Drilling Community.

50. Because horizontal directional drilling is a specialized technique, experts in the method are few and they are a small, interconnected community. Indeed, only a limited number of companies can perform this specialized drilling at the scale necessary to complete the KRC project, including HDD, Cherokee Horizontal Directional Drilling ("Cherokee"), and Campos.

51. Employees of these horizontal drilling companies are well acquainted with each other—attending the same conferences, working together on large projects, and even switching between the different companies.

52. HDD and Campos have been partners on several different construction projects. PacWave South, for example, is an offshore wave energy test site in Oregon. The project involved installing shore landing conduits via horizontal directional drilling, the same method used for the KRC project. The two companies worked intimately together on the project from 2019 to 2022;

HDD was the primary contractor and Campos was a subcontractor on the design team that provided construction management services.

53.    The two companies also joined forces to address an emergency in Novato, California in 2023.  Specifically, HDD was contracted to address a landslide that buried two natural gas transmission lines.  Campos was part of HDD's design team.

54.    HDD and Campos have engaged in other joint initiatives too, including industry demonstrations.  For instance, in February 2022 the two companies partnered up for a demonstration on the Geonex Platform in a controlled operational display, with the companies' executives and employees closely collaborating on the demonstration.

## II.    HDD CONTRACTS FOR THE KRC.

### A.    HDD Obtains the Successful Bid.

55.    On May 3, 2019, the Maine Public Utilities Commission ("PUC") found the NECEC Project to be in the public interest and issued a Certificate of Public Convenience and Necessity for the NECEC Project.  The NECEC Project also received the necessary permits from the Maine Department of Environmental Protection ("DEP"), the U.S. Army Corps of Engineers ("Corps"), and the United States Department of Energy ("DOE").

56.    After receiving all necessary permits and approvals, NECEC solicited bids from contractors to engineer, procure, and construct the NECEC Project's HVDC underground transmission line at the KRC.

57.    HDD submitted a winning bid to be the primary contractor for the KRC, and on February 8, 2021, NECEC and HDD entered an Agreement for Engineering, Procurement and Construction of the New England Clean Energy Connect HVDC Underground Transmission Line ("HDD Agreement") (Ex. 2).

58.     Engineering, Procurement and Construction ("EPC") agreements place all responsibility on a single contractor to oversee the engineering, procurement, and construction of a project, such that the owner—in this case, NECEC—is provided with a turnkey solution.

59.     HDD—the primary contractor—hired Campos as the engineering subcontractor for the KRC project.  Together, HDD and Campos were to engineer and construct the HVDC transmission pipe at the KRC site.

**B.     The HDD Agreement Calls for Seven Conduit Pipes.**

60.     The HDD Agreement had one primary purpose: drill and install seven conduits at the KRC.  All seven of these conduits play an important role in the contract and for the KRC more broadly.  Two would house positively charged transmission lines and two would hold negatively charged transmission lines, creating two complete circuits.  One would house a spare electrical cable that could be put into use if one of the four primary lines failed.  One would hold a fiber optic cable to facilitate control and protection signals (*i.e.*, key safety communications) between HVDC converter stations and provide high-speed broadband access to rural areas.  And the final conduit would initially be left empty but would provide flexibility to address future reliability issues or a potential upgrade of the line's capacity.

61.     Electrical energy relies on a complete circuit, with one positive line and one negative line.  The combination of the positive and negative lines—each running through its own conduit—provides the necessary pathway for electrons to flow, creating a complete circuit for the transfer of electricity.  The more pairs of positive and negative lines, the more electricity can be transmitted.

62.     The fiber optic cable will carry control and protection signals between the HVDC converter stations and will provide broadband internet services to communities along the route, including underserved communities in rural areas of Maine that currently have limited or no high-

speed access.  The fiber optic cable was an important aspect of NECEC's HVDC converter's functionality and part of NECEC's obligation to Maine.

63.    The two remaining conduits were similarly important.  They would provide an opportunity to create an additional full circuit (one positive line and one negative line), which would substantially increase the power transmission of the NECEC Project in the future.  And since the NECEC Project has a 40-year lifespan, the additional conduits were intended to anticipate other needs in the future, such as the need to replace the cables.  It is best practice to install additional conduits given the challenge and expense of drilling and the difficulty of making repairs once construction is complete.  Without those additional conduits, NECEC could be left flat-footed: if later NECEC determined an additional conduit would be necessary or beneficial, it would require a new bore hole with all the attendant cost and effort required to design and construct such a project, in addition to the permitting and regulatory approvals necessary.

64.    The Agreement expressly calls for the construction of all seven conduits.  Each conduit plays an essential role in construction, planning and utility for the future, and was an important aspect of NECEC's contract negotiations.

## C.    Progress on the NECEC Project Unexpectedly Halts.

65.    In August 2021, the Commissioner of the Maine DEP notified NECEC that the Department was initiating a proceeding to consider suspending a license necessary for the NECEC Project.  The proceedings were prompted by a land dispute pending in Maine state court.  A couple months later, a Maine referendum forced the work on the NECEC Project to halt until resolution of the dispute and the Maine DEP issued a stop work order for the project.

66.    Although NECEC brought a suit seeking declaratory and injunctive relief regarding the referendum, NECEC was forced to notify HDD of the stop work order.

**D.**    **HDD and Campos Conspire to Extract Higher Fees and More Favorable Terms.**

67.    While construction was paused, HDD and Campos—the primary contractor and subcontractor on the KRC project—strengthened their relationship.  During this time, the two companies partnered on the PacWave South Project described above.

68.    Two individuals worked particularly closely on the PacWave South Project: Phill Perron—Vice President of Projects at HDD—and Romeo Shiplee—the Director of Geotechnical Engineering at Campos.  Perron was the project manager for PacWave South and Shiplee was the lead engineer.  Based on their working relationship, Shiplee publicly commented on Perron's "technical acumen" and stated that Perron "commands the respect of everyone he works with."

69.    During the multi-year PacWave South Project—which commenced after HDD had signed the HDD Agreement for the KRC project—Perron and Shiplee began to understand the leverage they had in the renewable energy sector.  As Shiplee explained:

> [The PacWave South Project] is important to the industry as a whole because of the implementation of this trenchless technology into another subsector of the market. …  We are now doing things on the renewable energy side of the market that were seldomly if ever used in the past especially in this size and scale.  This has a huge potential for the business as more and more of the world is moving toward renewables.[2]

70.    In 2023, the DEP lifted its stop work order.

71.    At that time, NECEC and HDD began to discuss resuming construction.  But HDD wanted more than the over $9 million it previously agreed to.

72.    By then, HDD and Campos, upon information and belief, hatched a plan to extract more money from NECEC.  Namely, HDD would demand more money and walk away from the

---

[2] *HDD Co. Adapts Pipeline Know-How for PacWave Energy Project*, Trenchless Technology (Aug. 15, 2022) https://trenchlesstechnology.com/hdd-co-adapts-pipeline-know-how-for-pacwave-energy-project/.

contract with NECEC, in favor of Campos becoming the primary contractor under a new, more lucrative agreement, with HDD later becoming Campos's subcontractor on the project.

73.     When the work stoppage lifted, NECEC was under intense pressure to complete the KRC to satisfy contracts with Massachusetts utilities.  HDD and Campos used this time pressure as an opportunity to extract higher fees.

74.     Amidst this context, HDD refused to work for less than $12 million and requested as much as $14 million.  HDD then changed course once again, demanding that NECEC pay day-by-day under a "time and materials" approach, as opposed to the flat-fee arrangement that the parties had already agreed to.

75.     NECEC refused HDD's demands.  NECEC had contracted for a fixed fee and would not agree to a time-and-materials deal that had no pricing certainty and did not incentivize prompt and efficient completion of the KRC project.

**E.      HDD Terminates the Agreement.**

76.     On February 1, 2024, months after the work stoppage was lifted, HDD sent notice that it was terminating its agreement with NECEC.  HDD's purported reason for termination was the Force Majeure Event[3] (*i.e.*, the work stoppage), claiming that HDD "ha[d] been unable to perform their obligations" since November 26, 2021.  (Ex. 3, Feb. 1, 2024 HDD Notice of Termination; *see* Ex. 2, HDD Agreement § 7.2(f).)

77.     In that letter, HDD explained that it "does not feel that it would be responsible to execute a project of this size, expense, and technical complexity under the current contractual

---

[3] Capitalized terms used but not defined in this Complaint have the meaning set forth in the HDD and Campos Agreements, respectively.

relationship," but would be willing to reconsider the KRC "under a new contract." (Ex. 3, HDD Notice of Termination.)

78.    In other words, HDD wanted to do the work—just at a higher price.  The work stoppage was just the means by which HDD sought to achieve that end.

79.    NECEC was surprised by HDD's unwillingness to move forward and was concerned about the timing of the termination given the pressure to complete the project.

80.    Throughout February and March, the parties negotiated a potential path forward, meeting virtually to discuss the project on multiple occasions.

81.    During negotiations, HDD made clear that it would not do the project for less than $19 million—the same single-bore project it originally agreed to do for $6 million.

82.    HDD wanted more money to do the same work.  When NECEC refused, HDD terminated the parties' agreement.  Rather than risk further delay to the KRC project, NECEC decided to solicit new bids from other contractors.

## III.    DESPERATE TO PROCEED, NECEC CONTRACTS WITH CAMPOS FOR THE KRC PROJECT.

### A.    Campos Wins the Rebid, Then Installs HDD as Subcontractor.

83.    Soon after HDD terminated the contract, but before that termination was public and before NECEC even solicited any new bids for the KRC, Patrick McHugh (a Vice President at Campos) called Nick Achorn (Project Manager at NECEC) and explained that Campos would be willing to take over the KRC project as the primary contractor.

84.    NECEC did not know how Campos knew that HDD had terminated the HDD Agreement—but surmised that Campos had been talking to HDD about its termination.

85.    Eager to get construction back on track, NECEC began the rebidding process for the KRC project.

86.    On April 2, 2024, Campos submitted a bid proposing to do the KRC project—the same scope of work that HDD originally agreed to—for $20 million.

87.    On April 3, 2024, NECEC issued a Notice to Proceed to Campos.

88.    A few weeks later—on May 21, 2024—NECEC and Campos executed an Agreement for Engineering, Procurement and Construction of the New England Clean Energy Connect HVDC Underground Transmission Line ("Agreement" or "Campos Agreement"). (*See* Ex. 1, Campos Agreement.)

89.    Under the Agreement, NECEC would pay Campos $20 million for a single bore hole—more than three times the $6 million that HDD had once agreed to for a single bore hole.

90.    Campos initially indicated it would use Cherokee as its drilling sub-contractor for the KRC project. Unbeknownst to NECEC, however, Campos had no intention of keeping Cherokee as the subcontractor; HDD was waiting in the wings.

91.    Shortly after Campos and NECEC inked the Agreement, Campos told NECEC that Cherokee was no longer available due to supposed scheduling conflicts. Campos removed Cherokee from the KRC project on July 26, 2024, with Cherokee performing no work.

92.    Less than a week later, Campos lined up HDD as the subcontractor to replace Cherokee.

93.    On July 31, 2024, Campos submitted a construction plan that detailed various milestones with HDD as subcontractor and set the substantial completion deadline for the project as November 16, 2024. (Ex. 6, July 31, 2024 Change of Drilling Subcontractor Plan.)

94.    Although NECEC had serious concerns with HDD, NECEC was unaware of another entity that could perform the drilling work and keep the KRC progressing without even further delays. NECEC had no alternative options.

95.    On August 21, 2024—approximately six months after HDD terminated its Agreement with NECEC—HDD finally mobilized to the work site as Campos's subcontractor.

**B.    Campos Adopts the HDD Agreement But Spikes the Price.**

96.    The Agreement between NECEC and Campos was substantially similar to NECEC's original contract with HDD save for one significant detail:  the price was more than triple the $6 million HDD option for a single bore.

97.    Like the HDD Agreement, the Campos Agreement—in no uncertain terms—called for the installation of seven conduits.  The specifications for the KRC defined the project's scope as to "install seven (7) ten-inch (10") conduits to cross the Kennebec River in Maine."  (Ex. 1, Campos Agreement, Attachment A-2.)

98.    Campos was well aware of this obligation.  Indeed, as part of its role as the original subcontractor to HDD, Campos drafted the engineering plans for the project's specifications.

99.    Further, Campos was contractually obligated to perform in a timely fashion.  In fact, the Campos Agreement specified—in capital letters, no less—that "TIME IS OF THE ESSENCE IN THE CONTRACTOR'S PERFORMANCE OF THE WORK."  (Ex. 1, Campos Agreement § 7.6.)

100.    The inclusion of this provision—while standard in the industry—was especially fitting given the immense time pressure that NECEC was already under due to the many delays up to this point, all of which Campos knew.

**C.    Campos & HDD Demonstrate Carelessness and Unprofessionalism on the Job Site.**

101.    Campos and HDD caused numerous problems during construction, demonstrating carelessness throughout.  At every turn, NECEC worried that Campos and HDD were behaving unprofessionally, causing undue delay, and not using best drilling practices.

102.    Due to Campos and HDD's poor performance, NECEC hired a third-party engineering expert, Abhinav (Abhi) Huli, to provide feedback and oversee the drilling operations on site. Huli reported back to NECEC that HDD did not have a "scientific approach" and appeared to be winging it with its drilling methodology.

103.    Huli also commented on Campos and HDD's poor management of drilling "mud"—a specially designed fluid that helps stabilize the bore hole, lubricate the drilling apparatus, and carry material out of the bore hole. Management of this mud is a significant aspect of horizontal directional drilling.

104.    Among other things, HDD was supposed to have an on-site mud engineer, but did not, and conducted no advanced testing of the drilling mud.

105.    Romeo Shiplee from Campos was the lead engineer on the KRC project. That Campos (rather than HDD) provided the lead engineer for the project was unusual since HDD was the one actually doing the drilling.

106.    Shiplee was nonchalant and did not manage the day-to-day drilling activities well. Consistent with Huli's findings, the mud analysis was deficient. Huli encouraged Shiplee and Campos to perform further analysis of the drilling fluid, but Campos refused. NECEC therefore had to contract a third party to perform fluid analysis. The degree of drilling fluid management significantly impacts the progress of the work, as well as material and equipment break down, and likely contributed to Campos's delays.

**D.    Campos Submits Baseless Change Orders to Raise Its Profits.**

107.    Campos's complaints about the specifications for the KRC project continued throughout construction. The gripes ranged from winter conditions, to closures during the holidays, to "unexpected" rock formations underground—all of which Campos raised as excuses for further delays, non-conforming work, and requests for more money.

18

108.    Under the Agreement, Campos was required to submit a Change Order to NECEC to request any change in the specifications or pricing of the KRC.  (Ex. 1, Campos Agreement § 9.1.)

109.    Campos sent the first "Change Notice" at issue in this case on November 12, 2024 ("Change Notice #4").  In it, Campos suggested there was a "change in condition"—namely "rock conditions with the drilling operations." Campos claimed these purportedly different conditions would add an additional 57 days to the project and required an additional $8,328,327 from NECEC. (Ex. 7, Nov. 12, 2024 Change Notice #4.)

110.    Campos sent a series of additional Change Notices over the next few weeks seeking additional monies for various issues.  On December 18, 2024, Campos sent Change Notice #5, asking for a review of accumulated monthly costs for winter conditions and describing unanticipated delays due to winter weather conditions.  (Ex. 8, Dec. 18, 2024 Change Notice #5.) In Change Order #7 Campos requested an additional $23,175 for additional site work necessary for crane access.  (Ex. 4, Jan. 24, 2025 Change Notice #7.)  And in Change Notice #8, Campos sought another $78,568 for additional work to drill and obtain sufficient water flow.  (Ex. 5, Jan. 24, 2025 Change Notice #8.)

111.    None of Campos's Change Notices was permitted or justified under the Campos Agreement.

112.    The Agreement defines five discrete circumstances in which Campos may seek a Change Order.  (Ex. 1, Campos Agreement § 9.1(b).)  For example, Campos could have requested a Change Order if there was a suspension of the Work, Force Majeure Event, or a Change in Law, (*Id.* § 9.1(b)(i)-(ii), (v)), but none took place.  Campos could have also requested a Change Order if there were delays, interferences, or hindrances in the performance of the Agreement "occasioned

by an act or omission of the Owner or any of the Owner's other contractors or representatives," or in the event of the possession or use of portions of the Work by the Owner. (*Id.* § 9.1(b)(iii)-(iv).) Again, none of those circumstances were present.

113.    NECEC was under no contractual obligation to accept Campos's demands.

**E.    The Parties Negotiate the Change Orders.**

114.    Although it had no contractual obligation to do so, NECEC responded to each of Campos's Change Notices.  With regard to Change Notice #5, NECEC resisted the idea that operations needed to shut down due to inclement weather.  NECEC had previously suggested best practices for work in winter weather, such as using chains on tires and other common tools and techniques used to manage winter conditions.  But HDD refused to implement these winter safety measures, putting its own workers at risk and causing delay by shutting down operations.  A Change Order was not warranted for winter conditions that were known to all parties at the time the contract was negotiated; indeed, cold and snow in Maine winter could not have surprised anyone.

115.    With regard to Change Notice #4, NECEC needed additional information to evaluate the request.  Campos's short, vague description in the Change Notice included only conclusory reference to changed underground conditions but said nothing about why the underground formation was unknown at the time of the bidding process and why it required so much additional money.  Campos's demand was particularly troubling since it opted not to do additional bore testing before it commenced drilling, instead, relying on test bores done years earlier.  NECEC therefore requested more information from Campos before providing an answer on Change Notice #4.

116.    NECEC received no response for nearly a month.  On December 12, 2025, Campos responded with an email purporting to provide the technical reasons for why it had submitted the Change Notice.

117.    The parties exchanged numerous correspondence on the issue, without any clarity on NECEC's original questions.  On January 24, 2025, NECEC made clear that it had "request[ed] additional information (multiple times) from Campos to evaluate the validity of the Change Notices, [and NECEC] has not yet been in a position to approve or deny them."  (Ex. 9, Jan. 24, 2025 Avangrid Letter.)

118.    While NECEC and Campos went back and forth on Campos's requested Change Notices, little progress was made on the KRC project and construction was idling.  NECEC and Campos held an in-person meeting between Vice Presidents of the two companies on January 28, 2025 to discuss the issues.

**F.    Campos and HDD Cause Further Delay.**

119.    During the negotiations over the Change Notices, HDD had walked off the job site and shut down operations.  On information and belief, Campos had failed to keep up with HDD's payment schedule and so the workers refused to continue.

120.    In addition, HDD shut down its operations from December 19, 2024 to January 3, 2025, despite NECEC's insistence that Campos and HDD work through the holidays because the KRC project was already substantially behind schedule.  When HDD eventually got back to work, the KRC project was even further delayed; it was well into January before things were moving forward again.

121.    These unfounded Change Notices and delays in progress on the KRC project were part of Campos and HDD's effort to use all available means to extract as much money as possible to complete the work.

**G.**      **Campos Coerces NECEC to Sign the Change Agreement Under Duress.**

122.    On February 3, 2025, leaders from Campos met with NECEC executives.

123.    Campos leaders were hostile, confrontational and did not seem interested in a collaborative solution.

124.    The same day, while the parties were still negotiating Campos's requested Change Notices, Campos issued a Stop Work Notice, threatening to stop work just hours later, at 7:00pm that day.  (*See* Ex. 10, Feb. 3, 2025 Campos Stop Work Notice.)

125.    NECEC had been clear with Campos that it did not have sufficient information to make a determination on the outstanding Change Notices, as NECEC had not received the requested defined and detailed back up for the claim.  But Campos threatened to walk off the job without even responding to those requests.

126.    Under the Agreement, Campos had no right to submit the Change Notices in the first place, and certainly had no right to stop work—particularly on just a few hours' notice—if the Change Notices were unpaid.

127.    Just as it had hoped, Campos's threats put NECEC in an impossible situation. NECEC could not risk delaying the KRC project further by allowing the work to stop, the progress to date to be destroyed, or Campos and HDD to walk away leaving it to another contractor.  Indeed, restrictions on when work could be done in that area meant that any further delay would have pushed the KRC completion another six months to a year.

128.    To contextualize the time pressure on NECEC, it is important to understand that road closures in rural Maine are standard practice in the spring due to significant rainfall and spring thaw, which naturally impacts construction projects in the region.  As a general matter, moving heavy equipment on rural roads during April and May is difficult if not impossible, as local municipalities will "post" the roads to limit travel to vehicles under a certain weight.  For all intents

22

and purposes, any knowledgeable contractor involved in a construction project during this timeframe knows and expects that it will be unable to move heavy equipment until the road postings are taken down.  Particularly given the road closure schedules, the process of demobilizing and bringing in a new contractor was increasingly difficult.  In addition, Campos threatened to remove the casing of the bore hole, meaning that another contractor would have to start over from scratch.  In fact, it is highly unlikely in the industry that another contractor would take ownership of the quality or performance of the work of another contractor given the complexity involved.  In short, NECEC was stuck with Campos and HDD.

129.    Even if NECEC did have the time to re-open bidding, there was no suitable replacement for Campos and HDD.  As mentioned, there are few companies skilled enough to do the horizontal directional drilling required on the KRC project—and two of them (HDD and Campos) were causing the delay and a third (Cherokee) purportedly was too busy for the KRC project.  Campos and HDD leveraged this market power to their advantage, knowing NECEC could not proceed in their absence.  NECEC was captive.

130.    Constrained for time and without alternatives, NECEC responded to Campos's demand immediately on February 3, 2025.  NECEC once again explained that "NECEC ha[d] followed the contract process for reviews of change order requests," but had not yet received a sufficiently defined and detailed backup of the claim itself, and the claim was inextricably linked to Change Notice #4, which was subject to active discussions.  NECEC further expressed that a "work stoppage by Campos in the meantime would be a breach of contract that would almost certainly result in very significant damages."  (Ex. 11, Feb. 3, 2025 NECEC Response to Stop Work Notice at 1.)

131.    Nevertheless, to avoid a work stoppage, destruction of the drilled bore hole, and the need to start over, NECEC agreed to advance $2.5 million to Campos, split across five weekly installments, to keep the KRC project moving forward.

132.    That was not enough for Campos and HDD.  The same day, February 3, 2025, Campos sent another letter making clear it would continue to work only if NECEC agreed to pay $8 million by Friday, February 7, 2025 and resolve all outstanding Change Notices by 5:00pm on Tuesday, February 11, 2025.  Campos reiterated its threat, explaining that "i[f] all outstanding change orders are not resolved at that time, Campos will stop work."  (Ex. 12, Campos Confirmation of Agreement.)

133.    Campos's threats held the KRC project hostage.  NECEC either had to pay or work would halt, and the project would be destroyed.

134.    The next day, February 4, 2025, NECEC acquiesced to Campos's payment demand.  Avangrid Networks' CEO, Joe Purington, responded on behalf of NECEC agreeing to pay the $8 million to Campos that week and stating that the Change Notices would be properly and fairly addressed.  NECEC maintained that Campos's threats to stop work were inconsistent with the Agreement and were wholly unjustified.  (*See* Ex. 13, Feb. 4, 2025 Purington Letter.)

135.    Indeed, Campos's threats were wrongful, unjustified under the Agreement, and without any legal basis.

136.    To ensure NECEC could meet its own contractual obligations to Massachusetts, NECEC had no other choice but to concede to Campos's demands.

137.    On February 12, 2025, the day after Campos's deadline for NECEC to resolve the Change Notices, Campos again threatened to stop work and demobilize if resolution was not reached by 5:00pm that day.  This time Campos said that it would resume work on the KRC project

24

only if NECEC paid an additional $6.5 million—for a total change amount of $14.5 million—and agreed to a revised schedule, including a new Substantial Completion deadline of March 11, 2025.

138.    That day, NECEC offered to send $6.5 million.  That was not enough for Campos. It demanded that NECEC also had to sign the February 2, 2025 Change Agreement that Campos sent to NECEC ("Change Agreement").  Otherwise, Campos was demobilizing.  (*See* Ex. 14, Feb. 12, 2025 Change Agreement.)

139.    These were not empty threats.  NECEC leaders heard from their representatives at the job site that Campos was taking steps to demobilize at this same time.  Campos leaders at the job site, including (among others) Romeo Shiplee, threatened to withdraw the steel casing in the bore hole already drilled.  Withdrawing the casing in the bore hole was tantamount to destroying all of the work done to that point: the bore hole would have collapsed and NECEC would have to start over.

140.    Seeing no other option, NECEC executed the Change Agreement, which (i) increased the Agreement total to $34.5 million (an additional $14.5 million)—more than five times HDD's original contract price—(ii) moved the Substantial Completion deadline to March 11, 2025, and (iii) added a revised construction timeline.  The language of the Change Agreement was never negotiated.

141.    NECEC had no other choice but to accept the Change Agreement.  If Campos had followed through on its threat to withdraw and collapse the bore hole, NECEC would need to start from scratch.  That process would lead to serious delays and impact NECEC's ability to satisfy its own contracts with third parties.  Put simply, starting from scratch was not an option.

**IV.    CAMPOS BREACHES THE AGREEMENT.**

    **A.    Campos Fails to Install Seven Conduits.**

142.    The Agreement specified that Campos would construct seven conduits.  It failed to do so.

143.    As part of the construction process, the contractor must perform what is known as a "pullback."  That is the final stage of the process, and when the conduits are pulled back through the bore hole.  Calculating the pullback force is very important to ensure successful execution. While there is some risk that a conduit may break during pullback, Campos expressed confidence that it could complete the job without breakage.

144.    On February 23, 2025, Campos performed the "pullback."  Due to its lack of proper care and attention, two conduits broke.  One broke above ground, likely due to improper supports at the job site; it was ultimately repaired, although imperfectly.  The other broke inside the bore hole during pullback and Campos was unable to repair or recover it.  Campos did an "after action" assessment of the breakage.  That assessment does not specify why or how the second conduit broke, but states only that an "assumption could be made that a fusion"—that is, a bond between pieces of PVC—"failed during pull back."

145.    Again, this poor outcome is consistent with Campos's undisciplined, unprofessional approach to work at the KRC project.

146.    On April 2, 2025, Campos sent NECEC a Notice of Substantial Completion, certifying in part that "the Project, as a whole, is Energized, or capable of being Energized, and capable to unattended operation in a safe manner in strict compliance with all Permits, Applicable Laws and Good Utility Practice."  (Ex. 15, Apr. 2, 2024 Notice of Substantial Completion at 1.)

147.    On April 11, 2025, NECEC sent a letter to Campos (i) rejecting Campos's Notice of Substantial Completion, (ii) notifying Campos of various defaults under the parties' Agreement,

and (iii) rescinding the extortionate Change Agreement between Campos and NECEC executed in February 2025.  (*See* Ex. 16, Apr. 11, 2025 NECEC Rejection of Substantial Completion.)

148.    NECEC rejected the Notice of Substantial Completion because only six, rather than seven, conduits were installed as required under the Agreement.

149.    At this point, it is no longer feasible to install the seventh conduit.  Campos cannot meet either Substantial Completion or Final Completion of the Work under the Agreement.  (*Id.* at 1.)

150.    NECEC also identified numerous defaults under § 7.11(b)(v) of the Agreement, including but not limited to, (i) Campos's failure to perform a Material Obligation by installing only six of the seven conduits, (ii) Campos's failure and inability to achieve Substantial Completion of the Work on or before the Guaranteed Substantial Completion Date, and (iii) Campos's failure and inability to achieve Final Completion of the Work on or before the Guaranteed Final Completion Date.  None of those defaults are capable of cure in any of the cure periods set forth in § 7.11(b).  (*Id.* at 1–2.)

**B.    Campos's Change Agreement is Invalid and Has Been Rescinded.**

151.    In its April 11, 2025 letter, NECEC also notified Campos that the February 2025 Change Agreement is invalid and rescinded.  That Change Agreement increased the cost of the KRC project by $14.5 million and extended the Guaranteed Substantial Completion Date and the Guaranteed Final Completion Date.  (*Id.* at 2.)

152.    Campos demanded those changes without any contractual basis, despite § 9.1(b) of the Agreement enumerating limited bases for Campos to request a change order.  Campos did not identify any of those bases.  When NECEC refused to consent to the Change Agreement, Campos resorted to threats, including stopping work, demobilizing, dismantling all prior installations, and

irreparably destroying the bore path (despite having no contractual basis to stop work), if NECEC did not agree to the Change Agreement terms within twenty-four hours.

153.    As a result, NECEC complied with Campos's demands and agreed to the Change Agreement—but NECEC did not consent freely, only doing so under economic duress. (*Id.*)

154.    As required under the Dispute Resolution provisions of the Campos Agreement, the parties engaged in negotiations concerning the dispute but failed to reach agreement.

155.    In this lawsuit, NECEC seeks damages from Campos and HDD for its losses, in addition to attorneys' fees, costs, and any other relief this Court may find proper.

156.    NECEC complied with the Agreement and fulfilled its duties.

**FIRST CLAIM FOR RELIEF**
**(Antitrust Violations Pursuant to Section 1 of the Sherman Act – Bid Rigging)**
**(Against Defendants HDD and Campos)**

157.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

158.    HDD and Campos acted under an unlawful bid-rigging agreement to artificially inflate the price of the KRC project.

159.    The existence of such unlawful agreement and conspiracy is shown by the facts alleged herein.

160.    During the time when the NECEC construction was on hold, HDD (then the prime contractor) and Campos (then the sub-contractor) conspired to raise the price of the KRC project.

161.    When the work stoppage was lifted, HDD demanded more money for the KRC project than it originally agreed to with NECEC and then demanded an entirely different form of agreement that did not fix its fee. When NECEC refused, HDD terminated the HDD Agreement purportedly—and pretextually—due to the work stoppage.

162.    Campos then won the rebid for more than triple the original $6-million, single-bore project with HDD.

163.    HDD and Campos agreed that HDD would ultimately be the subcontractor and perform the drilling work on the KRC project.  To that end, Campos replaced Cherokee with HDD in July 2024.

164.    Defendants acted contrary to their economic interests.  HDD terminated its agreement with NECEC.  In doing so, HDD exposed itself to legal action despite its ability to fulfil the contractual obligations.  And Defendants walked away from a contract that would generate revenues for them—risking those revenues on the chance to secure a more lucrative, and financially rewarding, contract for the same work.

165.    HDD and Campos had a common motive to conspire, as both reaped more financial reward—namely greater profits—than they otherwise would have if HDD had not terminated the HDD Agreement.

166.    HDD and Campos's bid-rigging scheme was anti-competitive in intent and effect, amounting to a conspiracy in restraint of trade among the several States.

167.    Defendants' bid-rigging scheme is manifestly anti-competitive and has no procompetitive rationale.  Bid-rigging is a per se violation of the Sherman Act.

168.    As a direct and proximate result of Campos and HDD's illegal acts, NECEC suffered damages, in an amount to be determined in litigation, but believed to be no less than $25 million with costs and interest, and treble damages for harm caused by the anti-competitive scheme.

## SECOND CLAIM FOR RELIEF
### (Tortious Interference with Contract)
### (Against Defendant Campos)

169.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

170.    Campos was aware and had been aware at all relevant times that HDD had a contract with NECEC.

171.    Campos intended for HDD to terminate its contract with NECEC in order to rebid the KRC project itself at a higher contract price and hire HDD as the subcontractor.

172.    There is no legitimate business justification for Campos's conduct, which has the purpose and effect of rigging the bidding process for the KRC project.

173.    But for Campos's interference, there is a reasonable likelihood that HDD would have completed the KRC project pursuant to its contract.

174.    As a direct and proximate result of the foregoing, NECEC has been injured in its business and property.

175.    Campos acted willfully and maliciously in its tortious interference with HDD and NECEC's contract.  Thus, NECEC is entitled to punitive damages.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to Fed. R. Civ. P. 57 – Economic Duress)
### (Against Defendant Campos)

176.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

177.    NECEC seeks a declaratory judgment to resolve questions concerning the respective rights, obligations, and duties of NECEC and Campos under the Campos Agreement and Change Agreement.

178.    An actual case or justiciable controversy exists between NECEC and Campos concerning the validity of the Change Agreement, and Campos's actions resulting in the execution of the Change Agreement under NECEC's economic duress.

179.    Campos wrongfully threatened to stop work, demobilize, and effectively destroy the bore hole already drilled unless NECEC signed the Change Agreement, even though the Change Notices underlying the Change Agreement did not have any contractual or legal basis.

180.    NECEC was under the press of financial circumstances given the 24-hour period that Campos gave NECEC to comply with the Change Agreement, and its own contractual obligations to Massachusetts and other entities to complete the NECEC Project.

181.    In addition, NECEC had no alternative but to accede to Campos's demands given Campos's threats and the pressure NECEC faced to complete the KRC project.

182.    Further, NECEC acted promptly to repudiate the Change Agreement, doing so as soon as NECEC received Campos's Notice of Substantial Completion.

183.    NECEC could not have practically repudiated the Change Agreement any sooner given that Campos could have again threatened to stop work, demobilize, and destroy the work already completed—putting NECEC back in the same position it had been.

184.    Accordingly, the Change Agreement is invalid and NECEC has adequately rescinded it.

185.    The issuance of declaratory relief by this Court will terminate some or all the existing controversy between the parties and will provide certainty to the parties with respect to their rights and obligations under the Campos Agreement and the Change Agreement.

186.    NECEC therefore requests a declaration by this Court that the Change Agreement is invalid and rescinded based on NECEC's economic duress, and that Campos is not entitled to any form of payment under the Change Agreement.

### FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment – Change Agreement)
### (Against Defendants HDD and Campos)

187.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

188.    Campos, on behalf of itself and HDD, engaged in coercive and fraudulent conduct to increase its and HDD's profits.

189.    Campos submitted Change Notices to artificially inflate the price of the KRC project, while threatening to stop work, demobilize, and destroy the work if NECEC did not agree to the Change Agreement.

190.    NECEC had no alternative but to agree to the terms of Campos's wrongful threat.

191.    As a result, NECEC did not exercise free will in agreeing to the Change Agreement.

192.    Campos and HDD were enriched by $14.5 million, the amount of additional costs that resulted from the Change Agreement.

193.    That enrichment was at NECEC's expense, as Campos and HDD received payment resulting from Campos's wrongful threats.

194.    Allowing Campos and HDD to retain the benefits accrued through these unreasonable, coercive, and tortious acts would be inequitable and against good conscience, absent payment to NECEC, given that NECEC has been foreclosed from completing the KRC project at the price that was in accordance with the Agreement.

195.    As a result of Defendants' conduct, NECEC has suffered damages in an amount to be determined but believed to be in excess of $14.5 million.

196.    NECEC seeks this remedy in equity to the extent there is a lack of remedy provided in law.

## FIFTH CLAIM FOR RELIEF
### (Breach of Contract – Failure to Perform a Material Obligation)
### (Against Defendant Campos)

197.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

198.    The Campos Agreement provides that a "Contractor shall be in default of its obligations under this Agreement" if "the Contractor has failed or refused to perform any material obligations under this Agreement."  (Ex. 1, Campos Agreement § 7.11(b)(v).)

199.    Campos failed to perform a Material Obligation under the Agreement by installing only six of the seven conduits.

200.    Campos's actions, as set forth above, constitute a Contractor Default under and a breach of the Campos Agreement.

201.    As a result of Campos's Default, NECEC has decided to terminate the Campos Agreement, and is in the process of providing notice pursuant to the Agreement's terms.

202.    Campos's Contractor Default, as alleged herein, will have a severe financial impact on NECEC's business, resulting in damage to NECEC in an amount to be determined at trial, including any fines imposed by regulatory authorities, plus applicable interests, attorneys' fees, costs, and other such relief as the Court may deem just and proper.

203.    Under the Campos Agreement, NECEC is entitled to actual damages.

204.    Upon information and belief, if Campos had followed best industry practices, then the seventh conduit would not have broken during pull through.

205.    As a result, NECEC is entitled to Consequential Damages—including any indirect, incidental, consequential, exemplary, punitive, or special damages—arising out of Campos's Contractor Default.

206.    NECEC is also entitled to recover attorneys' fees, as a result of this Contractor Default.

### SIXTH CLAIM FOR RELIEF
**(Breach of Contract – Failure to Achieve Substantial Completion)**
**(Against Defendant Campos)**

207.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

208.    Campos failed to complete the Work in strict accordance with the requirements of the Campos Agreement because Campos installed only six conduits when the KRC's Specifications require Campos to install seven conduits.

209.    Campos is now unable to install the seventh conduit.

210.    Campos's inability to install seven conduits prevents it from achieving Substantial Completion of the Work under the Campos Agreement.

211.    Campos's failure to achieve Substantial Completion of the Work constitutes a Contractor Default and a breach of the Campos Agreement.

212.    As a result of Campos's Default, NECEC has decided to terminate the Campos Agreement, and is in the process of providing notice pursuant to the Agreement's terms.

213.    Campos's Contractor Default, as alleged herein, will have a severe financial impact on NECEC's business, resulting in damage to NECEC in an amount to be determined at trial, including any fines imposed by regulatory authorities, plus applicable interests, attorneys' fees, costs, and other such relief as the Court may deem just and proper.

214.    Under the Campos Agreement, NECEC is entitled to actual damages.

215.    Upon information and belief, if Campos had followed best industry practices, then the seventh conduit would not have broken during pull through.

216.    As a result, NECEC is entitled to Consequential Damages—including any indirect, incidental, consequential; exemplary, punitive, or special damages—arising out of Campos's Contractor Default.

217.    NECEC is also entitled to Liquidated Damages as a result of Campos's failure to achieve Substantial Completion of the Work.

218.    In addition, NECEC is entitled to recover attorneys' fees, as a result of this Contractor Default.

**SEVENTH CLAIM FOR RELIEF**
**(Promissory Estoppel – Bid Rigging)**
**(Against Defendants HDD and Campos)**

219.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

220.    HDD made a clear and unambiguous promise that it would perform its obligations under the HDD Agreement, without foul play.

221.    Similarly, Campos made a clear and unambiguous promise that it would perform its obligations under the Campos Agreement, without foul play.

222.    NECEC reasonably relied on HDD's and Campos's promises that they would execute their obligations under their respective agreements, and both companies confirmed their ability to perform under their contracts.

223.    HDD and Campos wrongfully engaged in a bid-rigging conspiracy in violation of their promises to NECEC.

224.    HDD terminated the HDD Agreement, despite its ability to perform its obligations, in an attempt to earn more money from the KRC project.

225.    Campos replaced Cherokee as the subcontractor with HDD in furtherance of their bid-rigging conspiracy.

226.    Campos further increased the cost of the KRC project by submitting baseless Change Notices, and coercing NECEC into signing the Change Agreement.

227.    NECEC's reliance on HDD's and Campos's promises to perform harmed NECEC, given HDD and Campos's conspiracy to raise the price of the KRC project.

228.    The final cost of the KRC project ($34.5 million) was nearly six times the price HDD and NECEC originally agreed to for the single bore ($6 million).

229.    HDD and Campos's conduct, as alleged herein, has had a severe financial impact on NECEC's business, resulting in damage to NECEC in an amount to be determined at trial, including any fines imposed by regulatory authorities, plus applicable interests, attorneys' fees, costs, and other such relief as the Court may deem just and proper.

230.    Further, NECEC is entitled to recover attorneys' fees as a result of this breach.

**EIGHTH CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against Defendants HDD and Campos)**

231.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

232.    New York law recognizes the implied covenant of good faith and fair dealing as an integral part of every contract, which imposes upon each party a duty not to do anything that will deprive the other party of the benefits of the contract.

233.    The HDD Agreement implies a covenant of good faith and fair dealing between NECEC and HDD.

234.    The Campos Agreement implies a covenant of good faith and fair dealing between NECEC and Campos.

235.    Campos and HDD breached the covenant of good faith and faith dealing through their conduct in conspiring to artificially raise the price of the KRC project and rig the bidding process for the KRC project when HDD terminated the HDD Agreement.

236.    Specifically, HDD intentionally terminated its existing agreement with NECEC for pretextual reasons, so that Campos could submit a bid as the primary contractor at a much higher cost and later utilize HDD as its drilling subcontractor, increasing both companies' profits from the KRC project.

237.    Upon information and belief, HDD and Campos conspired to bid rig before HDD terminated the HDD Agreement.

238.    NECEC reasonably understood both the HDD Agreement and Campos Agreement to state a duty to refrain from engaging in a conspiracy to bid rig, and take the actions that HDD and Campos took in furtherance of the bid-rigging conspiracy.

239.    HDD and Campos's breach of the implied covenant of good faith and fair dealing as alleged herein will have a severe financial impact on NECEC's business, resulting in damage to NECEC in an amount to be determined at trial, plus applicable interest, attorneys' fees, costs, and other such relief as the Court may deem just and proper.

### NINTH CLAIM FOR RELIEF
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against Defendant Campos)**

240.    NECEC realleges and incorporates by reference all allegations set forth in the preceding paragraphs, as if fully set forth herein.

241.    New York law recognizes the implied covenant of good faith and fair dealing as an integral part of every contract, which imposes upon each party a duty not to do anything that will deprive the other party of the benefits of the contract.

242.    The Campos Agreement implies a covenant of good faith and fair dealing between NECEC and Campos.

243.    Campos breached the covenant of good faith and faith dealing in performing the Work by engaging in unprofessional conduct, including but not limited to creating undue delay, failing to institute proper safety measures on the job site, and failing to perform adequate mud-testing and other best drilling practices, among other issues.

244.    As a result of Campos's breach, two of the conduits broke during pullback.

245.    NECEC also incurred additional costs as a result of Campos's breach, including additional road maintenance and hiring an independent subject matter expert to oversee Campos's work and perform independent mud testing.

246.    Campos's breach of the implied covenant of good faith and fair dealing as alleged herein has had a severe financial impact on NECEC's business, resulting in damage to NECEC in an amount to be determined at trial, plus applicable interest, attorneys' fees, costs, and other such relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court:

1.    Find that Defendants Campos and HDD violated Section 1 of the Sherman Act;

2.    Find that the Change Agreement between Plaintiff NECEC and Defendant Campos is invalid due to NECEC's economic duress;

3.    Find that Defendants Campos and HDD were unjustly enriched by the sums NECEC paid under the invalid Change Agreement;

4.    Find that Defendant Campos tortiously interfered with NECEC's contract with HDD;

5.    Find that Defendant Campos breached the Campos Agreement;

6.    Find that Defendants Campos and HDD engaged in a bid-rigging conspiracy in violation of their promises to Plaintiff NECEC;

7.    Find that Defendants Campos and HDD breached the Implied Covenant of Good Faith and Fair Dealing;

8.    Award Plaintiff damages—both punitive and compensatory—in an amount to be determined at trial, plus treble damages for the Sherman Act violation, plus pre- and post-judgment interest, attorneys' fees, and costs for Defendants' violations;

9.    Award any further relief the Court deems just and appropriate.

Dated: June 27, 2025          By:   _/s/ Victoria Ryan_
                                    Judson Brown, P.C. (*pro hac vice* forthcoming)
                                    Emily M. Snoddon (*pro hac vice* forthcoming)
                                    Hanna Eddy (*pro hac vice* forthcoming)
                                    KIRKLAND & ELLIS LLP
                                    1301 Pennsylvania Avenue, N.W.
                                    Washington, DC 20004
                                    Telephone: 202-389-5000
                                    judson.brown@kirkland.com
                                    emily.snoddon@kirkland.com
                                    hanna.eddy@kirkland.com

                                    Victoria Ryan
                                    KIRKLAND & ELLIS LLP
                                    601 Lexington Avenue
                                    New York, NY 10022
                                    Telephone: 212-446-4800
                                    victoria.ryan@kirkland.com

                                    *Attorneys for Plaintiffs*