# Exhibit 1

**AGREEMENT**

**For**

**Engineering, Procurement and Construction**

**of the**

**New England Clean Energy Connect HVDC Underground Transmission Line**

**TABLE OF CONTENTS**

**Pages(s)**

ARTICLE 1 - ORDER OF PRECEDENCE AND DEFINITIONS ...................................... 3

ARTICLE 2 - OWNER ............................................................................................. 18

ARTICLE 3 - CONTRACTOR ................................................................................... 19

ARTICLE 4 – SPECIFICATIONS AND QUALITY.......................................................... 36

ARTICLE 5 – INSURANCE ...................................................................................... 51

ARTICLE 6 - LEGAL RESPONSIBILITY .................................................................... 52

ARTICLE 7 – PERFORMANCE OF THE WORK .......................................................... 57

ARTICLE 8 – AGREEMENT SUM; MILESTONE PAYMENTS; PROJECT SECURITY 76

ARTICLE 9 - CHANGES IN THE WORK .................................................................... 82

ARTICLE 10 - MISCELLANEOUS PROVISIONS ........................................................ 84

**ATTACHMENTS**

| | |
|---|---|
| ATTACHMENT A | Specifications |
| ATTACHMENT B | Form of Purchase Order |
| ATTACHMENT C | Owner Information |
| ATTACHMENT D | Work Schedule |
| ATTACHMENT E | Key Personnel |
| ATTACHMENT F | Approved Subcontractors and Suppliers |
| ATTACHMENT G | [Not used] |
| ATTACHMENT H | Form of Application for Milestone Payment |
| ATTACHMENT I | Site Description |
| ATTACHMENT J | Form of Notice of Commercial Operations |
| ATTACHMENT K | Form of Change Order |
| ATTACHMENT L | Milestone Payment Schedule |
| ATTACHMENT M | Owner's Permits |
| ATTACHMENT N | [NOT USED] |
| ATTACHMENT O | Insurance Requirements |
| ATTACHMENT P | Forms of Waivers and Releases |
| ATTACHMENT Q | Confidentiality Agreement |
| ATTACHMENT R | Contractor's Rate Schedule |
| ATTACHMENT S | Form of Notice of Substantial Completion and Form of Certificate of Substantial Completion |
| ATTACHMENT T | Form of Notice of Final Completion and Form of Certificate of Final Completion |

**TABLE OF CONTENTS**
**(continued)**

Pages(s)

| | |
|---|---|
| ATTACHMENT U | Form of Limited Notice to Proceed and Form of Notice to Proceed |
| ATTACHMENT V | [Not used] |
| ATTACHMENT W | Definition of NECEC Transmission Line |
| ATTACHMENT X | Real Property Rights |
| ATTACHMENT Y | Data Security Rider |
| ATTACHMENT Z | [Not used] |
| ATTACHMENT AA | Project Execution Plan Requirements |
| ATTACHMENT BB | Tests and Test Procedures |
| ATTACHMENT CC | Contractor Background Check Rider |
| ATTACHMENT DD | IT Computer Usage and Personally Identifiable Information Policy |
| ATTACHMENT EE | Form of Notice of Project Completion and form of Certificate of Project Completion |

This **Engineering, Procurement and Construction Agreement for New England Clean Energy Connect HVDC Underground Transmission Line** is made as of the date of the last signature to this Agreement (the "**Effective Date**"), by and between NECEC Transmission LLC, a limited liability company organized and existing under the laws of the State of Maine, with offices located at 83 Edison Drive, Augusta, Maine 04330 United States (the "**Owner**"), and Campos EPC, LLC, a limited liability company organized and existing under the laws of the State of Colorado, with offices located at 1401 Blake Street, Denver, CO 80202 (the "**Contractor**," or the Owner, individually a "**Party**," or, together with the Owner, the "**Parties**") and includes all subsequent amendments thereto.

For good and valuable consideration, the Parties agree as follows:

## ARTICLE 1 - ORDER OF PRECEDENCE AND DEFINITIONS

This Agreement, its Attachments, the Exhibits thereto, and the Purchase Order(s) are complementary. Therefore, what is required by any one of them shall be as binding as if required by all of them.  In the event of a conflict, discrepancy, inconsistency or ambiguity among the elements of this Agreement, or in any of them, the interpretation of this Agreement shall be made in accordance with the following order of precedence:

(a)      the requirements of Applicable Law;

(b)      with respect to a Project, any executed Purchase Order (provided however, consistent with the definition of "Purchase Order," the standard pre-printed terms and conditions of the Purchase Order shall be null, void and of no force or effect, and the terms and conditions of this Agreement shall exclusively apply to any such Purchase Order), issued by the Owner to the Contractor;

(c)      Amendments or other modifications to this Agreement (including Change Orders) issued after the Effective Date, but prior to the date of issuance of the Purchase Order to which this provision is being applied, with those of a later date having precedence over those of an earlier date;

(d)      this Agreement; and,

(e)      the Attachments to this Agreement, with the Specifications, as set forth in **Attachment A**, taking precedence over all other Attachments.  In the event of conflict, discrepancy, inconsistency or ambiguity among elements of this Agreement of the same level of precedence, the element containing the more stringent requirement, which is applicable to the obligations of the Contractor, shall govern and control.  In the case in which a conflict, discrepancy, inconsistency or ambiguity exists among, or within, any specifications, codes or standards applicable to the Contractor's performance of the Work, the most stringent of such specifications, codes or standards, which is applicable to the obligations of the Contractor, shall govern and control. In the event that the Contractor discovers any conflict, discrepancy, inconsistency or ambiguity among, or within, any of the elements that form this Agreement, or any

DocuSign Envelope ID: 591BDF1C-1AB5-4857-A4C4-431788B15152

of the specifications, codes or standards applicable to the Contractor's performance of the Work, the Contractor shall immediately notify the Owner of such conflict, discrepancy, inconsistency or ambiguity, in writing, and the Owner shall resolve such conflict, discrepancy, inconsistency or ambiguity in accordance with this provision, and transmit such resolution to the Contractor in writing. In the event that the Owner resolves such conflict, discrepancy, inconsistency or ambiguity in accordance with this provision, the Contractor shall not be entitled to request a Change Order for any adjustment to the Agreement Sum or the Work Schedule in connection therewith. The Owner's resolution of any such conflict, discrepancy, inconsistency or ambiguity shall be final and conclusive upon the Parties, subject to dispute resolution in accordance with Section 10.5 of this Agreement. The provisions of this Article 1 shall survive the completion or earlier termination of this Agreement.

The following terms, as used in this Agreement, shall have the meanings ascribed to them, as follows:

**1.1** **"Abandon"** or **"Abandonment"** (or any cognate thereof) means the cessation of performance of all, or substantially all, of the Work, by the Contractor, or the departure by the Contractor from the Site, for a period of seven (7) consecutive days, in a manner that is inconsistent with the requirements of the Work Schedule.

**1.2** "**Acceptable Security Issuer**" means United States of America federally or state chartered bank that has both a short-term deposit rating of at least P-1 by Moody's and A-2 by S&P and a long-term deposit rating of at least A2 by Moody's and A by S&P; provided that, if such ratings are no longer utilized by Moody's or S&P for deposits of such banks, then the equivalent replacement rating or ratings shall be required to have been satisfied.

**1.3** **"Affiliate"** means in relation to any Person, any other Person: (i) which directly or indirectly controls through one or more intermediaries, or is controlled by, or is under common control with, such Person; or (ii) which directly or indirectly through one or more intermediaries beneficially owns or holds fifty percent (50%) or more of any class of voting stock or other equity interests of such Person; or (iii) which has fifty percent (50%) or more of any class of voting stock or other equity interests that is directly or indirectly through one or more intermediaries beneficially owned or held by such Person; or (iv) who either directly or indirectly through one or more intermediaries holds a general partnership interest in such Person or such Person holds a general partnership interest in the other Person. For purposes of this definition, the word "**controls**" means possession, directly or indirectly through one or more intermediaries of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or otherwise.

**1.4** **"After Tax Basis"** means the calculation, with respect to any payment required to be made pursuant to an indemnity obligation under this Agreement, to any Person, so that the sum of the amount of the payment (the "**Base Payment**") to which such person is entitled under such indemnity obligation set forth in this Agreement, is supplemented by a further payment (the "**Additional Payment**") to that Person, so that the sum of the Base Payment plus the Additional Payment shall, after deduction of the amount of all federal, state, and local income taxes required to be paid by such Person in respect of the receipt or accrual of the Base Payment and the Additional Payment (taking into account any reduction in such income taxes resulting from tax

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 501BDF1C-1AB5-4857-A4C4-431786B15152

benefits realized by the recipient as a result of the payment or the event giving rise to the payment), is equal to the amount required to be received pursuant to the relevant indemnity obligation set forth in this Agreement, with such calculation being made on the basis of the highest federal, state, and local income tax rates applicable to the Person for whom the calculation is being made for all relevant periods, and taking into account the deductibility of state and local income taxes for federal income tax purposes.

1.5 **"Agreement"** means this Engineering, Procurement and Construction Agreement, including all Attachments hereto, and all Exhibits thereto, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof.

1.6 **"Agreement Sum"** has the meaning set forth in Section 8.1(a).

1.7 "**Annex**" means the current edition of the Iberdrola USA Annex to the Code of Ethics.

1.8 **"Applicable Laws"** means and includes any constitution, treaty, statute, license, law, rule, regulation, code, ordinance, judgment, arbitral award, Permit Requirement, decree, writ, injunction, legal requirement or order, of any national, federal, state or local court or other Governmental Authority, and the official, written judicial interpretations thereof, whether presently existing or later enacted, promulgated or issued, applicable to the Work, the Site, the Project or the Parties, or to the performance of any of the obligations of either of the Parties under this Agreement.

1.9 "**Application for Milestone Payment**" has the meaning set forth in Section 8.1(c)(i).

1.10 "**Base Payment**" has the meaning set forth in the definition of After Tax Basis.

1.11 "**Business Day**" means a calendar day other than Saturday, Sunday or a legal, public or bank holiday in the State of Maine.

1.12 "**Certificate of Final Completion**" has the meaning set forth in Section 7.8 of this Agreement.

1.13 "**Certificate of Project Completion**" has the meaning set forth in Section 7.8 of this Agreement.

1.14 "**Certificate of Substantial Completion**" has the meaning set forth in Section 7.8 of this Agreement.

1.15 "**Change**" means (i) a change in the Work required by the Owner pursuant to Section 9.1 of this Agreement, or (ii) a change in the Work requested by the Contractor pursuant to Section 9.1 of this Agreement.

1.16 "**Change in Law**" means any new law, or any amendment, derogation, repeal, invalidation or interpretation of any existing law, by a competent authority, with respect to any law or regulation of the State of Maine, issued or promulgated after the Effective Date, excluding any such new law,

\\MI - 028195/000003 - 658133 v5

or any such amendment, derogation, repeal, invalidation or interpretation, impacting the costs of labor, taxes, tariffs or customs duties.

**1.17** **"Change Order"** has the meaning set forth in Section 9.1 of this Agreement.

**1.18** "**Code of Ethics**" means the current edition of the Code of Ethics of Iberdrola S.A.

**1.19** **"Commercial Operations"** means the stage in the progress of the Work when the Project is Energized by the Owner for commercial operations.

**1.20** **"Commercial Operations Critical Milestone Date"** means the earliest date for the Critical Milestone (as defined in the Distribution Agreements), set forth in the Distribution Agreements, by which the Owner shall achieve Commercial Operations (as defined in the Distribution Agreement in which such earliest date for such Critical Milestone is set forth (i.e., not as defined in the Contract)), as the same may be extended pursuant to such Distribution Agreements.

**1.21** **"Commercial Operations Date"** means the date on which the Owner determines that Commercial Operations has occurred, which shall be set forth in the Notice of Commercial Operations issued by the Owner to the Contractor.

**1.22** "**Confidentiality Agreement**" has the meaning set forth in Section 10.19 of this Agreement.

**1.23** "**Consequential Damages**" has the meaning set forth in Section 10.8 of this Agreement.

**1.24** **"Contractor"** has the meaning set forth in the introductory paragraph and includes the Contactor's successors and permitted assigns.

**1.25** "**Contractor Default**" has the meaning set forth in Section 7.11 of the Agreement.

**1.26** **"Contractor Deliverables"** means all of the deliverables required to be delivered by the Contractor to the Owner, under this Agreement, as set forth in the Specifications, including the Drawings, Record Drawings and Specifications, the Operations and Maintenance Manuals, Subcontractors' and Suppliers' warranties and guarantees, the Proposed Punchlist, the Punchlist, the Revised Punchlist, the Final Punchlist, the Preliminary Recovery Plan (if any), the Recovery Plan (if any), the Project Execution Plan, the Quality Control Plan, the HASP Plan and the Schedule of Values.

**1.27** "**Contractor Intellectual Property**" means all Intellectual Property, whether owned by, or licensed to, Contractor, whether now existing or hereafter developed, that is: (a) necessary for, or used or held for use by, Contractor and/or any Subcontractor or Supplier thereto in connection with the design, construction, installation, completion, operation, maintenance, repair, replacement, expansion, modification, alteration or reconstruction of the Project (or any portion, subsystem or component thereof, including any Materials, Equipment or Contractor's Equipment and Temporary Facilities) or (b) related to the Project and conceived or developed by Contractor and/or any Subcontractor or Supplier thereto in the performance of any Work hereunder.

DocuSign Envelope ID: 501BDF1C-1AB5-4857-A4C4-431785B15152

**1.28** "**Contractor Parties**" means the Contractor, the Contractor's Affiliates, any Subcontractor, any Supplier and each of their employees, agents, partners, shareholders, members, directors, officers, managers, contractors, consultants, successors and permitted assigns.

**1.29** "**Contractor's Equipment and Temporary Facilities**" means all of the facilities, accommodations, systems, equipment, tools and appurtenances, not incorporated into the Work, necessary or  required  in order to perform the Work to achieve Project Completion, which a contractor, in the ordinary course of business, engaged to engineer, procure and construct a transmission facilities project, similar in scope, complexity and magnitude to the Project, would be expected to own, hire, lease, or provide for the performance of the work for such project, including, without limitation, field offices and all structures and services therefor; hand tools (powered or otherwise); fixed equipment and stationary facilities such as, but not limited to, temporary batching or mixing plants and associated equipment, temporary material crushing and screening plants, temporary repair, maintenance and fabricating shops and included equipment and tools, haul roads and railroads, storage and warehouse facilities, temporary fuel and lubrication storage and distribution facilities, temporary water supply and distribution systems, drainage, sewer and waste disposal systems, sanitary facilities, compressed air systems, electric source and distribution systems; temporary communications systems; and, administrative and expediting support systems, including but not limited to vehicles for transportation, maintenance, and/or other purposes not used directly in construction.

**1.30** "**Contractor's Permits**" means all Permits required to construct and operate the Project, except the Owner's Permits.

**1.31** "**Contractor's Taxes**" has the meaning set forth in Section 10.7 of this Agreement.

**1.32** "**Critical Cyber Assets**" means programmable electronic devices and communication networks, including hardware, software and data that are essential to the reliable operation of the Project, and related facilities, systems and equipment, which, if destroyed, degraded or otherwise rendered unavailable, would affect the reliability or operability of the NECEC Transmission System.

**1.33** "**Critical Infrastructure**" has the meaning set forth in Section 10.25 of this Agreement.

**1.34** "**Critical Path**" means the longest aggregate duration of sequentially dependent activities in the Work Schedule, which are necessary or required in order to complete the Work in accordance with the dates set forth for all milestones, to achieve Substantial Completion on or before the Guaranteed Substantial Completion Date, and to achieve Final Completion on or before the Guaranteed Final Completion Date, in accordance with this Agreement, which Critical Path shall be shown in the Work Schedule, specifically identifying all unique activities and durations, and the sequencing thereof, which are necessary or required in order to complete the Work, using generally accepted critical path method precedence networking techniques applied by Contractor and accepted by the Owner.

**1.35** "**Date of Commencement**" means the date set forth in the Notice to Proceed, upon which the Contractor is directed and authorized, by the Owner, to commence the performance of the Work.

**1.36** "**DART Rate**" is the rate of days away, restricted or transferred, per one hundred (100) full-time employees, calculated on the basis of the completed OSHA forms 300 for the Contractor and all Subcontractors.

**1.37** "**Default**" means a Contractor Default or an Owner Default, as the context may require.

**1.38** "**Delay Liquidated Damages**" has the meaning set forth in Section 7.10 of this Agreement.

**1.39** "**Delay Notice**" has the meaning set forth in Section 7.2 of this Agreement.

**1.40** "**Dispute**" has the meaning set forth in Section 10.5 of this Agreement.

**1.41** "**Dispute Notice**" has the meaning set forth in Section 10.5 of this Agreement.

**1.42** "**Distribution Companies**" means those certain Persons with which the Owner has entered into Distribution Agreements.

**1.43** "**Dollar**" or "**US$**" means United States dollar.

**1.44** "**Drawings**" means all drawings, including related data, calculations, sketches, reproductions of drawings, pertaining to the Work, or to any structure connected thereto, prepared by, or on behalf of, the Contractor for the performance of the Work, in strict accordance with the requirements of this Agreement, and accepted by the Owner.

**1.45** "**Effective Date**" has the meaning set forth in the introductory paragraph of this Agreement.

**1.46** "**Employment Benefits**" means any payroll taxes, or contributions, for insurance (including unemployment insurance), old age pensions, annuities, and similar taxes, charges, fees, housing allowances, transportation and travel time allowances, bonuses, and other employment benefits, pursuant to, and in conformity with, an employer's employment policies and practices and Applicable Laws**.**

**1.47** "**Energized**" means operational, on-line and connected to the NECEC Transmission System.

**1.48** "**Equipment**" means any and all equipment or apparatus, components, packages, assemblies, special tools and other appurtenances, to be incorporated into the Work, or otherwise used in connection with other Equipment, necessary or required in order to achieve Project Completion.

**1.49** "**Extended Warranty Period**" has the meaning set forth in Section 4.12 of this Agreement.

**1.50** "**Extended Warranty**" means the Extended Defect Warranty, , any of them, or all of them, as the context may require.

**1.51** "**Final Completion**" means the stage in the progress of the Work, at which the Contractor has achieved the following conditions precedent, as determined by the Owner: (i) Substantial Completion shall have been achieved, and the Work, to the date of the Contractor's Notice of Final Completion, has been completed in strict accordance with the requirements of this Agreement; (ii) all of the Contractor's and Subcontractors' personnel, except those personnel

required to remain on the Site in order to fulfill the obligations of the Contractor under this Agreement, have left the Site, all surplus materials, waste materials, rubbish and construction facilities, other than those to which the Owner holds title, have been removed from the Site, and the Contractor has removed all Contractor's Equipment and Temporary Facilities from the Site, except as necessary for the Contractor to fulfill its obligations under this Agreement; (iii) the Contractor has delivered the Notice of Final Completion to the Owner; (iv) no Liens have been imposed, and remain outstanding, against the Materials, the Equipment, the Work, the Site or the Project or, any such Liens have been transferred to a bond, and the Owner has received all of the required waivers and releases pursuant to Section 8.1 of the Agreement; (v) the Contractor has delivered, to the Owner, all Contractor Deliverables in relation to the Project, as set forth in the Specifications, including the Record Drawings and Specifications; (vi) the Contractor has paid, or the Owner has set-off, as the case may be, all amounts due and owing for Liquidated Damages, if any, (vii) all Punchlist Items on the Final Punchlist have been completed by the Contractor, or pursuant to Section 8.1 of this Agreement, the Owner has retained a sufficient portion of the Punchlist Withholding Amount to complete any Punchlist Items on the Final Punchlist that were not completed by Contractor in accordance with the terms of this Agreement; and (viii) any other conditions precedent for Final Completion set forth in this Agreement.

**1.52** "**Final Completion Date**" means the date on which the last of the conditions precedent to achieving Final Completion, as set forth the definition of Final Completion, has been satisfied by the Contractor, or, in the sole discretion of the Owner, waived by the Owner.

**1.53** "**Final Punchlist**" has the meaning set forth in Section 7.3 of this Agreement.

**1.54** "**Forced Outage**" means an Unplanned Outage that involves the unexpected removal from service of a generating unit, transmission facility, or other facility or portion of a facility, due to an emergency failure or the discovery of a problem.

**1.55** "**Force Majeure Event**" means any event or circumstance, or combination of events or circumstances, that: (i) is not within the reasonable control of the Party claiming the occurrence of such event; (ii) is not due to the fault, negligence, willful misconduct or fraud of the Party claiming the Force Majeure Event; (iii) is unavoidable, or could not have been prevented or avoided by such Party through the exercise of reasonable diligence; and (iv) prohibits or prevents such Party from performing its obligations under this Agreement. Without limiting the generality of the foregoing, events that may give rise to a Force Majeure Event include, without limitation, pandemic, epidemic, acts of God, natural disasters, fires, earthquakes, lightning, floods, unusually severe weather conditions (except as set forth below), civil disturbances, hurricanes or other named storms, terrorism, riots, war, strikes, lockouts or other labor disputes (except strikes, lockouts or other labor disputes as set forth below), and the action of, or the failure to act on the part of, any Governmental Authority having or asserting jurisdiction that is binding upon the Parties and has been opposed by all reasonable means, in each case, which satisfies the definition of Force Majeure Event as set forth above; provided however, with respect to any action ordered by the courts or act or omission of a Governmental Authority, the action required to be taken must be totally mandatory and enforceable, and not a simple recommendation or inquiry for the Party claiming it as a Force Majeure Event. Notwithstanding the foregoing, the following shall not be considered Force Majeure Events: strikes, lockouts or labor disputes

A–9

affecting Contractor or any Subcontractor, except for strikes, work stoppages (or deteriorations), slowdowns or other labor actions or lockouts that are national or regional in scope and not specifically targeted at, or undertaken by, Contractor or any Subcontractor, work stoppages (or deteriorations), slowdowns or other labor actions; any labor or manpower shortages; unavailability of labor, Materials, Equipment, Contractor's Equipment and Temporary Facilities, late delivery, failure, breakage or malfunction of Materials, Equipment or Contractor's Equipment and Temporary Facilities, or other materials or equipment, or events that affect the cost of Materials, Equipment or Contractor's Equipment and Temporary Facilities, or other materials or equipment; economic hardship (including lack of money); perils of sea; delays in transportation (including delays in clearing customs, except to the extent caused by a Force Majeure Event as defined above); weather conditions within the range of severity as recorded by the National Oceanic and Atmospheric Administration over the past twenty-five (25) years in the vicinity of the Site or elsewhere; actions of a Governmental Authority with respect to the Contractor's compliance, or failure to comply, with Applicable Laws or Permits; any failure by Contractor to obtain and/or maintain any Permit which it is required obtain and/or maintain hereunder; any other act, omission, delay, default or failure (financial or otherwise) of a Subcontractor; any change in Applicable Law; or any act, event or condition that occurs outside of the United States of America; provided however, notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall a Force Majeure Event, involving the NECEC Transmission Line, include (i) any full or partial curtailment in the operation of the NECEC Transmission Line that is caused by or arises from a mechanical or equipment breakdown or other mishap or events or conditions attributable to normal wear and tear or flaws of the NECEC Transmission Line, unless such curtailment or mishap is caused by one of the following: acts of God such as floods, hurricanes, tornados, or other significantly unusual and abnormal weather conditions such as severe blizzards and severe ice storms; sabotage; terrorism or war; national or regional general strikes, lockouts or other labor disputes; (ii) any occurrence or event that increases the costs or causes an economic hardship to a Party but is not otherwise a Force Majeure Event; (iii) a delay or inability to perform attributable to a Party's lack of preparation; (iii) a Party's failure to timely obtain and maintain all necessary Owner Permits or Contractor Permits, as the case may be, or approvals which such Party is obligated to obtain and maintain; (iv) a Party's failure to satisfy contractual conditions or commitments, or lack or deficiency in funding or other resources; or (v) a failure related to the availability of the Quebec Line.

**1.56 "Good Utility Practice"** means those design, construction, operation, maintenance, repair, removal and disposal practices, methods and acts that are engaged in by a significant portion of the electric transmission industry in the United States during the relevant time period, or any other practices, methods or acts that, in the exercise of reasonable judgment in light of the facts known at the time a decision is made, could have been expected to accomplish a desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be the optimum practice, method or act to the exclusion of others but rather to be a spectrum of acceptable practices, methods or acts generally accepted in such electric transmission industry for the design, construction, operation, maintenance, repair, removal and disposal of electric transmission facilities in the United States. Good Utility Practice shall not be determined after the fact in light of the results achieved by the practices, methods, or acts undertaken, but rather shall be determined based upon the consistency of (a)

the practices, methods, or acts when undertaken with (b) the standard set forth in the first two (2) sentences of this definition at such time.

**1.57 "Governmental Authority"** means any applicable national, federal, state, county, municipal and local government, and all agencies, authorities, departments, instrumentalities, courts, corporations, political entities, and their subdivisions, lawfully exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power over the Site, the Project, the Work or the Parties

**1.58 "Guaranteed Final Completion Date"** means the date which is seventy-five (75) days following the Guaranteed Substantial Completion Date.

**1.59 "Guaranteed Substantial Completion Date**" has the meaning set forth in Section 7.10 of the Agreement.

**1.60** "**HASP Plan**" has the meaning set forth in Section 4.8 of the Agreement.

**1.61** "**HASP Plan Requirements**" means the health, safety, security and environmental plan requirements set forth in **Appendix D** to the Specifications.

**1.62 "Hazardous Material"** means any chemical, substance or material regulated or governed by any Permit or Applicable Law, or any substance, emission or material now or hereafter deemed by any Governmental Authority to be a "regulated substance," "hazardous material," "hazardous waste," "hazardous constituent," "hazardous substance," "toxic substance," "radioactive substance" or "pesticide."

**1.63** "**HVDC Underground Transmission Line**" means the 1,280MW +/-320kV HVDC cable system from all equipment and facilities located between the overhead to underground transition stations, including the transition stations, overhead dead-end structures and associated hardware, as well as the underground cable monitoring station, and any other items not excluded to make a functional HVDC cable system and interface with the rest of the NECEC Transmission System.

**1.64** "**Intellectual Property**" means, United States and foreign intellectual property, used in or created to complete the Work under this Agreement including all (a) inventions (whether or not patentable or reduced to practice), improvements, patents and industrial designs (including utility models, designs, and industrial property) and patent and industrial design applications, and inventions and patent disclosures, together with all renewals, reissues, reexaminations, provisionals, divisionals, revisions, continuations, continuations-in-part, and extensions thereof; (b) works of authorship (whether or not copyrightable), registered and unregistered copyrights, mask works, database rights, and moral rights, together with all applications therefor and renewals thereof; (c) trade secrets, confidential or proprietary information (including unpublished patent applications, technical data, customer and suppliers lists, pricing and cost information, and business and marketing plans and proposals), technology, know-how, processes, techniques, protocols, specifications, data, compositions, industrial models, architectures, layouts, designs, drawings, plans, ideas, research and development, formulae, algorithms, models, and methodologies; and (d) trademarks, service marks, trade names, domain

DocuSign Envelope ID: 591BDF1C-1AB5-4857-A4C4-4378BB151E2

names, designs, trade dress, business names, corporate names, logos, slogans, and all other indicia of origin, together with all goodwill, registrations, renewals, and applications relating to the foregoing.

**1.65** "**Intellectual Property Claim**" means any claim, demand, suit or legal action arising out of, or based on, any actual or alleged unauthorized disclosure, use or misappropriation of any Intellectual Property, or, any actual or alleged infringement or other violation of any right in, to or under, any Intellectual Property of any other Person that: (a) concerns any Materials, Equipment, Contractor's Equipment and Temporary Facilities or Work provided by the Contractor, any of its Affiliates, or any Subcontractor or Supplier under this Agreement; (b) is based upon or arises out of the performance of the Work by the Contractor, any of its Affiliates, or any Subcontractor or Supplier, including the use of any tools or other implements of construction by the Contractor, any of its Affiliates, or any Subcontractor or Supplier; (c) is based upon or arises out of the completion, design, construction, installation, operation, maintenance, repair, replacement, expansion, modification, alteration or reconstruction of the Project (or any portion, subsystem or component thereof, including any Materials, Equipment, Contractor's Equipment and Temporary Facilities, or Work) by the Contractor or any of its respective Affiliates or Subcontractors or Suppliers under this Agreement, or their use of any Contractor Intellectual Property in connection therewith; or (d) is based upon or arises out of the Owner's exercise of its rights pursuant to, and in accordance, with Section 6.2 of the Agreement; provided that such claim or legal action does not result from the Contractor following the written instructions of the Owner to use, incorporate, or install the subject matter of the claim or legal action or offending or infringing process or item.

**1.66** "**Key Personnel**" means the Contractor's personnel identified on **Attachment E**.

**1.67** "**Letters of Credit**" means the Performance Letter of Credit, the Warranty Letter of Credit, either of them, or both of them, as the context may require.

**1.68** "**Lien**" means, with respect to any property or asset, any mortgage, deed of trust, security interest, lien, charge or encumbrance of any kind with respect to such property or asset, whether or not filed, recorded or otherwise perfected, effective under Applicable Law, including any conditional sale agreement, title retention agreement, capital lease, any right of retention, pledge, assessment, lease, advance claim, levy, construction lien, mechanic's lien or claim against the Site, the Work, the Materials, the Equipment, the Project, or any part thereof, or interest therein, or other similar lien pertaining to such property or asset.

**1.69** "**Limited Notice To Proceed**" means the written notice delivered by the Owner to the Contractor, directing the Contractor to commence the limited portion of the Work set forth therein, in accordance with the terms and conditions set forth therein, and in accordance with the terms and conditions set forth in this Agreement (to the extent not inconsistent with the terms and conditions set forth therein), in the form set forth in **Attachment U, Exhibit U-1**.

**1.70** "**Liquidated Damages**" means Delay Liquidated Damages and/or Performance Liquidated Damages, as the context may require.

\\MI - 028195/000003 - 658133 v5

**1.71** "**Losses**" means any and all losses, liabilities, damages, costs, charges, expenses, fines, interest, awards, penalties, taxes, which are the result of actions, suits, claims, demands, causes of action, litigation, lawsuits, administrative proceedings or administrative investigations, including attorneys' fees and costs, in arbitration and at the trial and appellate levels, subject in each case, to the extent applicable, to the limitations set forth in Section 10.8 of the Agreement

**1.72** "**Material**" means each and every material, including raw materials, products, consumables, supplies, fasteners, fittings and fixtures, necessary or required, to be incorporated into, or consumed in connection with, the Work, acceptable to the Owner and strictly conforming to the requirements of the Specifications.

**1.73** "**Milestone**" means any of the milestones set forth on the Milestone Payment Schedule, as the context may require.

**1.74** "**Milestone Payment**" has the meaning set forth in Section 8.1(c)(i) of this Agreement.

**1.75** "**Milestone Payment Schedule**" means the milestone payment schedule attached to the Agreement as **Attachment L.**

**1.76** "**NECEC Transmission Line**" has the meaning set forth in **Attachment W**.

**1.77** "**NECEC Transmission System**" means the transmission system comprising the New England Clean Energy Connect Project, which is a 1200 MW HVDC Link between Central Maine Power and Hydro-Quebec.

**1.78** "**NERC**" means the North American Electric Reliability Corporation.

**1.79** "**Non-Critical Deficiencies**" means those portions of the Work that: (a) the Owner or the Contractor identifies as defective or requiring completion prior to Final Completion; (b) do not impede the safe operation of the Project or any portion thereof; (c) do not materially affect the capacity, efficiency, reliability, operability, safety or mechanical or electrical integrity of the Project; and (d) do not impede the Project, or any portion thereof, from being Energized for commercial operations.

**1.80** "**Notice of Commercial Operation**" has the meaning set forth in Section 7.8 of this Agreement.

**1.81** "**Notice of Final Completion**" has the meaning set forth in Section 7.8 of this Agreement.

**1.82** "**Notice of Project Completion**" has the meaning set forth in Section 7.8 of this Agreement.

**1.83** "**Notice of Substantial Completion**" has the meaning set forth in Section 7.8 of this Agreement.

**1.84** "**Notice of Termination**" means a notice, in writing, issued by one Party to the other Party, terminating the Agreement in accordance with this Agreement, specifying the effective date of the termination.

**1.85** "**Notice To Proceed**" means the written notice delivered by the Owner to the Contractor, directing the Contractor to commence the Work on the Date of Commencement set forth therein, in the form set forth in **Attachment U, Exhibit U-2**.

**1.86** "**Operations and Maintenance Manuals**" has the meaning set forth in Section 3.12 of this Agreement.

**1.87** "**Original Agreement Sum**" means the Agreement Sum as of the Effective Date, not including any subsequent adjustments to the Agreement Sum.

**1.88** "**Owner**" has the meaning set forth in the introductory paragraph, and includes the Owner's successors and permitted assigns.

**1.89** "**Owner Default**" has the meaning set forth in Section 7.11 of this Agreement.

**1.90** "**Owner Indemnitee**" has the meaning set forth in Section 6.1 of this Agreement.

**1.91** "**Owner Information**" means all information identified in **Attachment C**.

**1.92** "**Owner Performance Notice**" has the meaning set forth in Section 4.12 of this Agreement.

**1.93** "**Owner's Lenders**" means any Person providing financing for the Project.

**1.94** "**Owner's Permits**" means the Permits identified in **Attachment M** which the Owner is required to secure and maintain.

**1.95** "**Party**" or "**Parties**" has the meaning set forth in the introductory paragraph, and includes the Parties' successors and permitted assigns.

**1.96** "**Permits**" means all Contractor's Permits and Owner's Permits, including all Permit Requirements contained, or otherwise referenced, therein.

**1.97** ""**Permit Requirement**" means any requirement, covenant, condition or restriction on, or with respect to: (i) the issuance, maintenance, renewal or transfer of any Permit, and (ii) the rights granted under any Permit, or any application therefor.

**1.98** "**Person**" means any individual, corporation, company, voluntary association, partnership, incorporated organization, trust, limited liability company, or any other entity or organization, including any Governmental Authority.  A Person shall include any officer, director, member, manager, employee or agent of such Person.

**1.99** "**Preliminary Recovery Plan**" has the meaning set forth in Section 7.7 of this Agreement.

**1.100** "**Prime Rate**" means, on any day, the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A., or its successor, as its prime rate in effect at its principal office in New York City, New York.

**1.101** "**Project**" means the engineering, procurement and construction of the HVDC Underground Transmission Line, pursuant to this Agreement.

**1.102** "**Project Completion**" means the stage in the progress of the Work, at which the Contractor has achieved the following conditions precedent, as determined by the Owner: (i) Final Completion shall have been achieved, and the Work, to the date of the Contractor's Notice of Project Completion, has been completed in strict accordance with the requirements of the Agreement, and all Warranty Periods, and Extended Warranty Periods, if any, have expired; (ii) the Contractor has delivered the Notice of Project Completion to the Owner; (iii) all Performance Guarantees have been satisfied by the Contractor, or, in lieu thereof, all Performance Liquidated Damages, if any are due and owing, have been paid by Contractor to the Owner; (iv) no Liens have been imposed and remain outstanding against the Materials, the Equipment, the Work, the Site or the Project, and the Owner has received all of the required waivers and releases under Section 8.1(d) of this Agreement; and (v) any other conditions precedent for Project Completion set forth in this Agreement.

**1.103** "**Project Completion Date**" means the date on which the last of the conditions precedent to achieving Project Completion, as set forth the definition of Project Completion, has been satisfied by the Contractor, or, in the sole discretion of the Owner, waived by the Owner.

**1.104** "**Project Execution Plan**" has the meaning set forth in Section 4.6 of this Agreement.

**1.105** "**Project Execution Plan Requirements**" means those certain project requirements set forth in Attachment AA**.**

**1.106** "**Project Security**" means the warranty or bonds required under this Agreement, as the context may require.

**1.107** "**Proposed Punchlist**" has the meaning set forth in Section 7.3 of this Agreement.

**1.108** "**Punchlist**" has the meaning set forth in Section 7.3 of this Agreement.

**1.109** "**Punchlist Amount**" has the meaning set forth in Section 7.3 of this Agreement.

**1.110** "**Punchlist Items**" means any component of the Work identified as defective or incomplete on the Punchlist, the Revised Punchlist or the Final Punchlist.

**1.111** "**Punchlist Withholding Amount**" has the meaning set forth in Section 8.1 of this Agreement.

**1.112** "**Purchase Order**" means a purchase order issued by the Owner to the Contractor for the Work, establishing certain provisions, specifically applicable to the Project, supplementing the terms and provisions of this Agreement, in the form set forth in **Attachment B**; provided however, the standard pre-printed terms and conditions of the Purchase Order shall be null, void and of no force or effect, and the terms and conditions of this Agreement shall exclusively apply to any such Purchase Order.

**1.113** "**Quality Control Plan**" has the meaning set forth in Section 4.7 of this Agreement.

**1.114** "**Quality Control Plan Requirements**" means those certain Quality Control Plan requirements set forth in the Specifications.

**1.115** "**Quebec Line**" means the HVDC transmission line extending from the Apalachees converter station in Canada to the Québec-Maine border, at which point the NECEC Transmission Line is intended to connect.

**1.116** "**Real Property Rights**" means the rights appurtenant to real property set forth in the documents identified in **Attachment X**.

**1.117** "**Record Drawings and Specifications**" means detailed, dimensioned drawings which represent the Work, as constructed, based upon field measurements and data developed during construction, together with the specifications for the Equipment and Materials incorporated into the Work, as more particularly described in the Specifications.

**1.118** "**Recovery Plan**" has the meaning set forth in Section 7.7 of this Agreement.

**1.119** "**Reimbursement Amount**" has the meaning set forth in Section 7.9 of this Agreement.

**1.120** "**Request for Change Order**" has the meaning set forth in Section 9.1 of this Agreement.

**1.121** "**Retainage**" has the meaning set forth in Section 8.1 of this Agreement.

**1.122** "**Revised Punchlist**" has the meaning set forth in Section 7.3 of this Agreement.

**1.123** "**Schedule of Values**" has the meaning set forth in Section 8.1 of this Agreement.

**1.124** "**Serial Defect**" has the meaning set forth in Section 4.12 of this Agreement.

**1.125** "**Site**" means that certain real property upon which the Project will be constructed, including lay-down areas, as more particularly described in the Purchase Order for the Work, as more particularly described on **Attachment I**.

**1.126** "**Spare Parts List**" has the meaning set forth in Section 3.15 of this Agreement.

**1.127** "**Specifications**" means the specifications set forth in **Attachment A**, including written and graphic requirements for Materials, Equipment, systems, standards and workmanship for the Work, and the performance of related services.

**1.128** "**Subcontractor**" means a subcontractor, at any tier, who is engaged in the performance of the Work, regardless of whether the services of the Subcontractor are obtained under a subcontract, purchase order, or any other contractual means, all of which shall be deemed to be subcontracts.

**1.129** "**Substantial Completion**" means the stage in the progress of the Work, at which the Contractor has achieved the following conditions precedent, as reasonably determined by the Owner: (i) (A) the Project, as a whole, is Energized, or capable of being Energized, and capable of unattended operation in a safe manner in strict accordance with all Permits, Applicable Laws and

Good Utility Practice; (B) the Work, other than Warranty Related Work to the date of the Notice of Substantial Completion has been completed in strict accordance with the requirements of this Agreement; and (C) all required irrevocable, non-appealable certifications have been obtained by the Contractor, and delivered to the Owner, indicating that the Work can be legally used for its intended occupancy or use; (ii) all Tests relating to the Work except any Warranty Related Work (other than: (x) those that the Owner agrees should be on the Final Punchlist and (y) those necessary to achieve Project Completion) have achieved successful results; (iii) the Contractor has delivered to the Owner the Warranty Bond, pursuant to Section 8.2 of this Agreement; (iv) the Final Punchlist, including the schedule for the completion of the Punchlist Items thereon, has been accepted by the Owner, as provided in Section 7.3 of this Agreement, and only Non-Critical Deficiencies remain on the Final Punchlist for the Project; (v) the Contractor has delivered the Notice of Substantial Completion to Owner; (vi) no Liens have been imposed, and remain outstanding, against the Materials, the Equipment, the Work, the Site or the Project, or any such Liens have been transferred to a bond, and the Owner has received all of the required waivers and releases, pursuant to Section 8.1 of this Agreement; (vii) all Contractor's Permits have been obtained, and such Contractor's Permits are in the name of the Owner, unless required by Applicable Law or the Owner to be in the name of the Contractor; (viii) the Contractor has delivered, to the Owner, all Contractor Deliverables in relation to the Project, as set forth in the Specifications, including the Operations and Maintenance Manuals, except for the Record Drawings and Specifications which shall be delivered to the Owner as a condition precedent to Final Completion; (ix) all spare parts for which Change Orders have been issued, shall have been delivered by the Contractor, pursuant to Section 3.15 of this Agreement, and are available to the Owner for use in the Project, with the exception of spare parts that have been used for the Project, provided that replacement spare parts for such used spare parts that have been ordered by the Contractor, as evidenced to the Owner by valid and binding purchase orders; (x) the Contractor has paid, or the Owner has set-off, as the case may be, all amounts due and owing for Delay Liquidated Damages, if any, and (xi) any other conditions precedent for Substantial Completion set forth in this Agreement.

**1.130** **"Substantial Completion Date"** means the date on which the last of the conditions precedent to achieving Substantial Completion, as set forth the definition of Substantial Completion, has been satisfied by the Contractor, or, in the sole discretion of the Owner, waived by the Owner.

**1.131** **"Supplier"** means a supplier, at any tier, subcontractor, at any tier, who is engaged to supply any of the Materials or Equipment for the Work, regardless of whether the services of the Supplier are obtained under a subcontract, purchase order, or any other contractual means, all of which shall be deemed to be subcontracts.

**1.132** "**Suppliers' Code of Ethics**" means the Code of Ethics and the Annex.

**1.133** **"Test"** means the functional tests and performance tests set forth in Attachment BB, and in accordance with Section 4.13 of this Agreement.

**1.134** **"Unplanned Outage"** means the loss of operation to any element of Owner's electric transmission system or distribution system, and includes Forced Outages, caused by Contractor

or any of the Subcontractors, regardless of impact or lack of impact to Owner's customers, as determined by Owner.

**1.135** **"Vice President"** has the meaning set forth in Section 10.5 of this Agreement.

**1.136** **"Warranty Claim Notice"** has the meaning set forth in Section 4.12 of this Agreement.

**1.137** **"Warranty Bond"** has the meaning set forth in Section 8.2 of this Agreement.

**1.138** **"Warranty Bond Stated Amount"** has the meaning set forth in Section 8.2 of this Agreement.

**1.139** **"Warranty Period"** has the meaning set forth in Section 4.12 of this Agreement.

**1.140** "**Warranty Work**" means repair or replacement of any Work which does not comply with the Defect Warranty, the Design Warranty, the Installation Services Warranty, or any Extended Warranty, as the case may be, including all required disassembly, reinstallation and shipping.

**1.141** **"Work"** means all work required pursuant to, and in strict accordance with, this Agreement, including, in particular, the Specifications and scope set forth in the RFP issued by NECEC Transmission LLC for the Work hereunder, and Contractor's Proposal attached hereto as A-2, and any work reasonably inferable therefrom, incidental to, implicit therein, or otherwise necessary to achieve Project Completion, including, without limitation, the design, engineering, manufacturing, procurement, delivery, civil works, erection, installation, testing, commissioning and field verification of all work in place, for the Project, as well as the supply of Materials, Equipment, Contractor's Equipment and Temporary Facilities and labor of every kind required, the performance of all warranty obligations, including the completion of all Warranty Work, and all other obligations of the Contractor under this Agreement, all in strict accordance with this Agreement (as hereinafter defined), Applicable Laws (as hereinafter defined), Good Utility Practice and all Permits.

**1.142** **"Work Schedule"** means the schedule set forth in **Attachment D**, identifying activities and critical milestones including the Guaranteed Substantial Completion Date and the Guaranteed Final Completion Date, as such Work Schedule may be amended from time to time.

**ARTICLE 2 - OWNER**

**2.1** **In General**.

(a)    This Agreement will be administered by the Owner, and all correspondence in connection herewith shall be directed to the Owner, and to any other Person as required pursuant to this Agreement.

(b)    The Owner shall secure the Site, in fee, by leasehold, or by easement, at its discretion.  The Owner shall furnish, to the Contractor, copies of all instruments granting real property rights applicable to the Site, prior to the Date of Commencement, if any, in addition to the Real Property Rights as set forth in **Attachment X**, which instruments shall automatically become a part of the Real Property Rights.  However, except for access required by Contractor

as set forth in the Work Schedule, the Owner offers no assurance that all of the portions of the Site will be secured for construction purposes as of the Date of Commencement. Notwithstanding the foregoing, the Owner shall provide the Contractor access rights to the Site during the dates and times set forth in the Work Schedule, in order for the Contractor to perform the Work by the date set forth in the Work Schedule.

(c)    Unless otherwise specified, the Owner will establish base lines necessary for the location of the principal component parts of the Work together with a suitable number of benchmarks relating to the Work.

(d)    The Owner shall secure and pay for permanent changes to existing facilities, as may be required in order for the Contractor to perform the Work.

**2.2    Owner's Audit Rights**. Contractor has a duty to keep accurate and complete accounting records to support all billings related to this Agreement in accordance with generally accepted accounting principles and practices in the United States of America and in accordance with all applicable requirements of federal, state, or local taxing authorities for audits, refunds, or incentives afforded to the Owner, consistently applied. The Owner or its audit representatives have the right at any reasonable time or times to examine, audit, and reproduce the records, vouchers, and their source documents which serve as the basis for billing under this Agreement. Such documents must be available for examination, audit, and reproduction for five (5) years after Substantial Completion Date or earlier termination of this Agreement, unless the Owner notifies Contractor of additional record retention due to audit, appeal, or litigation within such five (5) year period. Contractor agrees to assist the Owner y with preparing necessary audit material and will allow the Owner to review any work papers prepared by independent auditors as allowed by professional standards. Any over-collections by Contractor must be returned to the Owner within thirty (30) days from date of notice of overcharge. Audit findings will be considered to be final for the period audited. If Contractor is audited by state or local taxing authorities related to Work under this Agreement, and such audit could significantly increase tax amounts invoiced by Contractor hereunder, Contractor agrees to notify the Owner in a reasonable time to allow the Owner to enter into a joint defense with Contractor regarding the additional assessment of taxes.

**ARTICLE 3- CONTRACTOR**

**3.1    In General**.

(a)    The Contractor covenants that it has carefully examined this Agreement, including the Owner Information, the surface conditions of the Site, as well as the surrounding territory of the Site, and has inquired into, and obtained, all necessary data as to the existing and presently planned access highways, railroads, water and sewer utilities and air transportation facilities, and is fully informed  regarding, and assumes, all risks relating to all of the conditions affecting the surface conditions at the Site, and any subsurface conditions identified in the Owner Information, including the Work to be performed and the Materials, Equipment, Contractor's Equipment and Temporary Facilities and labor to be furnished, to achieve Project Completion, and that the Contractor's information was secured by personal investigation and research and not from information or representations provided by, or on behalf of, the Owner (except for the Owner

A-19

Information).  Owner Information shall be, and shall remain, the property of the Owner or the Owner's Affiliate(s), as appropriate.  All Owner Information prepared, to be prepared, furnished, or to be furnished, to the Contractor by the Owner, has been, or will be, prepared with reasonable care; provided however, the Owner does not represent that any such Owner Information is accurate or sufficient for the performance of the Work.  The Contractor shall verify such Owner Information for accuracy and sufficiency for the performance of the Work, prior to using such Owner Information to perform such Work.  Any inaccuracy or insufficiency in such Owner Information, discovered by the Contractor, shall be reported to the Owner, in writing, by the Contractor, immediately upon discovery thereof by the Contractor.  The Contractor shall maintain, at the Site, a copy of all of the Owner Information listed in **Attachment C**, and shall, at all times, provide the Owner with access thereto.

(b)    Except as expressly set forth below, the Contractor expressly agrees that the Contractor shall have no claim against the Owner for any adjustment to the Agreement Sum by reason of unavailability of, or difficulties in, or restrictions related to, accessing transportation facilities, including, by reason of seasonal posting of roads, seasonal weather variations and fluctuations, weight or dimensional restrictions, or permit conditions, or unavailability or difficulty of securing any particular form or mode of transportation, provided that Contractor shall be entitled to adjustment to Work Schedule if events set forth above have adverse impact on the Work Schedule.  The Contractor shall be entitled to adjustment to the Work Schedule and additional costs incurred by reason of (i) information or representations prepared, provided or made by the Owner, the Owner's Lenders, or any of their Affiliates, respective parent companies, partners, shareholders, general managers, officers, directors, managers, agents, insurers, representatives, assigns, employees, contractors and consultants, and any other Person acting on behalf of, or in representation, interest, benefit, of the Owner, including Owner Information; (ii) unforeseen conditions.  However, Contractor does not control the access road or use of said road, as such inability to use the access road in its current conditions shall be a basis to seek an adjustment to the Work Schedule and additional costs incurred. The Contractor shall: (1) notify the Owner, in writing, immediately upon the discovery, or notification, of the existence of any archeological artifacts on the Site; (2) comply with the requirements set forth in Section 3.18 of the Agreement, with respect to Hazardous Materials on the Site; (3) protect, and not cause any destruction to, or removal or disposal of, any such archeological artifacts, unless directed to do so by the Owner; and (4) not cause any exacerbation of any conditions at the Site impacted by the presence of Hazardous Materials, or mitigate, remove or dispose of, any such Hazardous Materials unless directed to do so by the Owner. The discovery or presence of archeological artifacts or Hazardous Materials on the Site shall not be cause for, or entitle, the Contractor to terminate this Agreement.  The Contractor shall cooperate with any contractor, which the Owner might engage, to conserve or remove archeological artifacts existing on the Site, or to remediate, remove, or dispose of, Hazardous Materials existing on the Site.

(c)    The Contractor shall perform the Work, free from errors, omissions, defects and deficiencies with respect to the engineering Work, and in a good and workmanlike manner.  In strict accordance with, and subject to the terms of this Agreement, including the Specifications, Applicable Laws, Good Utility Practice and all Permits, the Contractor shall: (a) diligently, duly and properly perform and complete the Work and the Contractor's other obligations set forth in this Agreement; (b) procure, provide and pay for all items and services necessary for the proper

A-20

execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated into the Work, including all design, engineering, procurement, installation and construction services, all administration, management, training and coordination, all commissioning and verification services, and all Materials, Equipment, Contractor's Equipment and Temporary Facilities, labor, Contractor's Permits, licenses (other than licenses required to be procured by the Owner in order to perform its obligations under this Agreement), Tests, inspections, Storage prior to duct installation, excluding spare accessories and transportation, and all other items, facilities and services necessary to perform the Work; (c) complete the design, engineering, construction and installation of the Project pursuant to this Agreement, including providing all control equipment necessary for the construction and operation of the Project, all interconnections set forth in the Specifications, and all equipment not specifically described in the Specifications which is necessary to complete the Work; (d) deliver the Materials and  Equipment to the Site free of any Liens; (e) achieve Substantial Completion, Final Completion and Project Completion; and (f) satisfy all warranty obligations, including the completion of all Warranty Work.  The Contractor acknowledges and agrees that this Agreement constitutes a fixed price obligation of the Contractor (subject to the terms hereof) for the performance of the Work to achieve Project Completion.

(d)      As set out in further detail in Sections 3.17 and 4.5 of this Agreement, the Owner shall be responsible for bringing all power to the boundary of the Site, including temporary construction power.  During the performance of the Work, the Contractor shall be responsible for (i) the connection and distribution of such power on the Site, the cost of which is included in the Agreement Sum, and (ii) the costs of consumption of all utility services at the Site, the cost of which is included in the Agreement Sum.

(e)      The Contractor shall carefully study and compare the provisions of this Agreement, and shall at once report to the Owner any error, inconsistency or omission Contractor may discover. The Contractor shall not be liable to the Owner for any damage resulting from any such errors, inconsistencies or omissions which are first reported to Owner and do not relate to any act or omission by Contractor or its employees, Subcontractors or agents. The Contractor shall do no work that is not in accordance with the Contractor Deliverables accepted by the Owner, or the Specifications, as such may be modified or amended in accordance with the terms of this Agreement.

(f)      All Work shall be performed under the direct supervision of the Contractor. The Contractor shall be responsible for construction means, methods, techniques, procedures, and safety, and for coordinating all portions of the Work under this Agreement.  The Contractor shall give constant attention to the performance of the Work, while the Work is in progress.

(g)      The following provisions pertain to Key Personnel:

(i)      The Contractor shall employ a qualified superintendent, and any necessary assistants, as set forth in **Attachment E**, or who are otherwise acceptable to the Owner, to supervise the performance of the Work at all times. Such superintendent shall be responsible for supervising the performance of the Work at the Site, on behalf of the Contractor, and for all communications between the Owner and the Contractor respecting this Agreement and the

Work. The Contractor's superintendent shall have full authority to act on behalf of the Contractor and all communications given to the superintendent shall be considered as given to the Contractor. The Contractor's superintendent shall coordinate the Work of all the Subcontractors and Suppliers. The Contractor's superintendent shall be present on the Site at all times required to perform adequate supervision and coordination.

(ii)     Other supervisory employees, as set forth in **Attachment E**, shall be designated by the Contractor for the performance of various portions of the Work, to receive communications from the Owner. At no time shall any Work be conducted at the Site without an English speaking supervisor present, who has been designated by the Contractor, and who is acceptable to the Owner, with the authority to receive and to execute orders given by the Contractor and the Owner.

(iii)     The Contractor shall not assign a superintendent, any superintendent's assistants or any other supervisory personnel to the Site, except as set forth in **Attachment E**, without the Owner's prior written consent with respect to such personnel. The Contractor shall furnish, to the Owner, an experience record for each of the supervisory personnel, before assigning them to the Work. The removal or reassignment any such supervisory personnel shall be subject to the Owner's prior written consent.

(iv)     The individual or individuals who, on behalf of the Contractor, are responsible for, and in charge of, the preparation of Applications for Payment and for surveys as required pursuant to this Agreement, as such individuals are identified in **Attachment E**, or as may be nominated by the Contractor, shall be properly qualified for such Work and shall require the Owner's consent if not identified in **Attachment E**. If requested by the Owner, the Contractor shall furnish the experience records of such individuals. Except as set forth in **Attachment E**, the Contractor shall not assign such individuals to the Work, until the Owner has consented to such assignment.

(v)     For any individual identified in **Attachment E**, or, subsequent to the Owner's consent to the assignment of any of the individual, referenced in this Section 3.1(g), to the Work, the Contractor shall not remove or reassign any such individual, without first notifying the Owner, in writing, indicating which individual the Contractor proposes to remove or reassign, and proposing a properly qualified replacement or replacements. The Owner shall have ten (10) days, following the receipt of such notice, to offer its consent, in writing, to any such removal(s), reassignment(s) and replacement(s).

(h)     The Contractor shall perform the Work at the Site during the dates and times set forth in the Work Schedule and in a manner consistent with the covenants, conditions or restrictions set forth in the Real Property Rights as well as any other instruments granting leasehold estates and easements The Contractor shall become familiar with the conditions, covenants and restrictions set forth in the Real Property Rights, as well as any other conditions, covenants and restrictions affecting the Site, and shall, at all times, strictly comply with all such conditions, covenants and restrictions. Breaks in the continuity of the Site can be expected to occur. If such breaks occur, the Contractor shall adjust the construction sequencing in order to assure that Substantial Completion occurs on or before the Guaranteed Substantial Completion

Date. The Contractor shall be entitled to request an adjustment to the Agreement Sum or the Work Schedule in accordance with Section 9.1 of this Agreement, in the event any such adjustment to the construction sequencing (i) causes an actual and demonstrable adverse impact upon the Critical Path of the Work Schedule, or (ii) causes a material and demonstrable increase in the Contractor's cost of performing the Work.

(i)      These provisions pertain to the Contractor's obligations with respect to the Contractor Deliverables and Specifications:

(i)      The Contractor shall perform the Work, and shall cause the Subcontractors to perform the Work, and the Suppliers to deliver Materials and Equipment, in strict accordance with the Contractor Deliverables accepted by the Owner and the Specifications. The Contractor shall not deviate, in any respect, from the Contractor Deliverables accepted by the Owner or the Specifications, without the prior, written approval of the Owner.

(ii)      The Contractor shall check all of the Contractor Deliverables accepted by the Owner and the Specifications carefully, and advise the Owner of any errors, omissions, inconsistencies or conflicts discovered by the Contractor. The Contractor shall not use, or rely upon, any Contractor Deliverables accepted by the Owner or Specifications, which contain errors, omissions, inconsistencies or conflicts, which the Contractor knows to exist, or, in the exercise of reasonable diligence, should have known to exist, without first reporting such errors, omissions, inconsistencies or conflicts, in writing, to the Owner and receiving direction from the Owner as to how to proceed.

(iii)      The Contractor Deliverables, including the Drawings, shall become the property of the Owner pursuant to Section 6.2(b), and shall not be used by the Contractor, and the Contractor shall not permit any Subcontractor or Supplier to use the Contractor Deliverables or the Specifications, for any purpose other than to complete the performance of the Work, or as otherwise provided in this Agreement.

(j)      These provisions pertain to correspondence related to construction administration matters:

(i)      All correspondence and other written communications, in connection with this Agreement, related to construction administration matters, shall reference:

Contract Number:      [_____]

(ii)      All correspondence relating to, or affecting, any matters bearing upon the administration of this Agreement, in addition to being sent to the addressees provided in Section 10.20 of this Agreement, shall be delivered to:

Benjamin Shepard
Director Transmission - NECEC
83 Edison Drive
Augusta, Maine 04336

207-629-2036
benjamin.shepard@cmpco.com


With a copy to:

Inmaculada Sanz
Director PMO - NECEC
83 Edison Drive
Augusta, Maine 04336
585-402-3718
inmaculada.sanz@avangrid.com


(k)     The use of the Site for any purpose, other than as specified in this Agreement, shall be subject to the Owner's prior written consent.

**3.2     Subcontractors and Suppliers**.

(a)     The Contractor shall notify the Owner, in writing, of names and addresses of all proposed subcontractors and suppliers, together with the extent and character of the Work to be performed, or the Materials or Equipment to be provided, by each proposed subcontractor or supplier.  In addition, at the request of the Owner, the Contractor shall submit, to the Owner, data for each proposed subcontractor which will perform Work on the Site, from the previous three (3) years plus the year-to-date, including each year's experience modification rate, recordable injury/illness rate, lost time injury/illness rate, and the number of fatalities, if any, that occurred, related to, arising from, or in connection with, the proposed subcontractor's work, in each of those years.

(b)     The Owner shall have the right to consent, without such consent being unreasonably withheld or denied, to all proposed subcontractors and suppliers which will perform Work on the Site, or provide Materials or Equipment for the Work, and all subcontracts or purchase orders with proposed subcontractors and suppliers.   A list of approved Subcontractors and Suppliers is set forth in **Attachment F** to this Agreement.  The Owner shall allow the replacement of approved Subcontractors and Suppliers in **Attachment F** with substantially equivalent Subcontractors and Suppliers, or additions of substantially qualified Subcontractors and Suppliers, as might be required to complete the Work, subject to the Owner's right to consent to such proposed replacement. If for sufficient reason, at any time during the term of this Agreement, the Owner determines that:  (i) any Subcontractor is incompetent or undesirable, in its sole discretion, the Owner may, but shall not be obligated to, notify the Contractor accordingly, and, upon receipt of such notice, the Contractor shall take immediate steps for cancellation of such Subcontractor's subcontract, and the removal of such Subcontractor from the Site; or (ii) any Supplier is undesirable or is not competent to supply conforming Material or Equipment to the Project, in its sole discretion, the Owner may, but shall not be obligated to, notify the Contractor accordingly, and, upon receipt of such notice, the Contractor shall take immediate steps for cancellation of such Supplier's subcontract or purchase order.  In either such event, the Owner shall not be liable for any costs or expenses incurred by the Contractor in connection with such cancellation and removal, or with respect to the

DocuSign Envelope ID: 591BDF1C-1AB5-4867-A4C4-4437BBB151E2

engagement of a substitute Subcontractor or Supplier, and, in no event, shall the Contractor be entitled to request an adjustment to the Work Schedule or the Agreement Sum, as a result thereof.  Nothing contained in this Agreement shall create any contractual relation between any Subcontractor or Supplier, and the Owner, except as otherwise expressly provided in this Agreement.  The Contractor shall transmit to the Owner:  (i) two (2) complete unpriced copies of (A) each subcontract with a Subcontractor who will perform Work on Site, and (B) each subcontract or purchase order with a Supplier who will provide Material or Equipment for the Project, in each case, immediately following the execution thereof; (ii) two (2) complete unpriced copies of the commercial terms and conditions that are modified by each subcontract or purchase order amendment or change order, with any Subcontractor or Supplier, in each case, immediately following the execution thereof.  The Contractor agrees that the Owner shall assume no liability for consenting to any Subcontractor, Supplier, subcontract or purchase order, and no consent to any Subcontractor, Supplier, subcontract or purchase order, by the Owner, shall be deemed or construed to relieve the Contractor of any of its obligations to strictly comply with the requirements of this Agreement.

(c)      Except as otherwise expressly provided in this Agreement, each subcontract for Subcontractors which will perform Work at the Site, shall preserve and protect the rights of the Owner under, and consistent with, this Agreement with respect to that portion of the Work to be performed by such Subcontractor so that the subcontracting thereof will not prejudice, or otherwise diminish, such rights.

(d)      Each subcontract with a Subcontractor, and each subcontract or purchase order with a Supplier, as indicated herein, shall, at a minimum:

(i)      ensure that the performance of the Work by the Subcontractor, or the supply of Material and Equipment by the Supplier, is in strict conformance with the terms and conditions set forth in this Agreement, the Permits (including the Permit Requirements), Applicable Laws and Good Utility Practice;

(ii)      if the Subcontractor has access to the Site, subject the Subcontractor to the labor obligations hereunder as well as to the health, safety, security and environmental provisions of this Agreement;

(iii)      ensure that the Subcontractor will strictly comply with the provisions of Section 3.5 of this Agreement, regarding the Contractor's Equipment and Temporary Facilities, *mutatis mutandis*, in relation to any of such Subcontractor's equipment and temporary facilities brought onto the Site by such Subcontractor;

(iv)      provide that the Subcontractor or Supplier consents to the transfer or assignment to the Owner, or its designee, of the rights of the Contractor in such Subcontractor's or Supplier's subcontract or purchase order, as the case may be, automatically, upon the assumption of same by the Owner, or its designee, in the Owner's sole discretion, in the event of a termination of this Agreement for a Contractor Default;

\\MI - 028195/000003 - 658133 v5

(v)     ensure that any contractual relationship with the Subcontractor or Supplier is exclusive to the Contractor, and provide for the Subcontractor's or Supplier's waiver of any and all rights to demand any payment whatsoever directly from the Owner;

(vi)     grant to the Owner, the Owner's Lenders and their designees, upon the Owner's reasonable request, the right to inspect: (A) the Subcontractor's portion of the Work, and (B) the Supplier's Material and Equipment at the respective manufacturing facilities for such Material or Equipment, or at the Supplier's facility, as the Owner may reasonably require;

(vii)     require the Subcontractor to provide insurance coverage with limits of coverage that would be reasonably expected to be provided by such Subcontractor, consistent with Good Utility Practice, taking into consideration the scope, magnitude and complexity of such Subcontractor's portion of the Work and the insurance requirements of this Agreement, and, in either case, strictly comply with all of the insurance requirements under this Agreement, including the delivery of insurance certificates to the Contractor, naming the Contractor, the Owner and the Owner's Lenders as additional insureds under all policies of insurance except workers' compensation insurance and professional liability insurance, with the Owner having the right to consent to any coverage limits different from those set forth in **Attachment O**, provided that the Owner may not unreasonably withhold consent;

(viii)     subject the Subcontractor or Supplier to the restrictions on the disclosure of any Confidential Information pursuant to the Confidentiality Agreement;

(ix)     provide for a grant a license from the Subcontractor or Supplier with respect to the Subcontractor's or Supplier's Intellectual Property, consistent with the license granted by the Contractor to the Owner, pursuant to Section 6.2 of this Agreement;

(x)     provide for the Subcontractor's or Supplier's default under the subcontract or purchase order, as the case may be, consistent with the provisions for Contractor Default under Section 7.11 of this Agreement, including termination rights and remedies;

(xi)     include the following provision to make the Owner an express third-party beneficiary of the Subcontractor's or Supplier's subcontract or purchase order, as the case may be, with all brackets completed, with the understanding that the Owner shall not exercise any right with respect to any Subcontractor or subcontract, as a third-party beneficiary, unless or until the Owner determines that a Contractor Default has occurred pursuant to Section 7.11:

"The parties hereto agree and acknowledge that the services/work/equipment/material to be provided hereunder by [Insert name of the Subcontractor or Supplier] will be incorporated into the electrical transmission facilities being constructed for NECEC Transmission LLC (hereinafter referred to as the "Owner"). As such, the parties expressly agree that the Owner shall be a third-party beneficiary of this [agreement], entitled, in its own name or in the name of [Insert name of the Contractor], to enforce this [agreement] against [Insert name of Subcontractor or Supplier], in the event of a default by [Insert name of Subcontractor or Supplier] under this [Agreement]"; and

(xii)    in all other respects, impose upon the Subcontractor or Supplier, all of the duties and obligations required to fully perform the Work, or deliver Material or Equipment, as the case may be, in strict accordance with this Agreement, which the Contractor has with respect to the Owner under this Agreement, *mutatis mutandis*.

(xiii)    At the request of the Owner, the Contractor shall provide evidence to the Owner, reasonably satisfactory to the Owner, that each subcontract or purchase order with every Subcontractor or Supplier, as the case may be, who will perform Work, or provide Materials or Equipment for the Project, as the case may be, complies with the requirements of this Section 3.2.

(e)    If the Contractor shall cause any part of the Work to be performed by a Subcontractor, or any part of the Materials or Equipment to be supplied by a Supplier, as the case may be, the Contractor shall be liable hereunder for all acts and omissions of such Subcontractor or Supplier. The Contractor shall be liable, to the Owner, for the acts and omissions of its Subcontractors and Suppliers, in the same manner, and to the same extent, as the Contractor is liable to the Owner for the Contractor's acts and omissions under this Agreement. Nothing contained in this Agreement shall create a contractual relationship between Owner and any Subcontractor, Supplier or sub-subcontractor, unless expressly indicated in this Agreement.

**3.3    Access to Work.**  The Owner and its representatives shall, at all reasonable times, have:  (i) reasonable access to all places where Materials or Equipment are being manufactured,  assembled and stored, and (ii) an unrestricted right to reasonably inspect such Materials and Equipment, provided that all times Contractor's safety agent shall accompany them during the course of their visit. The Contractor's personnel shall have the reasonable access to the Site by the Owner.

**3.4    Emergencies**. The Contractor shall perform any Work, and shall furnish and install any Materials and Equipment, necessary during an emergency affecting the safety of persons and property. In all cases, Contractor shall notify the Owner of the emergency as soon as practicable, but shall not wait for instructions before proceeding to properly protect both life and property. Any adjustment to the Work Schedule or the Agreement Sum claimed by the Contractor on account of emergency Work shall be determined as provided in Section 9.1 for Changes in the Work.

**3.5    Contractor's Equipment and Temporary Facilities**.

(a)    The Contractor shall provide and maintain the Contractor's Equipment and Temporary Facilities properly adapted to the Work, in good condition, and with sufficient capacity and efficiency, to accomplish the Work in a safe and workmanlike manner on or before the Guaranteed Substantial Completion Date.   All Contractor's Equipment and Temporary Facilities shall be maintained in good working order and shall be subject to inspection of the Owner at all times.  The Contractor shall immediately remove from the Site, at its sole cost and expense, any component of Contractor's Equipment and Temporary Facilities furnished by the Contractor, which is, in the reasonable opinion of the Owner, unsafe or incapable of performing its function acceptably, and shall replace such component of Contractor's Equipment and Temporary Facilities, at once, with acceptable replacements.   The Owner shall have the right to prohibit the use of any Contractor's Equipment and Temporary Facilities by the Contractor,

A–27

DocuSign Envelope ID: 591BDF1C-1AB5-4867-A4C4-4437BB151E2

which, in the Owner's commercially reasonable opinion, would adversely affect the quality of the Work. Adequate provisions shall be made by the Contractor for immediate emergency repairs to the Contractor's Equipment and Temporary Facilities. Contractor shall not be allowed to reduce Contractor's Equipment and Temporary Facilities, other than any reduction that may arise in the ordinary course of business in order for the Contractor to complete the Work in accordance with the Work Schedule. Any reduction of Contractor's Equipment and Temporary Facilities that is not in accordance with the Work Schedule shall require the written consent of the Owner. Neither the Owner's consent to any such reduction, nor the Owner's failure to prohibit, or object to, the use of any part of the Contractor's Equipment and Temporary Facilities, shall relieve the Contractor from its obligation to perform the Work in strict accordance with this Agreement. All of the Contractor's Equipment and Temporary Facilities shall strictly conform to applicable safety standards as set forth in the Specifications and the HASP Plan.

(b)     For any Contractor's Equipment and Temporary Facilities that are leased or rented from a third party, the Contractor shall negotiate, and enter into an agreement for the lease or rent thereof, with such third party, which agreement shall contain a provision that such third party, upon the written request of the Owner, within seven (7) days following the effective date of termination of this Agreement, provided that the Owner undertakes to pay all lease, rent or hire charges under such agreement, accruing from such effective date of termination, consents to the assignment of such agreement to the Owner, or, alternatively, agrees to lease or rent  the relevant Contractor's Equipment and Temporary Facilities to the Owner on the same terms and conditions, in all respects, as leased or rented to the Contractor, provided that the Owner shall be entitled to permit the use of such Contractor's Equipment and Temporary Facilities by, or further assign such agreement to, any other contractor employed by the Owner for the purpose of completing the Work, and the Contractor shall take such action as required to enforce such provision.

(c)     The Contractor shall, upon request made by the Owner, at any time,  in relation to any leased or rented Contractor's Equipment and Temporary Facilities: (i)  promptly notify to Owner, in writing, of the name and address of the owner of such Contractor's Equipment and Temporary Facilities, and (ii) shall confirm, in writing, to the Owner that the agreement for the lease or rental of such Contractor's Equipment and Temporary Facilities contains a provision in accordance with the requirements of Section 3.5(b) of this Agreement. Upon the termination of the Agreement, the Contractor shall assign all such agreements for the rental or lease of Contractor's Equipment and Temporary Facilities to the Owner, subject to the Owner's assumption thereof.

(d)     Contractor's Equipment and Temporary Facilities may include the following:

(i)     camp sites, the locations of which shall be subject to the Owner's written consent;

(ii)     all water for construction, potable water and temporary sanitary facilities for use by the Contractor, the Subcontractors, and their employees, shall be provided by the Contractor, including the source of supply, supply connections, piping, sanitary drains, lines and

\\MI - 028195/000003 - 658133 v5

sanitary disposal facilities, all of which shall be installed at such locations in a manner consistent with the Permits and Applicable Laws;

> (iii)    lighting, providing sufficient lighting for the performance of the Work, and to provide safe working conditions and to perform complete inspections of the Work; and

> (iv)    all necessary connections, transformers, distribution circuits, and other electrical equipment required for distributing the power to the places of its use at the Site, which the Contractor shall be required to install and maintain as a part of the Work, with all equipment, materials, and Work required in connection with the Contractor's temporary electrical installations to be maintained in a safe and serviceable condition by the Contractor.

(e)    In the event of termination of this Agreement for any cause whatsoever, the Contractor, if requested by the Owner to do so, shall promptly remove the Contractor's Equipment and Temporary Facilities from the Site, failing which, the Owner shall have the right to remove such Contractor's Equipment and Temporary Facilities, at the cost and expense of the Contractor.

(f)    The Agreement Sum includes all sums necessary to provide and maintain the Contractor's Equipment and Temporary Facilities, including the consumption of construction power.

**3.6    Cooperation**.  The Owner reserves the right to enter into other contracts with other contractors to perform work in connection with the Project and the NECEC Transmission System, both on and off the Site.  The Contractor shall afford other contractors reasonable opportunity, for the assembly of plant, equipment and materials for the work of such other contractors.  The Contractor shall cooperate with, and perform the Work so as not to unreasonably interfere with, or hinder, the progress or completion of the work being performed by, such other contractors. In case of dispute between any other contractors and the Contractor, the Owner shall issue a decision on the dispute, and the Owner's decision shall be final and binding on all parties, subject to Contractor's right to dispute resolution, pursuant to Section 10.5 of this Agreement.  The Contractor shall, to the greatest extent possible, perform the Work, arrange the Contractor's Equipment and Temporary Facilities, and store, place, assemble, move and dispose of the Materials and Equipment, so as not to unreasonably interfere with the operation of such other contractors at the Site.  The Contractor shall join its Work with the work of other contractors, as required pursuant to this Agreement, or as otherwise determined by the Owner, and shall perform the Work in a sequence so as to reasonably accommodate the performance of work by such other contractors.  In case of delay due to coordination pursuant to this Article 3.6, the Contractor shall be entitled to additional costs incurred and an adjustment on Work Schedule, but only to the extent of such documented delay in the Critical Path and increased costs. The Contractor shall cause its personnel and laborers, and those of its Subcontractors, to work in a reasonably harmonious manner in the same areas, if necessary, with the personnel and laborers of other contractors.  The remedies that the Owner may have for any failure of the Contractor, in this regard, shall include the withholding of Milestone Payments, until such failure is cured. The provisions of this 3.7 shall survive the completion or earlier termination of this Agreement.

**3.7**    **Identification of Contractor's and Subcontractors' Employees, Equipment and Facilities**.
The Contractor shall provide each of its employees, and all Subcontractors' employees, with a
suitable numbered badge bearing the name or initials of the employees' employers.  The
Contractor shall cause each employee to wear his or her badge, upon his or her person, while at
the Site, in such a manner that it will be plainly visible as a means of identification.  All vehicles,
boats and other floating or stationary Contractor's Equipment and Temporary Facilities, and all
Subcontractors' equipment and temporary facilities, shall be clearly marked with the
identification of the Contractor, or Subcontractor which owns same, as the case may be, and shall
be appropriately numbered.  All entries involving labor and equipment on the Contractor's daily
reports, as well as on all payroll and other cost records required to be submitted under this
Agreement, shall include both the name and assigned identification number for all employees,
and for all Contractor's Equipment and Temporary Facilities, and all Subcontractors' equipment
and temporary facilities.  The Contractor shall maintain and deliver, to the Owner, records of all
such forms of identification, including employee names, equipment and facility descriptions, and
corresponding numbers.

**3.8**    **Use of Site**.  The following provisions pertain to the use of the Site:

(a)    The Contractor shall confine its apparatus, the storage of Materials and
Equipment, and the operations of its personnel and laborers, to the limits indicated by Applicable
Laws, Permits and directions of the Owner and shall not unreasonably encumber the Site with
the Materials or Equipment or the Contractor's Equipment and Temporary Facilities.

(b)    The storage of Materials, Equipment, Contractor's Equipment and Temporary
Facilities, and the operation thereof, and similar uses of the Site, shall be confined to locations
designated by this Agreement, or for which the Owner has otherwise given written consent.  In
the event that no, or insufficient, real property or improvements is available for such purposes,
the Contractor shall make arrangements with third Persons for the use of necessary real property
or improvements.  All such arrangements shall be made at the Contractor's sole cost and
expense, and subject to the Owner's prior written consent, and the use, care and cleanup of such
real property shall be subject to: (i) the same specific requirements of this Agreement which
govern use of the Site, and (ii) any particular covenants, conditions and restrictions, or other Real
Estate Rights, affecting such real property.  The Owner shall not be obligated to make any
payments to the Contractor related to, arising from, or in connection with, the Contractor's use
of real property, owned by any third Person, and the Contractor shall cause such third Person to
acknowledge to the Owner, in writing, that the Owner shall have no obligation to such third
Person related to, arising from, or in connection with, the Contractor's use of such real property.

(c)    The Contractor's Equipment and Temporary Facilities, including temporary
buildings, storage sheds, shops, offices and temporary utilities, may be erected by the Contractor,
only with the written consent of the Owner, at the Contractor's sole cost and expense.  Title and
risk of loss to such Contractor's Equipment and Temporary Facilities shall remain vested in the
Contractor, notwithstanding anything to the contrary contained in this Agreement.  The
Contractor shall remove, from the Site, all Contractor's Equipment and Temporary Facilities, at
its sole cost and expense, upon Final Completion, and shall cause all Subcontractors to remove
from the Site, all Subcontractors' equipment and temporary facilities, upon Final Completion,

unless, in either case, otherwise specified in this Agreement, otherwise directed, in writing, by the Owner.

(d)    The Contractor shall use public roadways to access the Site, or shall construct and use such temporary roadways to access the Site, as may be authorized by the Owner, at the Contractor's sole cost and expense. Access roads and access areas shall be substantially restored to the condition in which they existed prior to the performance of any Work by, or on behalf of, the Contractor, unless otherwise indicated by the Owner.

**3.9    Reports; Progress Meetings**.    The following provisions pertain to the Contractor's reporting and progress meeting requirements:

(a)    The Contractor is required to provide the Owner with written daily reports, submitted to the Owner on a weekly basis, and in a form accepted by the Owner, recording the following data:

(i)    the Contractor's and Subcontractors' entire work force, at the Site, including their names and titles, and the number of employees;

(ii)    the respective hours worked each day by each employee during the reporting period, the portions of the Work performed, and the locations where such Work was performed, with an indication of any idle, down-time, standby time or other unproductive time, and the reasons therefor;

(iii)    the quantities and types of Contractor's Equipment and Temporary Facilities, and hours that each was used on a daily basis, and the portions of the Work, for which each was used, with an indication of any idle, down-time, standby time or other unproductive time, and the reasons therefor;

(iv)    the status of the performance of the Work in relation to the Work Schedule, which shall include scheduled and completed inspections and Tests; and

(v)    the formulation of any Hazardous Material, including any pesticide, used at the Site during the reporting period, by the Contractor or any Subcontractor, as well as the date of use, the area of use, and the quantity used, and the qualifications of the personnel using same.

(b)    The Contractor shall also be required to furnish daily reports for all Subcontractors in a like manner.  The failure to strictly comply with all of the above requirements will be cause for the Owner to withhold payment of any Milestone Payment due, until such noncompliance is cured.

(c)    The schedule, location and time of regular progress meetings shall be established in strict accordance with the requirements of the Specifications, or as otherwise required by the Owner.

(d)    The foregoing requirements are in addition to any other reporting requirements set forth in this Agreement.

**3.10**   **Use of Roads and Railroads**.  All roads and railroads on real property, owned or controlled by the Owner, by leasehold, easement or otherwise, whether or not built by the Contractor, shall be available for use by the Owner, its contractors, and any of their supervisory personnel, laborers and contractors, at no charge to any of them.  The Owner shall not be obligated to reimburse the Contractor for use or maintenance of such roads or railroads.

**3.11**   **Preservation of Property**.  The Contractor shall exercise due care in the performance of the Work to avoid injury, damage or loss to existing improvements, utility facilities, and other property of any nature on or near the Site.  In the event of any such injury, damage or loss caused by the breach of contract, negligence or intentional misconduct of the Contractor or any Subcontractor or Supplier, the Contractor shall repair, replace, or otherwise restore any such property to the condition, in which it existed, when the Contractor first commenced the Work, or as otherwise required by the Contractor Deliverables accepted by the Owner and the Specifications, if applicable, at the Contractor's sole cost and expense.  In addition, the Contractor shall perform such temporary repairs of any such property, as may be necessary to restore such property to service, as required by the Owner, at the Contractor's sole cost and expense.  The Contractor shall defend, indemnify and save the Owner Indemnitees harmless, on an After-Tax Basis, from any and all claims, suits, actions, judgments and Losses, of any nature, incurred by any such Owner Indemnitee, related to, arising out of, or in connection with, any such injury, damage or loss to the extent caused by the Contractor's breach of this provision, or by the Contractor's or any Subcontractor's negligence or intentional misconduct.  The provisions of this Section 3.11 shall survive the completion or earlier termination of this Agreement

**3.12**   **Operations and Maintenance Manuals**.  The Contractor shall prepare operations and maintenance manuals, consistent with Good Utility Practice, for all of the Work (the "**Operations and Maintenance Manuals**"), as a part of the Contractor Deliverables, and shall deliver same to the Owner, as required pursuant to this Agreement.

**3.13**   **Workers' Compensation Law**.  The Contractor agrees, in accordance with the Maine Workers' Compensation Act and such other state compensation acts as may apply, including but not limited to 39-A M.R.S. § 401 et. seq., that:

      (a)    To the extent required pursuant to **Attachment O**, the Contractor shall, and shall ensure that all Subcontractors, secure and maintain Workers' Compensation insurance or self-insurance coverage for the benefit of all of its or their employees during the period of performance under this Agreement, and shall provide proof of such coverage upon demand by the Owner; and

      (b)    This Agreement: (1) shall not be effective until such time as the Contractor complies with this provision, and (2) shall be voidable by the Owner in the event that the Contractor fails to so comply.

**3.14**   **Information Required of Contractor**. The Contractor shall promptly furnish weights, bills of material and such other data, as are reasonably required by Owner.  Unless otherwise specified, four copies of such data shall be furnished.

      **3.15**   **Spare Parts**.

(a)  The Contractor shall prepare a recommended preliminary list of spare parts, and deliver such preliminary list to the Owner at least one hundred and eighty (180) days prior to the Guaranteed Substantial Completion Date.  Following the receipt of such preliminary list of spare parts,, the Owner shall prepare a definitive list of spare parts, from such preliminary list of spare parts, that the Owner intends to purchase, as may be amended from time to time (the "**Spare Parts List**"), and shall execute a Change Order for any such spare parts on the Spare Parts List, adjusting the Agreement Sum (but not the Work Schedule) to account for same.  The Contractor shall deliver such spare parts to the Site, or to a storage facility designated by the Owner, prior to the Substantial Completion Date.

(b)  The Contractor shall maintain a detailed inventory of all spare parts delivered to the Site, or to a storage facility designated by the Owner, and all additional spare parts agreed upon by the Owner and the Contractor, subject to review and acceptance by the Owner.  The Contractor agrees to replace, at its sole cost and expense, all spare parts which are used by the Contractor or any Subcontractor, to satisfy the Contractor's warranty obligations under this Agreement.  Without limiting, or otherwise diminishing, the Contractor's obligations as set forth herein, the order to replace such spare parts shall be placed by the Contractor no later than thirty (30) days following the date of the use of same.  In the event that the Contractor does not place the order for such spare parts within such thirty (30)-day period, the Owner may proceed to place the order, deducting the total cost of such order from the amount that the Owner owes to the Contractor under this Agreement, and, alternatively, the Owner shall have the right to draw upon the Performance Letter of Credit or the Warranty Letter of Credit, as the case may be, to recover such cost.

**3.16  Misplaced Materials and Equipment**. The Owner shall not be obligated to make any payment on account of any Materials or Equipment that are deposited, or placed, in locations, other than at the locations designated by this Agreement, or for which the Owner has otherwise given written consent, and the Contractor shall be required to remove such Materials or Equipment, so deposited or placed, and discard same, or re-locate same, as directed by the Owner, at the Contractor's sole cost and expense.  If the Contractor, during the progress of Work, loses, misplaces, or discards, any Materials or Equipment on or near the Site or elsewhere which, in the opinion of the Owner, may be dangerous or damaging, or which may create a nuisance, or which may interfere with the performance of the Work, or the activities of others, the Contractor shall remove and re-locate same, promptly, upon notification, and as directed, by the Owner.  If the Contractor refuses, neglects, or delays, to strictly comply with the above requirements, the Owner may, but shall not be obligated to remove and relocate such Materials or Equipment, at the Contractor's sole cost and expense. The Contractor shall pay any such costs or expenses incurred by the Owner within thirty (30) days following the date of receipt of an invoice therefor from the Owner.  If such invoice is not paid by the Contractor, within such period, the Owner shall have the right to set-off any such costs or expenses, incurred by the Owner, against any sums due to the Contractor, or to make a drawing upon the Letters of Credit.  The Owner's removal and relocation of any such Materials and Equipment shall not relieve the Contractor from liability for, or release the Contractor from, any obligations under this Agreement, including its warranty obligations with respect to such Materials and Equipment.

**3.17  Existing Utilities**.

(a)      The following provisions pertain to existing utilities located on or off the Site:

(i)      The Contractor shall familiarize itself with the existence of publicly and privately owned utility facilities occupying the Site, and shall cooperate with the owners or operators of such utility facilities in relocating, altering or protecting such utility facilities, as required for the performance of the Work, as a part of the Work.  The Contractor shall not disturb any part or parts of any such utility facilities, without the written consent of the Owner.  During the performance of the Work, the Contractor shall assume all risk and liability for damage to, or destruction or loss of, all such utility facilities, located on off the Site, whether or not such utility facilities have been identified in the Specifications, or in Contractor Deliverables accepted by the Owner.  Contractor's liability under this Section may be reduced by the extent to which any damage, destruction or loss is covered by and paid out under the Owner's Builder's Risk insurance.  The provisions of this Section 3.17(a)(i) shall survive the completion or earlier termination of this Agreement.

(ii)      The Contractor shall make arrangements with the owners or operators of utility facilities, located on or off the Site, for the purpose of coordinating the Work with any specified or required relocation or alteration of such utility facilities.  The Owner shall negotiate all instruments, which are necessary to relocate or alter such utility facilities.  The Contractor shall strictly comply with all of the terms and conditions of all such instruments, and shall promptly report, to the Owner, any failure on the part of any such owner or operator to cooperate in the relocation or alteration of any utility facility, in accordance with any such instrument.

(iii)      The Contractor shall make its own arrangements, at its sole cost and expense, for any alteration or relocation of a utility facility, which the Contractor requires for its convenience.

**3.18    Hazardous Materials**.

(a)      Except as required for Applicable Laws and Permits, Contractor shall not, and shall not permit any of the Subcontractors or Suppliers, directly or indirectly, to:  (i) permit the manufacture, storage, transmission, or presence of any Hazardous Materials on the Site, or (ii) release, discharge or otherwise dispose of any Hazardous Materials on the Site.

(b)      The Contractor shall conduct and complete all investigations, studies, sampling, testing and remediation of the Site, as required by Applicable Laws and Permits in connection with the release, discharge or presence of Hazardous Materials brought onto or generated at the Site by the Contractor or any Subcontractor or Supplier.  The Contractor shall promptly and strictly comply with all lawful orders and directives of all Governmental Authorities, relating to the use, transportation, storage, handling, presence, discharge, disposal or release by the Contractor, any Subcontractor, Supplier or any Person acting on its or their behalf or under its or their control, of any Hazardous Materials brought onto, or generated at, the Site by the Contractor or any Subcontractor or Supplier.

(c)     If the Contractor discovers, encounters or is notified of, any threatened or actual discharge, spill or release of any Hazardous Materials at the Site, brought onto the Site or discharged on Site, by the Contractor or any Subcontractor or Supplier:

(i)     the Contractor shall immediately notify the Owner thereof, and restrict access to the area of such threatened or actual discharge, spill or release, as required by Applicable Laws or Permits;

(ii)     the Contractor shall immediately dispose of such Hazardous Materials and remediate the Site, in strict accordance with all Applicable Laws and Permits, in each case, at the Contractor's sole cost and expense; and

(iii)     the Contractor shall not be entitled to any adjustment to the Work Schedule or the Agreement Sum, for any delay or costs incurred by Contractor as a result of the existence of such Hazardous Materials., except as otherwise provided Section 9.1.

**3.19     Artifacts**.  The Contractor shall strictly comply with all Applicable Laws, in particular, 27 M.R.S. § 371, et seq., as such law applies to the excavation of protected sites and/or discovery of artifacts, specimens, or materials, on or under lands owned by the State of Maine.  The Contractor shall ensure that no Person appropriates, excavates, injures or destroys any object of archaeological, cultural or paleontological interest, situated on or under lands owned by the State of Maine, without receiving necessary approvals of the Director of the Maine Historic Preservation Commission, the Director of the State Museum, and the director of any agency with primary jurisdiction over the matter. A violation of this provision shall constitute a misdemeanor, in accordance with Applicable Law.  The discovery of such objects shall be immediately reported by the Contractor to the Owner, pursuant to Section 3.1.

**3.20     Owner Information**.  The Contractor shall not possess or assert any Lien or other right against, or to, the Owner Information. No Owner Information, or any part thereof, shall be sold, assigned, leased, or otherwise disposed to third parties by the Contractor or commercially exploited by, or on behalf of, the Contractor or any of the Contractor Parties.  Upon the Owner's request, the Contractor shall promptly return to the Owner all Owner Information (including copies thereof) to the Owner, in a form reasonably requested by the Owner or, if the Owner so elects, the Contractor shall destroy such Owner Information.  The Contractor shall not use Owner Information for any purpose other than to perform the Work.  The Contractor shall establish and maintain safeguards against the destruction, loss, alteration, or unauthorized use of Owner Information which are equivalent to those best practices employed within the transmission facility construction industry.

**3.21     Contractor Deliverables; Drawings**.     The Contractor shall prepare the Contractor Deliverables in strict accordance with this Agreement, and, in particular, the Specifications, as definitively and in as much detail as is possible at the present stage of the development of the design. The Contractor shall perform no construction Work, unless and until the Contractor Deliverables, including the Drawings, have been accepted by the Owner, in strict accordance with Section 5.6.

**3.22     Responsibility for Design.** The Contractor shall assume full liability for complete design of the portion of the Project for which Work is to be performed by the Contractor pursuant to this

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 591BDF1C-1AB5-485F-44C4-4378BB151E2

Agreement, and shall conform to the good engineering practices for the operating conditions specified.  Upon request by the Owner, the Contractor shall furnish complete information as to the maximum stresses used in the Contractor's design for the Project.  If at any time prior to initial operation of any Equipment, the Contractor learns of operating difficulties with any equipment, which is of similar design, the Contractor shall promptly notify the Owner, so that proper remedial measures can be considered, to the extent necessary or required, to ensure safe operation of the portion of the Project for which Work is to be performed by the Contractor pursuant to this Agreement.

## ARTICLE 4– SPECIFICATIONS AND QUALITY

**4.1** **Discrepancies**.  Any discrepancies, inconsistencies, conflicts or ambiguities discovered in or among the Contractor Deliverables and/or the Specifications shall be immediately reported in writing, by the Contractor, to the Owner's engineer, who shall review and correct, or clarify, any such discrepancies, inconsistencies, conflicts or ambiguities in the Contractor Deliverables or the Specifications, in writing.  Any Work performed by the Contractor, after such discovery or after the Contractor should have reasonably made such discovery, in the exercise of reasonable diligence, unless authorized in writing by Owner, shall be deemed to be performed at the Contractor's sole risk.

**4.2** **Additional Instructions**.  The Owner may issue additional instructions during the progress of the Work, which may be necessary to illustrate interpretations, adjustments or minor changes in the Contractor Deliverables or the Specifications.

**4.3** **Contractor Due Diligence**. By executing this Agreement, the Contractor represents that it has visited the Site, familiarized itself with the local conditions under which the Work is to be performed, and correlated its observations with all the requirements of this Agreement.  The Owner assumes no responsibility whatsoever for ascertaining for the Contractor any facts which the Contractor could have ascertained for itself through such reasonable diligence.

**4.4** **Materials, Equipment and Labor**.

(a)    Unless otherwise specifically noted, the Contractor shall provide and pay for all Materials, labor, Equipment, tools, water, heat, utilities, transportation and other facilities necessary for the proper execution and completion of the Work.

(b)    The Contractor, at all times, shall employ workers, in sufficient number, and having the various degrees of skill and experience required, to perform the Work in a timely manner in strict accordance with the requirements of this Agreement.  For Work requiring particular specialties or skills, the workers engaged shall have had sufficient experience in such specialties or skills to satisfactorily and properly perform the Work and operate the Contractor's Equipment and Temporary Facilities involved.  The Contractor shall also employ competent experienced supervisory personnel who are familiar with the nature of Work to be performed.

(c)    The Owner may, in writing, require the Contractor to remove from the Work, promptly, such Contractor's or Subcontractors' employees as the Owner deems incompetent, careless, insubordinate, or otherwise objectionable, or whose continued employment is deemed by

\\MI - 028195/000003 - 658133 v5

the Owner to be contrary to the public interest or the interest of the Project, and the Contractor shall not later employ any such removed employee in connection with the Work.

(d)    All other factors being equal and consistent with Applicable Laws and applicable labor agreements, the Contractor shall, and shall cause all Subcontractors, to give preference to hiring Maine workers.

(e)    The Contractor shall make all deliveries of Materials and Equipment, or cause all deliveries of Materials and Equipment to be made, to the Site in accordance with the conditions of Permits and Applicable Laws.  Any demurrage or premium time labor incurred, in connection with any deliveries, shall be at the sole cost and expense of the Contractor.

**4.5    <u>Contractor Deliverables</u>.**

(a)    The Contractor shall prepare, and deliver to the Owner, all Contractor Deliverables, required to be delivered to the Owner pursuant to the Specifications and other requirements of this Agreement, in strict accordance with this Agreement.  Insofar as any Applicable Law requires, the Contractor Deliverables shall be signed, as the case may be, by a responsible professional that has the professional certification or licensure required by such Applicable Law.  The Owner shall use reasonable efforts to review and comment on any Contractor Deliverable within a maximum period of fourteen (14) days following the date of receipt by the Owner of such Contractor Deliverable, unless, due to size or complexity of such Contractor Deliverable, such period may prove insufficient, in which case, the Owner may have twenty-one (21) days, following the date of receipt thereof, to review and comment on such Contractor Deliverable.  Further, in the event that the Contractor is delayed in the delivery of any Contractor Deliverable for the Owner's review, and such delay on the part of the Contractor makes it impracticable for the Owner to review such Contractor Deliverable within such twenty-one (21)-day period, the Owner shall have as much time as may be reasonably required, in its sole discretion, to review and comment on such delayed Contractor Deliverable.

(b)    Any comment by the Owner with regard to any Contractor Deliverable shall be resolved by the Contractor and the Contractor shall resubmit such Contractor Deliverable to the Owner for review and comment, along with an explanation of the resolution of each of the Owner's comments.  In no way, and under no circumstances, will the Owner's comments or failure to comment on any other Contractor Deliverables exempt the Contractor in whole, or in part, from the Contractor's obligation to strictly comply with the requirements of this Agreement.

(c)    The Contractor may not alter or change any Contractor Deliverable that has been presented to the Owner for review, except as expressly authorized by the Owner in writing.  Any authorization by the Owner for the Contractor to alter or change any Contractor Deliverable, previously reviewed by the Owner, shall not:  (i) relieve the Contractor in whole, or in part, from the Contractor's obligation to strictly comply with the requirements of this Agreement, or (ii) entitle the Contractor to an adjustment to the Agreement Sum or the Work Schedule.

(d)    The Contractor may, upon request of the Owner, periodically, or as often as the Owner may reasonably require, deliver to the Owner preliminary drafts of Contractor Deliverables, including technical documents such as the drawings, criteria, samples and

A–37

procedures, for informational purposes, so as to keep the Owner well-informed with regard to the progress of the engineering, design and development of the Contractor Deliverables.

(e)      The Owner shall be entitled, at any time, to inspect all Contractor Deliverables and any other part of the Work in progress.  Once the Contractor has commenced to perform the Work at the Site, the Contractor shall maintain, at the Site, all Contractor Deliverables accepted by the Owner.

(f)      The Contractor shall be liable for any costs which the Contractor incurs as the result of any mistake, error, defect, discrepancy or omission in the Contractor Deliverables, or in any information prepared by the Contractor, or by third parties on the Contractor's behalf, whether the Owner has reviewed or accepted such Contractor Deliverables or information, or not, which costs shall include costs incurred by the Contractor to remedy any such mistakes, errors, defects, discrepancies or omissions, or any delay in the performance of the Work as a result thereof.

**4.6**    **Project Execution Plan**.  Within thirty (30) days following the Effective Date, the Contractor shall deliver to the Owner a draft project execution plan, in conformance with the Project Execution Plan Requirements. The Owner shall have fifteen (15) days following the receipt of such draft plan to deliver comments to the Contractor.  Upon receipt of the Owner's comments to such draft plan, the Contractor shall either incorporate such Owner's comments into such draft plan, or notify the Owner of the reasons for which the Contractor cannot incorporate any of such Owner's comments into such draft plan.  In the event that the Contractor has notified the Owner of the reasons for which the Contractor cannot incorporate any of such Owner's comments into such draft plan, the Owner and the Contractor shall meet to discuss the draft plan.  In the event that the Owner and the Contractor cannot reach an agreement on such draft plan within ninety (90) days following the Effective Date, then the Contractor shall incorporate the Owner's comments into such draft plan.  If the Contractor continues to disagree with the Owner's comments, regardless of such incorporation, the Contractor may avail itself of the dispute resolution procedures set forth in Section 10.5.  Once the draft plan has been either accepted by the Owner, or the Contractor has incorporated all of the Owner's comments into such draft plan, such draft plan shall be deemed to be the final project execution plan (the "**Project Execution Plan**"), and the Contractor shall not amend or modify such Project Execution Plan without the Owner's written acceptance.   The Contractor shall be obligated, and shall cause the Subcontractors, to strictly comply with such Project Execution Plan in the performance of the Work.  Notwithstanding anything to the contrary contained in this Agreement, the Contractor shall not commence to perform any of the Work until the Contractor has delivered the Project Execution Plan to the Owner.

**4.7**    **Quality Control Plan**.  Within fourteen (14) days following the date of issuance of the Notice to Proceed, the Contractor shall deliver to the Owner a draft Quality Control plan (the "**Quality Control Plan**"), in strict conformance with the Quality Control Plan Requirements. The Owner shall have fifteen (15) days following the receipt of such draft plan to deliver comments to the Contractor.  Upon receipt of the Owner's comments to such draft plan, the Contractor shall either incorporate such Owner's comments into such draft plan, or notify the Owner of the reasons for which the Contractor cannot incorporate any of such Owner's comments into such

draft plan. In the event that the Contractor has notified the Owner of the reasons for which the Contractor cannot incorporate any of such Owner's comments into such draft plan, the Owner and the Contractor shall meet to discuss the draft plan. In the event that the Owner and the Contractor cannot reach an agreement on such draft plan within ninety (90) days following the Effective Date, then the Contractor shall incorporate the Owner's comments into such draft plan. If the Contractor continues to disagree with the Owner's comments, regardless of such incorporation, the Contractor may avail itself of the dispute resolution procedures set forth in Section 10.5. Once the draft plan has been either approved by the Owner, or the Contractor has incorporated all of the Owner's comments into such draft plan, such draft plan shall be deemed to be the final quality control plan (the "**Quality Control Plan**"), and the Contractor shall not amend or modify such Quality Control Plan without the Owner's written acceptance. The Contractor shall be obligated, and shall cause the Subcontractors, to strictly comply with such Quality Control Plan in the performance of the Work. Notwithstanding anything to the contrary contained in this Agreement, the Contractor shall not commence to perform any of the Work until the Contractor has delivered the Quality Control Plan to the Owner.

**4.8**    **Heath, Safety, Security and Environmental Obligations**.

(a)    Within thirty (30) days following the Effective Date, the Contractor shall deliver to the Owner a draft health and safety plan (the "**HASP Plan**"), in strict conformance with the HASP Plan Requirements. The Owner shall have fifteen (15) days following the receipt of such draft plan to deliver comments to the Contractor. Upon receipt of the Owner's comments to such draft plan, the Contractor shall either incorporate such Owner's comments into such draft plan, or notify the Owner of the reasons for which the Contractor cannot incorporate any of such Owner's comments into such draft plan. In the event that the Contractor has notified the Owner of the reasons for which the Contractor cannot incorporate any of such Owner's comments into such draft plan, the Owner and the Contractor shall meet to discuss the draft plan. In the event that the Owner and the Contractor cannot reach an agreement on such draft plan within ninety (90) days following the Effective Date, the Contractor shall incorporate the Owner's comments into such draft plan. If the Contractor continues to disagree with the Owner's comments, regardless of such incorporation, the Contractor may avail itself of the dispute resolution procedures set forth in Section 10.5. Once the draft plan has been either accepted by the Owner, or the Contractor has incorporated all of the Owner's comments into such draft plan, such draft plan shall be deemed to be the final health and safety plan (the "**HASP Plan**"), and the Contractor shall not amend or modify such HASP Plan without the Owner's written acceptance. The Contractor shall be obligated, and shall cause the Subcontractors, to strictly comply with such HASP Plan in the performance of the Works. Notwithstanding anything to the contrary contained in this Agreement, the Contractor shall not commence to perform any of the Work until the Contractor has delivered the HASP Plan to the Owner.

(b)    The HASP Plan, in addition to complying with the HASP Plan Requirements, shall provide that the Contractor shall:

(i)    at all times, exercise reasonable precautions for the safety of the general public and Persons engaged in the performance of the Work, and shall be liable for the

DocuSign Envelope ID: 591BDF1C-1AB5-4867-84C4-4378BB151FE2

performance and maintenance of safety activities among the Contractor's and the Subcontractors' employees;

(ii)    (A) provide adequate equipment, facilities and personnel, as required by Applicable Laws and the HASP Plan Requirements, as necessary or required to render adequate first aid service to any Person who may be injured in the performance of the Work, and (B) have pre-existing arrangements, as required by Applicable Laws and the HASP Plan Requirements, for adequate medical care, and for removal and hospital treatment, for any Person who may be injured or who may become ill;

(iii)    provide all fire and safety equipment (including fire extinguishers, respirators and lifelines and the like), necessary for the safe performance of the Work;

(iv)    (A) ensure that all testing equipment, rental equipment or other equipment, of any kind, furnished by the Contractor or any Subcontractor, for the performance of the Work, is in good working order and condition, properly tested, grounded, fit or otherwise suitable for its intended purpose or use, and free from defects, in order to prevent personal injury or damage to property, and (B) furnish, to the Owner, proof of inspection and maintenance of same, immediately following the date of such inspection or maintenance;

(v)    ensure that the Contractor's or any Subcontractor's employees, required by Applicable Law to have training or certifications, have such training or certifications, and furnish, to the Owner, proof of same prior to the date on which such employees commence to perform any portion of the Work;

(vi)    immediately report, to the Owner, every injury and illness to individuals, damage to property, spill, environmental damage, and environmental non-compliance or accident, shall furnish, in writing, to the Owner, complete information including testimony of witnesses, regarding each such event, and shall maintain a log of such injuries and illnesses on OSHA form No. 300, which log shall be submitted to the Owner, by the Contractor, on a monthly basis;

(vii)    strictly comply with all Applicable Laws, in particular, the applicable provisions of the Occupational Safety and Health Act of 1970, (Public Law 91-596 of the United States, 29 U.S.C. Sec. 651 et. seq.) as it may be or may have been amended, all orders, directives, rules and/or regulations issued pursuant thereto and/or deemed to be occupational safety and health standards issued under such act or amendments, and all standards legally incorporated by reference in such laws, rules and regulations; provided however, in the event that a State of Maine plan for the development of occupational safety and health standards has the approval of the United States Secretary of Labor in accordance with such act or amendments thereto, then the Contractor shall strictly comply with such State of Maine occupational safety and health standards, and with all applicable provisions of State of Maine laws, and with all valid rules and regulations adopted or promulgated by State of Maine agencies pursuant thereto; provided further, if such plan or such laws of State of Maine, or rules or regulations issued pursuant thereto, contain particular provisions for standards, measures, equipment, devices, techniques, or conditions, not inconsistent with, and which provide for greater protection for employees, appropriate to the performance of Work than,

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 591BDF1C-1AB5-4957-A4C4-4237BB151F2

those prescribed or approved pursuant to the Occupational Safety and Health Act of 1970, the Contractor shall strictly comply with such particular provisions;

(viii)    strictly comply with all applicable rules, regulations, codes and bulletins of the Maine Department of Labor, Board of Standards and Appeals;

(ix)    cooperate with the Owner's safety representatives and comply with any specific safety recommendations, as the Owner's safety representatives may issue to the Contractor, in writing, at the Contractor's sole cost and expense.   If any of the Owner representatives' safety recommendations are more stringent than those set forth in the HASP Plan Requirements or Applicable Laws, then the Owner may direct the Contractor to comply with such recommendations, subject to the Contractor's right to request a Change in the Work pursuant to Section 9.1;

(x)    enforce the mandatory wearing of: (a) safety hats, which comply with ANSI Z89.1, by all individuals in the Work area; and (b) eye protection, that complies with ANSI Z87.1, at all times when employees are performing operations considered hazardous to the eyes; and

(xi)    provide, in both printed copy and electronic PDF format, to the Owner, a SDS (Safety Data Sheet), in strict conformity with the specific format which satisfies the current requirements of OSHA Part 1926 for:  (i) Materials to be used in the performance of the Work, before the date on which each Material is first used in the Work, and (ii) all materials to which workers are exposed in the performance of the Work, to the extent that OSHA Part 1926.59 requires a SDS for such material;  provided that, the foregoing requirement applies to those Materials brought to the Site to be incorporated into the Work, as well as to all materials that are encountered at the Site as a result of the use or incorporation of the any other Materials or materials; provided further, this requirement may be waived for commonly used generic construction Materials, such as Portland cement and asphalt cement, by providing to the Owner, a list of such Materials; provided further, such waiver however does not relieve the contractor from the responsibility to maintain a copy of the SDS for each Material to which workers are exposed, as required by OSHA Part 1926.

(xii)    on a quarterly basis, submit to the Owner's facility safety representative or designee, all required reporting and information requests through the ISNetworld information management system.

(c)    The Contractor shall employ, at all times, such usual and ordinary means as may be required to prevent acts of vandalism and theft which would cause injury, loss of life or property damage to the Work or the work of any other contractor at the Site, in connection with the Project, or substantial delay in the completion of the Work or the work of any other contractor at the Site.  The Contractor shall exclude all unauthorized Persons from the vicinity of the Contractor's construction operation, and shall, at the Contractor's sole cost and expense, take all protective measures which are usually employed under a contract of this scope, magnitude and complexity, such as the establishment of a security guard force, the installation of security fencing and the like.

(d)    The Owner cannot guarantee, warrant or represent to the Contractor that there will be no demonstrations, or attempts to interfere with the Contractor or the Work.  If the Owner

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 591BDF1C-1AB5-4967-A4C4-4317BBB151E2

hires a security guard force, such force shall be hired by the Owner, for the exclusive protection and security of the Site, and the Owner, and not for the benefit of the Contractor. The Contractor shall be expected to take such care in providing protection and security to its and the Subcontractors' employees, the Contractor's Equipment and Temporary Facilities, the Contractor's, Subcontractors' and their employees' other personal property, and the Work, as the circumstances may warrant, at the Contractor's sole cost and expense

(e)      In the event that the Contractor fails to comply with any of the provisions of this Section 4.8, the Owner may suspend the Work, and, in such event, notwithstanding anything to the contrary contained in this Agreement, the Contractor shall not be entitled to any adjustment to the Work Schedule or the Agreement Sum as a result of such suspension.

**4.9      Substitution; Alternate Materials or Equipment**.

(a)      Any reference in the Specifications to Material or Equipment, by product manufacturer or model number (or use of the term "or equal"), is intended to convey to the Contractor the level of quality, strength, suitability, durability appearance and function required. Except in those instances where the Material or Equipment is designated to match other material or equipment in use in a particular installation, either completed or in the course of completion, the use of alternative Material or Equipment, which the Contractor represents and warrants, to the Owner, will strictly conform, in all respects, to the standard of quality, strength, suitability, durability appearance and function established in the Specifications, and is, at least, of equivalent quality, strength, durability and appearance, and will perform the required function for the purpose intended, maybe permitted, as an alternative, subject to acceptance by the Owner, and subject to each of the following requirements:

(i)      The burden of proof as to the quality, strength, suitability, durability appearance and function of alternatives shall be upon the Contractor and the Contractor shall furnish all information necessary as required by the Owner, at the Contractor's sole cost and expense. The Owner shall be the sole judge as to the quality, strength, suitability, durability appearance and function of such alternatives, and the Owner's decision to accept or reject any alternative shall be final.

(ii)      In the case in which the use of any such alternative involves the redesign of, or changes to, other parts of the Work, the cost and the time required to effect such redesign or changes will be considered by the Owner in evaluating the quality, strength, suitability, durability appearance and function of the alternatives. Any such redesign or changes shall be at the sole cost and expense of the Contractor.

(iii)      No Tests or action relating to the Owner's acceptance of any alternative, will be made until the Contractor's request for such alternative is made, in writing, by the Contractor, accompanied by complete data as to the quality, strength, suitability, durability appearance and function of the proposed alternative. Such request shall be made in ample time to permit the Owner's review of such data, without delaying the performance of the Work, or otherwise adversely impacting the Work Schedule.

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 591BDF1C-1AB5-4867-A4C4-4357BB151E2

(iv)    Whenever a classification, rating, or other certification by a body such as UL, NEMA, or ANSI is a part of the Specifications for any Material or Equipment, proposals for use of alternatives shall be accompanied by reports from the listed or equivalent Laboratory indicating compliance with the requirements of the Specifications.

(v)    All testing required to prove the quality, strength, suitability, durability appearance and function of any alternative proposed shall be at the Contractor's sole cost and expense.

(vi)    The Owner's acceptance of an alternative shall be only for the characteristics or use named in such acceptance, and shall not be used to change or modify any Contract requirement, or to establish acceptance for the alternative to be used in any other phase or portion of the Work.

(vii)    If the Owner accepts an alternative with a lesser cost than the Material or Equipment specified in the Specifications by product manufacturer and model number, then, the Parties agree that the Agreement Sum shall be reduced, by Change Order, to account for such lesser cost.

(viii)    The Owner's acceptance of any alternative shall not relieve the Contractor from its obligation under this Agreement to strictly comply with the requirements of this Agreement, and shall not impose any liability upon the Owner in the event that such alternative is later determined to be insufficient, defective, or otherwise not in strict conformity with the requirements of this Agreement.  The Contractor shall have no claim against the Owner related to, arising from, or in connection with, the Owner's rejection of any alternative.

(b)    Any changes required in the details and dimensions shown on any Contractor Deliverable, for the substitution of any alternative accepted by the Owner, shall be promptly made by the Contractor, at the Contractor's sole cost and expense.  Any additional expense incurred by the Contractor arising from the use of any alternative shall be borne solely by the Contractor.  In the event that the Contractor requests an alternative, and the Owner accepts such alternative, and, later, the Contractor discovers that changes in the design, or other parameters, or to the existing Work, are required, or, otherwise, the alternative is rendered unusable, the Contractor shall be liable for all costs and expenses that may be incurred in connection with the use of such alternative.

(c)    Whenever the words "or equal" appear in the Specifications, the following shall also be deemed to be inserted immediately thereafter by virtue of this reference: "in accordance with Section 4.9 of the Agreement."

**4.10**    **Samples; Shop Drawings**.

(a)    All samples, required pursuant to this Agreement, shall be furnished by the Contractor to illustrate Materials, Equipment, or workmanship, and to establish standards by which the Work will be evaluated.

(b)    Any samples or shop drawings required pursuant to this Agreement shall be:

\\MI - 028195/000003 - 658133 v5

(i)       promptly submitted by the Contractor to the Owner, for the Owner's review, within the time specified in this Agreement, including the Work Schedule, or, if no time is specified, within a reasonable time to permit review, inspection and Tests, in order to avoid any adverse impact to the Work Schedule;

(ii)       shipped prepaid and delivered as specified in this Agreement, or as directed by the Owner; and

(iii)       properly marked to show the name of the Project, the trade name of the Supplier or manufacturer of the Material or Equipment, and the name of the Subcontractor submitting the sample or shop drawing to the Contractor for submittal to the Owner.

(c)       Deviations from the Specifications shall be brought to the attention of the Owner, by the Contractor, at the time of the first submission of any samples or shop drawings.  The Owner's approval of any samples or shop drawings shall not release the Contractor from liability for such deviations.    The failure of any sample or shop drawings to strictly conform to the requirements of this Agreement will be sufficient cause for the Owner's refusal to consider any samples or shop drawings from the same Supplier or manufacturer, whose sample or shop drawings fail to so conform.

(d)       By submitting any sample or shop drawing to the Owner, the Contractor thereby represents to the Owner that the Contractor has:   (i) determined and verified all field measurements, field construction criteria, Materials, Equipment, catalog numbers and similar data in relation to such sample or shop drawing; (ii) checked and coordinated each sample or shop drawing with the requirements of this Agreement with respect to the Work; and (iii) approved the sample or shop drawing as conforming to the requirements of this Agreement, for incorporating the designs, Materials or Equipment, referenced therein, into the Work.

**4.11    Cutting and Patching**.  The Contractor shall perform all cutting, fitting or patching of the Work that may be required to make the several parts of the Work come together properly and fit the Work to receive, or to be received, by the work of the Owner's other contractors, as indicated in the Specifications and as generally required by any other provisions of this Agreement.  The Contractor shall not endanger any work of any such other contractor by cutting, excavating or otherwise altering the Work, and shall not cut or alter the work of any such other contractor, except with the written consent of the Owner.

**4.12    Warranty & Quality.**

(a)       The Contractor warrants to Owner that all services provided by, Work performed by, and Materials and Equipment furnished by, the Contractor (and any of the Subcontractors or Suppliers) under this Agreement shall:

(i)       be free from defects, deficiencies and damage;

(ii)       be new and unused (when installed, unless the Parties agree otherwise) in advance and in writing;

(iii)     be of good quality and good condition (when installed); and

(iv)     strictly conform to the requirements of this Agreement, including, in particular, the Specifications, the Contractor Deliverables, Applicable Laws and Permits, in each case, in effect as of the Substantial Completion Date (collectively, the "**Warranty**"). The following warranty periods shall apply to the Warranty:

(v)     The warranty period with respect to the Work shall commence on the Substantial Completion Date, and shall expire ten (10) years following the Commercial Operations Date or the Final Completion Date, whichever occurs later (the "**Defect Warranty Period**"); provided that a claim may be made by the Owner within ten (10) Business Days following the date which is the end of a Warranty Period for a matter which arose within such Warranty Period; and provided further that the Warranty Period for any Materials and Equipment required to be repaired or replaced, or Work required to be re-performed, repaired, corrected or replaced following discovery of a defect or other non-compliance with the Warranty during the Warranty Period shall continue until the end of the later of (A) the expiration of such Warranty Period, and (B) six (6) months following the date of completion of such re-performance, repair, correction or replacement (each, an "**Extended Warranty Period**"), up to a cumulative maximum period of 10 (ten) years after the warranty commencement date.

(b)     The Warranty shall not apply to damage to, or failure of, any portion of the Materials, the Equipment or the Work, to the extent such damage or failure is caused by:

(i)     the Owner's failure to maintain the Materials, the Equipment or the Work in substantial accordance with the requirements set forth in the Operations and Maintenance Manuals;

(ii)     the operation of Equipment by the Owner in excess of, or outside of, the explicit operating parameters or specifications set forth for such Equipment, as set forth in the Operations and Maintenance Manuals; or

(iii)     damage to Materials, Equipment or the Work caused by a Force Majeure Event, provided that the Contractor is not in breach of any of its obligations under this Agreement, with respect to such Force Majeure Event.

(c)     The Contractor shall obtain all original warranties for all Materials and Equipment supplied by, and Work performed by, each Supplier and Subcontractor on the standard terms and conditions of such Supplier or Subcontractor (which shall, in any case, be commercially reasonable terms and conditions).   If a Contractor Default occurs, and this Agreement is terminated in accordance with Section 7.11 of this Agreement, or otherwise, at the end of the Warranty Period, or the last of the Extended Warranty Periods to expire, as the case may be, whichever occurs later, the Contractor shall assign to the Owner (unless previously assigned), or otherwise hold in trust on behalf of the Owner until such assignment shall occur, at the request of the Owner, all unexpired and assignable original warranties of each such Supplier and Subcontractor, subject to the terms and conditions of any such warranties, with respect to any Materials and Equipment supplied by, or Work performed by, each such Supplier and Subcontractor; provided that, notwithstanding such assignment, the Contractor shall be entitled

A–45

DocuSign Envelope ID: 591BDF1C-1AB5-4957-A4C4-4357BB151EE2

to enforce each such warranty, to the exclusion of the Owner, through the earlier of: (i) the date of termination of this Agreement in accordance with Section 7.11 of this Agreement, or (ii) the date of expiration of the Warranty Period, or the last of the Extended Warranty Period to expire, as the case may be, whichever occurs later. At the Owner's request, the Contractor shall deliver to the Owner, upon the earlier of the date of termination of this Agreement, or the date of expiration of the Warranty Period, or the Extended Warranty Period, as the case may be, whichever occurs later (unless previously provided) copies of all subcontracts, purchase orders, or other instruments, containing such unexpired and assignable warranties of each Subcontractor.

(d)      Subject to Sections 4.13 (g) and 4.13(h) of this Agreement, if, during the applicable Warranty Period or Extended Warranty Period, the Owner provides a notice to the Contractor within thirty (30) Business Days following the date of the discovery by the Owner that any of the Materials, Equipment or other Work fails to satisfy the Warranty, during the Warranty Period applicable to such Work, or any Extended Warranty, related to any of the foregoing, during any applicable Extended Warranty Period, then, the Contractor shall have a reasonable opportunity to inspect such claimed non-conformity or defect, and, at Contractor's sole cost and expense, remedy such non-conforming or defective Materials, Equipment, design services or other Work, and resulting damage to the portion of the Project for which Work is to be performed by the Contractor pursuant to this Agreement caused by such non-conforming or defective condition, as well as all necessary disassembly, transportation, reassembly and retesting. In addition, the Contractor shall be liable, at its sole cost and expense, for all costs related to the removal, replacement and re-installation of any other Materials and Equipment necessary to have access to the non-conforming or defective Equipment, Materials or other Work. The timing and duration of, and the Work to be completed with respect to, any such remediation shall be subject to Owner's consent, such consent not to be unreasonably withheld or delayed. Notwithstanding the foregoing and subject to Section 4.12(h) of this Agreement, if any of the Work shall fail to satisfy the applicable warranty during the applicable Warranty Period or Extended Warranty Period, and such failure endangers human health or property or materially and adversely affects the operation of the Project, the Contractor shall immediately remedy such failure. Notwithstanding anything to the contrary contained herein, the Contractor shall have the right to dispute any warranty claim, pursuant to Section 10.5 of this Agreement.

(e)      The Contractor may request the Owner to perform any or all of the Contractor's obligations with respect to any warranty claim. Upon such request, the Owner may elect to perform such obligations, in the Owner's sole discretion, and, if the Owner elects not to perform such obligations, the Contractor shall remain obligated to, and shall, perform such obligations. The Contractor shall reimburse the Owner for all reasonable and documented costs and expenses incurred by the Owner and its Affiliates to perform the Contractor's obligations with respect to such warranty claim, within ten (10) days following the date of the receipt by the Contractor of the Owner's invoice of such costs. If the Owner elects to perform such obligations, the Owner shall provide the Contractor, and its representatives, with reasonable access to the Project to observe Owner's and its Affiliates' or other third parties' performance of the Warranty Work. The Owner's performance of any Warranty Work, in accordance with this Agreement, shall not relieve the Contractor from liability for, or release the Contractor from, any obligations under this Agreement with respect to any Warranty Work required to be performed, with respect to

A–46

any Materials, Equipment, or other Work, during any Warranty Period or Extended Warranty Period.

(f)        If the Contractor fails to exercise commercially reasonable efforts to proceed to complete any Warranty Work, or to cause any Subcontractor to proceed to complete such Warranty Work, without prejudice to any other right or remedy of the Owner or the Contractor under this Agreement, the Owner, may provide the Contractor with a notice detailing the nature of such failure, offering the Contractor an opportunity to discuss such failure with the Owner (a "**Warranty Claim Notice**").  Within fifteen (15) days following the date of the Contractor's receipt of such Warranty Claim Notice, if the Owner reasonably believes that such failure has not been adequately remedied or resolved, or continues to disagree with the Contractor position regarding such failure, the Owner shall give the Contractor a notice of the Owner's intent to perform, or cause to be performed by third parties, such Warranty Work as the Contractor has failed to perform (an "**Owner Performance Notice**").  If the Contractor fails to commence, or to cause any relevant Subcontractor to commence, to perform such Warranty Work within ten (10) days following the date of the Contractor's receipt of such Owner Performance Notice (or thereafter fails to diligently continue to complete or cause the completion of such Warranty Work), the Owner shall have the right to perform, or engage third parties to perform, such Warranty Work, at the Contractor's sole cost and expense, for which the Owner shall be entitled to make a drawing upon the Warranty Letter of Credit, provided that the Contractor be given the opportunity to observe, review and test the performance of such Warranty Work, and the results of such Warranty Work, for the purposes of being satisfied that such Warranty Work has been performed in accordance with this Agreement.  The Owner's performance of any Warranty Work, in accordance with this Agreement, shall not relieve the Contractor from liability for, or release the Contractor from any obligations under this Agreement with respect to, any Warranty Work required to be performed, with respect to any Materials, Equipment, or other Work, during any Warranty Period or Extended Warranty Period.

(g)        If, prior to the expiration of the Warranty Periods, five (5) or more of the same components of the Work experience a Defect of an identical, or nearly identical, nature, that causes, or could reasonably be expected to cause, an outage in, or derating of, the Project (herein, a "**Serial Defect**"), in addition to its obligations in Section 4.12(f) of this Agreement, the Contractor shall, at the Contractor's sole cost and expense, upon receipt of written notice from the Owner regarding such potential Serial Defect, or upon discovery of such potential Serial Defect by the Contractor: (i) promptly undertake a technical analysis of the underlying "root cause" in order to determine (A) the root cause of such Serial Defect, and associated damage, in all affected components of the Work, and in all like components of the Work, as yet unaffected by such Serial Defect, and (B) the remedial Work that may be required to avoid future occurrences of such Serial Defect; (ii) promptly prepare and provide to Owner a written report setting forth the results of such analysis; and (iii) promptly repair, replace or correct, as necessary, all affected components of the Work, and all like components of the Work, as yet unaffected by such Serial Defect; provided that no such repair, replacement or correction, as the case may be, shall be considered complete until the Owner has reviewed and approved such remedial Work. The Contractor shall, within fourteen (14) Business Days following the date of receipt of such notice from the Owner, advise the Owner of its planned schedule for such root cause analysis and the Contractor shall complete such root cause analysis within a commercially reasonable

A–47

time; provided that such period shall not exceed forty-five (45) days following the date of receipt of written notice from the Owner, or discovery of such potential Serial Defect by the Contractor. The Warranty Period for that portion of the Work that Contractor repairs, replaces or corrects in connection with the Serial Defect shall be extended in the same manner, and to the same extent, in which the Warranty Period is extended for portions of the Work remedied pursuant to Section 4.12(c) of this Agreement; provided, however, that in no event shall the Warranty Period for all such components repaired, replaced, or corrected in connection with the Serial Defect be less than twelve (12) months but not more than sixty (60) months following the date upon which such components have been repaired, replaced, or corrected, notwithstanding anything contained in this Agreement to the contrary. The Contractor's obligations under this Section 4.12(i) shall not be minimized, impaired or otherwise adversely affected, by any actual or possible legal obligation or duty of any the Subcontractors to the Contractor or the Owner concerning any defect or non-conformity.

(h)    THE CONTRACTOR WARRANTS THE MATERIALS, THE EQUPMENT AND THE WORK, ONLY AS SET FORTH IN THIS AGREEMENT, AND MAKES NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT. THE CONTRACTOR MAKES NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED. THESE WARRANTIES SHALL CONSTITUTE THE ONLY WARRANTIES PROVIDED BY THE CONTRACTOR TO THE OWNER AND THE SOLE AND EXCLUSIVE REMEDIES FOR ANY BREACH OF WARRANTY SHALL BE THOSE REMEDIES INCLUDED HEREIN.

(i)    Nothing contained in this Agreement shall be deemed or construed to limit, discharge, waive or otherwise diminish or release Contractor from liability with respect to latent defects, to the extent that a claim may be asserted within the period authorized by any Applicable Law, in particular any statute of repose or statute of limitations.

(j)    If requested by the Owner, the Contractor shall furnish evidence to the Owner as to the type and quality of Work supplied or installed by the Contractor.

(k)    The Contractor warrants and represents to the Owner that all Warranty Work shall be performed by the Contractor in strict accordance with this Agreement, including all Applicable Laws.

(l)    The provisions of this Section 4.12 shall survive the completion or earlier termination of this Agreement.

**4.13    Tests**.

(a)    The Contractor shall notify the Owner, in writing, at least twenty-one (21) days prior to the date of the performance of any inspection or Test. The Contractor shall not schedule or request any inspection or Test of any Materials or Equipment, until the Contractor has first conducted a personal inspection of such Materials or Equipment for completeness, acceptability and strict conformance to this Agreement. The Contractor shall submit, to the Owner, triplicate copies of unpriced purchase orders, mill orders, shop orders, including drawings, and other pertinent information as the Owner may request, for all Materials and Equipment subject to inspection and Tests. The cost of performing all of the Tests, not including the cost of the Owner's

A–48

inspector, shall be borne by the Contractor, and are included in the Agreement Sum, unless otherwise specified. The Owner shall have the right to perform additional Tests of any Materials and Equipment, at the Owner's sole cost and expense, unless such additional Tests are necessitated, in the reasonable judgment of the Owner, by the failure of the Contractor to perform the Tests in accordance with this Agreement, in which case, such additional Tests shall be performed by the Owner, at the Contractor's sole cost and expense, and the Owner shall be entitled to charge the Contractor the costs thereof.  Acceptance of the Materials and Equipment, or waiving any Tests with respect thereto, shall, in no way, relieve the Contractor from its obligations under this Agreement with respect to such Materials or Equipment.  All Tests shall be performed in strict accordance with Attachment BB and the test time schedule and test program approved by the Owner, pursuant to the requirements of Attachment BB.

(b)    The Contractor shall perform all Tests in strict accordance with Attachment BB, the Work Schedule and the requirements of the Specifications and in strict conformity with generally accepted modern methods of testing for the particular Materials, Equipment or other Work, except as otherwise indicated in Attachment BB, unless any Tests are waived, in writing, by the Owner.  Unless waived in writing by the Owner, the Contractor shall perform all Tests in the presence of an inspector representing the Owner, and the Contractor shall furnish to the Owner five (5) copies of all reports for such Tests, certified by a test engineer, qualified in HVDC cable testing, with not less than five (5) years of experience in HVDC cable testing, indicating the results thereof, promptly upon the completion of any such Tests.  All Materials and Equipment shall strictly conform to the requirements of this Agreement.  No Materials or Equipment shall be shipped until all Tests, analyses and inspections have been performed, and the Materials or Equipment has passed such Tests and the Owner has received acceptable copies of certified reports of such Tests and analyses (certified as provided above), and manufacturer's guarantees with respect to such Materials or Equipment.

(c)    All Materials and Equipment shall be subject to inspection by the Owner, and its authorized representatives, to the extent practicable, at all times and places, including but not limited to manufacturers' facilities upon consent by the Contractor, which shall not be unreasonably withheld, and, in any event, prior to the Substantial Completion Date.  If the Owner requires the performance of any test or inspection in addition to those set forth in this Agreement on the premises of the Contractor, a Subcontractor, or a Supplier, then the Contractor shall provide all reasonable facilities, labor, materials equipment and assistance, as necessary, that Contractor provides for its own personnel for the safety and convenience of the Owner's inspectors in the performance of their duties.  The costs and expenses incurred in connection with such additional tests or inspections shall be borne by the Owner, except with respect any additional tests or inspections performed due to failure of a Test or inspection required to be performed by the Contractor pursuant to this Agreement; provided that the Owner's responsibility for such portion of the costs and expenses shall be conditioned on (i) the performance of the additional tests or inspections to the Owner's reasonable satisfaction, and (ii) the Owner's acceptance of the Materials and Equipment which are subject to the additional tests and inspections.  If the Owner performs any test or inspection at a location other than the premises of the Contractor, a Subcontractor or a Supplier, then the Owner shall do so at its sole cost and expense, except as otherwise provided herein; provided that, in the event that the Owner rejects any Materials or Equipment on the basis of such tests or inspections, the

A-49

Contractor shall be liable to the Owner for the cost of such tests or inspections. The Owner reserves the right to charge the Contractor any additional costs or expenses, incurred by the Owner in arranging for any inspection or test, when Materials or Equipment are not ready for inspection or testing, at the time such inspection or test was scheduled by the Contractor to be performed, as provided in the notice required pursuant to Section 4.13(a) of this Agreement. The Contractor shall pay any such costs or expenses incurred by the Owner, within thirty (30) days following the date of receipt of an invoice therefor from the Owner. If such invoice is not paid by the Contractor, within such period, the Owner shall have the right to set-off any such costs or expenses, incurred by the Owner, against any sums due to the Contractor, or to make a drawing upon the Performance Letter of Credit or the Warranty Letter of Credit, as the case may be. Neither the acceptance, nor rejection, of any Materials or Equipment, shall: (i) relieve the Contractor of any of its obligation under this Agreement, including the obligation to provide Materials and Equipment in strict conformity with the requirements of this Agreement, or (ii) impose liability on the Owner as a result of such acceptance or rejection.

(d)    The Contractor shall not be entitled to an adjustment to the Agreement Sum or the Work Schedule in connection with time or costs incurred by the Contractor as a result of the Owner having to perform any inspections or tests due to failure of a Test or inspection required to be performed by the Contractor pursuant to this Agreement, or the Contractor's failure to perform such inspection or Test.

(e)    The Owner shall have the right to stop affected portions of the Work, in the event that the Contractor fails to strictly comply with the any of the provisions of this Section 4.13, in which case, the Contractor shall not be entitled to request an adjustment to the Agreement Sum or the Work Schedule.

**4.14    Packing and Marking**. All Materials and Equipment to be furnished by the Contractor, as a part of the Work, shall be packed, crated or otherwise suitably protected to withstand shipment undamaged to the destination, in accordance with Good Utility Practices. Each package, crate or part shall be marked plainly with the name of the consignee, shipping destination, the Owner's order number, and such other markings as might be required by the Owner or Applicable Law. The Contractor shall provide industry-standard nameplates for all Equipment, in accordance with Good Utility Practices. Complete packing lists, one copy with each package and two (2) copies by mail to the Owner, at time of shipment, shall be supplied by the Contractor to the Owner, indicating the contents and identity of each package.

**4.15    Preparation for Shipment**. The Contractor shall prepare all Materials and Equipment for shipment in such a manner as to protect them from damage in transit. All finished non-ferrous metalwork and devices subject to damage shall be suitably wrapped or otherwise protected from damage during shipment. The Contractor shall furnish the Owner with written instructions for storage, handling and maintenance for all Equipment prior to installation; provided however, the Contractor shall be obligated to provide all such storage, handling and maintenance.

**4.16    Notice of Shipment**. Every time a shipment of Materials and Equipment critical to the construction of the Project is made, the Contractor shall notify the Owner, in writing, providing a description of the Materials or Equipment shipped, the packing list, and any other information

necessary for the identification, storage, and assembly of the Materials and Equipment shipped.  The shipping weight and dimensions of each item shall also be provided to the Owner.  The Contractor shall notify the Owner, at least fifteen (15) days in advance of the date of any such shipment, of the expected shipping dates

**4.17    Warehousing and Protection of Materials, Equipment and Work**.  The Contractor shall, at all times, protect and preserve all Materials and Equipment of every description, which will be incorporated into the Work, and all Work performed.  For this purpose, the Contractor shall provide suitable storage and protection against deterioration and damage, to the reasonable satisfaction of the Owner.  The Contractor shall comply with all reasonable requests of the Owner, to enclose or specially protect such Materials and Equipment.  If, as determined by the Owner, Materials and Equipment, or the Work, are not suitably stored or protected by the Contractor, storage or protection may be provided by the Owner, at the Contractor's sole cost and expense.

**4.18    Work Stoppage**.  The Contractor shall ensure that the Contractor's employees and laborers shall not honor any union picket lines or strikes or take part in any slow-down or stoppage of the performance of the Work, or refuse to report to the Site to perform the Work, unless such action is protected by any state or federal labor relations law.  Notwithstanding the preceding sentence, the Contractor shall retain the right to remove its employees and laborers from any situation that the Contractor reasonably determines may pose an unreasonable health or safety risk to the Contractor's employees or laborers.  Except as provided in this Section 4.18, the Contractor is obligated, at all times, to supply sufficient skilled and qualified personnel and laborers to achieve Substantial Completion on or before the Guaranteed Substantial Completion Date, in accordance with the Work Schedule.

**4.19    Language and Measurements**.  All dimensions, descriptions, calculations, drawings, Test reports, progress estimates, packing lists and correspondence to be submitted to the Owner shall be in the English language, shall have English inscriptions, and shall be prepared using the United States system of measurements.  If any Material or Equipment manufacturer's or Supplier's  design is furnished in metric units, then both systems shall be indicated with United States system of measurements as the primary system.

**ARTICLE 5 – INSURANCE**

**5.1    Insurance**. The insurance obligations of the Parties are set forth in **Attachment O**.  If the Contractor fails to furnish the certificate(s) of insurance required to be procured by the Contractor under **Attachment O**, if any, or maintain the coverage required under this under **Attachment O**, if any, or if any of the insurance, procured by the Contractor, is canceled and not replaced by the Contractor, within ten (10) days following the date of such cancellation, the Owner may, but shall not be obligated to, procure such insurance, at the Contractor's sole cost and expense.  The Contractor shall pay any such costs or expenses incurred by the Owner, within thirty (30) days following the date of receipt of an invoice therefor from the Owner.  If such invoice is not paid by the Contractor, within such period, the Owner shall have the right to set-off any such costs or expenses, incurred by the Owner, against any sums due to the Contractor, or to make a drawing upon the Performance Letter of Credit or the Warranty Letter of Credit.

Nothing contained in **Attachment O** shall be deemed or construed to reduce or diminish any liability, obligation or requirement of the Contractor under this Agreement.

## ARTICLE 6 - LEGAL RESPONSIBILITY

**6.1**    **Liability; Indemnification**.

(a)    Subject to Section 10.8 of this Agreement, the Contractor shall be liable for all damage of whatever nature, resulting from the performance of the Work, or resulting to the Work during its progress, from whatever cause, except in the case in which such damage arises out of the negligence or willful misconduct of the Owner or Owner's contractors.  To the extent such damage is caused by an event covered under the Owner's Builder's Risk Insurance, Contractor's liability under this Section may be reduced by the extent to which any damage is covered by and paid out under the Owner's Builder's Risk insurance.

(b)    To the extent permitted by law, the Contractor shall defend, indemnify, and hold the Owner, its Affiliates, the Owner's Lenders, and all of their respective Affiliates, parent companies, partners, shareholders, general managers, officers, directors, managers, agents, insurers, representatives, successors, assigns, employees, contractors and consultants, and any other Person acting on behalf of, or in representation, interest, benefit, of the Owner (each, together with the Owner, an "**Owner Indemnitee**") harmless, on an After Tax Basis, from and against any and all claims, suits, actions, judgments and Losses, of any nature, incurred by any such Owner Indemnitee, related to, arising out of, or in connection with the following:

(i)    any and all claims by third parties for property damage , personal injury or bodily injury or death, to the extent caused by breach of this Agreement or any negligent, willful, reckless or otherwise tortious act or omission (including strict liability) of the Contractor, any Subcontractor, or anyone directly or indirectly employed by any of them, relating to, arising from, or in connection with, the performance of the Work, failing to perform any obligations under this Agreement, or failing to perform any remedial action under any warranty obligation in connection with the performance of the Work, which are not addressed under Section 4.12;

(ii)    any and all:

(A)    claims for payment of compensation for Work performed hereunder, whether or not reduced to a Lien, filed, recorded or served by the Contractor or any Subcontractor, any Supplier or other Person performing any portion of the Work, except to the extent of a breach of this Agreement by the Owner in relation to any obligation to make a payment;

(B)    employers' liability or workers' compensation claims, or other labor-related or employment-related claims, filed by any employees or agents of the Contractor, the Subcontractors or the Suppliers, regardless of the negligence of any Owner Indemnitee contributing to such Losses; and

(C)    claims for Employment Benefits;

(iii)     any and all claims of, and any and all fines and penalties imposed by, any Governmental Authority, due to any violation of, or failure to strictly comply with, Applicable Laws, Permits or Permit Requirements by the Contractor or any Contractor Indemnitees, in the performance of the Work, or the failure of the Project (or any portion thereof), as designed, constructed or completed by the Contractor or any Subcontractor, to be capable of operating in compliance with Applicable Laws or any Permit Requirements, in each case, as in effect as of the Substantial Completion Date;

(iv)     any and all claims by any Governmental Authority that directly or indirectly arise or result from the failure of the Contractor to pay, as and when due, all Contractor's Taxes, fees or charges, of any kind, imposed by any Governmental Authority for which the Contractor is obligated to pay pursuant to the terms of this Agreement;

(v)     any and all claims by any Governmental Authority, claiming Contractor's Taxes are due, based on the gross receipts or the income of the Contractor, any of the Subcontractors or the Suppliers, or any of their respective agents or employees with respect to any payment for the Work, made to, or earned by, the Contractor, any of the Subcontractors, or any of their respective agents or employees;

(vi)     any and all claims related to the Contractor's, or any Subcontractor's or Supplier's, failure to strictly comply with any covenants, conditions or restrictions set forth in the Real Property Rights;

(vii)     any and all claims for property damage, personal injury or bodily injury or death, but only to the extent of Contractor's fault if determinable, whether or not involving damage to the Project or the Site, as the case may be, that arise or result from the use of, or contamination by, Hazardous Materials, whether lawful or unlawful, brought onto the Site by the Contractor or any Subcontractor or Supplier, with such use of, or contamination by, Hazardous Materials, such use including:

(A)     the storage, transportation, processing, discharge or disposal of such Hazardous Materials, and

(B)     any environmental condition caused by a release or spill of such Hazardous Materials; provided however, the Contractor shall, in no case, be liable or responsible in any way for any Hazardous Materials existing on the Site prior to the Date of Commencement, or brought on Site by the Owner or an Owner's contractor, except to the extent that the Contractor or any Subcontractor or Supplier exacerbates an existing condition affecting any Hazardous Materials at the Site, which results in contamination to, or a discharge, release or spill upon, the Site;

(viii)     any claim in connection with any Lien imposed by the Contractor, any Contractor Parties, or any claim for payment related to the performance of the Work, asserted by any Contractor Parties, or any other Person for whom any of them is responsible, or any payment made with respect thereto;

(ix)    any vitiation of any insurance policy of the Owner or the Contractor as a result of: (a) any Contractor Party's failure to strictly comply with any of the requirements set forth in any such policy, or (b) any act of any of the Contractor Parties; oror

(x)    any claim related to, arising out of, or in connection with, the Contractor's failure to comply with the requirements this Agreement.

(c)    In furtherance of the foregoing indemnities, and not by way of limitation thereof, the Contractor hereby waives any defense or immunity that the Contractor might otherwise have under applicable worker's compensation laws or any other statute or judicial decision (including, for Work to be conducted in Maine, without limitation, Diamond International Corp. v Sullivan & Merritt, Inc. 493 A2d. 1043 (Me 1985)) disallowing or limiting such indemnification, and the Contractor consents to a cause of action for indemnity.

(d)    To the extent permitted by law, the Owner shall defend, indemnify, and hold the Contractor, its Affiliates, the Subcontractors, and their employees, agents, partners, shareholders, members, directors, officers, managers, contractors, consultants and permitted assigns (each, together with the Contractor, a "**Contractor Indemnitee**"), harmless, on an After Tax Basis, from and against any and all claims, suits, actions, judgments and Losses, of any nature, incurred by any such Contractor Indemnitee, related to, arising out of, or in connection with, claims for property damage, personal injury or bodily injury or death, to the extent caused by breach of this Agreement, or any negligent, willful, reckless or otherwise tortious act or omission (including strict liability) of the Owner, or anyone directly or indirectly employed by the Owner, or anyone for whose acts the Owner may be liable.  The Owner shall further defend and indemnify the Contractor Indemnitees from any and all claims, suits, actions, judgements, Losses and costs arising from the presence of any pre-existing Hazardous Materials on Site not brought on Site by the Contractor or any Subcontractor or Supplier.

(e)    If the joint, concurring, comparative or contributory fault, negligence or willful misconduct of the Parties gives rise to damages for which a Party is entitled to indemnification under this Section 6.1, then such damages shall be allocated between the Parties in proportion to their respective degrees of fault, negligence or willful misconduct, as the case may be, contributing to such damages.

(f)    The provisions of this Section 6.1 shall survive the completion or earlier termination of this Agreement.

**6.2    Intellectual Property**.

(a)    The Contractor hereby grants to the Owner a fully paid-up and royalty-free, permanent and perpetual, irrevocable, nonexclusive, worldwide right and license in, to and under Contractor Intellectual Property to utilize, practice, and exploit the Contractor Intellectual Property but only in connection with the completion, design, construction, installation, operation, maintenance,  repair, replacement, expansion, modification, reconstruction or alteration of the Project (or any portion, subsystem or component thereof, including any Materials and Equipment).  The Owner (and its sub-licensees) shall have the right to grant sublicenses under such license without the prior consent of the Contractor.  The Owner (and its

assignees) shall have the right to assign the benefit of such license without the prior consent of the Contractor to any Owner's Lender in connection with granting a security interest in the Project or any portion thereof, to a purchaser in connection with a transfer of the Project, or to any subsequent purchaser or assignee of same. Any such sub-licensee or assignee shall acquire such license, subject to the same terms and restrictions as stated in this Section 6.2. The Contractor shall, prior to any Subcontractor's performance of any Work hereunder, obtain either: (i) a valid, written assignment of all Contractor Intellectual Property from such Subcontractor to the Contractor, or, alternatively, (ii) in the event such an assignment cannot reasonably be obtained, a valid, written license, reasonably acceptable to Owner, to all such Intellectual Property sufficient for the Contractor to grant to the Owner the rights licensed under this Agreement.

(b)     Subject to Section 6.2(a) of this Agreement, upon the Substantial Completion Date, or the earlier termination of this Agreement, the Contractor Deliverables accumulated, prepared or developed in respect of the Project by the Contractor, or any Subcontractors, shall become the property of the Owner with any further consideration to be provided therefor. The Contractor shall maintain ownership of all Contractor Intellectual Property contained within the Contractor Deliverables, subject to the license granted pursuant to Section 6.2(a) of this Agreement.

(c)     To the extent the Contractor purchases or provides any software from a Subcontractor or Supplier in connection with the Work, which software is necessary or otherwise desirable for the operation of the Project, such software, shall be subject to the license granted pursuant to Section 6.2(a) of this Agreement.

(d)     The Contractor represents and warrants to the Owner that the Contractor has the full right, power, and authority to grant all of the rights, licenses and interest in, to and under all Intellectual Property granted by it to the Owner under this Agreement.

(e)     The Contractor hereby agrees to defend, indemnify, and hold the Owner Indemnitees harmless, on an After Tax Basis, from and against any and all claims, suits, actions, judgments and Losses incurred by any such Owner Indemnitee related to, arising from, or in connection with, any Intellectual Property Claim. If the Owner is impeded from completing the Project, or any part thereof, or from the use, operation, or enjoyment of the Project, or any part thereof, as a result of a final, non-appealable judgment of a court of competent jurisdiction, or as a result of injunctive relief provided by a court of competent jurisdiction, then, in addition, the Contractor shall promptly commence action to remove such impediment. In no event later than thirty (30) days following the date of receipt by the Contractor of notice from the Owner, indicating that the Owner has been so impeded, the Contractor shall take all action necessary to remove any impediment, including, at the Contractor's option, the following: (a) the Contractor shall procure for the Owner, or reimburse Owner for procuring, the right to continue using the infringing Materials, Equipment, other Work or Contractor Intellectual Property; (b) modify the infringing Materials, Equipment, other Work or Contractor Intellectual Property with Materials, Equipment, other Work or Contractor Intellectual Property, as applicable, with substantially the same performance, quality and expected life, in strict accordance with the requirements of this Agreement, to the reasonable satisfaction of the Owner, so that the infringing Materials,

Equipment, other Work or Contractor Intellectual Property become non-infringing; or (c) replace the Materials, Equipment, other Work or Contractor Intellectual Property with non-infringing Materials, Equipment, other Work or Contractor Intellectual Property, as applicable, of comparable functionality and quality and satisfying the requirements of this Agreement, to the reasonable satisfaction of the Owner; provided that in no case shall the Contractor take any action which adversely affects Owner's continued use and enjoyment of the applicable Materials, Equipment, other Work or Contractor Intellectual Property, without the prior written consent of the Owner.  For the avoidance of doubt, Owner's acceptance of any portion of the Work, or the Project, shall not be deemed or construed to relieve the Contractor of any obligation hereunder.

(f)    The provisions of this Section 6.2 shall survive the completion or earlier termination of this Agreement.

**6.3    <u>Permits</u>.**

(a)    The Contractor shall identify, apply for, obtain and maintain all Contractor's Permits.  The Owner shall apply for, obtain and maintain the Owner's Permits.  The Owner shall provide to the Contractor a copy of all of the Owner's Permits listed in **Attachment M**.

(b)    The Contractor shall obtain from the proper authorities, all Contractor's Permits, shall pay any and all Contractor's Taxes and fees legally required under such Contractor's Permits, and shall be responsible for conducting its operations in strict accordance with all Permits.  The Contractor shall deliver to the Owner, without charge, copies of all Contractor's Permits, promptly upon the issuance thereof.  The Contractor shall not delay the performance of any Work, at any time, by refusal to pay any required fees, or to post required bonds, in connection with the issuance of any Contractor's Permits; provided however, the Contractor may dispute any such fees or bond requirements; provided, further, that any such dispute shall not entitle the Contractor to an adjustment of the Agreement Sum or the Work Schedule.

(c)    The Contractor shall strictly comply with the following obligations:

(i)    No Work, which is deemed to require a Permit, shall be commenced until the issuance of such Permit, with all appeal periods having expired, and no appeals having been made or, in the event that an appeal has been made, a final non-appealable decision has been rendered by a court of competent jurisdiction.

(ii)    All Permits, to the extent required by Applicable Laws, shall be posted in a conspicuous location at the Site.  Such posted Permits shall be protected from weather exposure or damage.

(iii)    The Contractor shall not violate the Permit Requirements of any Permit, and shall strictly comply with all Permit Requirements, including required inspections, witness of testing of systems/equipment, and submittal of documents verifying system or equipment acceptability (*e.g.*, Test reports, drawings, manufacturers' technical information and the like).

(iv)    To the extent required by Applicable Laws, no building, structure or system, for which a Permit was issued, shall be occupied or used, until the Contractor has

obtained, from the Governmental Authority with jurisdiction for such Permit, an irrevocable, non-appealable certificate indicating that such building, structure or system can be occupied or used.

**6.4**    **Compliance with Applicable Laws and Permits**.

(a)    The Contractor shall give all notices and comply with all Applicable Laws bearing on the performance of the Work. If the Contractor discovers that any provision of this Agreement is at variance therewith in any respect, with any Applicable Law, the Contractor shall promptly notify the Owner, in writing, and any necessary changes shall be made by appropriate modification, pursuant to Section 9.1.

(b)    The Contractor shall, and shall cause all Subcontractors to, strictly comply with all Applicable Laws, Permits, including Permit Requirements. No violation by the Contractor, or any Subcontractor, of any such Applicable Laws, Permits (or Permit Requirements), during the performance of the Work, shall relieve the Contractor of any of its obligations under this Agreement, and any fines, penalties or expenses resulting therefrom shall be payable by the Contractor, at its sole cost and expense.

**ARTICLE 7– PERFORMANCE OF THE WORK**

**7.1**    **Limited Notices To Proceed; Notice to Proceed**.

(a)    Notwithstanding anything to the contrary contained in this Agreement, prior to issuing the Notice to Proceed, the Owner may, but shall not be obligated to, issue to the one or more Limited Notices to Proceed; provided that the Parties shall mutually agree to the scope of the Work, the payment terms and other terms of any Limited Notice to Proceed prior to the Owner's issuance of such Limited Notice to Proceed. Upon the issuance of a Limited Notice to Proceed, the Contractor shall commence the Work specified therein, in accordance with the terms and conditions set forth therein, and in accordance with the terms and conditions set forth in this Agreement (to the extent not inconsistent with the terms and conditions set forth in any such Limited Notice to Proceed). In the event that the Owner issues a Limited Notice to Proceed, prior to the Notice to Proceed, the Owner shall be obligated to provide reasonable access to the Site to the Contractor, as necessary, for the Contractor to perform the Work under such Limited Notice to Proceed. Except as set forth in any Limited Notice to Proceed, the Contractor shall have no obligation under this Agreement to proceed with the Work until the issuance of the Notice to Proceed. Any payments made by the Owner for Work performed under a Limited Notice to Proceed shall be credited towards the payment of the Agreement Sum, and all Work performed pursuant to such Limited Notice to Proceed shall be deemed to be a part of the Work performed pursuant to this Agreement.

(b)    The Contractor shall commence to perform such limited portion of the Work as may be set forth in a Limited Notice to Proceed, on the date set forth for the commencement thereof in such Limited Notice to Proceed, and shall prosecute the Work with such diligence as to achieve completion thereof in accordance with the terms and conditions set forth in such Limited Notice to Proceed.

(c)      Upon the issuance of the Notice to Proceed: (A) all Limited Notices to Proceed shall automatically terminate; (B) all obligations of the Contractor, performed pursuant to any Limited Notice to Proceed, shall be deemed to be Work performed under this Agreement; (C) any payments made on account of any Limited Notice to Proceed shall be credited to the Agreement Sum; (D) any rights, remedies or liabilities of the Contractor or the Owner under any Limited Notice to Proceed, shall be deemed to be rights, remedies or liabilities under this Agreement; and (E) any obligations of the Contractor, performed, or required to be performed, under any Limited Notice to Proceed, that are not expressly included within the scope of the Work under this Agreement, shall be deemed to be obligations of the Contractor under this Agreement and included within the scope of the Work under this Agreement.

(d)      Notwithstanding anything contained herein to the contrary, the Owner may terminate this Agreement, for convenience pursuant to Section 7.11(a), prior to the issuance of a Notice to Proceed, by delivering a written notice of termination to the Contractor, and, in such event, notwithstanding anything to the contrary contained in this Agreement, this Agreement shall be null and void, and of no further force and effect, and the Parties shall be relieved of their respective obligations hereunder, with the exception of any obligations, set forth in any Limited Notice to Proceed that was duly issued prior to the date of the notice of termination, which are expressly indicated, by the Owner, in such notice of termination, to survive such termination.  For the avoidance of doubt, in the event of such termination prior to the Date of Commencement , the Contractor shall be entitled to the remedies set forth in Section 7.11(h) of this Agreement, provided that, notwithstanding anything to the contrary contained in Section 7.11(h) of this Agreement, the Owner shall not be obligated to pay to the Contractor any amount in excess of the remaining balance due and owing under any Limited Notice to Proceed issued prior to the effective date of termination.

(e)      In the event that the Notice to Proceed, has not been issued within three hundred sixty-five (365) days following the Effective Date, either Party shall have the right to terminate this Agreement, in which case, this Agreement shall be null, void and of no further force or effect. In such event, neither Party shall be liable to the other Party for damages; provided, however, nothing contained in this Section 7.1(e) shall relieve the Owner from its obligations to pay any amounts due to the Contractor under any Limited Notice to Proceed that is issued by the Owner pursuant to this Agreement.

**7.2     Force Majeure**.

(a)      No failure or omission on behalf of a Party to perform its obligations under this Agreement shall give rise to any claim against such Party, nor shall such Party be deemed to be in breach, nor shall a Default be deemed to have occurred under this Agreement, to the extent such failure or omission is caused by, or arises out of, a Force Majeure Event.  If a Force Majeure Event occurs, the Party claiming relief for any such failure or omission shall be entitled to relief from such failure or omission solely in accordance with this Section 7.2 Notwithstanding anything to the contrary contained in this Agreement, the obligation to pay money in a timely manner in accordance with the terms hereof shall not be subject to the provisions hereof.  Any failure by the Party, claiming the relief for such failure or omission due to a Force Majeure Event, to comply

with the provisions of this Section 7.2 shall constitute a voluntary, intentional and irrevocable waiver of any Dispute or claim of such Party relating to such Force Majeure Event.

(b)     If a Party's ability to perform its obligations under this Agreement is impacted by a Force Majeure Event, such Party shall, within forty-eight (48) hours of the time at which the Force Majeure Event first impacted the performance of such Party's obligations under this Agreement, provide the other Party with written notice of the Force Majeure Event, and, within ten (10) days following the date on which the Force Majeure Event first impacted the performance of such Party's obligations under this Agreement, the affected Party shall provide the other Party with written notice describing, in detail, the particulars of the occurrence giving rise to such impact, including: (i) the date on which the Party claiming relief first became aware of the occurrence of such Force Majeure Event; (ii) an estimate of the anticipated duration of the Force Majeure Event; (iii) the effect of the Force Majeure Event upon the performance of such Party's obligations under this Agreement; (iv) the actions taken, or being taken, to avoid or minimize the effect of the Force Majeure Event; and (v) the relief sought by the affected Party (a "**Delay Notice**"). If the affected Party fails to timely provide a Delay Notice as provided in this Section 7.2(b), with respect to a Force Majeure Event, such Party shall be deemed to have voluntarily, intentionally and irrevocably waived its right to claim relief under this Agreement due to such Force Majeure Event. The affected Party shall have a continuing obligation to deliver, to the other Party, regular updated reports and any additional documentation and analysis supporting its claim regarding a Force Majeure Event, promptly, after such information becomes available to such affected Party.

(c)     The suspension of, or impact on, the affected Party's performance of its obligations under this Agreement, due to a Force Majeure Event, shall be of no greater scope, or longer duration, than the duration of the effects of the Force Majeure Event that impacted the performance of the affected Party. The affected Party shall exercise commercially reasonable efforts to:

(i)     mitigate the duration of, and costs arising from, any suspension or delay in, or other impact on, the performance of its obligations under this Agreement; and

(ii)     continue to perform its obligations under this Agreement which are not affected by such Force Majeure Event.

(d)     When the affected Party is able to resume performance of its obligations under this Agreement, such Party shall give the other Party written notice to that effect. The respective remedies set out this Section 7.2 shall be the affected Party's sole remedies with respect to the occurrence of a Force Majeure Event.

(e)     As the Contractor's sole and exclusive remedy resulting from a Force Majeure Event, provided that Contractor has fully complied the requirements of this Section 7.2, to the extent that such Force Majeure Event had an actual and demonstrable adverse impact on the Critical Path of the Work Schedule, the Contractor may submit to the Owner a Request for Change Order for an adjustment to the Work Schedule, in accordance with Section 9.1, which shall be adjusted to the extent of the impact of the Force Majeure Event on the Critical Path of the Work Schedule, but, in any event, no longer than the duration of the effects of the Force Majeure Event.

The Contractor shall not be entitled to an adjustment to the Agreement Sum, or to any other cost relief, as a result of a Force Majeure Event.

(f)    Notwithstanding anything to the contrary contained in this Agreement, either Party may terminate this Agreement in the event that the effects of a Force Majeure Event materially prevented the affected Party from performing its obligations under this Agreement for more than three hundred and sixty-five (365) consecutive days.  Such termination shall be deemed to be a termination for the Owner's convenience, for the purpose of ascertaining the Owner's rights and the Contractor's remedies, pursuant to Section 7.2.

(g)    The provisions of this Section 7.2 shall survive the termination or completion of this Agreement.

**7.3    Punchlist**.

(a)    No less than forty (40) days prior to the Guaranteed Substantial Completion Date, the Contractor shall deliver to the Owner a notice requesting the Owner to examine the Work and to confer with the Contractor at the Site to determine the list of items to be included in a proposed punchlist.  Thereafter, the Owner and the Contractor shall establish a mutually agreeable time to examine the Work and to confer to determine the list of items to be included in a proposed punchlist. The Contractor shall then create the proposed punchlist to reflect the result of such examination and conferral, and deliver same to the Owner for its review and acceptance, setting forth all Work remaining to be remedied or completed (the "**Proposed Punchlist**"). The Contractor shall submit the Proposed Punchlist to the Owner within five (5) Business Days following the date of the conclusion of the examination of, and conferral at, the Site.  Such Proposed Punchlist shall include all deficiencies in the Work, and incomplete Work, to be remedied or completed by the Contractor.  The Owner shall either accept the Proposed Punchlist, or deliver any changes to the Proposed Punchlist to the Contractor, after the Contractor's delivery to the Owner of such Proposed Punchlist.  This process shall be repeated on an iterative basis until the Owner accepts the Proposed Punchlist (such accepted Proposed Punchlist, the "**Punchlist**").

(b)    No less than twenty (20) days prior to the Guaranteed Substantial Completion Date, the Contractor and the Owner shall meet at the Site to examine the Work and to confer to determine the list of items to be added or removed from the Punchlist.  The Contractor shall then revise the Punchlist to reflect the result of such examination and conferral, and deliver same to the Owner for the Owner's review and acceptance, setting forth all Work remaining to be completed or remedied as a condition precedent to achieving Final Completion. The revised Punchlist shall be submitted by the Contractor to the Owner within one (1) Business Day following the date of the conclusion of the examination and conferral at the Site.  The Owner shall either accept the revised Punchlist or deliver any changes to the revised Punchlist to the Contractor following the Contractor's delivery to the Owner of such revised Punchlist.  This process shall be repeated on an iterative basis until the Owner accepts the revised Punchlist (such accepted revised Punchlist, the "**Revised Punchlist**").

(c)    When only Non-Critical Deficiencies in the Work remain to be remedied or completed, the Contractor and the Owner shall meet at the Site to examine the Work and confer

A-60

together to determine the list of Non-Critical Deficiencies that should be incorporated into a final Revised Punchlist.  The Contractor shall then revise the Revised Punchlist to reflect the result of such examination and conferral and deliver same to the Owner for its review and acceptance, setting forth all Non-Critical Deficiencies remaining to be completed before Final Completion, and an estimated amount for the completion or remedy of each Non-Critical Deficiency (the "**Punchlist Amount**").  Such final Revised Punchlist shall include only Non-Critical Deficiencies. The Owner shall either accept the final Revised Punchlist (including the Punchlist Amounts), or deliver any changes to the final Revised Punchlist (including the Punchlist Amounts) to the Contractor.  This process shall be repeated on an iterative basis until the Owner accepts the final Revised Punchlist (including the Punchlist Amounts) (such accepted final Revised Punchlist, the "**Final Punchlist**").

**7.4**    **Title and Risk of Loss.**

(a)    Title to all Materials and Equipment provided by the Contractor to the Owner as part of the Work, and which become, or are intended to become, a part of the Project, shall vest in the Owner, free and clear of any and all Liens, upon the earliest of:   (i) the occurrence of any event by which, under Applicable Laws, title passes from the Contractor, Subcontractors or Suppliers providing such Materials and Equipment for the Work; (ii) the date of payment therefor by the Contractor or the Owner, notwithstanding any amounts withheld by the Owner in accordance with this Agreement; (iii) the date any of the Materials and Equipment are delivered to the Site or to storage; (iv) the date on which the fabrication or assembly of any of the Materials and Equipment, custom fabricated or assembled for the Project, has been completed by the manufacturer; or (v) the date that title transfers to the Contractor from any of its Subcontractors or Suppliers providing such Materials and Equipment for the Work.  Notwithstanding the passage of title from the Contractor to the Owner, subject to the terms of this Agreement, the Contractor will retain care, custody and control of the Work and all such Materials, Equipment and Contractor's Equipment and Temporary Facilities related to the Work, and bear the complete risk of loss, destruction and damage (including deterioration in quality) thereof (including any deductibles and uninsured losses), arising from any cause whatsoever, to the extent not covered by the Owner's Builder's Risk Insurance; provided however, following Final Completion, the Owner shall have care, custody and control of the Work and the Materials and Equipment incorporated into to the Work, and bear the complete risk of loss, destruction and damage (including deterioration in quality) thereof (including any deductibles and uninsured losses), arising from any cause whatsoever, except for loss due to, damage caused by, the Contractor or its Subcontractors or Suppliers.  Should the Owner take possession of or operate any portion of the Work prior to the Substantial Completion Date, Section 7.8(d) of this Agreement shall apply. All Materials and Equipment for which title has passed to Owner in accordance with this Section 7.4, which have not been incorporated into the Work or stored at the Site, shall be suitably stored, subject to Owner's written consent, at an off-Site location, clearly identified and labeled as the property of the Owner, stored separately from, and not co-mingled with, other materials or equipment of the Contractor, any Subcontractor, any Supplier, or any manufacturer, and insured, by the Contractor, or the appropriate Subcontractor, Supplier, or manufacturer, against all theft, damage, loss or other casualty, for full value, pursuant to the requirements of **Attachment O**.  The Contractor shall be liable for the cost of any deductible under any such insurance policies.

(b)      Notwithstanding anything contained in this Agreement to the contrary, the Contractor shall bear all risk of loss, destruction and damage to Materials and Equipment rejected by the Owner, as well as all costs and expenses of transportation of rejected Materials and Equipment from the Site.

(c)      This provisions of this Section 7.4 shall survive the completion or earlier termination of this Agreement.

**7.5      Progress and Completion**.

**7.6**      TIME IS OF THE ESSENCE IN THE CONTRACTOR'S PERFORMANCE OF THE WORK.  The Contractor shall diligently perform the Work, in such a manner, and with sufficient Contractor's Equipment and Temporary Facilities and forces, to achieve Substantial Completion on or before the Guaranteed Substantial Completion Date and Final Completion on or before the Guaranteed Final Completion Date.  The Contractor shall achieve Project Completion of the Work upon the later of: (a) the date of expiration of the last of the Warranty Periods to expire, and (b) the date of expiration of the last of the Extended Warranty Periods, if any, to expire.  The Contractor shall perform the work in strict accordance with the Work Schedule, as may be amended, from time to time, pursuant to Change Order issued in accordance with Section 9.1 of this Agreement.

**7.7      Recovery Plan**. In the event that the Owner reasonably believes that the Contractor will not achieve Substantial Completion on or before the Guaranteed Substantial Completion Date, or Final Completion, on or before the Guaranteed Final Completion Date,  the Owner shall notify the Contractor, in writing, and the Contractor shall, within fourteen (14) days following the date of receipt of such notice, promptly provide a recovery plan to the Owner, in form and content reasonably acceptable to the Owner, reflecting any deviations that have occurred in the Work Schedule, and changes that will occur in the Work Schedule in order for the Contractor to achieve Substantial Completion on or before the Guaranteed Substantial Completion Date, or Final Completion on or before the Guaranteed Final Completion Date, as the case may be, which recovery plan shall, at a minimum, indicate the methods of expediting the performance of the Work and the increased manpower, work shifts and supervision anticipated in order to achieve Substantial Completion on or before the Guaranteed Substantial Completion Date or Final Completion on or before the Guaranteed Final Completion Date, as the case may be (a "**Preliminary Recovery Plan**").  The Owner shall review the Preliminary Recovery Plan, which review shall be reasonable, and either:  (i) reject the Preliminary Recovery Plan, and notify the Contractor of such rejection; (ii) accept the Preliminary Recovery Plan, and notify the Contractor of such acceptance; or (iii) return the Preliminary Recovery Plan to the Contractor with comments, and request the Contractor to address such comments and to resubmit such Preliminary Recovery Plan to the Owner for review.  Upon the acceptance of a Preliminary Recovery Plan delivered by the Contractor to the Owner, which the Owner has accepted, in writing (a "**Recovery Plan**"), the Contractor shall be required to satisfy the terms of the Recovery Plan, shall immediately thereafter implement such Recovery Plan, and shall diligently thereafter perform all Work that is required to be performed in order to achieve the progress of the Work as set forth in the Recovery Plan, as accepted by the Owner, including all Work that is required to be performed in order to achieve Substantial Completion on or before the Guaranteed Substantial Completion Date and Final Completion on or before the Guaranteed Final Completion

Date.  All costs incurred to prepare and implement a Preliminary Recovery Plan and a Recovery Plan shall be at the Contractor's sole cost and expense, and the Contractor shall not be entitled to an adjustment to the Agreement Sum or the Work Schedule in connection with such Recovery Plan.

**7.8    Substantial Completion; Commercial Operations; Final Completion.**

(a)    When the Contractor has satisfied all of the conditions precedent for achieving Substantial Completion, including the completion and acceptance by the Owner of the Final Punchlist pursuant to Section 7.3 of this Agreement, the Contractor shall deliver to the Owner a notice of Substantial Completion in the form set forth in **Attachment S, Exhibit S-1** (the "**Notice of Substantial Completion**").  The Owner shall, within ten (10) Business Days following the date of receipt of such Notice of Substantial Completion:  (i) issue a certificate of Substantial Completion to the Contractor, setting forth the Substantial Completion Date in the form set forth in **Attachment S, Exhibit S-2** (the "**Certificate of Substantial Completion**"), or (ii) reject such Notice of Substantial Completion, in writing, setting forth the reasons for such rejection, in which case, the Contractor shall take the appropriate corrective action to achieve Substantial Completion.  Upon the completion of such corrective action, the Contractor shall deliver to the Owner a new Notice of Substantial Completion.  This process shall be repeated on an iterative basis until the Owner accepts the Notice of Substantial Completion and issues a Certificate of Substantial Completion.

(b)    Following the Substantial Completion Date, when the Owner determines that Commercial Operations has occurred, the Owner shall issue to the Contractor a notice of Commercial Operations, setting forth the Commercial Operations Date, in the form set forth in **Attachment J** (the "**Notice of Commercial Operations**").

(c)    When the Contractor has satisfied all of the conditions precedent for Final Completion, the Contractor shall deliver to the Owner a notice of Final Completion in the form set forth in **Attachment T, Exhibit T-1** (the "**Notice of Final Completion**").  The Owner shall, within ten (10) Business Days after receipt of such Notice of Final Completion:  (i) issue a certificate of Final Completion to the Contractor, setting forth the Final Completion Date, in the form set forth in **Attachment T, Exhibit T-2** (the "**Certificate of Final Completion**"), or (ii) reject such Notice of Final Completion, in writing, setting forth the  reasons for such rejection, in which case, the Contractor shall take the appropriate corrective action to achieve Final Completion.  Upon the completion of such corrective action, the Contractor shall deliver to the Owner a new Notice of Final Completion.  This process shall be repeated on an iterative basis until the Owner accepts the Notice of Final Completion and issues a Certificate of Final Completion.

(d)    When the Contractor has satisfied all of the conditions precedent for Project Completion, the Contractor shall deliver to the Owner a notice of Project Completion in the form set forth in **Attachment EE, Exhibit EE-1** (the "**Notice of Project Completion**").  The Owner shall, within ten (10) Business Days after receipt of such Notice of Project Completion: (i) issue a certificate of Project Completion to the Contractor, setting forth the Project Completion Date, in the form set forth in **Attachment EE Exhibit EE-2** (the "**Certificate of Project Completion**"), or (ii) reject such Notice of Project Completion, in writing, setting forth the reasons for such rejection,

in which case, the Contractor shall take the appropriate corrective action to achieve Project Completion.  Upon the completion of such corrective action, the Contractor shall deliver to the Owner a new Notice of Project Completion.  This process shall be repeated on an iterative basis until the Owner accepts the Notice of Project Completion and issues a Certificate of Project Completion.

(e)    The Owner shall have the right to take possession of, or use, any completed or partially completed portion of the Work.  Such possession or use shall not be deemed an acceptance of any Work not completed in accordance with this Agreement, nor shall such possession or use relieve the Contractor of any obligations under this Agreement; provided however, if the possession or use by the Owner, prior to the Substantial Completion Date, delays the progress of the Work, or causes the Contractor to undertake additional Work, the Contractor shall be entitled to submit to the Owner a Request for Change Order, to request an adjustment in the Agreement Sum and the Work Schedule, pursuant to Section 9.1 of this Agreement. Notwithstanding anything contained in this Agreement to the contrary, upon possession of, or use of, any completed or partially completed portion of the Work by the Owner, the risk of loss for such portion of the Work shall transfer to the Owner and the Warranty Period for that portion of the Work shall commence; provided however, the Contractor shall remain liable to the Owner for any damage or destruction to the Work caused by the Contractor or any Subcontractor.

(f)    Notwithstanding anything to the contrary contained in this Agreement, the Contractor is obligated to achieve Substantial Completion, achieve Final Completion and Project Completion, at whatever the cost to the Contractor, which are absolute, unconditional obligations of the Contractor under this Agreement.

**7.9    [Intentionally Omitted.]**

**7.10    Liquidated Damages.**

(a)    The Contractor shall be liable to the Owner for Delay Liquidated Damages as follows:

If the Contractor fails to achieve Substantial Completion on or before October 6th 2024, as agreed to in the Schedule set forth in Attachment D (the "**Guaranteed Date**"), due solely to the fault of the Contractor or any Subcontractor, the Contractor shall pay to the Owner as liquidated damages, and not as a penalty, the sum of twenty-five thousand Dollars and no cents (US $25,000.00), for each and every day, or portion thereof, from the Guaranteed Substantial Completion Date, until the Substantial Completion Date, unless the Owner terminates the Agreement (the foregoing liquidated damages), the "**Delay Liquidated Damages**").  The Contractor's liability for Delay Liquidated Damages set forth in this Section 7.10 shall be cumulative.  The Contractor's aggregate liability for Delay Liquidated Damages shall not exceed twenty percent (20%) of the Agreement Sum. Delay Liquidated Damages shall be the Owner's sole and exclusive remedy, and Contractor's sole and exclusive liability, for failure to achieve Substantial Completion on or before the Guaranteed Substantial Completion Date.

(b)    The Contractor shall be liable to the Owner for Delay Liquidated Damages, except in the event that delays are caused by: any act or omission of the Owner, or any of the Owner's

other contractors or representatives unaffiliated with Contractor, to the extent that such delays, have adversely impacted the Critical Path of the Work Schedule, with all float time having been consumed or otherwise allocated, or (ii) a Force Majeure Event, provided that the Contractor has complied with the requirements of Section 7.2 of this Agreement. If multiple entities, including Contractor, are the cause of a concurrent delay, Contractor will only be allocated Liquidated Dagames in proportion to the delay it caused.

(c)    The Parties agree that the Liquidated Damages, assessed together or separately, are a reasonable approximation of the damages that the Owner will suffer in the event that a cause, for which such Liquidated Damages are assessed under this Agreement, should occur, which damages cannot be reasonably ascertained as of the Effective Date. The Owner shall have the right to set-off any Liquidated Damages assessed hereunder against amounts due, or to become due, to the Contractor. In the event that amounts due, or to become due, to the Contractor are insufficient for the Owner to recover such Liquidated Damages, the Contractor shall pay, to the Owner, sums due on account of any such Liquidated Damages, within seven (7) days following the date of receipt of an invoice therefor from the Owner.

(d)    The provisions of this Section 7.10 shall survive the completion or earlier termination of this Agreement.

**7.11    Default; Termination**.

(a)    This Agreement may be terminated by the Owner, in accordance with this Section 7.11, for the Owner's convenience. In the event of a termination for the Owner's convenience, the Owner shall deliver a Notice of Termination to the Contractor. In the event of a termination for convenience, the Contractor's exclusive remedies for such termination are set forth in Section 7.11(h) of this Agreement. For the avoidance of the event that the Owner determines, that the Owner cannot obtain the Owner's Permits, for any reason, the Owner may, but shall not be obligated to, terminate this Agreement for convenience.

(b)    The Contractor shall be in default of its obligations under this Agreement, upon the occurrence of any one or more of the events of default set forth below (each, a "**Contractor Default**"):

(i)    the Contractor either fails to promptly commence the Work subject to a Purchaser Order, following the Date of Commencement, or suspends performance of the Work in a manner inconsistent with the Work Schedule and fails to pursue a remedy to resume the Work in the event of such suspension, or Abandons the performance of the Work at any time following the Date of Commencement, unless such failure, suspension or Abandonment is permitted under this Agreement; or

(ii)    The Contractor assigns its rights or transfers its obligations, or any part thereof, under this Agreement, to any third party, without the prior written consent of the Owner; or

(iii)    a proceeding is instituted against the Contractor seeking to adjudicate the Contractor as a bankrupt or insolvent, or to have a receiving or administration order made against

it, and such proceeding is not dismissed within sixty (60) days following the date of filing, or Contractor goes into liquidation, or makes a general assignment for the benefit of its creditors, or a receiver, trustee or manager is appointed on account of the insolvency of the Contractor, or the Contractor files a petition seeking to take advantage of any other Applicable Laws relating to bankruptcy, insolvency, reorganization, winding up or composition or readjustment of debts that has a similar effect to any of these events or acts; or

(iv)    the reasons for a Contractor Default under Section 7.14(b) of this Agreement have occurred;

(v)    except, as otherwise provided in this Section 7.11(b), the Contractor has failed or refused to perform any material obligation under this Agreement, or is otherwise in breach of any of its representations or warranties, or material obligations under this Agreement, and has failed to cure such failure, refusal or breach within fifteen (15) days following the date of receipt of written notice of such failure, refusal or breach from the Owner (in the case in which such failure, refusal or breach is capable of cure within such period) or, if such failure, refusal or breach is not capable of cure within fifteen (15) days following the date of receipt of such notice, within a commercially reasonable time given the nature of the Default, but (i) not longer than forty-five (45) days following the date of receipt of such written notice from the Owner or (ii) if such failure, refusal or breach is not capable of cure within forty-five (45) days following the date of receipt of notice from the Owner, such longer period as approved by the Owner, so long as the Contractor has commenced, and is diligently pursuing, a cure within fifteen (15) days following the date of receipt of such notice from the Owner, provided  that the Contractor shall not be entitled to such longer cure period if the failure, refusal or breach poses a threat to the life or safety of any Person on the Site or a threat to the safety of the Project; or

(vi)    the Contractor (a) refuses to strictly comply with Applicable Laws, or (b) fails to strictly comply with Applicable Laws and fails to cure such noncompliance within five (5) days following the date on which the Contractor first knew, or reasonably should have known, of the noncompliance (in the case in which such noncompliance is capable of cure within such period) or within a reasonable time, but, in no event, longer than ten (10) days following the date on which the Contractor first knew or reasonably should have known of the noncompliance (in the case in which such noncompliance is not capable of cure within such five (5)- day period), provided that such longer period shall only apply if Contractor is diligently pursuing a cure; or

(vii)    the Contractor has violated any of the provisions of the Suppliers' Code of Ethics; or

(viii)    the Contractor has failed to make payment, within the time specified in this Agreement, of any undisputed amount duly owing to the Owner, or any Subcontractor or Supplier, from the Contractor, under this Agreement, and has not cured such failure within ten (10) days after the date of receipt of written notice of such failure from the Owner; or

(ix)    the Contractor fails to remove, transfer to a bond, or provide security reasonably acceptable to the Owner with regard to, any Lien filed against the Project, the Site, the Work, or any other property of the Owner, by any Subcontractor (i) if such transfer occurs by operation of law, within ten (10) days following the date on which the Contractor first knew of

A–66

the existence of such Lien or (ii) if a court proceeding is required, within a reasonable amount of time given the requirements of the Applicable Laws that apply to Liens in the jurisdiction in question; or

(x)     the Contractor fails to achieve Substantial Completion of the Work on or before the Guaranteed Substantial Completion Date and a result of such failure, Liquidated Damages or

(xi)     the Contractor fails to achieve Final Completion of the Work on or the Guaranteed Final Completion Date and a result of such failure, Liquidated Damages have cumulated up to maximum amount of ten percent (10%) of the Agreement Sum.

(xii)     the failure to achieve Performance Guarantees, pursuant to this Agreement, for which Performance Liquidated Damages are recoverable, and the Contractor has failed to pay Performance Liquidated Damages due and owing;

(xiii)     the Contractor fails to satisfy the Minimum Active Power Transfer Capability on or before the Guaranteed Substantial Completion Date;

(xiv)     the Contractor fails to deliver a Preliminary Recovery Plan or a Recovery Plan to the Owner, if required, in accordance with, and within the time provided pursuant to, this Agreement, or the Contractor fails to diligently pursue the prosecution of the Work to strictly conform to such Recovery Plan; or

(xv)     the Contractor fails to provide and maintain the Project Security in accordance with Section 8.2 of this Agreement; or

(xvi)     the Contractor fails to maintain the insurance coverages, if any, required pursuant to this Agreement; provided that, the Owner notifies the Contractor of such failure, providing the Contractor with the right to cure such failure within ten (10) days following the date of such notice.

(c)     In addition to the Owner's remedies for a Contractor Default under this Agreement, the Owner may, but shall not be obligated to, terminate this Agreement by delivering a Notice of Termination to the Contractor, setting forth the cause for such termination and the effective date of such termination. In the event that the Owner terminates this Agreement, due to a Contractor Default, the Owner shall be entitled to the rights and remedies set forth in Sections 7.11(g), (i), (j), (k), (l) and (m) of this Agreement.

(d)     The Owner shall be in default of its obligations under this Agreement, upon the occurrence of any one or more of the events of default set forth below (each, an "**Owner Default**"):

(i)     The Owner fails to pay to the Contractor any sum that is properly due, and not disputed in good faith, under the terms of this Agreement and Owner fails to cure such Default within sixty (60) days following the date of receipt of a written notice to the Owner from the Contractor stating that Owner is in default due to such failure; or

(ii)    A proceeding is instituted against the Owner seeking to adjudicate the Owner as a bankrupt or insolvent, or to have a receiving or administration order made against it, and such proceeding is not dismissed within sixty (60) days following the date of filing, or the Owner goes into liquidation, or makes a general assignment for the benefit of its creditors (other than in connection with an assignment made to any of its lenders), or a receiver, trustee or manager is appointed on account of the insolvency of the Owner, or the Owner files a petition seeking to take advantage of any other Applicable Laws relating to bankruptcy, insolvency, reorganization, winding up or composition or readjustment of debts that has a similar effect to any of these events or acts; or

(iii)    Any failure by the Owner to maintain the insurance coverages required pursuant to this Agreement, if any; provided that, the Contractor notifies the Owner of such failure, providing Owner with the right to cure such failure within twenty (20) days following the date of such notice; and, further provided, if such failure is due solely to the rating of the Owner's insurance provider falling below the requirements set forth therefor in this Agreement, the Owner shall have sixty (60) days, following the date on which such ratings fell, to replace such insurance with insurance from an insurance provider meeting such requirements.

(e)    In addition to the Contractor's remedies for an Owner Default under this Agreement, the Contractor may, but shall not be obligated to, terminate this Agreement. The Contractor may terminate this Agreement in the event of an Owner Default by delivering a Notice of Termination to the Owner, setting forth the cause for such termination and the effective date of such termination. In the event that the Contractor terminates this Agreement, due to an Owner's Default, the Contractor shall be entitled to the remedies set forth in Section 7.11(h) of this Agreement.

(f)    Promptly following receipt of a Notice of Termination for a Contractor Default or for the Owner's convenience, and except as otherwise directed by the Owner, the Contractor shall:

(i)    stop the performance of the Work on the effective date of termination, or on the date otherwise specified in the Notice of Termination;

(ii)    place no further orders and enter into no further subcontracts for Materials, Equipment, Contractor's Equipment and Temporary Facilities or services, except as may be required by the Owner;

(iii)    terminate all purchase orders and subcontracts, except as may be required by the Owner;

(iv)    deliver copies of all purchase orders and subcontracts required by the Owner, and assign to the Owner, in the manner, and, to the extent directed by the Owner, all of the right, title, and interest of the Contractor under such purchase orders and subcontracts, with the written consent of the respective Subcontractors, subject only to assumption by the Owner, and deliver to the Owner:

(A)    unconditional waivers and releases from all Subcontractors and Suppliers who provided Materials, Equipment, Contractor's Equipment and Temporary Facilities

and services, running in favor of the Owner, effective as of the date of termination for all subcontracts and purchase orders not assigned to the Owner, or effective as of the date of assignment, for all subcontracts and purchase orders assigned to the Owner, which waivers and releases shall include a customary indemnity obligation on the part of the Subcontractor or Supplier, running to the benefit of the Owner; and

(B)      unexpired warranties, endorsed, or assigned, to the Owner, for all Materials and Equipment incorporated into the Work, and services performed, by Subcontractors and Suppliers.

(v)      settle all outstanding claims arising out of such termination of orders and subcontracts and purchase orders, with the written consent of the Owner, to the extent the Owner may require;

(vi)      transfer title, free and clear of all Liens, and deliver, to the Owner in the manner, at the times, and to the extent, if any, directed by the Owner:

(A)      Materials and Equipment, whether fabricated or in progress, whether in transit, or whether stored on or off the Site, Work in process, completed Work and all other Materials and Equipment, produced as a part of, or acquired in connection with, the Contractor's performance of the Work, and

(B)      The completed or partially completed Contractor Deliverables;

(vii)      take such action as may be necessary, or as the Owner may direct, for the protection and preservation of the Work, and any Materials, Equipment and Contractor's Equipment and Temporary Facilities, in the possession of the Contractor, in which the Owner has or may acquire an interest; and

(viii)      when requested by the Owner, submit to the Owner a list, certified as to quantity and quality, of any or all property of the types, referenced Sections 7.11(f)(vi)(A) and(B) of this Agreement, which has not been subject to disposition.

(g)      After receipt of a Notice of Termination for convenience, or upon the issuance of a Notice of Termination for Owner Default, the Contractor shall submit to the Owner its termination claim, in the form, and with the certification, prescribed by the Owner.  Such claim shall be submitted promptly, but in no event later than thirty (30) days following the effective date of such termination.  Failure to submit such claim, within such time period, shall constitute a knowing, intentional and irrevocable waiver of the claim by the Contractor, and the Owner shall thereafter be discharged from all liabilities arising from, related to or in connection with, such termination.

(h)      In the event of termination for convenience, or as a result of an Owner Default, as the Contractor's exclusive remedies under this Agreement, the Contractor shall be entitled to recover the following costs, and no other costs, from the Owner, subject to the provisions of this Section 7.11:

(i)      reasonable and substantiated direct costs incurred by the Contractor in the performance of the Work performed in accordance with this Agreement, prior to the effective date of termination of this Agreement, including reasonable and substantiated direct costs of labor incurred in the performance of the Work in accordance with this Agreement, Materials and Equipment delivered to the Site or incorporated into the Work in accordance with this Agreement and services furnished in accordance with this Agreement;

(ii)      reasonable and substantiated direct costs incurred by the Contractor in settling and paying claims, arising out of the termination of this Agreement, under subcontracts or orders, as required pursuant to Section 7.11(f)(v) of this Agreement, which are properly chargeable under this Agreement (exclusive of amounts paid or payable on account of labor incurred in the performance of the Work in accordance with this Agreement, Materials and Equipment delivered to the Site or incorporated into the Work in accordance with this Agreement, and services furnished in accordance with this Agreement, prior to the effective date of the termination, which amounts shall be included in the costs payable under subsection (i) above);

(iii)      reasonable and substantiated direct costs of storage, transportation and other costs incurred in connection with the protection of the Work, and disposition of property pursuant to Section 7.11(f)(viii) of this Agreement; and

(iv)      overhead (including cumulative labor burden, general conditions and general requirements costs, for all tiers) and profit (cumulative for all tiers) on the total sum of the direct costs of the subsections (i) through (iii) above, which shall be limited, for such overhead and profit combined, to ten percent (10%) of such direct costs.

The Owner shall not be obligated to pay to the Contractor, under this Section 7.11(h):  (a) any amount in excess of the remaining unpaid balance of the Agreement Sum, as of the effective date of termination of the Agreement, or (b) except with respect to property, for which the Owner shall have expressly assumed the risk of loss, the cost of any property, or Work, which is destroyed, lost, stolen, or damaged, or otherwise non-conforming to the requirements of this Agreement.  The Owner shall set-off, from the amount due to the Contractor on account of a termination for convenience, or as a result of an Owner Default, the anticipated amount of any claim, which the Owner may have against the Contractor in connection with this Agreement.

(i)      In the event of termination of the Agreement for a Contractor Default, the Owner shall have no further obligation to make payment to the Contractor on account of this Agreement, until:  (a) the Owner has had the Work completed and has ascertained its damages, or (b) the Owner has otherwise ascertained its damages in the event that the Owner does not elect to have the Work completed.

(j)      In the event of termination of this Agreement for a Contractor Default, the Owner may, but shall not be obligated to, complete the Work, or have the Work completed by another contractor.  In the case in which the Owner elects to have the Work completed by another contractor, the Owner shall be entitled to recover from the Contractor, as damages, the amount, if any, by which the sum of all of the costs and expenses incurred by the Owner, or by any Person

acting on the Owner's behalf, or appointed by the Owner, to complete the Work in accordance with this Agreement, as a result of the Contractor Default, exceeds the balance of the Agreement Sum, as of the effective date of termination.  Such costs and expenses shall include those costs incurred:

       (i)    as incremental costs, in excess of the costs of performing the Work without accelerated construction methods, for accelerated construction methods, utilized with the purpose of accomplishing Substantial Completion on or before the Guaranteed Substantial Completion Date, or to reduce, in any other way, the impact on the Work Schedule caused by the Contractor Default;

       (ii)    in the administration of the contracts for a subsequent contractor and any subcontracts, whether they are pre-existing or subsequent to the termination of the Agreement; and

       (iii)    all other costs and damages incurred by the Owner, resulting from the Contractor Default.

In addition, in the event of a Contractor Default, the Owner shall have the right to draw under, or make a claim against, as the case may be, the Project Security, in order to recover any and all of the costs and expenses described above.  The Contractor shall pay such amounts to the Owner within fifteen (15) days following the date on which the Contractor receives from the Owner an invoice for such amount, together with the reasonable supporting documentation of such costs and expenses.  The remedies set forth in this Section 7.11(j) shall not relieve or restrict the Contractor from paying the Owner any other amounts due to the Owner under this Agreement. In the event that balance of the Agreement Sum, as of the effective date of termination, exceeds the sum of all of the costs and expenses incurred by the Owner to complete the Work, the Owner shall pay to the Contractor the remaining amount owed to the Contractor under this Agreement, within fifteen (15) days after the date on which the Owner receives from the Contractor an invoice for such amount, provided that such remaining amount, together with the sum of all such costs and expenses incurred by the Owner to complete the Work, shall not exceed the Agreement Sum.

       (k)    In the event of a Contractor Default, the Owner, in addition to any other rights provided under this Agreement, at law or in equity, may take possession of, and utilize in completion of the Work required under this Agreement, any Contractor Deliverables, Materials, and Equipment incorporated or to be incorporated into the Work, or anything that the Contractor has produced, or acquired, that is to be incorporated into the Work, and the Contractor shall, upon direction of the Owner, protect and preserve any Contractor's Deliverables, Materials and Equipment incorporated or to be incorporated into the Work in the possession of the Contractor or any Subcontractor, which the Owner may so elect to possess and use in the completion of this Agreement.  The fair value of the use of such Contractor's Deliverables, Materials, Equipment and Contractor's Equipment and Temporary Facilities, for which the Owner has not theretofore paid, shall be a credit applied to the damages incurred by the Owner as a result of the termination of the Agreement for a Contractor Default.

(l)　　　In order to verify all costs which the Contractor claims are due to the Contractor following the termination of this Agreement for convenience, Owner Default or Contractor Default, the Owner shall have access to all payrolls, records of personnel, records and invoices for labor, Materials, Equipment, Contractor's Equipment and Temporary Facilities and services, and any and all other data relevant to the performance of the Work or necessary to determine such costs, as the Owner may reasonably require.  The Contractor shall maintain separate daily records of all labor, Materials, Equipment and Contractor's Equipment and Temporary Facilities required for the performance of, or incorporated into, the Work, and the cost thereof, as directed by the Owner for Work performed subsequent to the date of receipt by the Contractor of a Notice of Termination.  The Contractor shall furnish all assistance reasonably required by the Owner to verify all costs, which the Contractor claims are due to the Contractor. The Contractor, for a period of six (6) years following the effective date of termination of this Agreement, for convenience, Owner Default or Contractor Default, shall preserve and make available to the Owner, at all reasonable times, at the office of the Contractor, and without charge to the Owner, all of its books, records, documents, and other materials related to the costs and expenses of the Contractor under this Agreement.

(m)　　　Nothing contained in this Section 7.11, or elsewhere in this Agreement, shall be deemed or construed to preclude or deny to the Owner, to any extent whatsoever, any rights or remedies, or the exercise thereof, otherwise available to the Owner under this Agreement, at law or in equity, on account of a Contractor Default or any failure on the part of the Contractor to perform in accordance with this Agreement.

(n)　　　The provisions of this Section 7.11 shall survive the completion or earlier termination of this Agreement.

**7.12    Suspension of Work.**

(a)　　　The Owner may, in its sole discretion, order the Contractor to suspend the performance of the Work, in whole or in part, for a period of time as the Owner may determine. The suspension shall commence on the date specified in the Owner's notice of suspension, which shall be at least five (5) days following the date on which the Owner notifies the Contractor concerning such suspension, unless such suspension is due to an imminent threat of material injury or damage to Persons or property or is the result of a material injury or damage to Persons or property, in which event such suspension may commence upon receipt of the Owner's notice of suspension.  Upon the commencement of the suspension, the Contractor shall stop the performance of the suspended Work, except as may be necessary to carry out the suspension and protect and preserve the Work completed prior to the suspension.

(b)　　　Except as provided in this Section 7.12, as full compensation for any suspension of the Work under Section 7.12(a) of this Agreement, the Owner shall reimburse the Contractor for the following costs, incurred as a result of such suspension, without duplication of any item, provided, and to the extent, that such costs directly result from such suspension of the Work and to the extent that such costs do not reflect reimbursement of the Contractor's or any Subcontractor's anticipated profit from unperformed Work, including: (i) a reasonable standby charge, without mark-up or multiplier, sufficient to compensate the Contractor for the direct

costs attributable to keeping, to the extent required in the notice of suspension, the Contractor's organization and equipment committed to the Work on a standby basis, as agreed, in writing, by the Owner and the Contractor; (ii) all necessary and reasonable direct costs incurred in connection with demobilization and remobilization of the Contractor's employees and equipment; and (iii) a reasonable amount to reimburse the Contractor for the direct cost of maintaining and protecting that portion of the Work for which performance has been suspended, as agreed, in writing, by the Owner and the Contractor. The Owner shall only reimburse such costs to the Contractor, provided that such costs are reasonable, and have been substantiated by the Contractor to the Owner, with such documentation as the Owner may request.

(c)    Upon delivery of notice by the Owner to the Contractor to resume suspended Work, the Contractor shall immediately resume performance under this Agreement, to the extent required in such notice.  In the event that the Work is suspended by the Owner for a period in excess of one hundred and twenty (120) consecutive days, the Contractor shall be entitled to request a Change Order, as a result of a suspension of the Work pursuant to Section 7.12(a) of this Agreement, within fourteen (14) days after receipt of a notice to resume the suspended Work; provided that such suspension was not due to the Contractor's negligence, willful misconduct or noncompliance with the terms of this Agreement; and, provided further, that, during the resumption of the Work, the Contractor shall use reasonable efforts to minimize the effect of the suspension on the Work Schedule.  In the event that the Contractor is entitled to request a Change Order, due to a suspension of the Work, the Contractor shall submit to the Owner a Request for Change Order in accordance with Section 9.1 of this Agreement, and such request shall be accompanied by substantiating documentation setting forth the impact of such suspension upon the Critical Path of the Work Schedule, and the amount of the Contractor's claim, in sufficient detail to permit a thorough analysis by the Owner; provided that, if such information is not available within such fourteen (14)-day period, the Contractor shall notify the Owner of such unavailable information within such fourteen (14)-day period and provide an expected date (which shall be as soon as reasonably practicable) for providing such information. If the Contractor does not submit a Request for Change Order within such fourteen (14)-day period, and provide the information regarding the impact of such suspension upon the Critical Path of the Work Schedule, and the amount of the Contractor's claim, as required herein, within such fourteen (14)-day period (or by the expected date if not possible during such fourteen (14)-day period), the Contractor shall not be entitled to any adjustment to the Work Schedule or the Agreement Sum, and shall be deemed to have voluntarily, intentionally and irrevocably waived any and all claims against the Owner as a result of the suspension of the Work.  The Contractor shall permit access by the Owner to pertinent records for purposes of reviewing the claims by the Contractor of impact to the Agreement Sum and the Work Schedule.

(d)    In addition to the foregoing, no adjustment to the Work Schedule or the Agreement Sum, or other terms herein, shall be made for any suspension of the performance of the Work under Section 7.12(a) of this Agreement, to the extent that performance would have been suspended, delayed or interrupted as a result of the Contractor's noncompliance with the requirements of this Agreement.  The Contractor shall require a suspension for convenience provision with terms similar to the foregoing in all subcontracts with Subcontractors; provided that, in no event shall the Owner be liable for any costs or damages due to a suspension that exceeds the amount of costs and damages for which the Owner would have been liable if all of

such subcontracts included a suspension for convenience provision with terms similar to the foregoing.

**7.13    Layout; Surveys; Field Data**.

(a)      The Contractor shall establish base lines, benchmarks and other pertinent reference points at the Site to complete the layout of the Work.  From the basic data established in the Contractor Deliverables accepted by the Owner and the Specifications, the Contractor shall establish reference control points and complete the layout of the Work.  The Contractor shall be responsible for all measurements that may be required for execution of the Work to the exact position and elevation as prescribed in Contractor Deliverables accepted by the Owner and the Specifications, and as may be modified at the direction of the Owner to meet changed conditions or modifications to the Work.

(b)      The Contractor shall furnish, at its sole cost and expense, such stakes and other required Materials and Equipment, and all labor, as may be required, in laying out any part of the Work from the basic data established in the Contractor Deliverables accepted by the Owner and the Specifications.  If, for any reason, monuments are disturbed, regardless of the cause, or whoever caused the disturbance, the Contractor shall re-establish such monuments without cost to the Owner.  The Owner may require construction Work to be suspended, at any time, when location and limit marks established by the Contractor are not reasonably adequate to permit checking completed Work or Work in progress.

(c)      The Owner may, but shall not be obligated to, prepare such check surveys as the Owner deems necessary to verify that the Contractor's surveys are correct, and to determine the conformance of the completed Work, as it progresses, with the Specifications, and pertinent Contractor Deliverables accepted by the Owner.  Such checking by the Owner shall not release the Contractor from its obligation to perform the Work in strict accordance with this Agreement, in any respect.  If errors are found in the Contractor's layout of the Work, or in completed Work, as the Work progresses, the cost and expense of correcting such erroneous layout, correcting the Work, and preparing any additional surveys, which the Owner deems necessary to prepare in order to verify that the layout of the Work has been properly corrected by the Contractor and that the completed Work is corrected in strict accordance therewith, shall be borne exclusively by the Contractor, and as a part of the Agreement Sum.  The Contractor shall pay any such costs or expenses incurred by the Owner within thirty (30) days following the date of receipt of an invoice therefor from the Owner.  If such invoice is not paid by the Contractor, within such period, the Owner shall have the right to set-off any such costs or expenses, incurred by the Owner, against any sums due to the Contractor, or to make a drawing upon the Performance Letter of Credit.

(d)      For Change Order Work that is based on unit prices, the Contractor shall furnish, at its sole cost and expense, all personnel, Materials, Equipment, and Contractor's Equipment and Temporary Facilities required to prepare such surveys, as are necessary, to determine the quantities of Work performed or in place.  Unless waived in each specific case, quantity surveys made by the Contractor shall be made under the direction of the Owner.  If errors are found in the Contractor's surveys, the Contractor shall pay any such costs or expenses incurred by the Owner, to check such surveys, together with the costs and expenses of such surveys as are necessary to rectify the errors

and verify the quantities in place, within thirty (30) days following the date of receipt of an invoice therefor from the Owner.  If such invoice is not paid by the Contractor, within such period, the Owner shall have the right to set-off any such costs or expenses, incurred by the Owner, against any sums due to the Contractor, or to make a drawing upon the Performance Letter of Credit.

(e)     All original field notes, quantity computations, cross sections, and other records made by the Contractor, or required by the Owner, for the purpose of the layout of Work and quantity surveys shall be furnished immediately to the Owner, copies of which the Contractor shall maintain at the Site for review by the Owner.  All field notes shall be taken on waterproof, loose leaf transit and/or level note sheets satisfactory to the Owner.  Notes shall be properly identified by title, page number, date, and names of individuals performing and checking such computations or other data, and shall be furnished electronically or in a format so as to be capable of duplication by photocopy methods.  The original copy of all field notes, computations, and records shall become the property of the Owner.

(f)     All of the Contractor's costs and expenses of preparing surveys, computations, and assembly of data, as described herein, shall be borne by the Contractor as a part of the Agreement Sum.

**7.14    Owner's Right To Reject Work**.

(a)     During construction, and until the Final Completion Date, the Owner shall have the right to reject defective, deficient and non-conforming Materials, Equipment, and workmanship, furnished by the Contractor, and to require remedial Work.  Rejected Work shall be satisfactorily remedied by the Contractor and rejected Materials and Equipment shall be satisfactorily repaired, or replaced with conforming Materials and Equipment by the Contractor, without an adjustment to the Agreement Sum or the Work Schedule. The Contractor shall promptly, at its sole cost and expense, segregate and remove all rejected Materials and Equipment from the Site, as specified or as otherwise directed by the Owner.  The Owner's performance of any repair, replacement or remedial Work, in accordance with this Agreement, shall not relieve the Contractor from liability for, or release the Contractor from, any obligations under this Agreement.

(b)     If the Contractor fails to commence, or provide a plan for the repair or replacement of defective, deficient or non-conforming Materials and Equipment, or to remedy defective, deficient or non-conforming Work, as soon as reasonably possible but in no event later than ten (10) days following the Owner's directive to do so (in writing or orally), such failure shall be deemed to be a Contractor Default, and the Owner may, but shall not be obligated to, repair or replace such Materials and Equipment, or remedy such Work, at the Contractor's sole cost and expense.  The Contractor shall pay any such costs or expenses incurred by the Owner, within ten (10)  days following the date of receipt of an invoice therefor from the Owner.  If such invoice is not paid by the Contractor, within such period, the Owner shall have the right to set-off any such costs or expenses, incurred by the Owner, against any sums due to the Contractor, or to make a drawing upon the Performance Letter of Credit.  The Owner's performance of any repair, replacement or remedial Work, in accordance with this Agreement, shall not relieve the

Contractor from liability for, or release the Contractor from, any obligations under this Agreement.

(c)     If the Owner, at any time prior to the Substantial Date, considers an examination of any covered or completed portion of the Work to be necessary or advisable, the Contractor shall, when ordered, in writing, uncover, tear out or disassemble such portion of the Work to enable the examination.  If the Work subject to such examination is found to be defective or nonconforming in any material respect, due to the fault of the Contractor or its subcontractors, the cost of such uncovering, destruction or disassembly and reconstruction shall be borne by the Contractor, at its sole cost and expense.  If, however, such Work, subsequent to examination, is found to be in strict accordance with this Agreement, the Owner shall pay, to the Contractor, the reasonable, direct and substantiated costs and expenses of such uncovering, destruction or disassembly and reconstruction.

(d)     If this Agreement requires the Owner's consent with respect to the performance of a particular portion of the Work, prior to such portion being covered or completed, and any such portion is covered or completed without the Owner's prior consent, in writing, the Contractor shall bear all costs and expenses involved in securing the Owner's consent, notwithstanding conformance of such Work with this Agreement, including the costs to uncover, tear out and disassemble such portions of the Work, and the costs of reconstruction of same.

**7.15    Interference with Operations**.  The Contractor shall not Interfere with normal operation of the Owner's, or the Owner's other contractors', plant or equipment.  The Contractor shall not operate any of the Owner's plant or equipment or control devices, or those of any Owner's other contractors, except at the direction of, and under the direct supervision of, the Owner.

**ARTICLE 8– AGREEMENT SUM; MILESTONE PAYMENTS; PROJECT SECURITY**

**8.1    Agreement Sum**.

(a)     The Owner shall pay to the Contractor, and the Contractor shall accept from the Owner, in full consideration for the performance of the Work in strict accordance with this Agreement, subject to additions or deductions as provided herein, **the amount of Twenty Million Dollars** [$ 20,000,000] **(the "Agreement Sum")**.  The Contractor has examined the Site and has determined the difficulties and hazards incident to the performance of the Work, pursuant to this Agreement, and agrees, on the basis of such examination, and subject to the terms of this Agreement, that the Agreement Sum is sufficient to perform the Work.

(b)     Payments to the Contractor for Work satisfactorily performed will be made upon the basis of Milestone Payments, in accordance with the Milestone Payment Schedule, as hereafter provided.

(c)     The following terms and conditions shall apply to Milestone Payments:

(i)     Except as otherwise set forth herein, payments to the Contractor shall be made on the basis of completed Milestones included in the Milestone Payment Schedule (each such payment, a **"Milestone Payment"**).  The Contractor shall submit an application for payment

DocuSign Envelope ID: 591BDF1C-1AB5-4867-A4C4-4337BBB151F2

for the Work in the form attached as **Attachment H**, for the payment of the Milestone achieved, together with an invoice (the **"Application for Milestone Payment"**), between the twentieth (20th) day and the twenty-fifth (25th) day of the month following the month in which the Contractor considers such Milestone to have been achieved.  Subject to the Owner's rights with respect to withholding, set-off and Retainage, and other rights set forth in this Agreement, the Owner shall make Milestone Payments to the Contractor, upon the satisfaction of the conditions for the relevant Milestone Payment, set forth in **Attachment L**, have been satisfied, in strict accordance with this Article 8.  However, for the first Milestone Payment, Contractor will submit an application for payment with an invoice within (five) 5 days of receipt of the Notice to Proceed and/or Purchase Order, and payment shall be issued within fifteen (15) days of receipt of the application and invoice, with no retainage held, and (ii-vii) below shall not apply.

(ii)    In each Application for Milestone Payment, the Contractor shall specify the Milestone(s) for which payment is being requested, the amount of payment being requested in respect of such Milestone(s) and the Milestone Payments made by the Owner to the date of such Application for Payment.

(iii)    As part of each Application for Milestone Payment, the Contractor shall include reasonable evidence that all Work, as described in the Milestone Payment Schedule, comprising the Milestone(s) for which the Milestone Payment is being requested, has been completed in strict accordance with the terms of this Agreement.

(iv)    Within fifteen (15) days after receipt by the Owner of an Application for Milestone Payment in compliance with this Article 8, the Owner shall notify the Contractor of the amount due and payable on account of such Application for Milestone Payment.  The Owner shall make payment, to the Contractor, of the amount due and payable on account of such Application for Milestone Payment (less Retainage, and any amounts withheld or set-off), within sixty (60) days after the AVANGRID accounts payable department has received the Application for Milestone Payment from the Contractor, pursuant to Section 8.1(e)(2).

(v)    If the Owner considers that any portion of a Milestone Payment requested in an Application for Milestone Payment is not due, the Owner shall promptly notify the Contractor of the reasons therefor.  The Owner shall not be obligated to make, and the Contractor shall not be entitled to receive, any payment for a partially completed Milestone.

(vi)    Notwithstanding anything to the contrary contained in this Agreement, the Contractor shall only be entitled to one (1) payment every month.

(vii)    The Owner and its respective consultants, agents and representatives, shall have the right, within the fifteen (15)-day period set forth in Section 8(c)(iv), to inspect the Work to verify the Contractor's completion of the Milestone for which payment is being requested.

(d)    The following are the conditions precedent to the Owner's obligation to make payment on account of each Application for Payment:

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 591BDF1C-1AB5-485F-A4C4-4378BB151EF2

(i)    The Owner shall not be obligated to make a Milestone Payment to the Contractor until the Contractor has delivered to the Owner the following submittals, applicable to such Milestone Payment:

(A)    all reports required to have been provided as of the date of such Application for Milestone Payment, including, without limitation, the reports required pursuant to Section 3.9(a);

(B)    with each Application for Milestone Payment submitted by the Contractor prior to Final Completion, fully executed conditional partial waivers and releases from the Contractor, and from all of the Subcontractors, which are entitled, under their respective subcontracts, to receive payment during the month for which such Application for Milestone Payment applies, to the extent that amounts for such payments are included in the Application for Milestone Payment, in the form attached hereto as **Attachment P, Exhibit P-1**, for the Contractor, and **Attachment P, Exhibit P-2**, for each such Subcontractor;

(C)    as conditions precedent to the Owner's obligation to make the final Milestone Payment, the Contractor shall:  (a) deliver to the Owner conditional final waivers and releases, in the form attached hereto as **Attachment P, Exhibit P-3**, for each Subcontractor, no later than ten (10) days following the date of the Owner's receipt of the Contractor's Application for Milestone Payment for Final Completion; (b) execute, and deliver to the Owner, an unconditional final waiver and release for the Contractor, in the form attached hereto as **Attachment P, Exhibit P-4**, contemporaneously with the delivery of the final Milestone Payment to the Contractor, and (c) execute and deliver a final affidavit, indicating, under oath, the names of each Subcontractor that performed Work under this Agreement, the amount due and owing to each Subcontractor, if any, pursuant to such Subcontractor's subcontract, and the amount of any outstanding Subcontractor's claims against the Contractor, if any;

(D)    The Owner may, without prejudice to any other rights that the Owner may have, under this Agreement, at law or in equity, withhold all or any portion of any Milestone Payment, to such extent as may be necessary, in the Owner's reasonable opinion, without duplication of any withholding or deduction previously made by the Owner from any Milestone Payment, to protect Owner from loss for which Contractor may be liable or responsible under this Agreement due to: (i) defective or non-conforming Work performed or supplied by the Contractor or any Subcontractor or Supplier; (ii) claims filed, or reasonable evidence indicating the probable filing of a claim, by third parties arising out of the Contractor's performance of the Work (other than contractual payments claimed to be due to Subcontractors) to the extent that the Contractor is not honoring its indemnity obligations in regards to any such claims; (iii) failure of the Contractor to make payments when due to its Subcontractors under their respective subcontracts or purchase orders, as the case may be, in cases in which such payments are not disputed by the Contractor in good faith; (iv) the reasonable

\\MI - 028195/000003 - 658133 v5

determination of the Owner that the Contractor will not achieve Substantial Completion on or before the Guaranteed Substantial Completion Date, or Final Completion on or before the Guaranteed Final Completion Date; (v) the performance of the Work does not comply with the requirements of this Agreement; (vi) Liens filed by a Subcontractor, Supplier, or any other Person claiming through a Subcontractor, Supplier or the Contractor against either the Project, the Site, the Work, the Materials, the Equipment or any other property of the Owner, in which case, the Owner shall be entitled to withhold an amount equal to one hundred and fifty percent (150%) of the amount of the Lien until the Lien is transferred to a bond; (vii) the failure of the Contractor to deliver any of the waivers and releases required to be delivered to the Owner pursuant to this Agreement; (viii) failure by the Contractor to maintain the insurance required by this Agreement, if any; or (ix) a Contractor Default that has occurred, and is continuing.  The Contractor agrees not to use the Owner's exercise, or attempted exercise, of its rights herein as a reason for termination;

(E)     The Contractor shall be obligated to release, discharge, or transfer to a bond, at its sole cost and expense, any Lien encumbering, or otherwise affecting, the Project, the Site, the Work or any other property of the Owner, filed by a Subcontractor or any other Person claiming through a Subcontractor or the Contractor.  If the Contractor fails to release, discharge, or transfer to a bond, any such Lien, as required pursuant to this subsection (e), the Contractor shall be liable for any costs and expenses, including attorneys' fees and court costs, incurred by the Owner in releasing, discharging, transferring to a bond, or otherwise vacating any such Lien, which costs shall be reimbursed by the Contractor to the Owner within seven (7) days following the date on which the Contractor receives an invoice from the Owner for such reimbursement.  The Owner shall have the right, but not the obligation, to make payments, on account of the Agreement Sum, directly to Subcontractors and Suppliers, in the amounts claimed, by such Subcontractors and Suppliers, to be due and owing, without any liability to the Contractor, in the event that the Contractor has failed to comply with its obligations, under this Agreement, with respect to the release, discharge or transfer to a bond, of Liens;

(F)     After the Contractor has remedied the cause for any withholding, and has furnished evidence of such remedy, reasonably satisfactory to the Owner, the Contractor may include, in the next Application for Payment, a request for payment of the amount withheld by the Owner for such cause, and the Owner shall pay such amount to the Contractor, provided that the cause for withholding has not recurred.  The payment of amounts withheld, by the Owner, shall not constitute a waiver of any Contractor Default under this Agreement;

(G)     Upon the Owner's acceptance of the Punchlist, the Revised Punchlist or the Final Punchlist, the Owner may withhold from any outstanding payment, certified by the Owner's engineer and due to the Contractor, an amount equal to two hundred percent (200%) of the estimated cost for completing or

remedying the Punchlist Items (such amount, the "**Punchlist Withholding Amount**"), as reasonably determined by the Owner. The Punchlist Withholding Amount shall be released to the Contractor, on a *pro rata* basis, as each Punchlist Item subject to the Punchlist Withholding Amount on the Punchlist, the Revised Punchlist, or the Final Punchlist, as the case may be, is completed in strict accordance with this Agreement. If the Contractor does not complete any such Punchlist Item within the time period for completion thereof, as set forth in the Punchlist, the Revised Punchlist or the Final Punchlist, as the case may be, then the Owner may either: (i) have such Punchlist Item completed or remedied at the Contractor's expense (which shall not be limited to two hundred percent (200%) of the estimated cost of completing or remedying such Punchlist Item), and set-off the cost of completion of such Punchlist Item against the Punchlist Withholding Amount, and, to the extent that the cost of completing or remedying such Punchlist Item exceeds the remaining Punchlist Withholding Amount, the Contractor shall pay such excess amount to the Owner within ten (10) days following the date of receipt by the Contractor of an invoice for such amount from the Owner; or (ii) set-off two hundred percent (200%) of the estimated cost of completing or remedying such Punchlist Item against the Punchlist Withholding Amount. In the event that the Owner exercises its rights in either (i) or (ii) above, the Contractor shall be released from the obligation to complete or remedy the relevant Punchlist Item; provided however, the Contractor's warranty obligations, including the completion of all Warranty Work, with respect to such Punchlist Items shall not be released, and shall remain in full force and effect;

(H)    If this Agreement is terminated at any time before Final Completion, the Owner shall not be obligated to make further Milestone Payments, or other payments to the Contractor, except as otherwise provided in this Agreement;

(I)    The Owner shall have the right, at any time, but shall not be obligated to, set-off any and all sums due from the Contractor to the Owner under this Agreement, against sums due from the Owner to the Contractor under this Agreement;

(J)    The Owner shall withhold from each Milestone Payment, and from any other payment made to the Contractor on account of the Work, including payments made pursuant to Change Orders, an amount equal to ten percent (10%) of each such payment (the "**Retainage**"). The Retainage shall be held by the Owner as security for the performance of the Contractor's obligations hereunder and any interest thereon, if any, shall accrue for the account of the Owner and not the Contractor. The Owner shall pay to the Contractor the Retainage, less any amounts required by the Owner for withholding or set-off pursuant to this Agreement, on the date which is the later of (i) the date on which final payment is made by the Owner to the Contractor on account of Final Completion, or (ii) the date on which the Contractor delivers the Record Drawings and Specifications to the Owner;

(K)    No Milestone Payment, or any other payment made by the Owner to the Contractor, or any use of the Project by the Owner or any other Person, shall be deemed or construed to constitute an acceptance of any of the Work furnished by the Contractor, or to relieve the Contractor of any of its obligations or liabilities under this Agreement;

(e)    The following provisions pertain to payment instructions:

(i)    Applications for Milestone Payments submitted to the Owner shall be in the form set forth in **Attachment H**.

(ii)    Upon review by the Owner, subject to the Owner's determination of the amount due, pursuant to Article 8, Applications for Milestone Payment shall be submitted by the Contractor to the AVANGRID accounts payable department, at the following address:

invoiceacceptanceAdminUSA@avangrid.com

(iii)    The Owner's obligation to pay any Milestone Payments is expressly conditioned on the Contractor supplying wire transfer instructions for any such Milestone Payment.

(iv)    The Contractor shall strictly comply with the following requirements for each Application for Milestone Payment, in addition to the requirements set forth elsewhere in this Agreement:

(A)    the Purchase Order number shall be set forth in the Application for Milestone Payment (purchase order numbers start with "450" and are followed by seven (7) additional digits (*i.e.*, 4501234567);

(B)    each line item on an Application for Milestone Payment shall correspond to the specific line item number in the Purchase Order, if any;

(C)    Applications for Milestone Payments shall be written, clearly and legibly, in the English language, and all currency shall be United States currency;

(D)    any and all additional supporting documentation, reasonably required by the Owner or required pursuant to this Agreement, shall accompany Applications for Milestone Payment; and

(E)    any and all additional requirements for Applications for Milestone Payments, as may be forth in this Agreement.

(f)    The provisions of this Section 8.1 shall survive the completion or earlier termination of this Agreement.

\\MI - 028195/000003 - 658133 v5

**8.2    Project Security**

(a)    Within twenty- (20) days following the Effective Date, the Contractor shall deliver to the Owner, at the address for the Owner set forth in Section 10.20 of this Agreement, a (**Payment and Performance Bond**) underwritten by a surety acceptable to the Owner. in the form set forth in **Attachment V**.

(b)    As a condition precedent to achieving Substantial Completion, the Contractor will provide to Owner an Annual Warranty Bond, which may be renewed for additional one-year periods.  If the Warranty Bond is not renewed for any reason, Contractor will provide a warranty letter of Credit in its place.

(c)    The provisions of this Section 8.2 shall survive the completion or earlier termination of this Agreement.

**ARTICLE 9- CHANGES IN THE WORK**

**9.1    Change Orders**.

(a)    The Owner may, at any time, initiate a Change in the Work within the general scope of this Agreement, by submitting to the Contractor a request, in writing, for a Change in the Work (a "**Request for Change Order**") sufficiently defined and detailed to give the Contractor an adequate basis upon which to review and respond to such Request for Change Order.  The Contractor, at no cost to the Owner, shall promptly review such Request for Change Order and notify the Owner in writing within fifteen (15) Business Days thereafter of the options for implementing the proposed Change and the effect, if any, that each such option would have upon the Agreement Sum and the Work Schedule. The Owner may, but shall not be obligated to, execute, and deliver to the Contractor, a written change order, in the form set forth in **Attachment K**, based upon such Request for Change Order (a "**Change Order**"), taking into account, as necessary and appropriate, such options, no later than seven (7) Business Days following the Owner's receipt of such Request for Change Order.  The Contractor shall perform the Work required by any such Change Order executed by the Owner and delivered to the Contractor, regardless of whether the Contractor disputes the Change Order, except for Change Order Work exceeding one million Dollars ($1,000,000.00) for which Contractor and Owner must reach agreement before the Contractor is required to start the Work.  If the Contractor does not dispute the Change Order, the Contractor shall execute the Change Order within five (5) days following delivery of same by the Owner to the Contractor.

(b)    The Contractor may request a Change in the Work within the general scope of this Agreement, only in the event of:

(i)    a suspension of the Work by the Owner, to the extent permitted pursuant to Section 7.12 of this Agreement;

(ii)    a Force Majeure Event, to the extent permitted pursuant to Section 7.2 of this Agreement;

DocuSign Envelope ID: 591BDF1C-1AB5-4857-A4C4-4357BB151E2

(iii)    delays, interferences or hindrances in the performance of this Agreement, occasioned by any act or omission of the Owner or any of the Owner's other contractors or representatives, to the extent permitted pursuant to Section 10.6(b) of this Agreement;

(iv)    the possession or use of portions of the Work by the Owner, prior to the Guaranteed Substantial Completion Date, to the extent permitted pursuant to Section 7.8(d) of this Agreement; or

(v)    a Change in Law; provided however, in the event of a Change in Law, the Contractor shall only be entitled to request a Change in the Work for an adjustment to the Agreement Sum, not an adjustment to the Work Schedule.

(c)    If the Contractor proposes such a Change in the Work to the Owner, the Contractor shall submit to the Owner a request, in writing, for a Request for Change Order sufficiently defined and detailed to give the Owner an adequate basis upon which to review and respond to such Request for Change Order, including the options for implementing the proposed Change and the effect, if any, that each such option would have upon the Agreement Sum and the Work Schedule.  The Owner may accept or reject such Request for Change Order.  If the Owner approves such Request for Change Order, the Owner shall execute a Change Order or issue to the Contractor a notice to proceed with the Change in the Work within seven (7) Business Days following the date of the Owner's receipt of such Request for Change Order and of all necessary substantiating documentation that is reasonably available at the time, and the Contractor shall perform the Work required by such Change Order.  If the Contractor desires to propose a Change in the Work, pursuant to this Section 9.1, the Contractor shall deliver a sufficiently defined and detailed Request for Change Order, including all necessary substantiating documentation that is reasonably available at the time, to the Owner, within twelve (12) Business Days following the date on which the cause, for which such Change is proposed pursuant to Sections 9.1(b)(i)-(vii) of this Agreement, was discovered or should have been discovered by the Contractor in the exercise of reasonable diligence.  In the event that the Contractor fails to deliver such Request for Change Order to the Owner within such period of time, the Contractor agrees that it has voluntarily, intentionally and irrevocably, waived any and all rights to propose such Change in the Work in the future.

(d)    Adjustments to the Agreement Sum in connection with a Change Order shall be payable by, or credited to, the Owner, as follows:  (i) on a lump sum cost basis, proposed by the Contractor, based on the all-inclusive rates and costs of Materials and Equipment set forth in **Attachment R** for calculating all inclusive (inclusive of all overhead (all general conditions and general requirements costs) and profit) lump sum Change Orders, and (ii) if the Owner does not accept the lump sum amount proposed by the Contractor, then on a not-to-exceed all-inclusive time and materials cost basis, determined by the Parties, using the all-inclusive rates and costs of Materials and Equipment set forth in **Attachment R**. If the Parties cannot agree upon any of the methods set forth above for determining an adjustment to the Agreement Sum in connection with a Change Order, following good-faith negotiations, then, the Contractor shall perform the Change in the Work which is the subject of the Change Order, pending resolution of any Dispute, pursuant to Section 10.5, and, until such Dispute is resolved, the Contractor shall be

compensated for the Change in the Work which is the subject of the Change Order using the all-inclusive rates and costs of Materials and Equipment set forth in **Attachment R**.

    (e)    Adjustments to the Work Schedule in an additive or deductive Change Order shall be subject to the mutual agreement of the Parties, subject to the dispute resolution procedures set forth in Section 10.5 of this Agreement; provided however, the Contractor shall only be entitled to an adjustment to the Work Schedule to the extent that the Change adversely impacts the Critical Path of the Work Schedule.

    (f)    All claims by the Contractor for adjustments to the Agreement Sum or the Work Schedule shall be substantiated by the Contractor with such documentation as the Owner may reasonably require from the Contractor.

    (g)    Unless otherwise agreed by the Parties, in writing, the Contractor shall not commence to perform a Change in the Work, unless and until the Owner has executed a Change Order for such Change in the Work, or has issued to the Contractor a notice to proceed with the Change in the Work, regardless of whether such Change Order has been executed by the Contractor. In the event that the Contractor commences to perform any such Change in the Work, without a Change Order having been executed by the Owner for such Change in the Work, the Contractor proceeds at its own risk, and shall not be entitled to recover the costs of performing such Change in the Work, unless the Owner agrees to such Change in the Work. For the avoidance of doubt, the Owner shall have no obligation to make payment to the Contractor for any work performed by the Contractor, which is not within the scope of the Work under this Agreement or is not subject to a Change Order executed by the Owner, and the Contractor expressly voluntarily, intentionally and irrevocably waives its rights to, and agrees not to, assert any theory of recovery, including *quantum meruit* or partial performance, to recover, from the Owner, any costs or expenses incurred in performing any work which is not within the scope of the Work under this Agreement or is not subject to a Change Order executed by the Owner. Subject to the limitation set forth in Section 9.1(a) of this Agreement, for any disputed Change Order executed by the Owner and delivered to the Contractor, the Contractor must proceed with Work that has been required by the Owner in respect of the corresponding Change in the Work; provided however, the Contractor reserves its right to dispute such Charge Order pursuant to Section 10.5 of this Agreement, after performing the Work required by the Owner.

    (h)    Notwithstanding anything contained in this Section 9.1 to the contrary, the Contractor shall not be entitled to an adjustment to the Agreement Sum or the Work Schedule, to the extent that the need for a Change was caused, in whole or in part, by the action or inaction of the Contractor or any Subcontractor or Supplier.

## ARTICLE 10 - MISCELLANEOUS PROVISIONS

**10.1**    <u>Governing Law</u>. The rights and obligations of the Parties under this Agreement shall not be governed by the provisions of the 1980 U.N. Convention on Contracts for the International Sale of Goods; rather, such rights and obligations shall be governed by the laws of the State of New York (regardless of New York's or any other jurisdiction's choice of law rules, except for Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York which shall apply).

\\MI - 028195/000003 - 658133 v5

**10.2**    <u>Assignment</u>. The Contractor shall not assign this Agreement, in whole or in part, or any interest in this Agreement, or any sums due or to become due under this Agreement, without the prior written consent of Owner. The assignment by the Contractor of this Agreement, in whole or in part, or of any interest therein, or of any sums due or to become due under this Agreement, without the prior written consent of Owner, shall be null, void and of no force or effect.  The Owner may assign this Agreement, in whole or in part, and transfer, convey, or otherwise dispose of, any of its right, title or interest therein, without the prior consent of the Contractor.

**10.3**    <u>Cleaning Up</u>.

(a)    The Contractor shall at all times keep the premises free from accumulation of waste materials or rubbish caused by its operations, and shall leave the Site in a neat and orderly condition.

(b)    Prior to the Substantial Completion Date, the Contractor shall remove, from the vicinity of the Work, all Contractor's Equipment and Temporary Facilities, all Subcontractors' equipment and temporary facilities, rubbish, waste materials, tools, construction equipment, surplus Materials, unused Materials, concrete forms and other like materials, and shall restore all areas affected by the Work, to a smooth, neat, orderly and clean condition, true to line and grade, or as otherwise directed by the Owner. In the event that the Contractor fails to so remove and restore as provided herein, the same may be removed and restored by the Owner at the Contractor's sole cost and expense. The Contractor shall pay any such costs or expenses incurred by the Owner, within thirty (30) days following the date of receipt of an invoice therefor from the Owner.  If such invoice is not paid by the Contractor, within such period, the Owner shall have the right to set-off any such costs or expenses, incurred by the Owner, against any sums due to the Contractor, or to make a drawing upon the Performance Letter of Credit or the Warranty Letter of Credit.

**10.4**    <u>Interest</u>.  All past due amounts under this Agreement shall incur interest at a rate equal to the Prime Rate, as determined on the date on which any such amount became past due, plus two percent (2%), *per annum*.

**10.5**    <u>Dispute Resolution</u>.  Any dispute or matter in question between the Parties arising out of or related to this Agreement, or the breach, termination or validity thereof (a "**Dispute**") shall be resolved pursuant to the procedures set forth in this Section 10.5, as follows:

(a)    Either Party may provide notice to the other Party of the existence of the Dispute (the "**Dispute Notice**");

(b)    A vice president of the Contractor and a vice president of the Owner (each such Person, a "**Vice President**") shall meet, either in person, or by telephonic conference, within fifteen (15) days following the date of the delivery of the Dispute Notice, to attempt to resolve the Dispute through mutual agreement. All statements, discussions and negotiations made or undertaken, pursuant to this Section 10.5, shall be confidential and shall be treated as inadmissible, as a part of compromise and settlement negotiations, for purposes of all applicable state and federal rules of evidence;

(c)     In the event that the procedures referenced in Section 10.5(b) of this Agreement do not result, for any reason, in the resolution of the Dispute within fifteen (15) Business Days following the date of the commencement of the meeting between Vice Presidents referenced in 10.5(b) of this Agreement, the aggrieved Party may proceed to litigate such Dispute, in which case, such Dispute shall be brought in the federal courts of the United States sitting in the Southern District of New York (in the Borough of Manhattan), or, if such federal courts refuse to hear such dispute or rule that they do not have jurisdiction to hear such Dispute, the courts of the State of New York, in and for the county of New York.

(d)     In the event that the Dispute is litigated, the prevailing party shall be entitled to recover its attorneys' fees and costs from the non-prevailing party, at the trial and appellate levels.

(e)     The procedures specified in this Section 10.5 shall be the sole and exclusive procedures for the resolution of Disputes between the Parties arising out of, or in connection with, this Agreement; provided however, a Party, without prejudice to the above procedures, may seek a preliminary injunction or other preliminary judicial relief in the courts of the State of New York, if, in its sole judgment, such action is necessary to avoid irreparable damage or to preserve the *status quo*.  Despite such action, the Parties shall continue to participate in good faith in the procedures specified in this Section 10.5.

(f)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER SECTION 10.5 HEREIN.  Each Party (i) certifies that no representative of the other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 10.5.

(g)     The provisions of this Section 10.5 shall survive the completion or earlier termination of this Agreement.

**10.6    Owner's Other Contractors**.

(a)     The Contractor acknowledges and agrees that, in certain respects, the sequencing and scheduling of the Work will be dependent upon the sequencing and scheduling of the work of the Owner's other contractors working at the Site, and in certain respects, the sequencing and scheduling of the work of the Owner's other contractors working at the Site will be dependent upon the sequencing and scheduling of the Work.  The Contractor shall perform the Work, at all times, in strict accordance with the Work Schedule, and, in such a manner as to avoid any delays, interference or hindrance in the work of the Owner's other contractors.  The Contractor shall exercise best efforts to integrate the schedule for the performance of the work of the Owner's other contractors into the Work Schedule, to the extent such schedules are provided to the Contractor within fifteen (15) days before any conflict arises or such other amount of time as otherwise agreed upon by the Parties in order to be able to perform the Work in the most efficient and effective manner, with due consideration being given to the sequencing and scheduling of the work of the Owner's other contractors.

(b)  The Contractor agrees to make no claim for an adjustment to the Agreement Sum, including damages due to delays, interferences or hindrances of any kind in the performance of the Work, occasioned by any act or omission of any of Owner's other contractors or representatives, related to, arising from, or in connection with any work undertaken, or to be undertaken, by any Owner's other contractors or representatives.  The Contractor agrees that any claim of the Contractor, due to such delays, interferences or hindrances, shall be fully compensated by an adjustment to the Work Schedule, which the Contractor may request, by submitting a Request for Change Order, to the Owner, pursuant to, and in strict accordance with, Section 9.1 of this Agreement; provided however, the Contractor shall not be entitled to request an adjustment to the Work Schedule, unless such delays, interferences or hindrances have adversely impacted the Critical Path of the Work Schedule.

(c)  Should the Contractor sustain any damages through any act or omission of any other Owner's contractor having a contract with the Owner for the performance of work upon, or adjacent to, the Site, or work which may be necessary to be performed hereunder, or through any act or omission of any subcontractor of such other Owner's contractor, Contractor shall first address any claim directly with the Owner's Contractor to attempt resolution before making any claim against Owner..

(d)  The Contractor shall cooperate with the Owner's other contractors with regard to storage of materials and equipment at the Site, or in adjacent lay-down areas as directed by the Owner.

(e)  The Contractor shall inspect all work by other contractors affecting the Work and shall promptly report to the Owner any irregularities which will not permit the Contractor to complete the Work in accordance with this Agreement.  The Contractor shall not be responsible for defects which develop in the work of the Owner's other contractors, unless such defects are attributable to the performance of the Work.

(f)  The provisions of this Section 10.6 shall survive the completion or earlier termination of this Agreement

**10.7  <u>Taxes; Custom Duties</u>**.

(a)  The following provisions pertain to Contractor's Taxes:

(i)  Except as provided otherwise in this Section 10.7, the Contractor shall pay any and all applicable:  (i) Maine and local sales and compensating use taxes on sales to, or use by, the Contractor of tangible personal property (*e.g.*, Equipment and Materials) and services employed by the Contractor in the performance of the Work; (ii) income, receipts, capital or net worth taxes applicable to the Contractor; (iii) sales or use taxes assessed against the Contractor's (or the Subcontractors') owned, leased, or rented Contractor's Equipment and Temporary Facilities; (iv) personal property taxes assessed by any Governmental Authority with respect to, or against, any of the Contractor's  Equipment and Temporary Facilities (or the equipment and temporary facilities of the Subcontractors) located at the place where the Work is performed; and (v) amounts related to licenses (other than licenses required to be procured by the Owner in order to perform its obligations under this Agreement) and the Contractor's Permits).  The

Agreement Sum includes all taxes imposed on or payable by the Contractor and the Subcontractors in connection with this Agreement (collectively, the "**Contractor's Taxes**").

(ii)    In the event that the Owner is entitled to an exemption with respect to any sales or use tax otherwise imposed by the State of Maine, the Contractor shall:  (i) cooperate with the Owner to establish an exemption from such sales or use tax, to the full extent of such exemption; (ii) provide the Owner, upon request, all forms and/or other documentation as may be required by federal, Maine or local law, for purposes of tax reporting; and (iii) provide such other information to the Owner as the Owner may reasonably need in order to qualify for such exemption from such sales or use taxes.   In the event that the Contractor fails to satisfy its obligations pursuant to this Section 10.7(a)(ii), the Contractor shall be liable for all such sales and use taxes, at its sole cost and expense, and the Contractor agrees that the Agreement Sum shall be reduced to account for such sales and use taxes by Change Order.

(iii)    The Contractor shall be, with respect to its employees, and shall cause the Subcontractors, with respect to their employees, to be, liable for, and obligated to pay, all Employment Benefits.

(iv)    For the avoidance of doubt, the Contractor, its employees and the Subcontractors, are independent contractors, and not agents or employees of the Owner, for tax purposes.

(b)    The following provisions pertain to custom duties:

(i)    All Materials and Equipment to be incorporated into the Work, if imported into the United States, will be subject to duty requirements of United States Customs, at the sole cost and expense of the Contractor, as a part of the Agreement Sum.

(ii)    Any additional expense, costs, damages, fines penalties or duties imposed pursuant to Applicable Law, including pursuant to the United States Antidumping Act of 1921 (19 U.S. Code Sec. 160 et seq., as amended by 19 U.S.C. 1673 et seq.), the Countervailing Duty Law (19 U.S.C. 1671 et seq.), Sections 337 and 337a of the Tariff Act of 1930 (19 U.S.C. 1337, 1337a, as amended) or arising, or alleged to have arisen, as a result of unfair trade practices, shall be borne exclusively by the Contractor, as a part of the Agreement Sum.

**10.8    Limitation of Liability**.

(a)    Neither Party shall be liable to the other Party for any Losses or other liability otherwise equivalent to, or in the nature of, any indirect, incidental, consequential, exemplary, punitive or special damages arising from performing or a failure to perform any obligation under this Agreement, including for any loss of profits, loss of revenue, loss of opportunity or goodwill, cost of purchased or replacement power, loss of use of equipment or systems or cost of capital (except interest charges as provided in this Agreement) ("**Consequential Damages**"), except for: (i) Liquidated Damages as expressly set forth in this Agreement; (ii) any and all damages due to a breach by either Party of its respective obligations under the Confidentiality Agreement, which include Consequential Damages; (iii) damages for which the Contractor or the Owner has an obligation to indemnify under this Agreement; (iv) damages due to failure to comply with

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 591BDF1C-1AB5-4957-A4C4-4317BBB151E2

Applicable Laws; (v) damages incurred by the Owner, with respect to any infringement of Intellectual Property rights; (vi) damages due to the gross negligence, fraud or willful misconduct of either Party; and (vii) costs incurred by the Contractor to achieve Project Completion, at whatever the cost to the Contractor, which is an absolute, unconditional obligation of the Contractor under this Agreement, or, in the event of a Contractor Default, costs incurred by the Owner to achieve Project Completion.

(b)     In no event shall the Contractor's aggregate liability under this Agreement exceed the Agreement Sum; provided, however, this provision shall not apply to the Contractor's liability under this Agreement for: (i) Liquidated Damages, as expressly set forth in this Agreement, which shall be subject to the limitations set forth in Section 7.10 of this Agreement; (ii) any and all damages due to a breach by either Party of its respective obligations under the Confidentiality Agreement; (iii) damages for third-party claims which the Contractor or the Owner has an obligation to indemnify under this Agreement; (iv) damages due to failure to comply with Applicable Laws to the extent that the damages caused by the failure to comply with the Applicable Laws exceed any claimed damages for delay in the Work; (v) damages incurred by the Owner, with respect to Intellectual Property rights; and (vi) costs incurred by the Contractor to achieve Project Completion at whatever the cost to the Contractor, if the Agreement is not terminated by Owner, which is an absolute, unconditional obligation of the Contractor under this Agreement, or, in the event of a Contractor Default, costs incurred by the Owner to achieve Project Completion.

(c)     In no event shall the Owner's aggregate liability of this Agreement exceed one hundred percent (100%) of the unpaid portion of the Agreement Sum. This provision shall not apply to the Owner's liability under this Agreement for: (i) any and all damages due to a breach by either Party of its respective obligations under the Confidentiality Agreement; (ii) damages for third-party claims which the Contractor or the Owner has an obligation to indemnify under this Agreement;

(d)     Limitations on Liquidated Damages shall not constitute a waiver or release of the Contractor from its obligation to achieve Project Completion, at whatever the cost to the Contractor, as an absolute, unconditional obligation of the Contractor under this Agreement.

(e)     The provisions of this Section 10.8 shall survive the completion or earlier termination of this Agreement.

**10.9**    **No Collusion or Fraud**.  The Contractor represents and warrants to the Owner that no Person, other than the Contractor, has any interest in this Agreement, or in the securing of the award of this Agreement, and this Agreement has been secured by the Contractor, without any connection with any Person, other than those named in the Contractor's proposal, and that this Agreement was secured without collusion, bribery or fraud.

**10.10**    **General Representations and Warranties**.

(a)     The Contractor represents and warrants to the Owner that:

\\MI - 028195/000003 - 658133 v5

(i)        the Contractor is duly authorized to enter into this Agreement, including under Applicable Laws, this Agreement does not conflict with another contract, deed or other obligation to which Contractor is legally bound, and this Agreement creates a legal, valid and binding obligation of the Contractor and enforceable against Contractor in accordance with the terms of this Agreement;

(ii)        the Contractor is, and shall be, at all times, qualified and capable of performing the Work, so as to complete the Work in strict accordance with the terms of this Agreement, and that the craft, technical, supervisory and professional personnel, provided by the Contractor, are highly qualified to perform the Work;

(iii)        the Contractor is aware of, and will abide by, the legal, technical and environmental requirements as well as of the commercial practices that must be pursued in the performance of all Work, and the performance of all Work shall be in strict accordance with those practices and conditions, including without limitation, Good Utility Practice;

(iv)        the Contractor is duly licensed under Applicable Laws to perform the Work;

(v)        the Contractor is not in violation of any Applicable Law or any Permit Requirement in effect as of the Effective Date, which violations, individually or in the aggregate, would affect the Contractor's performance of its obligations under this Agreement;

(vi)        there is no pending controversy, legal action, arbitration proceeding, administrative proceeding or investigation instituted, or to the best of the Contractor's knowledge, threatened, against or affecting, or that could affect, the legality, validity and enforceability of this Agreement or the performance by the Contractor of its obligations under this Agreement, nor does the Contractor know of any basis for any such controversy, action, proceeding or investigation;

(vii)        the Contractor has examined this Agreement, including all of the Attachments hereto, thoroughly, and has become familiar with all the terms and provisions of this Agreement, including all such Attachments;

(viii)        the Contractor has the proper experience and full qualifications, by itself and through the Subcontractors and Suppliers, to perform the Contractor's obligations under this Agreement,  in strict accordance with the terms of this Agreement;

(ix)        the Contractor owns or has the right to use all patents, trademarks, service marks, trade names, copyrights, other proprietary rights, licenses, franchises, permits and other Intellectual Property rights necessary to perform the Work, without conflict with the rights of others;

(x)        the Contractor is financially solvent, able to pay its debts as they mature, and possesses sufficient working capital to complete its obligations under this Agreement; and

(xi) the Contractor will not assign, transfer or otherwise dispose of, any interest in any actual or potential claims, of any kind, which the Contractor might have against Owner with respect to this Agreement, the Work or the Project, and the Contractor will not assign, transfer, pledge or encumber any right to receive payment under this Agreement.

The Contractor agrees to maintain the foregoing representations as true and correct from the Effective Date and throughout the period of the effectiveness of this Agreement.

(b) The Owner represents and warrants to the Contractor that:

(i) the Owner is duly authorized to enter this Agreement, that this Agreement does not conflict with another contract, deed or other obligation to which Owner is legally bound, and that this Agreement creates a legal, valid and binding obligation of the Owner and is enforceable against Owner in accordance with the terms of this Agreement; and

(ii) the Owner is financially solvent, able to pay its debts as they mature, and possesses sufficient working capital to complete its obligations under this Agreement.

The Owner agrees to maintain the foregoing representations as true and correct from the Effective Date and throughout the period of the effectiveness of this Agreement.

(c) The Owner may provide, or may have provided, the Contractor with copies of certain studies, reports or other information (including oral statements), and the Contractor agrees that all such documents or information have been, or will be, provided as unverified background information and as an accommodation to the Contractor. The Owner makes no representations or warranties, whatsoever, with respect to the accuracy, sufficiency, validity or completeness of such documents or the information (including oral statements) or opinions therein contained or expressed. The Contractor represents and warrants that it is not relying upon the Owner for any information, data, inferences, conclusions, or other information, in particular, with respect to the Site, including the surface conditions of the Site and the surrounding areas, and the Contractor shall be liable for the accuracy, sufficiency, validity and completeness of all such information, data, inferences, conclusions and other information, and any impact that such information, data, inferences, conclusions and other information may have upon the Project.

(d) The provisions of this Section 10.10 shall survive the completion or earlier termination of this Agreement.

**10.11 Successors and Assigns**. This Agreement shall be binding upon the successors and permitted assigns of the Parties.

**10.12 Entire Agreement**. This Agreement contains the entire and integrated understanding of the Parties concerning the subject matter of this Agreement, and supersedes any and all prior negotiations, understandings and agreements, concerning such subject matter, between the Parties.

DocuSign Envelope ID: 591BDF1C-1AB5-4867-A4C4-4378BB151E2

**10.13  Counterparts.**  This Agreement may be executed in any number of counterparts, and either Party may execute any such counterpart, each of which, when executed and delivered, shall be deemed to be an original and all of which counterparts taken together shall constitute one and the same instrument.  The Parties agree that the delivery of this Agreement may be achieved by means of an exchange of facsimile or emailed signatures with original copies to follow by mail or courier service.

**10.14  Modifications and Amendments**.  This Agreement shall not be modified or amended, except by mutual agreement of the Parties, pursuant to a written amendment executed by the Parties, unless otherwise provided in this Agreement to the contrary.  In no event shall course of conduct, course of dealing, partial performance, or course of performance, constitute, or give rise to, a modification or amendment to this Agreement.

**10.15  Rights, Privileges, Remedies**. All rights, privileges and remedies afforded each of the Parties hereto by this Agreement shall be deemed cumulative and the exercise of any one or more of such rights or remedies shall not be deemed a waiver of any other right, privilege or remedy provided for herein or available at law or in equity.

**10.16  No Waiver**.  Except as set forth herein or as may be specifically agreed in writing, the failure of Owner or Contractor to insist, in any one or more instances, upon the strict performance of any one or more of the provisions of this Agreement or to exercise any right herein contained or provided by law or equity, shall not be construed as, or constitute in any way, a waiver, modification or relinquishment of the performance of such provision or right(s), or of the right to subsequently demand such strict performance or exercise such right(s), and all such rights shall continue unchanged and remain in full force and effect.  No waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by a duly authorized representative of the Party to be bound.

**10.17  Severability**.  In the event any provision hereof shall be declared invalid, that provision shall be deemed severable from the remaining provisions of this Agreement, which shall remain in full force and effect.

**10.18  Survival**.  All provisions of this Agreement which are expressly indicated to survive the completion or early termination of this Agreement, or which include obligations or duties that,, by their nature, are to be, or can be, performed following the completion or earlier termination of this Agreement, shall survive the completion or earlier termination of this Agreement, without regard to the reason for termination.

**10.19  Third Party Beneficiaries**. The provisions of this Agreement are intended for the sole benefit of the Owner and the Contractor, and their successors and permitted assigns, and there are no third-party beneficiaries of this Agreement (other than Contractor Indemnitees and Owner Indemnitees).  The provisions of this Section 10.18 shall survive the completion or earlier termination of this Agreement.

**10.20  Confidentiality**.  The Parties agree, on the Effective Date, to enter into that certain confidentiality agreement, in the form set forth in **Attachment Q** (the "**Confidentiality Agreement**").

\\MI - 028195/000003 - 658133 v5

**10.21    Notice**.

(a)    All notices permitted or required hereunder shall be in writing and shall be transmitted either:

(i)    by certified or registered United States mail, return receipt requested;
(ii)    by facsimile transmission;
(iii)    by personal delivery;
(iv)    by expedited delivery service; or
(v)    by e-mail.

(b)    Such notices shall be addressed as follows or to such different addresses as the Parties may from time-to-time designate in writing, pursuant to Section 10.20(d) of this Agreement:

NECEC Transmission LLC
Name:                          Justin Tribbet
Title:                          Sr. Director of NECEC
Address:                      83 Edison Drive
                                    Augusta, ME 04336
Telephone Number:    (207) 837-4028
Fax Number:                N/A
E-mail Address:          justin.tribbet@avangrid.com

Contractor
Name:                          Holly Davies
Title:                          Chief Legal Counsel
Address:                      1401 Blake Street
                                    Denver, CO 80202
Telephone Number:    (303) 623-3345
Fax Number:                N/A
E-mail Address:          holly.davies@camposcompanies.com

(c)    Any such notice shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or certified or registered United States mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of facsimile transmission or email, upon receipt.

(d)    Either Party may, from time to time, specify any new or different address in the United States as their address for purpose of receiving notice under this Agreement, or designate a new individual, as the representative to whom notice should be given under this Agreement, by giving written notice to the other Party, in accordance herewith, at least fifteen (15) days prior to the date on which such new address becomes effective, or such designation of such new representative becomes effective.  Additional individuals may be designated, in writing, by the Parties, for purposes of implementation and administration/billing, resolving issues and problems and/or for dispute resolution.

**10.22** **Employee Solicitation**. During the term of this Agreement, and for a period of one (1) year following the Final Completion Date, except with the prior written consent of the Owner, the Contractor shall not offer employment to any employee of the Owner, or any of the Owner's Affiliates, with whom the Contractor has had contact in connection with the negotiation, execution, or performance of this Work, and the Contractor shall not induce or attempt to induce, directly or through an agent or third party, any such employee to leave the employ of the Owner or any of the Owner's Affiliates.  Nothing in this Section 10.21 shall restrict the Contractor from employing any Person who contacts the Contractor on his or her own initiative and without any solicitation by the Contractor specifically directed to such employee. This Section 10.21 shall survive the completion or earlier termination of this Agreement.

**10.23** **Ethics**. The Contractor shall strictly comply with the Suppliers' Code of Ethics in connection with its performance of the Work under this Agreement. The Suppliers' Code of Ethics can be found at the AVANGRID website (www.avangrid.com).

**10.24** **Performance Monitoring**. The Owner will evaluate Contractor's performance by utilizing Contractor corrective action reports and Contractor performance evaluation reports. The Contractor must provide upon request the OSHA incident rate and Experience modification rate for the Owner's review. The Owner's project manager will evaluate the Contractor's performance upon the conclusion of the Work by completing the specified report. The Owner will continuously monitor the Contractor's performance. Performance by a Contractor that is less than desirable may potentially eliminate this Contractor from bidding on future projects.

**10.25** **No Dispute**. The Contractor covenants that it is not aware of any pending billing dispute or other contractual dispute (pursuant to current contracts or contracts no longer in effect) or any pending or threatened litigation between Contractor or any of Contractor's Affiliates and the Owner or and of the Owner 's Affiliates.

**10.26** **Contractor Security Requirements**.

(a)     The Contractor shall strictly comply with the Owner's security requirements in the performance of the Work.

(b)      The Contractor shall strictly comply with the requirements of the NERC CIP- 004 for Work at, or relating to, Critical Cyber Assets and critical company operating facilities (together with Critical Cyber Assets, the "**Critical Infrastructure**").  The following is an excerpt from NERC CIP- 004, and is set forth below for informational purposes only, and not to limit or diminish, in any way, the Contractor's obligation to strictly comply with all of the requirements of NERC CIP-004:

CIP-004 Excerpt:

R3. Personnel Risk Assessment --The Contractor shall have a documented personnel risk assessment program, in accordance with federal, state and local laws, and subject to existing collective bargaining unit agreements, for all personnel (including all Contractor's and Subcontractors' personnel) having authorized cyber access or authorized unescorted physical access

to the Site. A personnel risk assessment shall be conducted pursuant to that program prior to such personnel being granted such access, except in specified circumstances, such as an emergency. The personnel risk assessment program shall at a minimum include:

R3.1. The Contractor shall ensure that each assessment conducted include, at least, identity verification (e.g., Social Security Number verification in the U.S.) and seven-year criminal check. The Contractor may conduct more detailed reviews, as permitted by Applicable Law and subject to existing collective bargaining unit agreements, depending upon the criticality of the position.

R3.2. The Contractor shall update each personnel risk assessment at least every seven (7) years after the initial personnel risk assessment or for cause.

R3.3. The Contractor shall document the results of personnel risk assessments of all personnel (including all Contractor's and Subcontractors' personnel) having authorized cyber access or authorized unescorted physical access to Critical Cyber Assets, and that personnel risk assessments of all personnel (including all Contractor's and Subcontractors' personnel), with such access, are conducted pursuant to NERC CIP-004.

(c)     The Contractor agrees to strictly comply with the terms and conditions of the Owner's: (i) Data Security Rider attached hereto as **Attachment Y**; (ii) Contractor Background Check Rider attached hereto as **Attachment CC**; and (iii) IT Computer Usage and Personally Identifiable Information Policy attached hereto as **Attachment DD**.

(d)     The provisions of this Section 10.26 shall survive the completion or earlier termination of this Agreement.

**10.27**   **Publicity**.  No marketing, publicity, promotion or advertising regarding this Agreement, the Project or the Work will be undertaken or disseminated by the Contractor without the Owner's prior written consent, which consent shall be subject to the sole discretion of the Owner. Prior to responding to news media inquiries related to this Agreement, the Contractor must obtain the written consent of the Owner, which may be withheld in the sole discretion of the Owner.  Any and all communications, whether to be delivered orally or in writing, must be submitted, in writing, to the Owner for the Owner's prior review and consent.  The Contractor agrees to abide by these terms regarding public announcements for a period of two (2) years following the Project Completion Date, or the effective date of termination of this Agreement, whichever shall occur earlier.  The provisions of this Section 10.27 shall survive the completion or earlier termination of this Agreement.

**10.28**   **Interpretation**.

DocuSign Envelope ID: 591BDF1C-1AB5-4857-A4C4-4378BB151E2

(a)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires.  Where a word or phrase is defined herein, each of its other grammatical forms and cognates shall have a corresponding meaning.

(b)     The terms such as "hereof," "herein," "hereto," "hereinafter" and other terms of like import are not limited in applicability to the specific provision within which such references are set forth but instead refer to this Agreement taken as a whole.

(c)     When a reference is made in this Agreement to an Article, Section, subsection or Attachment, or Exhibit thereto, such reference is to an Article, Section, subsection or Attachment, or Exhibit thereto, of this Agreement, unless otherwise specified.

(d)     The word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "without limitation," and, unless otherwise specified shall not be deemed limited by the specific enumeration of items, but shall be deemed without limitation.  The term "or" is not exclusive.

(e)     A reference to either Party to this Agreement or in any other agreement or document shall include such Party's successors and permitted assigns.

(f)     A reference to any Applicable Law means such Applicable Law as amended, modified, codified, replaced or re-enacted, and all rules and regulations promulgated thereunder.

(g)     The Parties have participated jointly in the negotiation and drafting of this Agreement.  Any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against either Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.

(h)     The term "day" shall mean calendar day, unless the term "Business Day" is used.

(i)     All Attachments, and Exhibits thereto, identified in this Agreement, and all exhibits thereto, are hereby incorporated into this Agreement by this reference.

(j)     Whenever in this Agreement the words "directed," "required," "permitted," "ordered," "designated," "prescribed," or words of like significance are used, it shall be understood that the direction, requirement, permission, order, designation, or prescription of the Owner is intended and similarly the words approved, accepted, satisfactory, to the satisfaction of, or words of like significance shall mean approved by, accepted by, or satisfactory to the Owner, unless otherwise expressly stated.

(k)     The following phrases, or phrases of similar significance, are used to mean that costs and expenses shall be borne by the Contractor:  (i) "will be borne by," "chargeable to," "charged to, or at the expense of," the Contractor; (ii) "without cost to," "at no cost to," or "at no expense to," the Owner; (iii) "at the Contractor's sole cost and expense"; and (iv) "no compensation,"  "no additional compensation," or "no payment will be allowed or made" to the Contractor.   All such

\\MI - 028195/000003 - 658133 v5

costs, and all other costs of Work required by the Specifications or shown on this Agreement, for which no particular provision for payment is made in this Agreement, shall be included in the Agreement Sum.  The Contractor shall be paid in accordance with the Milestone Payment Schedule.

(l)      For the purposes of this Agreement, the terms "inspection," "examination" and "test" shall mean the review of the Work performed by the Contractor, any Subcontractor, or any Suppliers or manufacturers of Materials and Equipment, to the extent necessary to ascertain conformance with general requirements of this Agreement.

(m)      The words "fabrication," "manufacture," and "production," and cognates thereof, as used in this Agreement, are synonymous.

**10.29   Reference Specifications.**

(a)      Specific industry standard specifications referenced in this Agreement (to the extent of such reference only) shall form part of this Agreement, as though set forth, in full, herein.  The Contractor agrees that the Owner is the contracting Party for whom the Work is being performed and to whom services, Materials and Equipment are being sold, or otherwise provided, and such industry standard specifications shall be so interpreted.   Notwithstanding anything contained in this Agreement to the contrary, all industry standard specifications referenced herein include all applicable amendments, revisions and emergency alternate specifications, which have been promulgated, and are in effect on or before the Effective Date, unless specifically indicated otherwise in the Specifications.  If any such amendments, revisions or alternate specifications are issued after the Effective Date, the Contractor will comply with any Owner's request to incorporate such amendments, revisions or alternate specifications into the Work subject to the terms of Section 9.1 of this Agreement.

(b)      Notwithstanding anything contained in this Agreement to the contrary, the words "State Specifications" shall mean the "Maine Department of Transportation Standard Specifications" including all addenda or other amendments thereto, which have been promulgated, and are in effect, on or before the Effective Date, unless indicated otherwise in the Specifications. If any such State Specifications are issued or amended after the Effective Date, the Contractor will comply with any Owner's request to incorporate such new requirements into the Work subject to the terms of Section 9.1 of this Agreement.

**10.30   Independent Contractor**.  The Contractor shall, at all times, be an independent contractor and shall be liable for all acts or omissions of its own employees and Subcontractors. No act or instruction of Owner shall be deemed to be the exercise of supervision or control of the Contractor's performance hereunder.

**10.31   Cooperation with Financing Efforts**.  The Contractor shall, if requested by the Owner (i) execute such documents (including a consent agreement, certificates and legal opinions) as the Owner or the Owner's Lenders may reasonably request in connection with Owner's efforts to obtain and maintain financing for the Project, and (ii) provide information (including financial information) concerning Contractor, as the Owner's Lenders may reasonably request.

**IN WITNESS WHEREOF**, the Owner and the Contractor have executed this Agreement as of the Effective Date:

**OWNER**
**NECEC Transmission LLC**

_____
**Signature**

Thiago Bigi
_____
**Print Name**

SVP Operations
_____
**Title**

5/15/2024
_____
**Date**

_____
**Signature**

Andrea VanLuling
_____
**Print Name**

VP Controller  - Networks
_____
**Title**

5/21/2024
_____
**Date**

**CONTRACTOR**
**Campos EPC LLC**

_____
**Signature**

Holly Davies
_____
**Print Name**

Chief Legal Counsel
_____
**Title**

4/23/2024
_____
**Date**

*DAD*

**ATTACHMENT A**

SPECIFICATIONS


Specification Documents in order of precedence. (Documents to be included in full format in PDF)

A-1 – Contractual Exceptions
A-2 –Proposal Document - CAMPOS NECEC 320 kV KENNEBEC RIVER CROSSING HORIZONTAL DIRECTIONAL DRILLIING EPC PRICING PROPOSAL
*A-X – Other Specifications (as applicable)*





# NECEC 320kV Kennebec River Crossing Horizontal Directional Drilling

## EPC   Pricing

## Proposal



Cherokee Directional Drilling

# TABLE OF CONTENTS

1. **Introduction** ..................................................................................................................3

2. **Pricing** ..........................................................................................................................3

3. **Project Scope** ...............................................................................................................3

    General .........................................................................................................................3

    3.1   Geographic and Site .............................................................................................5

    3.2   Materials, Equipment, and Consumables .............................................................5

    3.3   SWPPP & Environmental Compliance ..................................................................5

4. **General Campos EPC and Cherokee Drilling Qualifications** ....................................6

5. **General Campos Requirements** ..................................................................................6

    5.1   Communication .....................................................................................................6

    5.2   Coordination .........................................................................................................6

    5.3   Ancillary / Subcontracting ....................................................................................6

    5.4   Reporting ..............................................................................................................6

    5.5   Safety ...................................................................................................................7

    5.6   Performance Evaluations and Reporting ..............................................................7

        5.6.1   Safety Metrics ..............................................................................................7

        5.6.2   Health / Safety / Environment / Security / Damage .......................................7

6. **Project Management** ....................................................................................................7

    6.1   General .................................................................................................................7

    6.2   Scope of Services ................................................................................................7

        6.2.1   Qualifications of Project Management Personnel ..........................................8

    6.3   Project Management Deliverables ........................................................................8

7. **Construction Management** ...........................................................................................8

    7.1   General .................................................................................................................8

        7.1.1   Pre-Construction ..........................................................................................8

        7.1.2   During Construction ......................................................................................9

        7.1.3   Post-Construction .......................................................................................12

    7.2   Construction Management Deliverables ..............................................................12

## 1. INTRODUCTION

Campos EPC appreciates the opportunity to provide lump sum pricing for the EPC horizontal direction drill portion of the NECEC 320kV Kennebec River Crossing.  Our pricing and scope should be reviewed with the understanding that our pricing is based on the specified Exclusions and Clarifications noted on Tab 1.9 of the Bid Form.

## 2. PRICING

Our lump sum price based on the Bid Form is shown below.  This is based on the information that we have been able to obtain in going through all of the provided RFP documents.  The pricing is based on the Project Execution Plan as we have outlined it in Sections 3 through 7 in this Proposal.  Pricing is based on not having agreed to final contract terms and conditions. The items below represent our lump sum price and schedule based on our Execution Plan that follows.

- **Total Price**                            **$ 20,000,000**
- **Schedule**

   We are anticipating  a minimum of 125 days of drilling and pull back.  This is working around the clock twenty-four hours a day, seven days a week.  These 125 days of HDD are planned to begin on June 1, 2024, based on best case scenario.  We will need at least two weeks prior to that to stage equipment.  Also, we will need to drill both wells prior to beginning HDD drilling. If we can mobilize in May and drill the water wells in May, the best case of completing pull back is October 06, 2024.  This assumes continual drilling with no cave in due to substantially fractured rock, as shown in some of the Geotech results.  If Rock that is fractured falls in behind the drill, this could cause substantial delays and costs.  We cannot guarantee the rock type and stability other than where we have specific   bores.

## 3. PROJECT SCOPE

### General

Campos EPC, with our partner Cherokee Horizontal Directional Drilling (HDD) will finalize Issued for Construction Drawings(IFC) and Calculations, furnish all materials, and install seven (7) ten-inch (10") conduits to cross the Kennebec River in Maine. The seven (7) conduits will sit in a forty-eight-inch diameter bored hole that is non-cased.  The conduits are intended to carry the HVDC cable system for the Central Maine Power (CMP) New England Clean Energy Connect.

The proposed underground cable system is comprised of approximately 3500 feet of conduit installed by Horizontal Directional Drill (HDD).  Campos EPC and its partners will install the conduits from inlet to outlet of the HDD.  The conduit that is direct burial is not included in the proposed scope.  Our current understanding is that Avangrid has other contractors that will terminate the conduits from the HDD location to the connection point at which the overhead cable system goes underground.  Campos EPC has not included pulling cables as part of the scope.  The list below details the scope included in our pricing:

- Mobilization/demobilization
- Complete necessary Engineering to plan and install conduits based on Contractor's planned means and methods, including calculations prepared by a professional engineer registered in the State of Maine. Calculations shall include anticipated pipe pull back loads, and anticipated pipe tensile, bending and buckling stress calculations. In addition, submit calculations for anticipated down hole drill mud pressures and estimated drill pressures sustained by the overburden based on subsurface geology above the HDD alignment.
- Delivery of all furnished materials to the Job Site

- Perform all manufacturing, installation, and commissioning tests

- Handling and storage for all furnished materials

- Provide a full-time on-site Drill Mud Specialist to monitor drill mud parameters throughout pilot hole drilling, reaming, and pull back operations

- Finalize equipment and conduit assembly layout requirements, and coordinate with the Contractor to prepare the site including entry and exit areas as shown on the Drawings provided by Owner and as specified herein

- Coordinate with operators of the upstream Harris Hydropower Dam to facilitate Inadvertent Return (IR) release monitoring during periods of low river flows

- Furnishing pipe / conduit Ten inch (10") fusible PVC

- Assembly of pipe and conduit

- Perform HDD Operations including the drilling of the pilot holes.

- Ream pilot hole to a suitable diameter for the installation of the conduit bundles.

- Protection of the pipe during assembly, prior to installation and during installation

- Pull installation of the prefabricated bundles into the reamed holes

- Installation of pull rope

- Furnishing of water, drilling mud components and additives

- Disposal of spoils, water and drilling mud

- Applicable testing of materials as specified for this Work

- Circular/sizing testing of all pipes to be used as conduit for power cables after all installation operations are completed.  (Sizing tool run in each conduit)

- Complete site clean-up.  Stabilization is to be done by others.  (See comments in Section 2)

- Provide technical submittals as required

- Provide testing, construction records, and as-built records

The following are excluded from our scope and   pricing:

- Furnishing and installing of Underground Cable or Accessories

- Site work to prepare work areas

- Environmental erosion and sediment control measures (i.e. silt fencing, hay bales, etc.)

- Access road and bridge construction/upgrades

- Terminations

- Station Material or construction

- Inclusion of buried pipe outside of the HDD specific pipe

- Trenching and laying of overbend pipe for buried conduit outside of the HDD construction

- Trenching to support cable installation

- Overhead line construction

- Insulation, nitrogen, water, or other cooling material(s) or installation to mitigate conductor cable heat generation conductor heat

## 3.1  Geographic and Site

The geographic location of the river crossing is being permitted at this time.  Campos EPC has based our   pricing on performing the project at the location currently shown on the Permit Applications and Issued for Permit Drawings.  We understand from communications previously had during engineering that the following site conditions exist or will exist at the time of mobilization:

- ROW for the pipe stringing of approximately 3482 LF of 7 strings of 10" pipe will be cleared of all trees and stumps by owner prior to mobilization of Campos EPC.  Campos EPC will be required to mow and grub grass and weeds, and final grade the stringing area.  No matting is to be provided in the stringing area

- The pad for setting up the HDD equipment and staging will be flat, grubbed, and ready for set up.  Matts will be required and provided by Campos EPC for the staging of equipment only.

- Access will be per the logging/camp access roads.  Campos will fix the road if its employees or subcontractors equipment damages the road upon entry or exit.  Normal day to day cleaning and sweeping of the road is to be done by others.

- Campos EPC intends to pilot drill from both sides of the river and will fully utilize the drill pads on both sides.

- It is our understanding  the project has been permitted for two (2) water wells to be drilled.  Our   pricing includes an estimate for drilling, plumbing and pumping water for these wells at a depth of 200' each.  We do not plan on trucking water as part of our pricing

- The project is intended to take place during the summer months of 2024.  We have not included snowplows winter conditions, or specific heating and blanketing in our pricing

## 3.2  Materials, Equipment, and Consumables

Campos EPC will provide the materials as currently specified in the 90% drawing package.  We have not been able to fully establish the order dates and availability of the specified materials, however we understand  the materials have been pre-ordered by Avangrid.  We have included the price for such materials in our pricing.  All miscellaneous materials and consumables required for the installation of the HDD and pull back of the seven (7) conduits will be provided by Campos EPC and its partners.

We will provide all required equipment to perform the HDD crossing and pull back of the 7 conduits through the HDD.  We will not provide conductors, Insulation, thermal grout, or any other items beyond the installation of the seven (7) 10-inch diameter conduits.

We have included the following as per miscellaneous materials:

- All nuts, bolts, gaskets, special fasteners, and miscellaneous hardware required to assemble and interconnect components and equipment necessary for a complete installation

- Field office and furnishings for Contractor's field supervisor and Owner's technical service representative. We are not providing temporary field offices for other contractors.

- Required infrastructure to support operations. The surrounding area contains no power stations, water, sewer, etc.

- Grouting and sealing materials and the placing thereof when required.  The hole is to be filled with the mud that is left after the HDD is completed.  No special thermal grouting, insulation grouting, or non-shrink grout is planned

- Erection drawings, prints, information, instructions, and other data for use by Contractor

- Detailed storage requirements for use by Contractor will be supplied prior to mobilization

## 3.3  SWPPP & Environmental Compliance

Campos EPC will maintain existing SWPP items put in place.  We understand that previous civil work has been done on the site and SWPP required items have or will be installed.  We will maintain and inspect these existing items.  Campos will have a SWPPP inspector on site throughout the project.  The SWPP inspector will also inspect for compliance with all environmental and ROW permit conditions.   All program work will be completed per the rates submitted and the unit prices for construction submitted and approved.

## 4. GENERAL CAMPOS EPC AND CHEROKEE DRILLING QUALIFICATIONS

Campos is a full-service Engineering, Procurement, and Construction provider.  We serve utility clients throughout the United States on both the electrical and natural gas services.  We have been providing turn-key EPC services since 2011.  For this project we are teamed with Cherokee Directional Drilling and have partnered with Cherokee on 6 completed complex directional drill projects.   Apart from working with Cherokee, Campos EPC has completed as EPC, EPCM, and ECM 20 directional drills in the last 4 years. The projects include HDDs for PG&E, SoCal Gas (Sempra), SDG&E, NiSource, Nipsco, Xcel, and National Grid.  We have provided engineering only on another 28 directional drills during that same time.

## 5. GENERAL CAMPOS REQUIREMENTS

### 5.1 Communication

Campos and Avangrid shall work interactively and collaboratively throughout the project's lifecycle. The following processes are required to ensure a consistent basis for the design of natural gas facilities is achieved and high-quality deliverables are provided.

- All significant communications shall be documented for filing and traceability purposes such as in an email.
- Communication shall be required between Avangrid and the Campos for all significant decisions.
- Documentation of all significant decisions affecting both the cost of services provided by Campos EPC and the total cost of the project shall be filed in Avangrid's project file.
- Campos EPC shall communicate issues or concerns to Avangrid, which are known to affect the cost or timeliness of any project.
- Communications with vendors and service contractors shall be documented and copied to Avangrid's appropriate team members.
- As applicable and appropriate, Campos shall proactively identify to Avangrid the need for coordination with outside public or private entities, which may relate or be impacted by a specific project.
- Identify and apply Avangrid's standards and communicate to Avangrid any deficiencies or out-of-date standards which contribute to project inefficiencies.

### 5.2 Coordination

- Campos is expected to work in close relationship and interact with Company representatives provided to the program as personnel resources (outlined below in General Responsibilities of Avangrid). Company appointed representatives will be performing as oversight to Campos in the individual roles.
- Coordination with Avangrid's Department Resources/ Interface will also be an expectation of Campos with tasks to assist with project organization (also outlined below in General Responsibilities of Avangrid).

### 5.3 Ancillary / Subcontracting

Campos will subcontract portions of the work.  Campos will require all its subcontractors to follow the same requirements as Campos and share this Program Execution Plan with all subcontractors.  It is the plan the Campos will utilize  Cherokee as one of its main subcontractors for construction.  Campos is ultimately responsible for all sub-contractor/ ancillary services performance and safety.

### 5.4 Reporting

Campos will follow any identified existing processes in this scope by an identified single representative such as a Project Manager to provide all reporting and communications to Avangrid Project Manager regarding general updates, daily and weekly progress reporting on projects. Essential reporting to include but not limited to:

## 5.5  Safety

Campos EPC and its partners will perform all work safely. This includes implementation of a proactive safety culture throughout the multiple organization. Safe work practices are expected by all levels of project team leadership down to each subconsultant / subcontractor and passed onto the individual employees performing the work. All safe work shall comply with OSHA requirements, local, state, and federal labor laws, along with all Company standards, reporting and processes. Additional safety provisions are defined for each individual scope of work below. Campos EPC and its Partners will have a full-time safety manager on site throughout the entire project.

We will require on-site safety training for each employee working on site prior to beginning work.  This is anticipated to last up to four (4) hours.  A Site-Specific Safety Plan (SSSP) will be issued to Avangrid for their review and comment thirty (30) days prior to mobilization but no sooner than the 15 days following the issuance of a signed and agreed upon Master Service Agreement and Purchase Order. As part of the SSSP Campos and its partners will hold a pre job brief at the beginning of each shift or when the work scope changes for the crew(s).

## 5.6  Performance Evaluations and Reporting

Campos will self-report all following metrics on a weekly cadence in a comprehensive dashboard/ dashboard per project and, if requested by Avangrid, Campos shall provide all data used to derive these Key Performance Indicators (KPIs).

### 5.6.1  Safety Metrics

Campos will report on the following

- All near misses reporting to show potential trends and allow Campos EPC and its partners to correct possible unsafe conditions prior to having any incidents
- Recordable safety incidents
- Environmental spills or issues with SWPPP and or permits
- Copies of JHAs will be available on site for review by Avangrid

### 5.6.2  Health / Safety / Environment / Security / Damage

- Campos will Submit Program Incident Tracking Log and reports including:
    - Health & Safety Incidents and Near Miss events
    - Environmental Incidents (ex. Spills, Inadvertent Fluid Releases outside of ROW, Illicit Discharges)
    - Security Incidents
    - All damages identifying not at fault and at fault damages to Avangrid or 3rd party property/ utilities
    - All incidents reported in writing to Avangrid PM within 24hrs
- Job Safety Analysis (JSA) filed per crew / per project.
- Proactive Safety Observations completed per Avangrid specified program.

# 6.  PROJECT MANAGEMENT

## 6.1  General

Campos will provide professional project management services for the project.

## 6.2  Scope of Services

Campos will provide qualified and experienced personnel to provide project management services. Campos will include the following functions, as required by each specific project:

- Lead the EPC Project Team, from start of contract through construction and closeout. Ensuring that all aspects of the project scope meet required standards and policies.
- Liaison between all project stakeholders, subcontractors, and internal departments
- Project scope refinement and alternatives analysis if required
- Project constructability review and stakeholder engagement

- Project scope and cost change estimates, cost estimate review & approval.
- Project design engineering review & approval.
- Monthly project cost forecasting/accruals
- Weekly project schedule review & approval.
- Risk identification, mitigation, realization, actioning, and drawdown.
- Change management review and approval.
- Project records management verification
- Project materials and sub-contracted service management.
  - Coordinate to verify materials availability and ensure order / delivery.
  - Resolve discrepancies with materials.
  - Review BOMs received from EPC Engineering for completeness.
- Project construction, testing, inspection, quality, and procedure management.
  - Coordinate construction subcontractors
  - Review and report on work progress
  - Plan ahead to prevent problems and resolve any emerging ones via RFC process
- End of project Lessons Learned documentation
- Contactor safety program adherence for the Campos EPC and any sub-contracted services. Including incident notification, escalation, investigation, and reporting.

### 6.2.1  Qualifications of Project Management Personnel

- Campos will provide a qualified project management team and work force through the assignment of project managers, assistant project manager, and/or field engineers with appropriate supervision, such that all deliverables are transmitted with acceptable quality and meeting all specified performance measures.
- Campos project management supervision shall be experienced and knowledgeable in the respective disciplines of natural gas facility planning, design, construction, and closeout.

## 6.3  Project Management Deliverables

Campos will provide deliverables to Avangrid that meet industry standards and practices where the Company standards are not specific. The following Deliverables will be provided in a timely and scheduled cadence for completion of the project.

- Risk Register & Change Log
- Project Summary Report (PSR)
- Permit Tracker for HDD work only
- Pre-Construction Readiness Plan
- Punchlist
- Work Order Closeout Checklist
- Contractor Safety Documents
- RFC's/ FCA's
- Weekly schedule updates
- Daily JHA's made available
- Daily work drawdown tracker
- Final job book and close out documents

## 7.  CONSTRUCTION MANAGEMENT

## 7.1  General

Campos shall provide qualified and experienced personnel to provide construction management services for the Program projects. Construction management services required of Campos shall include the following functions are required by each specific project and the program as a whole:

### 7.1.1  Pre-Construction

- Participate in design reviews providing constructability insights.
- Provide input into project construction schedule development.
- Facilitate the Pre-Construction meeting and completion of the Pre-Construction Readiness Plan checklist.

- Support the EPC Project Manager with coordination of materials, subcontractors, permits, easements, safety documents, etc.

#### 7.1.1.1 Permitting/ Public Relations/ Local Governance, Environmental

- Support Avangrid with construction drawings and sketches ads required for obtaining permits

### 7.1.2 During Construction

- Hold responsibility of main point of contact for all project team members and become the "communication hub" between the field construction and engineering / stakeholder team.
- Oversight of contractor and inspection, daily coordination of work tasks to ensure safe and quality work practices meeting company standards, applicable codes, and regulatory requirements.
- Attend and assist in site meetings with contractor crew(s) and inspection crews to debrief on safety concerns, scope of work planned for the day, coordination with other contractors, traffic control and issues that may impact work productivity, i.e., weather, equipment breakdowns, labor shortages, permitting, etc.
- Ensure that materials are being properly handled, stored, and protected by the crews from vandalism and/or theft.
- Daily progress reporting to project team to include summary of work completed, project issues and action items, construction photo reports, potential schedule conflicts or delays, safety issues and pertinent correspondence summaries including any scope of work changes and/or work direction from Company /city officials/county officials etc.
- Coordinate all field changes or issues on design with engineer. Provide details of the change and communication between contractor and engineer. Facilitate request for change and/ or change order associated (if applicable) and provide interim between EPC contractor and EPC engineer. Advise on changes and constructability. Report all changes to EPC PM regularly.
- The onsite EPC construction managers will have the authority to make sound judgmental decisions on the project. Any major project decision making shall be communicated with Avangrid prior to implementation. Avangrid will always have the final decision-making authority as the project's owner regarding scope changes.

#### 7.1.2.1 Safety

Campos will provide a safety manager that oversees project safety.  The construction manager will support the safety manager in the following ways:

- Monitor and maintain a safe project culture throughout the construction lifecycle in compliance with policies and industry standards outlined by OSHA, Campos, and Avangrid.
- Coordinate and communicate with everyone onsite the importance of safe working practices and techniques at all times during construction activities
- Oversight and heavy involvement with overall project safety. Stay involved and influence safety meetings, tailgate meetings, etc. inspect site safety regularly.
- Communicate all safety concerns and address as needed on case-by-case basis
- Verify all Tools and Equipment utilized for Construction work is in proper working order and the right tool/ equipment is used for the job

#### 7.1.2.2 Operator Qualifications (OQ)

Campos Construction Manager will verify that workers all have the proper operator qualifications to perform the work.  The construction manager will ensure that all work is done under the supervision of a competent person.

#### 7.1.2.3 Quality Control/ Quality Assurance/ Standards

- Construction Management has comprehensive project oversight for all QA/ QC.
- Assure Inspection is Traceable Verifiable and Complete.

- Coordinate and communicate with Avangrid appointed Site Construction Mangers and Oversight Inspectors for project specifications or issues.
- Relay and Notify any Quality Control issues or Non-Compliance reports to the proper people
- Identify and remediate any Abnormal Operating Conditions (AOC's).
- Campos Construction Manager will adhere to Campos Quality Control Plan that shall be submitted and reviewed for comment by Avangrid

### 7.1.2.4 On Site Presence

- The Construction Manager should remain onsite during construction activities at a minimum of 70% of the project(s) duration with 30% of his/ her time for administrative and/ or other business relations daily.
- Field check of project. Make routine project visits prior to construction activities to familiarize yourself with the area to assure compliance of easements, design requirements, special conditions of easement, overhead and underground utilities, changes to site, etc.

### 7.1.2.5 Right-of-Way Preparation (Clearing/Survey/Staking)

- Campos is not to perform ROW grading. Campos will mow and stake the ROW areas that we are working in. Campos will mow and maintain the ROW we are working in.

### 7.1.2.6 Material Handling (Pipe stringing, material storage, etc.)

**Construction Manager is responsible to assure:**

- Proper delivery, handling and staging of materials including staging of pipe/conduit
- Assure inspection maintains tally sheets for offloaded materials as well as placing documentation into the Job Book
- Verify materials that arrive in good condition and are free of defects. Report any defects or unacceptable material
- Ensure the construction contractor is providing accurate on-site receiving of materials and verification of project bill of materials (BOM). Contractor is to take ownership of all materials once received onsite.
- Verify and collect from inspection material testing report (MTR) and/or certificate of compliance (COC) accompanying received materials.
- Collect and organize MTR and or COC data sheets (No material is to be installed without associated documentation)
- Assist with reconciliation of excess materials and associated paperwork.

### 7.1.2.7 Material Installation

- Confirm that all pipe and material installation has been established per standards
- Verify that all manufactured articles, material, and equipment shall be applied, installed, connected, erected, used, cleaned, and conditioned, as directed by the manufacturer, unless specified to the contrary
- Maintain applicable processes while pull back of pipe is taking place
- Monitor the project for proper construction and installation techniques as needed.

### 7.1.2.8 Fusion and or Welding (procedures, qualifications, techniques)

- All fusions and or welds must be performed by a qualified and tested person
- Oversight and inspection of actual fusion and welding processes/ procedures to be performed by a certified inspector.
- Verify use of proper procedures
- Verify material(s) is/are consistent with the specified procedure as needed.

- Oversee the production of weld maps and verify accuracy, quality and completeness from inspection. (Submitted to the CM on a weekly basis)
- Confirm verification of qualifications with inspection)

### 7.1.2.9    Trenchless Technologies

- Verify collection and review daily drill report from contractors.
- Validate with contractor and inspection all one call notifications by the responsible contractors are complete and updated prior to any excavating and throughout the project timeline.
- Ascertain all excavation contractors are working closely with all foreign underground utility owners and following their ownership requests on exposing/ excavating underground utilities while abiding state and federal excavating standards.
- Confirm that conditions are acceptable prior to working in the trench i.e. proper sloping, shoring, egress and regress, changes in conditions, etc.
- Verify trenching and shoring complies with the specification of OSHA Standards, safety inspector and/or company standards.
- Verify bore pipe conforms to the project specification (engineer drawings, design, radius, etc.)
- Reassure submitting of contractor pre-bore profile (if applicable) for engineering approval. Be sure final bore profile is handed off to engineering for review and approval prior to pull back.
- Review all Inadvertent Fluid Releases (IFR). Determine severity and cleanup operations accordingly. Be sure all bore fluids are cleaned up and removed appropriately from site.
- As needed confirm depth of cover conforms to Avangrid standards and project specification(s)
- Verify clearances from other structures (permanent and temporary) comply with company standards and project specifications. Be sure contractors exercise due diligence in locating and excavating around all foreign utilities to mitigate line strikes.
- Review and compile all pothole logs from contractor(s) and inspection prior to trenching/ boring.
- Help monitor all damage prevention processes and assure processes are closely followed. i.e., best management practice of No mechanical digging within Company facilities, existing utilities and structures are locate verified prior to crossing, all one call notifications are responded to and/ or cleared, all Company owned pipelines follow the proper "watch and protect" guidelines, etc.

### 7.1.2.10    Pressure Testing

- Caliper Geometry Test:  A caliper geometry tool (pig) will be pulled through each of the conduits to verify roundness of the conduit within standard tolerances.  The caliper tool will provide data as to dents, buckles, and wrinkles in each conduit.  Campos EPC will submit to the CMP/Avangrid for review and approval the data from the caliper geometry tool run for each of the 7 conduits.  It is understood that there will be minimum bend radiuses as calculated that will be seen in the results of the caliper tool readings.  Prior to pull back, the minimum bend radiuses will be identified and will become the tolerance for the acceptance of the bends, buckles and wrinkles in the conduits as to allow for passage of the electrical conductors that others will install.
- Pressure Test: The pressure test will be performed by industry standards to verify that each individual conduit is continuous and has retained its designed tightness.  This test will either be performed by "Hydro Testing" or by air testing. The pressure test intends to show that the conduit does not have any breaks or punctures in it.  A pressure test by air will be performed prior to pulling the conduits into the drilled hole.  Once the conduit is pulled through the drilled hole a second test will be performed to show that it retains pressure.  At the contractor's discretion, the pressure test can be done with water or air.  At no

point will the pressure test use pressures that exceed the design pressures of the fused conduits. Prior to testing the engineering team will specify the test pressure for acceptance. The tests will be done to show that each conduit will hold steady pressure (compensated for temperature) for a 2 hour period.

### 7.1.2.11  Backfilling & Compaction

- No backfill and compaction is required

### 7.1.2.12  Tie Ins

- No Tie-Ins

### 7.1.2.13  Project Documentation Outline

- Obtain all associated engineering documentation. Ensure all team members have up-to-date project documentation. Maintain any revisions during construction and uphold communications with project team to affirm correct revisions are issued and followed.
- Verify inspectors are tracking/recording all pertinent project documentation and handing it off to CM on a regular basis.
- All as built and project documentation is critical in the construction phase of projects for a complete, traceable and verifiable record for the life of the asset. Assure accuracy of data.
- All project documentation shall be complete, neat and organized in structure.
- Coordinate with inspection, surveyors, engineering and construction contractor(s) to ensure all pertinent project documentation is collected, organized and composed for project completion deliverables.
- Ensure all project documentation is transferred and/ or handed off to the corresponding group. (Engineering firm, internal engineers, project manager, etc.)
- Contractors, subcontractors and inspection shall be informed in the kickoff of projects by the construction manager on documentation hand off coordination's.

### 7.1.2.14  Sub- Contractors

- Sub- Contractors can be diverse on projects. Construction Management is responsible for managing and coordinating/ organizing any direct sub- contractor in day-to-day construction operations with vendor project management.

## 7.1.3  Post-Construction

- Administer construction punch list.
- Coordinate material returns and transfers.
- Coordinate end of project contractor safety documents, lessons learned, and score cards.

### 7.1.3.1  As-Built and Project Documentation

- Provide final Drill path HDD
- Provide fusion map

## 7.2  Construction Management Deliverables

- Daily / Weekly Construction Management Reports
- Compiled OQ documents
- Compiled Contractor daily job safety analysis (JSAs)
- Compiled Contractor and Inspection daily reports
- Compiled Incident and IFR reports as needed
- Compiled Material Test Reports (MTRs) and/or Certificates of Compliance (COCs)
- Compiled Field-Testing reports (ex. NDT, Density, Concrete, Pressure Tests)
- Pre-Construction Readiness Plan
- Construction Punchlist
- Contractor Safety Documents

**ATTACHMENT B**

FORM OF PURCHASE ORDER – Not Used

B-1

Internal Use

**ATTACHMENT C**

OWNER INFORMATION – Not Used

C–1

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

**ATTACHMENT D**

WORK SCHEDULE

Insert Agreed to Work Schedule (Contractor to submit Schedule 15 days prior to mobilization)

D–1

Internal Use

**ATTACHMENT E**

KEY PERSONNEL – Campos EPC

E-1

Internal Use

**ATTACHMENT F**

APPROVED SUBCONTRACTORS & SUPPLIERS

F-1

Internal Use

DocuSign Envelope ID: 591BDF16-1AB5-4827-A4C4-43178BB161E2

**ATTACHMENT G**

DISTRIBUTION AGREEMENTS – Not Used

G–1

Internal Use

**ATTACHMENT H**

FORM OF APPLICATION FOR MILESTONE PAYMENT

TO:          [Owner Entity]
             [Address]

      ATTN:  Accounts Payable

**APPLICATION FOR MILESTONE PAYMENT**

Contractor's Application for Milestone Payment No.:  _____      Date:  _____

| Milestone Number | Milestone Description | Milestone Value |
|---|---|---|
|  |  |  |
|  | Total Milestone Value |  |

Prepared by:  _____

Date:  _____

ORIGINAL AGREEMENT SUM _____

Net Change by Change Orders

AGREEMENT SUM TO DATE _____

Less Set-off Amounts

Less Payments Made Pursuant to

Prior Applications for Payment       _____

Less 10% Retainage        _____

CURRENT APPLICATION

FOR PAYMENT        _____

BALANCE OF AGREEMENT SUM,

INCLUDING RETAINAGE      _____

Attachment: [Evidence pursuant to Section 8.1(c) and (d) of the Agreement]
      [Waivers and releases pursuant to Article 8.1(d)(B) or (C) of the Agreement]

H-1

Internal Use

**ATTACHMENT I**

SITE DESCRIPTION

New England Clean Energy Connect (NECEC Transmission, LLC) is proposing to construct a pipeline crossing of the Kennebec River, using the Horizontal Directional Drilling (HDD) method. The project involves the installation of a single HDD crossing, 3,481-feet in length, with seven (7) 10-inch DR 14 FPVC pipelines under the Kennebec River.  The physical design of the site is represented in the include "Issued for Permit Drawings".

I-1

Internal Use

**ATTACHMENT J**

FORM OF NOTICE OF COMMERCIAL OPERATIONS

[Letterhead of Owner]

To:     **[Name of Contractor]**
        [Address]

RE:     **Notice of Commercial Operations**

NECEC Transmission LLC (the "Owner"), pursuant to that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line, as part of The New England Clean Energy Connect (NECEC) Project, made by and between Owner and **[Name of Contractor]** (the "Contractor") and entered into as of the **[ • ]** day of **[ • ], [ • ]** (the "Agreement"), hereby issues this Notice of Commercial Operations to the Contractor, effective as of the **[ • ]** day of **[ • ], [ • ],** which is the Commercial Operations Date.

                    NECEC Transmission LLC
                    By:     _____
                    Title:  _____
                    Date:   _____

\\MI - 028195/000003 - 658133 v5

Internal Use

## ATTACHMENT K

### FORM OF CHANGE ORDER

| | **CHANGE ORDER** |
|---|---|

NEW ENGLAND
**CLEAN ENERGY
CONNECT**

P.O. Number:     [_____]
Agreement Title:   [_____]
Agreement No.:   [_____]
COR No:    [_____]  **Date:**  [_____]
COR Title:   [_____]

| **From:** | Contractor | **To:** | Owner |
|---|---|---|---|
| | [_____] | | NECEC Transmission LLC |
| | [_____] | | [_____] |

**Change Mgr Number:** 0000[_]                       **Reason Code:** [_____]

The Owner and the Contractor agree to the following Change in the Work to that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project entered into as of [____], 20[__] (as amended, supplemented or otherwise modified, the "**Agreement**"). Capitalized terms used but not defined herein shall have the meanings set forth therefor in the Agreement. This Change in the Work, including any adjustment to the Agreement Sum and/or the Work Schedule set forth herein, as applicable, agreed upon by the Parties pursuant to Article 9 of the Agreement, is considered an amendment to the Agreement. Except to the extent specifically described in this Change Order, the Change in the Work set forth herein does not relieve Contractor of its responsibilities set forth in the Agreement. Further, except as expressly modified by this Change Order, all of the terms, conditions, covenants, agreements and understandings contained in the Agreement shall remain unchanged and in full force and effect and the same are hereby expressly ratified and confirmed by the Parties.

Provided that this Change Order is executed by both Parties, this Change Order shall constitute a full and final settlement and accord and satisfaction of all effects of the Change(s) in the Work described herein, and shall be deemed to compensate the Contractor fully for such effects, unless otherwise provided in the detailed description below.

**Scope:**

**Description of Change:** [_____], as more particularly described in the following documents, which are expressly made a part hereof by this reference: *[List documents which describe the Change in Work, including the date of the last revision of any such document, if applicable.]*

## Agreement Sum*:

The original Agreement Sum was:

      $_____

K-1

Internal Use

The net adjustment to the Agreement Sum by previously
    executed Change Orders is:
      $_____

The Agreement Sum prior to this Change Order was:
      $_____

The Agreement Sum will be [increased] [decreased] by this Change Order
    in the amount of:
      $_____

The adjusted Agreement Sum, including this Change Order, will be:
      $_____

*In the event this Change Order has been authorized pursuant to Section 9.1(d) of the Agreement, pending resolution of a Dispute, or the Parties cannot agree upon the basis of compensation and the Owner has directed the Contractor to perform this Change in the Work on the basis of the all-inclusive labor rates and costs of Materials and Equipment set forth in Attachment L to the Agreement, this Change Order will not include an adjustment to the Agreement Sum. This is by virtue of the fact that the adjustment to the Agreement Sum attributable to the Change in the Work is yet to be determined, because such adjustment: (i) is subject to the resolution of a Dispute, or (ii) will be calculated on the basis of the all-inclusive labor rates and costs of Materials and Equipment set forth in Attachment R to the Agreement. In such event, upon the completion of the Change in the Work, a calculation of the adjustment of the Agreement Sum attributable to such Change in the Work will be determined subject to the resolution of the Dispute or on the basis of the all-inclusive labor rates and costs of Materials and Equipment set forth in Attachment R to the Agreement, as the case may be, and, thereupon a subsequent Change Order will be executed by the Owner and the Contractor to adjust the Agreement Sum in accordance therewith.*

**Work Schedule:**
Describe the impact of the Change in the Work on the Guaranteed Substantial Completion Date and/or the Guaranteed Final Completion Date which is/are impacted by this Change:

_____
_____

Except as expressly set forth herein, this Change in the Work has no impact upon either the Guaranteed Substantial Completion Date and/or the Guaranteed Final Completion Date.

Therefore, the Guaranteed Substantial Completion Date shall be [_____] and the Guaranteed Final Completion Date shall be [_____].

To the extent applicable, a revised Work Schedule is attached here to as Attachment [___].

This Change Order is not valid, except as otherwise provided in the Agreement, until fully executed by the Contractor and the Owner.

Internal Use

**IN WITNESS WHEREOF**, the Owner and the Contractor have agreed to execute this Change Order, and to be bound by the terms and conditions set forth herein, as of the date first written above.

**NECEC Transmission LLC**

Name:

_____

Title: _____

**[CONTRACTOR]**

Name:

_____

Title: _____

K–3

Internal Use

ATTACHMENT L

MILESTONE PAYMENT SCHEDULE

| Milestone Number | Milestone Description | Total Price Per Line Item |
|---|---|---|
| 001 | Notice to Proceed/PO Issued Payment | $ 6,000,000.00 |
| 002 | Pilot Hole Complete | $ 3,018,000.00 |
| 003 | Pipe Stringing Complete | $ 590,000.00 |
| 004 | Ream to 36" complete | $ 4,151,974.67 |
| 005 | Ream to 48" Complete | $ 2,913,637.33 |
| 006 | Pull Back Complete | $ 948,388.00 |
| 007 | Spoils Disposal | $ 910,000.00 |
| 008 | Submission of Project Closeout Package | $ 68,000.00 |
| 009 | Retainage Payment (10% held by Owner) | $ 1,400,000.00 |

\\MI - 028195/000003 - 658133 v5

**ATTACHMENT M**

OWNER'S PERMITS

- Presidential Permit (US Department of Energy)
- Certificate of Public Convenience and Necessity (Maine Public Utilities Commission)
- Certification (Maine Land Use Planning Commission)
- Natural Resources Protection Act, Site Location of Development, Water Quality Certification, Stormwater Management, Construction General Permit (Maine Department of Environmental Protection)
- Individual Permit for Waters of the U.S (US Army Corps of Engineers)
- Infrastructure in Vicinity of Airports (FAA)
- Shoreland Zone, Site Plan, Conditional Use, Flood Hazard Development, Special Exception, Variances, Driveway Entrance, Utility Location (Municipal Permits)

M−1

Internal Use

**ATTACHMENT N**
**FORMS OF LETTERS OF CREDIT – Not Used**

\\MI - 028195/000003 - 658133 v5

ATTACHMENT O

INSURANCE REQUIREMENTS

**Overview:**

Owner procured a general liability and excess liability Owner Controlled Insurance Program (hereinafter "the OCIP") and a Builder's All Risk policy for the Project. However, Owner reserves the right to have the Contractor provide these coverages, should the OCIP not provide certain efficiencies and with the understanding that there will be a change order for the costs not accounted for in Contractor's pricing.

**CASUALTY INSURANCE:**

**Section I – The OCIP**

The Contractor bid the Project with the assumption that the OCIP will be procured by the Owner and exclude all cost of insurance associated with any general liability and excess liability coverage.

Owner may engage Aon as the OCIP Administrator to assist with the administration of the OCIP and preparation of an Insurance Manual. Section I of these Insurance Requirements outlines the general terms and conditions that will be provided under the OCIP but are in no way intended to reflect all of the terms and conditions of the coverage. An Insurance Manual for the Project will be published at a later date, which by reference, will be incorporated into the Agreement. A sample copy of the Insurance Manual is attached to these Insurance Requirements but in no means reflects all of the actual terms and conditions of the OCIP. The Contractor hereby acknowledges receipt of the sample Insurance Manual.

   1. **Enrolled Parties and Their Insurance Obligations:**

All Persons and/or Contractors performing work at the Site are eligible to enroll in the OCIP, unless they are an Excluded Party as defined below. The OCIP will only cover Enrolled Parties, who include: the Owner, the Contractor and all non-excluded Subcontractors, and such other Persons as the Owner may designate, in its sole discretion (each Person or Contractor insured under the OCIP is an "Enrolled Party").

The Contractor shall obtain and maintain, and shall require all Subcontractors who are Enrolled Parties, to obtain and maintain the insurance coverage required pursuant to Section I, paragraph 7, as more particularly set forth in Section II, and in the Insurance Manual, for all off-Site operations.

O–1

**2. Excluded Parties and Their Insurance Obligations**:

The OCIP Coverages do not cover the following "Excluded Parties":

   a) Hazardous materials remediation, removal and/or transport companies and their consultants;

   b) Architects, surveyors, engineers and soil testing engineers and their consultants;

   c) Vendors, suppliers, fabricators, material dealers, truckers, haulers, drivers and others that merely transport, pick up, deliver or carry materials, personnel, parts or equipment, or any other items or persons to or from the Site that do not perform any actual labor at the Project;

   d) Subcontractors of all tiers that do not perform any actual labor on the Site; and

   e) Subcontractors performing site security, any labor staffing firms or subcontractors performing demolition that utilizes explosives; and

   f) Any Persons not specifically identified in this Attachment as Enrolled Parties, or otherwise excluded in writing by the Owner, in its sole discretion, even if they are otherwise eligible.

The Contractor shall require all Subcontractors who are Excluded Parties, and Persons not enrolled in the OCIP, to obtain and maintain the insurance coverage, required pursuant to Section I, paragraph 7, as more particularly set forth in Section II, and in the Insurance Manual, for all on-Site and off-Site operations.

**3.          OCIP Insurance Policies Establish the OCIP Coverages:**

The OCIP Coverages and exclusions summarized in this Attachment and in the Insurance Manual are set forth in full in their respective insurance policies. The summary descriptions of the OCIP Coverages in this Attachment and the Insurance Manual are not intended to be complete or to alter or amend any provision of the actual OCIP insurance policies. Notwithstanding anything contained in this Attachment or in the Insurance Manual to the contrary, in the event that any provision of this Attachment or the Insurance Manual conflicts with the OCIP insurance policies, the provisions of the actual OCIP insurance policies shall govern.

**4.          Summary of OCIP Coverages:**

OCIP Coverages shall apply only to those operations of each Enrolled Party performed at the Site (as defined in the OCIP insurance policies) in connection with the Work, and only to Enrolled Parties. The OCIP shall provide only the following insurance to Enrolled Parties:

**Summary of OCIP Coverages**

**(a) Commercial General Liability Insurance:**

Equivalent to ISO Occurrence Form, or its equivalent.

| | |
|---|---|
| Each Occurrence Limit | $2,000,000 |
| General Aggregate Limit | $4,000,000 |
| Products & Completed Operations Aggregate | $4,000,000 |

O–2

Products & Completed Operations Extension equal to the state statute of repose in the state in which the Project is located, or 10 years, whichever is less.

This insurance is primary for all occurrences at the Site as defined in the OCIP CGL insurance policy. The policy limits are shared by all Enrolled Parties and are dedicated to the Project

**(b) Minimum Excess Liability Insurance (over General Liability):**

| | |
|---|---|
| Combined Single Limit | $100,000,000 |
| General Annual Aggregate | $100,000,000 |
| Products & Completed Operations Aggregate | $100,000,000 |

Products & Completed Operations Extension equal to the state statute of repose in the state in which the Project is located, or 10 years, whichever is less.

The policy limits are shared by all Enrolled Parties and are dedicated to the Project

**5. The Owner's Obligations Under the OCIP**

a) The Owner shall pay the costs of premiums for the OCIP insurance policies and the Owner will receive or pay, as the case may be, all adjustments to such costs, whether by way of dividends, retroactive adjustments, return premiums, other moneys due, audits or otherwise.

b) The Owner assumes no obligation to provide insurance other than that specified in this Attachment, as set forth in the OCIP insurance policies.

c) Except as provided by applicable law, the Owner's furnishing of OCIP Coverages shall in no way relieve or limit, or be construed to relieve or limit, the Contractor or any Subcontractors of any responsibility, liability, or obligation imposed by the Agreement, the OCIP insurance policies, or by law, including, without limitation, any indemnification obligations which the Contractor, or any Subcontractor, has to the Owner hereunder.

d) The Owner reserves the right, at its option, to furnish other insurance coverage of various types and limits provided that such coverage is not less than that specified in the Agreement.

**6. The Contractor's OCIP Obligations:**

a) The Contractor hereby assigns to the Owner the right to receive all adjustments, and shall require that each Subcontractor to assign to the Owner the right to receive all such adjustments.

b) The Contractor shall enroll, and maintain enrollment in, the OCIP, and shall ensure that each Subcontractor and their Subcontractors of every level that is not an Excluded Party, enrolls and maintains enrollment in the OCIP. Enrollment shall take place within five (5) days of execution of this Agreement and a receipt of the Notice to Proceed, or Limited Notice to Proceed, as the case may be, and, in any case, prior to commencement of any Work. The Contractor shall comply with all of the requirements set forth in this Attachment, the Insurance Manual, and the OCIP insurance policies, and shall cause the Subcontractors to do the same.

O–3

c) The Contractor shall incorporate the terms of this Attachment into all subcontracts with Subcontractors and require that they incorporate the terms of this Attachment into all subcontracts with their Subcontractors of every level, *mutatis mutandis*.

d) The Contractor shall provide, to each Subcontractor, a copy of the Insurance Manual and shall ensure that each Subcontractor, whether an Enrolled Party or an Excluded Party, complies with the provisions of the OCIP insurance policies, the Insurance Manual and this Attachment, as pertain to such Enrolled Party or Excluded Party. The failure of the Contractor to provide each of the Subcontractors with a copy of the same shall not relieve the Contractor, or any Subcontractors, of any of the obligations contained therein, and the Contractor shall be liable to the Owner for any Subcontractor's failure to comply with any such obligations.

e) By entering into the Agreement, the Contractor hereby acknowledges, and shall require each of the Subcontractors to acknowledge, in writing, that the Owner and the OCIP Administrator are not agents, partners, or guarantors of the insurance companies providing the OCIP insurance policies (each such insurer is an "OCIP Insurer"), that neither the Owner nor the OCIP Administrator is responsible for any claims or disputes between or among the Contractor, the Subcontractors, and any OCIP Insurer(s), and that neither the Owner nor the OCIP Administrator guarantees the solvency, or the availability of limits, of any OCIP Insurer(s). Any type of insurance coverage or limits of liability in addition to the OCIP insurance policies that the Contractor, or the Subcontractors, maintained for their own protection, or that is required by applicable laws or regulations, shall be the Contractor's or the Subcontractors' sole responsibility to obtain and maintain, at the Contractor's or Subcontractors' sole cost and expense, as the case may be, and the Owner shall not be liable, to any extent, for any such cost or expense.

f) The Contractor shall comply, and require all Subcontractors, who are Enrolled Parties, to comply with OCIP Administrator's instructions for enrolling in the OCIP using Aon Enrollment Form or electronically using "AonWrap" (if available) and for electronically reporting payroll using "AonWrap".

g) The Contractor shall reasonably cooperate, and require all Subcontractors to reasonably cooperate, fully with the OCIP Administrator and the OCIP Insurers, as applicable, in its or their administration of the OCIP.

h) The Contractor shall provide, and require all Subcontractors to provide, within five (5) days of the Owner's or the OCIP Administrator's request, all documents or information as requested. Such information may include, but is not limited to, payroll records, certificates of insurance, safety records or history, OSHA citations, or such other data or information as the Owner, the OCIP Administrator, or OCIP Insurers may reasonably request in the administration of the OCIP, or as required by the Insurance Manual.

O–4

i) The Contractor shall, and shall cause each Subcontractor to, be responsible to (i) promptly report to a representative designated by the Owner in writing any accident on the Site; (ii) promptly provide any form or document required by or related to the OCIP; and (iii) report in writing to the representative designated by the Owner the identity of every entity performing or to perform any portion of the Work at least 10 business days prior to commencement of the Work.

j) The Contractor agrees that the Owner, the OCIP Administrator, and/or any OCIP Insurer may audit the Contractor's or any of the Subcontractors' payroll records, books and records, or any subcontracted Work.

k) The Owner may, for any reason, modify the coverage provided by the OCIP insurance policies, discontinue the OCIP or any part thereof, or request that the Contractor, or any of the Subcontractors who are Enrolled Parties, withdraw from the OCIP upon written notice. Upon such notice, the Contractor shall obtain and thereafter maintain during the performance of the Work, all (or a portion thereof as specified by the Owner) of the Coverages as mandated to be in force for Excluded Parties. The form, content, limits of liability and the insurer issuing such replacement insurance shall be subject to the requirements of Section I, paragraph 7, as more particularly set forth in Section II, for operations both on and off the Site. The cost of the replacement insurance shall be at the Owner's expense. but only to the extent of the applicable costs of the OCIP insurance policies.

l) To the extent permitted by law, and with respect to the OCIP coverages only, the Contractor and Subcontractors of all tiers hereby waive all rights of recovery because of deductible clauses, inadequacy of limits of any insurance policy, limitations or exclusions of coverage, or any other reason, against the Owner, its Affiliates, the OCIP Administrator, the Owner's Lenders, and all of their employees, agents, partners, shareholders, members, directors, officers, managers, contractors, consultants and permitted assigns. The Contractor shall also ensure that all Subcontractors maintain insurance coverage related to the Work, and include clauses in all policies of insurance providing that each insurer shall waive all of its rights of recovery by subrogation against the Owner, its Affiliates, the OCIP Administrator, the Owner's Lenders, and all of their employees, agents, partners, shareholders, members, directors, officers, managers, contractors, consultants and permitted assigns. To the extent permitted by law, the Contractor shall ensure that similar written express waivers and insurance clauses are obtained from each of the Subcontractors.  A waiver of subrogation shall be effective as to Person, even if such Person (a) would otherwise have a duty of indemnification, contractual or otherwise, (b) did not pay the insurance premium directly or indirectly, and (c) whether or not such individual or entity has an insurable interest in the property damaged.

m) The Contractor acknowledges and agrees, and shall require each of Subcontractors to acknowledge and agree, that:

O–5

(i)     All information submitted to the Owner, or to the OCIP Administrator, shall be accurate and complete.

(ii)    Enrolled Parties have had the opportunity to read and analyze copies of the OCIP insurance policies provided to Contractor. Any reference or summary in the Agreement, this Attachment, the Insurance Manual, or elsewhere, as to the amount, nature, type or extent of OCIP Coverages, and/or potential applicability to any potential claim or loss, is for reference only. The Contractor and the Subcontractors have not relied upon said reference, but solely upon their own independent review and analysis of the OCIP insurance policies in formulating any understanding and/or belief as to the amount, nature, type or extent of any OCIP insurance policies and/or their potential applicability to any potential claim or loss.

**7. Additional Insurance Required from Enrolled Parties and Excluded Parties:**

Enrolled Parties shall provide all insurance set forth in Section II for off the Site operations as well as the conditions noted below:

a)  When Enrolled in the OCIP for all operations off the Site (as defined by the OCIP insurance policies) – General Liability and Excess Liability insurance; and

b)  For all operations both on and off the Site if the Owner discontinues the OCIP – General Liability and Excess Liability insurance.

**Section II**

The insurance requirements set forth in this Section II shall only apply in the event that the Owner elects not to provide insurance through the OCIP, or as otherwise specifically noted in Section I (e.g., with respect to Excluded Parties).

The Contractor shall purchase and maintain insurance of the types and in the amounts described below. The insurance shall be written by insurance companies and on policy forms reasonably acceptable to the Owner. Each insurer providing insurance coverage as required hereunder shall be authorized to conduct business in each state in which any part of the Work is performed. The insurer shall have an AM Best rating of "A- VII" or better.  The Owner, in its sole discretion, shall have the right to reject any insurer.

**1 Worker's Compensation & Employer's Liability**

Statutory Worker's Compensation coverage (including occupational disease) will be provided for the state in which the Project is located and the state of hire, if different. Employer's Liability Coverage will be provided with the following limits:

- Bodily Injury by Accident        $1,000,000    Each Accident
- Bodily Injury by Disease         $1,000,000    Policy Limit
- Bodily Injury by Disease         $1,000,000    Each Employee

O–6

Terms and conditions shall include:

- Waiver of subrogation in favor of the Owner
- USL&H - where applicable by law
- Jones Act - where applicable by law
- Other states endorsement - where required by Applicable Law
- Employers Liability/Stop Gap Liability if required in the State where the work is performed
- Where required in the State where the work is performed coverage must be secured through the State fund of that State
- Certificate must clearly identify that coverage applies in the state in which the Project is located
- The policy shall include a waiver of subrogation in favor of the Owner unless prohibited by state law.
- Contractor or any Subcontractor who leases employee or employees through payroll, employee management, or other company must have Alternate Employer Endorsement applicable on a blanket basis.

**2 Commercial or Comprehensive General Liability**

Coverage will be provided with the following limits:

- Bodily Injury and Property Damage Liability - Per Occurrence          $2,000,000
- Personal and Advertising Injury Limit - Per Person/Organization   $2,000,000
- Products - Completed Operations Aggregate Limits                          $4,000,000
- General Aggregate Limit                                                                   $4,000,000

Commercial/Comprehensive General Liability policy must be written on an "occurrence" form CG 00 01 (or equivalent) and include the following coverages:

- Owner as an additional insured on a primary and non-contributory basis on ISO form CG 20 10 10 01 or CG 20 10 07 04
- Independent Contractors, covering operations of the Contractor, and any and all Contractors and sub-subcontractors Broad Form Property Damage
- Ongoing Construction Operation(s) in effect at all times while work is being performed by the Owner
- Products and Completed Operations, to remain in force through the statute of repose or the time within which to file a lawsuit, whichever is longer whether by endorsement or renewal of coverage on ISO form Comp Ops on 07 04 or 10 01
- Owner, its Affiliates, the Owner's Lenders, any party required to be indemnified by the Agreement and any other party required by the Agreement to be named as an additional insured
- Waiver of subrogation in favor of the Owner
- No coverage restrictions for explosion, collapse, and underground hazards

O–7

- Contractual Liability (insured contract) coverage sufficient to meet the requirements of the Agreement (including defense costs and attorneys' fees assumed under the Agreement)
- Personal and Advertising Injury Liability coverage (with the contractual exclusion deleted)
- If applicable to the Work, the following coverage must be obtained:
  - Subsidence
  - Operations performed within 50' of railroad with railroad contractual exclusion deleted
  - All residential operations, no residential exclusions

Contractor will furnish Certificates of Insurance providing evidence that the Owner, its Affiliates, the Owner's Lenders, and any other Persons required by this Attachment or the Agreement, are additional insureds on a primary, non-contributory basis for both ongoing and completed operations. A copy of the CGL blanket additional insured Endorsement(s) must be attached to the Certificate of Insurance. The policy shall include a waiver of subrogation in favor of the Owner, and any other Person as may be required by this Attachment.

## 3    Automobile Liability

Commercial Automobile Liability insurance covering all owned, leased and non-owned vehicles used in connection with the work with limits of $1,000,000 combined single limit per accident for bodily injury and property damage which shall apply as primary and non-contributory insurance.  The Owner, its Affiliates and the Owner's Lenders shall be additional insureds on a primary and non-contributory basis but only to the extent of Contractor's indemnity obligations under the Agreement. The policy must include coverage for bodily injury, death and property damage arising out of ownership, maintenance, or use of any motorized vehicle on or off the Site, including contractual liability coverage.

If hauling of hazardous waste as defined in the Motor Carrier Act of 1980, as amended, is part of the Work, Automobile Liability Insurance with a $1,000,000 combined single limit per occurrence for bodily injury and property damage applicable to all hazardous waste hauling vehicles, and including the MCS 90 endorsement and the ISO Form CA 99 48 or equivalent (Pollution Liability Broadened Coverage for Business Automobile).

The policy shall include a waiver of subrogation in favor of the Owner, and any other Person as may be required by this Attachment.

## 4 Umbrella/Excess Liability

Umbrella or Excess Liability Insurance ("Umbrella") including coverage that is no more restrictive than scheduled underlying insurance including CGL, Employer's Liability and Automobile Liability. Each such excess/umbrella insurance policy shall be primary and noncontributing to any insurance of the Owner and any other additional insured to the extent of Owner's additional insured status.

O–8

The Umbrella insurance shall have the following minimum limits of liability, which shall be maintained with per occurrence and aggregate limits available to the Owner, its Affiliates, the Owner's Lenders, any party required to be indemnified by the Agreement and any other Person required by this Attachment or the Agreement to be named as an additional insured:

- Each Occurrence        $10,000,000
- General Aggregate      $10,000,000

Subcontractors shall have the following limits of liability:

- Each Occurrence        $10,000,000
- General Aggregate      $10,000,000

## 5 Contractor's Pollution Liability and Contractor's Pollution Legal Liability

The policy shall provide coverage as follows:

- Contractor's Pollution Liability (CPL) Insurance covering Bodily Injury, Property Damage, Cleanup Costs, Emergency Response and Defense Costs which the Contractor is legally obligated to pay as a result of Pollution Conditions arising out of Work performed by or on behalf of the Contractor
- Occurrence policy form on a CCIP basis (Named Insureds = the Contractor and all Subcontractors of every tier performing Work related to the Project)
- Minimum limits of $5M Each Pollution Condition/$5M Policy Aggregate
- $100,000 Maximum SIR/Deductible per Pollution Condition (unless approved by Owner)
- CPL insurance must be in effect for the period of the Work, commencing on the first day of contracting services at a jobsite and for not less than two (2) years completed operations following Substantial Completion.
- Delay in Construction Schedule as a result of Pollution Condition caused by Covered Operations
- Bodily injury, sickness, disease, mental anguish or shock sustained by any person, including death; medical monitoring not linked to physical injury
- Pollution Conditions arising out of transportation of goods, materials or waste to or from Job Sites (including staging and storage areas) by Contractor-owned or third-party conveyances including vehicles, vessels, aircraft, rail or rolling stock
- Coverage for Pollution Conditions arising at, on, under or emanating from non-owned disposal sites where materials including wastes from Contractor Operations associated with the Project are deposited, stored or treated
- Property damage including;
  - Physical injury or destruction of tangible property including resulting loss of use, clean-up costs, and loss of use of tangible property that has not been physically injured or destroyed
  - Natural Resource Damage as established by federal law (U.S.C.1801 et seq.), any state, local, provincial or foreign government or Native American Tribe

O–9

o Diminution in the value of third-party Property
- Emergency Response Costs with no sublimit and 21 days to report
- Sudden and non-sudden pollution conditions
- Blanket Additional Insured as required by contract
- Policy shall not include designated Choice of Law, Jurisdiction or Venue provision
- Other Insurance Primary and Non-Contributory
- Notice of Cancellation 120/30
- Policy shall have no exclusions or limitations for loss occurring over water including but not limited to a navigable waterway
- Exclusion for asbestos and lead paint shall be limited to abatement of materials from buildings or structures
- No exclusion for silica dust
- Definition of Covered Operations/Your Work shall include Site-Specific Pollution Liability Coverage for Storage and Staging Areas related to the Project
- Waiver of subrogation in favor of the Owner

**6 Professional Liability Coverage (CPPI)**

Contractor's Professional and Protective Indemnity insurance for all professional services rendered by or on behalf of lead contractor related to (including but not limited to) professional, advisory, architectural, engineering, environmental, design and survey services, and provided in conjunction with the insured project.

Named insured shall be the Contractor and the additional named insureds shall include all consultants, of all tiers, rendering professional services to the project. The limits shall be $5,000,000 per claim/project aggregate for Professional Liability and $5,000,000 for Cyber Liability and the deductible shall be no greater than $1M unless approved by the Owner. The policy shall provide coverage as follows:

- Shall be in effect from the Notice to Proceed through Substantial Completion and for at least two (2) years (or the maximum that is commercially available) following Substantial Completion with a Retroactive Date to the date first design services were provided for the Project by or on behalf of the Insured (including preliminary design work)
- Owner shall be provided Indemnified Party Status
- Rectification Coverage to allow the Insured to make corrections to identified Design Defects without third-party Claims.
- Exception to Faulty Workmanship Exclusion for Claims arising out of rendering or failure to render Professional Services
- Exception to Exclusion for Fines, Penalties and Punitive Damages where coverage for same is allowed by law
- Exception to Liquidated Damages Exclusion (if any) to the extent of actual damages caused by rendering or failing to render Professional Services by or on behalf of an Insured
- No Exclusion for Professional Liability Damages associated with Pollution Conditions

O–10

- Waiver of Subrogation in Favor of Owner
- Notice of Cancellation 120/30
- Broad definition of insured to include any other firm(s) which have or will provide professional services in regard to the project (no mid-term reporting requirement)
- Modification of faulty workmanship exclusion as long as it is arising out of professional services.
- Revised Liquidated Damages exclusion as long as it is equal to the insured's liability had there been no contractual obligation of the insured or a claimant to pay LDs.
- Policy shall not include designated Choice of Law, Jurisdiction or Venue provision

**General Requirements**

- **Certificate of Insurance and Proof of Insurance**: Prior to commencing its performance under the Agreement and anytime thereafter when required insurance changes or is modified, the Contractor shall provide the Owner with: (1) a current ACCORD or equivalent certificate of insurance evidencing the insurance coverages required by this Attachment (including the amount of any deductible); (2) a copy of the provisions in the policy or the endorsement adding the Persons required by this Attachment to be added as additional insureds; (3) a copy of the primary and non-contributory endorsement for the additional insureds; and (4) a copy of the blanket waiver of subrogation endorsement which shall operate in favor of the additional insureds required hereunder.

Owner may, at its discretion request complete copies of the Contractor's policies.

- All Certificates of Insurance shall provide for 30 day written notice to the Owner prior to the cancellation of any insurance referred to therein.
- The Owner shall have the right, but not the obligation, to prohibit the Contractor and/or any Subcontractor from entering the Site until a Certificate of Insurance indicating full compliance with these requirements is received and approved by the Owner and that approval shall not be unreasonably delayed.
- **Subcontractors**: Before permitting any Subcontractor to perform Work under a subcontract, the Contractor shall require by written contract that such Subcontractor maintains insurance as determined by the Contractor in like form and amounts to that required by this Attachment, unless otherwise approved in writing by the Owner.   The Contractor shall be responsible to require that each Subcontractor maintains insurance in such form and amounts, and shall provide evidence of same to the Owner if requested.
- **The Contractor** shall provide Certificates of Insurance for one (1) year following the Substantial Completion Date.

O-11

- **Notice of Cancellation**: The Contractor acknowledges, and shall require the Subcontractors to acknowledge, that all required coverages shall confirm that the insurance will not be cancelled with less than 30 days written notice by mail to the Owner, and, upon demand, the Contractor shall also provide an endorsement from its insurance carrier(s) to such effect.

- **Scope/Limits of Insurance**:

- **Notice to Insurers**: The Contractor and the Subcontractors are responsible for notifying their insurance carriers in the event of a loss or potential loss involving coverage for the additional insureds. However, this does not prohibit any additional insured from reporting a claim directly to the Contractor's, or any Subcontractor's, insurance carriers.

- **Retentions/Denial of Claims**:  The Contractor shall be responsible, at no additional cost to the Owner, for the payment of any deductibles or SIR in connection with the insurance coverages required by this Attachment, both for itself and all additional insureds. The Contractor may not procure policies that limit who may pay the SIR or deductible; rather, any SIR or deductible shall be payable by either the Contractor or the Owner.

- **OCIP Exclusion Limitation**: The insurance required to be provided by a Contractor pursuant to this Attachment O shall not contain any exclusion or limitation of coverage for any insured because an OCIP has been provided for this Project, except to the extent that coverage is provided by the OCIP Insurance Policies and insurance of Contractor is excess to said OCIP.

- **No Limitation**: The insurance requirements set forth and the coverage maintained by Contractor shall not limit any of Contractor's indemnity obligations or other liabilities under the Agreement or any subcontract with a Subcontractor.

- **Severability of Interests (Cross Liability)**: All insurance required by this Attachment (excluding only Workers Compensation/Employer's Liability Insurance and Professional Liability Insurance to the extent provided herein) shall include a provision or be endorsed to provide that, inasmuch as the policy is written to cover more than one insured, all terms, conditions, insuring agreements and endorsements, with the exception of limits of liability, shall operate in the same manner as if there were a separate policy covering each insured. No cross liability exclusions are permitted and there may not be any restrictions in any policies that limit coverage for a claim brought by an additional insured against a named insured. **Claims Made Policies**: Except for Professional Liability (to the extent required), Pollution Liability, and Environmental and Asbestos Insurance, claims made policies are not acceptable. Those policies permitted to be on a claims made basis shall be effective (retroactively, if

\\MI - 028195/000003 - 658133 v5

applicable) from the date of commencement of all activities in connection with the work until six (6) years after the Commercial Operations Date.

- **Effect of Specified Coverages**: In specifying requirements in this Attachment, the Owner does not assert or recommend this insurance as adequate to Contractor's own liability.  The Contractor is solely responsible to inform itself of types of insurance it may need beyond these requirements to protect itself from loss, damage or liability.  Any failure of the Contractor to identify deficiencies in any insurance provided hereunder shall not relieve the Contractor from any insurance obligations.

## BUILDER'S RISK INSURANCE

Owner shall procure and maintain Builders Risk insurance insuring the Work against all risks of physical loss or damage to property of every kind and description to be used in the fabrication, assembly, installation, erection or alteration of the Work, except those risks specifically excluded by the policy.  The policy shall provide inland transit coverage for domestic-sourced equipment and material transported within the Continental United States, off-site storage, start-up and testing, and debris removal.  The policy will also insure against the perils of windstorm, fire, lightning, explosion, collapse, earthquake and flood, mechanical breakdown, theft, vandalism, and malicious mischief from the Commencement Date through issuance of a Final Acceptance Certificate by Owner.  Coverage shall not exclude resulting loss or damage due to faulty workmanship, materials or design, except for related costs for rectification or repair of such faulty workmanship, materials or design.  Coverage shall be written on a completed value basis in an amount not less than 100% of the replacement value of the property under construction, including the equipment under various Purchase Agreements, and property of any kind purchased by Contractor in Owner's name plus other values Owner requires to be insured.

*The Builder's Risk policy shall extend to the horizontal and directional drilling (HDD) operations related to water crossings and other underground work. The HDD contractor shall accept risk of loss related to the HDD operations, in excess of the covered amount.*

Contractor, including subcontractors, lower-tier subcontractors and Lender shall be named as insureds and Owner, Contractor and subcontractors and suppliers waive subrogation against each other for damage to the extent covered by the builders risk insurance obtained pursuant to this subsection. The builders risk policy shall be endorsed to provide for the waiver of subrogation; provided that vendors or suppliers of Equipment will not be provided a waiver of subrogation for faulty design or materials. Owner shall furnish to Contractor copies of such policy of insurance showing that such policy is in effect and contains a provision to the effect that it may not be canceled except on at least thirty (30) days' prior written notice to Contractor.

\\MI - 028195/000003 - 658133 v5

Contractor and Owner shall cooperate in good faith to meet all terms and conditions of the Builders Risk policy, including claims reporting, claims adjustment with the insurer and other provisions of the policy.  All insured claims will be adjusted by Owner as fiduciary.  Any premiums for extension of the Builders Risk policy beyond the initial term of the policy shall be paid by Owner.  Owner shall provide evidence of the insurance provided by Owner pursuant to this Section.

The policy shall provide the following:

- Coverage for all property under construction, temporary works, declared existing property, and energized transmission lines
- Boiler and machinery
- Transit coverage
- Leg 3
- Property in transit
- Industry standard sub-limits
- AOP deductible shall not exceed $1.0M and to the extent that there will be separate flood and named storm deductibles, those shall be agreed upon prior to the procurement of the coverage.
- Severability of interest
- Notice of cancellation 30/10
- Primary & Non-Contributory
- Waiver of subrogation

**ATTACHMENT P**

FORMS OF WAIVERS AND RELEASES

[*The Attachment begins on the following page.*]

**Exhibit P-1**

**CONTRACTOR'S FORM OF PARTIAL WAIVER AND RELEASE**

This CONTRACTOR'S PARTIAL WAIVER AND RELEASE ("Contractor's Partial Waiver and Release") is made by [ • ], a [ • ] existing under the laws of [ • ] ("Contractor"), on behalf of itself, its successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of [ • ] Dollars ($[ • ]) ("Payment") and other good and valuable consideration, in hand paid, the receipt and sufficiency of which are hereby acknowledged, as full payment on account of all Work performed, other work product and materials prepared (whether or not finally delivered) through [ • ], 201[ • ] ("Release Date") in connection with that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project ("Project"), dated as of [ • ], 20[ • ] by and between Contractor and **NECEC Transmission LLC**, a [____] existing pursuant to the laws of the State of [____] ("Owner") (as the same may be amended, modified and supplemented from time to time, "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Conditioned solely upon the receipt of the Payment by the Contractor, the Contractor does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit-claim all claims, actions, demands, liens, lien rights and claims of lien, of any kind whatsoever, which Contractor ever had or now has, whether known or unknown, with respect to the Work, the Project, the Agreement, the Site or any fixtures or personal property located thereon or included in the Project, the Work and other work product, or against the Owner, any Affiliate of the Owner, any Owner's Lenders, and their partners, managers, parents, subsidiaries and other affiliates, at all tiers, and all of their respective insurers, sureties, employees, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively, "Released Entities"), including, without limitation, all claims related to, in connection with, or arising out of, all facts, acts, events, circumstances, changes or extra work, constructive or actual delays or accelerations, interferences and the like, which have occurred or may be claimed to have occurred.

The Contractor warrants and represents that (a) the Contractor has not assigned or pledged any rights or claims in any amount due or to become due from the Owner; (b) payment has been or will be made to all Subcontractors, laborers and material suppliers, at all tiers, for all labor, services, materials and equipment furnished by or through the Contractor; (c) no claims from Subcontractors, vendors, mechanics or materialmen against the Released Entities or the Work have been submitted to the Contractor or remain unsatisfied as of the date hereof; (d) no mechanics' or materialmen's liens or liens for professional services have been filed by Contractor's Personnel, Contractor, its Subcontractors, affiliates, or any Persons performing

P–2

services or materials for any them in connection with the Work, that have not been discharged or for which a bond has not been posted; and, (e) payment of all amounts due has been made to all Contractor's consultants, employees, Subcontractors, laborers and material and equipment suppliers, at all tiers, and all other entities, for all labor, services, Work or other work product or materials and equipment furnished by or through the Contractor for the performance of the Work, including, without limitation, all payroll taxes and contributions required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for use by the Owner or in connection with the Work.

The Contractor agrees to defend, indemnify and hold the Released Entities harmless from and against any and all actions, causes of action, losses or damages of whatever kind, including, without limitation, reasonable attorneys' fees and costs in arbitration and at the pre-trial, trial and appellate levels, which the Released Entities may suffer by reason of (a) any claim made against any of the Released Entities, the Site, the Project, the materials, the equipment or the Work relating to labor, services, materials or equipment furnished by or through the Contractor, or (b) any breach of any representation or warranty made by the Contractor to the Owner, including the representations and warranties included herein, any false statement made in this Contractor's Partial Waiver and Release or any misrepresentation or omission made to the Owner by the Contractor.

The Contractor acknowledges and agrees that (a) the Owner is relying upon the representations and warranties made herein as a material inducement for the Owner to make payment to the Contractor; (b) this Contractor's Partial Waiver and Release is freely and voluntarily given by the Contractor, and the Contractor has had the advice of counsel in connection herewith and is fully informed as to the legal effects of this Contractor's Partial Waiver and Release, and the Contractor has voluntarily accepted the terms herein for the consideration recited above; and (c) the tendering of payment by the Owner and the receipt of payment and the execution of this Contractor's Partial Waiver and Release by the Contractor shall not, in any manner whatsoever, release the Contractor from (i) its continuing obligations under the Agreement, including obligations with respect to the completion of any Work that remains incomplete; (ii) any contractual, statutory or common law obligations of the Contractor with respect to the Released Entities; or (iii) any other obligations of the Contractor with respect to Released Entities.

[**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES APPEAR ON FOLLOWING PAGE.**]

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-13178BB1E1E2

Dated this ____day of _____, 201___.


WITNESSES:                                    Contractor:


_____            By:_____
Name:_____            Name:_____
                                             Title:_____
_____            Address:_____
Name:_____            _____
                                             _____


**[CONTRACTOR TO INSERT APPLICABLE NOTARIAL ACKNOWLEDGMENT HERE]**

\\MI - 028195/000003 - 658133 v5

Exhibit P-2

## SUBCONTRACTORO INSERT APPLICABLE NOTARIAL ACKNOWLED

This SUBCONTRACTOR'S PARTIAL WAIVER AND RELEASE ("Subcontractor's Partial Waiver and Release") is made by [ • ], a [ • ] (the "Releasor"), on behalf of itself, its successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of [ • ] Dollars ($[ • ]) ("Payment") and other good and valuable consideration, in hand paid, pursuant to that certain Subcontract made as of [ • ], 201[ • ], by and between Releasor and [ • ], a [ • ] ("Releasor's Contractor"), the receipt and sufficiency of which are hereby acknowledged, as full payment on account of all labor, services, equipment and work product and materials prepared (whether or not finally delivered), through [ • ], 201[ • ] ("Release Date"), in connection with that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project ("Project"), dated as of [ • ], 20[ • ], by and between [_____], a [_____], existing pursuant to the laws of the State of [_____] ("Contractor") and **NECEC Transmission LLC**, a [_____] existing pursuant to the laws of the State of [_____] ("Owner") (as the same may be amended, modified and supplemented from time to time, "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.


Conditioned solely upon the receipt of the Payment, the Releasor does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit claim all claims, actions, demands, liens, lien rights and claims of lien, of any kind whatsoever, which Releasor ever had or now has, whether known or unknown, with respect to the Work, the materials, the equipment, the Agreement, the Site or any fixtures or personal property located thereon or included in the Work and other work product or services, or against the Owner, any Affiliate of the Owner, the Owner's Lenders, the Contractor, the Releasor's Contractor (if different from the Contractor), and their respective partners, managers, parents, subsidiaries and other affiliates, at all tiers, and all of their respective insurers, sureties, employees, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively, the "Released Entities"), including, without limitation, all claims related to, in connection with, or arising out of, all facts, acts, events, circumstances, changes or extra work, constructive or actual delays or accelerations, interferences and the like, which have occurred or may be claimed to have occurred.


The Releasor warrants and represents that (a) the Releasor has not assigned or pledged any rights or claims in any amount due or to become due from the Releasor's Contractor or the Contractor, as the case may be; (b) payment has been or will be made to all of its subcontractors, laborers and material suppliers, at all tiers, for all labor, services, materials and equipment furnished by or through the Releasor; (c) no claims from any of its subcontractors, vendors, mechanics or materialmen against the Released Entities, the Work, the materials, the equipment or the Site have been submitted to Releasor or remain unsatisfied as of the date

P-5

hereof; (d) no mechanics' or materialmen's liens or liens for professional services have been filed by Releasor, its subcontractors, affiliates, or any persons performing services or materials for any them in connection with the Work, that have not been discharged; and (e) payment of all amounts due has been made to all consultants, employees, subcontractors, laborers and material and equipment suppliers, at all tiers, and all other entities, for all labor, services, deliverables or other work product or materials and equipment furnished by or through Releasor for the Work, including, without limitation, all payroll taxes and contributions required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for use by the Owner or in connection with the Work.

The Releasor agrees to defend, indemnify and hold the Released Entities harmless from and against any and all actions, causes of action, losses or damages of whatever kind, including, without limitation, reasonable attorneys' fees and costs in arbitration and at the pre-trial, trial and appellate levels, which the Released Entities may suffer by reason of (a) any claim made against any of the Released Entities or the Work relating to labor, services, materials or equipment furnished by or through the Releasor, or (b) any breach of any representation or warranty made by the Releasor to the Released Entities, including the representations and warranties included herein, any false statement made in this Subcontractor's Partial Waiver and Release, or any misrepresentation or omission made to the Released Entities by the Releasor.

The Releasor acknowledges and agrees that (a) the Owner, the Contractor and the Releasor's Contractor, if different from the Contractor, are relying upon the representations and warranties made herein as a material inducement for the Contractor or the Releasor's Contractor, as the case may be, to make payment to the Releasor; (b) this Subcontractor's Partial Waiver and Release is freely and voluntarily given by the Releasor and the Releasor has had the advice of counsel in connection herewith and is fully informed as to the legal effects of this Subcontractor's Partial Waiver and Release and the Releasor has voluntarily accepted the terms herein for the consideration recited above; and (c) the tendering of payment by the Contractor or the Releasor's Contractor, as the case may be, and the receipt of payment and the execution of this Subcontractor's Partial Waiver and Release by the Releasor shall not, in any manner whatsoever, release the Releasor from (i) its continuing obligations with respect to the completion of any services with respect to the Project that remains incomplete, including warranty services; (ii) any contractual, statutory or common law obligations of the Releasor with respect to the Released Entities; or (iii) any other obligations of the Releasor with respect to the Released Entities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES APPEAR ON FOLLOWING PAGE.]**

DocuSign Envelope ID: 591BDF16-4AB5-4857-A4C4-43178BB161E2

Dated this ____day of _____, 201__.

WITNESSES:

                                [SUBCONTRACTOR]

_____

Name:_____

By:_____

Name:_____

Title:_____

_____

Name:_____

Address:_____

_____

_____

**[SUBCONTRACTOR TO INSERT APPLICABLE NOTARIAL ACKNOWLEDGMENT HERE]**

P–7

\\MI - 028195/000003 - 658133 v5

Exhibit P-3

**CONTRACTORCTOR TO INSERT APPLICABLE NOTARIAL AC**

This CONTRACTOR'S FINAL WAIVER AND RELEASE ("Contractor's Final Waiver and Release") is made by [ • ], a [ • ] under the laws of [ • ] ("Contractor"), on behalf of itself, its successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, in hand paid, the receipt and sufficiency of which are hereby acknowledged, as full and final payment on account of all the Work performed, other work product and materials prepared (whether or not finally delivered), in connection with that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project ("Project"), dated as of [ • ], 201[ • ] by and between Contractor and **NECEC Transmission LLC**, a [_____] existing pursuant to the laws of the State of [_____] ("Owner") (as the same may be amended, modified and supplemented from time to time, "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

The Contractor does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit-claim all claims, actions, demands, liens, lien rights and claims of lien, of any kind whatsoever, which Contractor ever had, now has, or may have in the future, whether known or unknown, with respect to the Work, the materials, the equipment, the Agreement, the Site or any fixtures or personal property located thereon or included in the Work and other work product, or against the Owner, any Affiliate of the Owner, any Owner's Lenders, and their partners, managers, parents, subsidiaries and other affiliates, at all tiers, and its and their respective insurers, sureties, employees, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively, "Released Entities"), including, without limitation, all claims related to, in connection with, or arising out of, all facts, acts, events, circumstances, changes or extra work, constructive or actual delays or accelerations, interferences and the like, which have occurred or may be claimed to have occurred.

The Contractor warrants and represents that (a) the Contractor has not assigned or pledged any rights or claims in any amount due or to become due from the Owner; (b) payment has been or will be made to all Subcontractors, laborers and material suppliers, at all tiers, for all labor, services, materials and equipment furnished by or through the Contractor; (c) no claims from Subcontractors, vendors, mechanics or materialmen against the Released Entities, the Site, or the Work have been submitted to the Contractor or remain unsatisfied as of the date hereof; (d) no mechanics' or materialmen's liens or liens for professional services have been filed by Contractor, its Subcontractors, affiliates, or any persons performing services or materials for any them in connection with the Work, that have not been discharged; (e) payment of all amounts due has been made to all consultants, employees, Subcontractors, laborers and material and equipment suppliers, at all tiers, and all other entities, for all labor, services, or other work product or materials and equipment furnished by or through the Contractor for the Work, including, without limitation, all payroll taxes and contributions

P-8

required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for use by the Owner or in connection with the performance of the Work; and (f) all contracts with Subcontractors employed, used or engaged by Contractor in connection with the Agreement have been completed or have been terminated.

The Contractor agrees to defend, indemnify and hold the Released Entities harmless from and against any and all actions, causes of action, losses or damages of whatever kind, including, without limitation, reasonable attorneys' fees and costs in arbitration and at the pre-trial, trial and appellate levels, which the Released Entities may suffer by reason of (a) any claim made against any of the Released Entities, the Site, the materials, the equipment, the Project or the Work relating to labor, services, materials or equipment furnished by or through the Contractor, or (b) any breach of any representation or warranty made by the Contractor to the Owner, including the representations and warranties included herein, any false statement made in this Contractor's Final Waiver and Release or any misrepresentation or omission made to the Owner by the Contractor.

The Contractor acknowledges and agrees that (a) the Owner is relying upon the representations and warranties made herein as a material inducement for the Owner to make payment to the Contractor; (b) this Contractor's Final Waiver and Release is freely and voluntarily given by the Contractor, and the Contractor has had the advice of counsel in connection herewith and is fully informed as to the legal effects of this Contractor's Final Waiver and Release, and the Contractor has voluntarily accepted the terms herein for the consideration recited above; and (c) the tendering of payment by the Owner and the receipt of payment and the execution of this Contractor's Final Waiver and Release by the Contractor shall not, in any manner whatsoever, release the Contractor from (i) its continuing obligations under the Agreement, including obligations with respect to the completion of any Work that remains incomplete; (ii) any contractual, statutory or common law obligations of the Contractor with respect to the Released Entities; or (iii) any other obligations of the Contractor with respect to the Released Entities.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES APPEAR ON FOLLOWING PAGE.]**

Dated this ____day of _____, 201___.


WITNESSES:                          [Contractor]:

_____   By:_____
Name:_____   Name:_____
                                    Title:_____
                                    Address:_____
_____   _____
Name:_____   _____


**[CONTRACTOR TO INSERT APPLICABLE NOTARIAL ACKNOWLEDGMENT HERE]**

\\MI - 028195/000003 - 658133 v5

**Exhibit P-4**

## SUBCONTRACTOR INSERT APPLICABLE NOTARIAL ACKNOWLEDGEMENT

This SUBCONTRACTOR'S FINAL WAIVER AND RELEASE ("Subcontractor's Final Waiver and Release") is made by [ • ], a [ • ] (the "Releasor"), on behalf of itself, its successors and assigns, and those acting by or through any of the foregoing, for and in consideration of the sum of [ • ] ($[ • ]) (the "Final Payment") and other good and valuable consideration, in hand paid, pursuant to that certain Subcontract made as of [ • ], 201[ • ], by and between Releasor and [ • ], a [ • ] ("Releasor's Contractor"), the receipt and sufficiency of which are hereby acknowledged, as full payment on account of all labor, services, equipment and work product and materials prepared (whether or not finally delivered), in connection with the agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line ("Project"), dated as of [ • ], 20[ • ],  by and between [_____], a [_____], existing pursuant to the laws of the State of [_____] ("Contractor") and **NECEC Transmission LLC**, a [_____] existing pursuant to the laws of the State of [_____] ("Owner") (as the same may be amended, modified and supplemented from time to time, "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Conditioned solely upon the receipt of the Final Payment, the Releasor does hereby unconditionally and irrevocably waive, release, remise, relinquish and quit-claim all claims, actions, demands, liens, lien rights and claims of lien, of any kind whatsoever, which Releasor ever had, now has, or may have in the future, whether known or unknown, with respect to the Work, the Project, the Agreement, the materials, the equipment, the Site or any fixtures or personal property located thereon or included in the Work other work product or services, or against the Owner, any Affiliate of the Owner, the Owner's Lenders, the Contractor, the Releasor's Contractor (if different from the Contractor), and their respective partners, managers, parents, subsidiaries and other affiliates, at all tiers, and all of their respective insurers, sureties, employees, officers, directors, representatives, shareholders, agents, and all parties acting for any of them (collectively, the "Released Entities"), including, without limitation, all claims related to, in connection with, or arising out of, all facts, acts, events, circumstances, changes or extra work, constructive or actual delays or accelerations, interferences and the like, which have occurred or may be claimed to have occurred.

The Releasor warrants and represents that (a) the Releasor has not assigned or pledged any rights or claims in any amount due or to become due from Releasor's Contractor or the Contractor, as the case may be; (b) payment has been or will be made to all of its subcontractors, laborers and material suppliers, at all tiers, for all labor, services, materials and equipment furnished by or through the Releasor; (c) no claims from any of its subcontractors, vendors, mechanics or materialmen against the Released Entities or the Project have been submitted to Releasor or remain unsatisfied as of the date hereof; (d) no mechanics' or materialmen's liens or liens for professional services have been filed by Releasor, its subcontractors, affiliates, or any Persons performing services or materials for any them in

P-11

DocuSign Envelope ID: 591BDF16-4AB5-4867-A4C4-43178BB15152

connection with performance of the Work, that have not been discharged; (e) payment of all amounts due has been made to all consultants, employees, subcontractors, laborers and material and equipment suppliers, at all tiers, and all other entities, for all labor, services, deliverables or other work product or materials and equipment furnished by or through Releasor for the Work, including, without limitation, all payroll taxes and contributions required to be made and all wages, overtime pay, premium pay, holiday pay, sick pay, personal leave pay, severance pay, fees, fringe benefits, commissions and reimbursable expenses required to be paid and all deductions for dues, fees or contributions required to be made in connection with all collective bargaining agreements in existence, if any, which affect any worker(s) providing services for use by the Owner or in connection with the Work; and (f) all contracts with consultants and subcontractors employed, used or engaged by Releasor in connection with the performance of the Work have been completed or have been terminated.

The Releasor agrees to defend, indemnify and hold the Released Entities harmless from and against any and all actions, causes of action, losses or damages of whatever kind, including, without limitation, reasonable attorneys' fees and costs in arbitration and at the pre-trial, trial and appellate levels, which the Released Entities may suffer by reason of (a) any claim made against any of the Released Entities, the Work, the Site, the materials, the equipment, or the Project relating to labor, services, materials or equipment furnished by or through the Releasor, or (b) any breach of any representation or warranty made by the Releasor to the Released Entities, including the representations and warranties included herein, any false statement made in this Subcontractor's Final Waiver and Release, or any misrepresentation or omission made to the Released Entities by the Releasor.

The Releasor acknowledges and agrees that (a) the Owner, the Contractor and the Releasor's Contractor, if different from the Contractor, are relying upon the representations and warranties made herein as a material inducement for the Contractor or Owner to make payment to the Releasor; (b) this Subcontractor's Final Waiver and Release is freely and voluntarily given by the Releasor and the Releasor has had the advice of counsel in connection herewith and is fully informed as to the legal effects of this Subcontractor's Final Waiver and Release and the Releasor has voluntarily accepted the terms herein for the consideration recited above; and (c) the tendering of payment by the Contractor or the Releasor's Contractor, as the case maybe,  and the receipt of payment and the execution of this Subcontractor's Final Waiver and Release by the Releasor shall not, in any manner whatsoever, release the Releasor from (i) its continuing obligations with respect to the completion of any services with respect to the Work that remains incomplete, including warranty services; (ii) any contractual, statutory or common law obligations of the Releasor with respect to any of the Released Entities; or (iii) any other obligations of the Releasor with respect to the Released Entities.

P-12

[**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES APPEAR ON FOLLOWING PAGE.**]

P-13

Dated this ____ day of _____, 201___.


WITNESSES:                                    Contractor:


_____          By:_____
Name:_____             Name:_____
                                              Title:_____
_____          Address:_____
Name:_____             _____
                                              _____


**[SUBCONTACTOR TO INSERT APPLICABLE NOTARIAL ACKNOWLEDGMENT HERE]**

P-14

## ATTACHMENT Q

### CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (this "Agreement"), is entered into and made as of the date of the last signature to this Agreement (the "Effective Date"), by and between **NECEC Transmission LLC**, a limited liability company organized and existing under the laws of the State of State of Maine, having a principal place of business at 83 Edison Drive, Augusta, Maine 04330 United States (the "Owner") and "), and Campos EPC, LLC, a limited liability company organized and existing under the laws of the State of Colorado, with offices located at 1401 Blake Street, Denver, CO 80202 (the "Contractor").

Whereas, Owner and Contractor have entered into that certain agreement for engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project (the "Project"), as of the effective date of the "Agreement", by virtue of which Contractor shall provide certain labor, materials, equipment and services in connection with the Project (collectively, "Work");

Whereas, in the course of Contractor's performance of the Work, it has been, or will be, necessary for certain Confidential Information (as hereinafter defined) to be released to Contractor; and,

Whereas Owner would not have entered into the Agreement with Contractor unless Contractor agreed to execute this Confidentiality Agreement;

Now, therefore, in consideration of the mutual premises and covenants made herein, and with the intent to be legally bound hereby, Owner and Contractor agree as follows:

1.    Definitions.

a. Affiliate means, in relation to any Person, any other Person: (i) which directly or indirectly controls through one or more intermediaries, or is controlled by, or is under common control with, such Person; or (ii) which directly or indirectly through one or more intermediaries beneficially owns or holds fifty percent (50%) or more of any class of voting stock or other equity interests of such Person; or (iii) which has fifty percent (50%) or more of any class of voting stock or other equity interests that is directly or indirectly through one or more intermediaries beneficially owned or held by such Person, or (iv) who either directly or indirectly through one or more intermediaries holds a general partnership interest in such Person or such Person holds a general partnership interest in the other Person. For purposes of this definition, the word "controls" means possession, directly or indirectly through one or more intermediaries of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or otherwise.

b. <u>Confidential Information</u> means all information, regardless of when provided or the form in which it is or has been communicated or maintained (whether oral, written, electronic or visual) and whether prepared or furnished by Owner, or otherwise, related to the Project or the Work, which is disclosed to Contractor, regardless of whether such information is disclosed intentionally or inadvertently prior to or after the date of this Agreement, and including all reports, analyses, notes, drafts or other information, including information derived from visual examinations of Project and other locations, based on, containing or reflecting any such Confidential Information; provided, however, that Confidential Information shall not include the following:

(1)    information that is or becomes publicly available, other than as a result of a breach of this Agreement;

(2)    information that is or becomes available on a non-confidential basis from a source which is not known to Contractor (after due inquiry) to be prohibited from disclosing such information pursuant to a legal, contractual or fiduciary obligation to Owner ; or,

(3)    information that Contractor can demonstrate was legally in its possession prior to disclosure by Owner.

Specific information shall not be deemed to be within any of the exceptions described in subparts (1) through (3) merely because it is embraced by more general information within such exceptions, nor shall a combination of features be deemed to be within such exceptions merely because the individual features are within such exceptions.

c. <u>Person</u> means an individual, partnership, corporation, limited liability company, company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

2.    <u>Nondisclosure and Use of Confidential Information</u>.  Confidential Information shall not be used by Contractor for any purpose other than in connection with the performance of the Work, nor shall Confidential Information be used by Contractor in any manner adverse to the interests of Owner.  Confidential Information shall be held in strict confidence by Contractor and shall not be disclosed without prior written consent of Owner, except to those Affiliates, employees, advisors, consultants and subcontractors of Contractor with a need to know the Confidential Information for the purpose of performing the Work.  Contractor shall require all such Affiliates, employees, advisors, consultants and subcontractors receiving Confidential Information to be bound to Contractor in the same manner, and to the same extent, as Contractor is bound to Owner under this Agreement. Contractor shall be liable to Owner for any breach of the terms of this Agreement, including, without limitation, any breach by its Affiliates, employees, advisors, consultants or subcontractors.

DocuSign Envelope ID: 591BDF16-4AB5-4857-A4C4-4317BB161E2

3.      Required Disclosure.  In the event that Contractor is requested or required by legal or regulatory authority to disclose any Confidential Information, Contractor shall promptly notify Owner of such request or requirement prior to disclosure so that Owner may seek an appropriate protective order and/or waive compliance with the terms of this Agreement, in Owner's sole discretion.  If such protective order or other remedy is not obtained, then Contractor shall furnish only that portion of the Confidential Information which is legally required to be furnished by court order; provided, however, that prior to making any such disclosure, Contractor shall: (i) minimize the amount of Confidential Information to be provided, consistent with the interests of Owner, and (ii) make every reasonable effort (which shall include participation by Owner in discussions with the legal or regulatory authority involved) to secure confidential treatment of the Confidential Information to be provided.  If efforts to secure confidential treatment are not successful, Owner shall have the prior right to review and redact such information in a manner consonant with its interests and the requirements of the legal or regulatory authority involved.

4.      Remedies. Contractor acknowledges that Owner would not have an adequate remedy at law for money damages if the covenants contained in this Agreement were breached and that any such breach would cause Owner irreparable harm.  Accordingly, Contractor also agrees that, in the event of any breach or threatened breach of the terms of this Agreement by Contractor or its Affiliates, employees, advisors, consultants or subcontractors, Owner, in addition to any other remedies that it may have at law or in equity, shall be entitled, individually or jointly, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance.

5.      Return or Destruction.  At any time upon written request by Owner, Contractor shall promptly deliver to Owner all Confidential Information, including all copies thereof, and shall promptly purge all electronic copies of Confidential Information.  The return of Confidential Information to Owner or the purging of electronic copies of Confidential Information shall not release Contractor from its obligations hereunder with respect to such Confidential Information.

6.      No Other Agreement.  No joint venture or partnership shall be created by this Agreement, and the parties hereto are independent entities.  This Agreement shall not obligate any party hereto to enter into any commercial or business relationship with any other party hereto or to request, propose, award or perform any work or services.  Except as otherwise expressly agreed in writing, each party hereto shall be solely responsible for its own costs incurred in the course of preparing or exchanging Confidential Information.

7.      No License.  It is understood and agreed that nothing contained in this Agreement shall be construed as granting or conferring rights by license or otherwise in any Confidential Information disclosed to Contractor.

8.      Amendment.  No course of dealing or performance shall constitute an amendment, change or modification of this Agreement.  No amendment, change or

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-1317BBB15JE2

modification of this Agreement shall be valid or of any effect unless the same is in writing and executed by a duly authorized representative of each party hereto.

9. <u>Assignment</u>. Contractor may not assign or otherwise transfer any of its obligations hereunder without the prior written consent of Owner; provided however, Contractor hereby consents to the assignment of this Agreement to by Owner.

10. <u>No Representation or Warranty</u>. Owner makes no representation or warranty as to the accuracy or completeness of the Confidential Information or as to the fitness for any particular intended use or purpose of such Confidential Information. Neither Owner nor any of its Affiliates or lenders, or any of their directors, officers, employees shall be subject to liability resulting from the use of the Confidential Information by Contractor, and Contractor hereby agrees to indemnify and hold Owner and its Affiliates harmless from any such liability, including any liability related to, in connection with, resulting from, any breach by its Affiliates, employees, advisors, consultants or subcontractors. This Agreement shall not be construed as an obligation of Owner to make any disclosure of Confidential Information. Contractor is not granted any right hereby to demand access to any Confidential Information. Owner is not under any obligation to update, revise or correct Confidential Information that is provided to Contractor.

11. <u>Non-Waiver</u>. No waiver of any provision of this Agreement shall be deemed or construed to constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by Owner. No failure by Owner to exercise, or any delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, and no single or partial exercise of any right, power or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12. <u>Governing Law, Venue</u>. This Agreement shall be governed in all respects by and construed in accordance with the laws of the State of New York (regardless of New York's or any other jurisdiction's choice of law rules other than the provisions of §5-1401 of the New York General Obligations Law). The parties hereby agree that any litigation between the parties hereto shall be exclusively conducted in the federal courts of the United States for the Southern District of New York; *provided*, that, if for whatever the reason, the federal courts of the United States for the Southern District of New York will not, or cannot, hear such action or proceeding, it may be brought and enforced in, and Contractor hereby submits to the jurisdiction of, the courts of the State of New York in New York City. EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

13. <u>Term</u>. This Agreement and the obligations contained herein shall remain in effect for a period of ten (10) years from the date of this Agreement.

14.    <u>Entire Agreement</u>.  This Agreement (i) contains the entire agreement and understanding between the parties hereto as to the subject matter hereof, and (ii) supersedes, in their entireties, any and all previous communications (whether written or oral) between the parties hereto related to the subject matter of this Agreement.

15.    <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

16.    <u>Notice</u>.  All notices and all other communications that are required or permitted under this Agreement (a) shall be in writing; (b) shall be personally delivered, by express courier service or transmitted via facsimile or via electronic mail ("email"); (c) in the case of personal delivery or by a courier service, it shall be deemed as delivered upon its receipt by the receiving party of the corresponding communication; and, in the case of delivery via facsimile transmission or email, on the first working day in the country of the recipient following when such transmission is completed as is indicated in the facsimile or email of the party to which the communication is addressed; and (d) all notices and communications under this Agreement must be delivered or transmitted to the address of the corresponding party that is indicated below or in such other address that such a party has designated to the other party by a written notice sent at least ten (10) days in advance.

To the Owner:

> Benjamin Shepard
> Director Transmission - NECEC
> 83 Edison Drive
> Augusta, Maine 04336
> (207) 629-2036
> benjamin.shepard@cmpco.com

with a copy to:

> Inmaculada Sanz
> Director PMO - NECEC
> 83 Edison Drive
> Augusta, Maine 04336
> (585) 402-3718
> inmaculada.sanz@avangrid.com

\\MI - 028195/000003 - 658133 v5

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

To the Contractor:

Campos EPC, LLC
1401 Blake Street, Denver, CO 80202
Attn:  Holly Davies, Chief Legal Counsel
Phone: (303) 623-3345
Fax: NA
Email:  holly.davies@camposcompanies.com

If a notice or other communication that is required or permitted under this Agreement is sent via facsimile or email, such notice or other communication must also be confirmed in writing and delivered personally or by express courier.  Subject to the next sentence, such notice or other communication shall be deemed to have been given for purposes of this Agreement when delivered pursuant to such additional method. Nevertheless, the lack of confirmation in accordance with the foregoing sentence shall not void or cancel the notice sent by facsimile if it was actually received by the Party that was the addressee thereof and any such notice sent by facsimile shall be deemed to have been given for purposes of this Agreement upon actual receipt by such addressee.

17.    Counterparts.  This Agreement may be executed in any number of counterparts, and either Party may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  The Parties agree that the delivery of this Agreement may be effected by means of an exchange of facsimile or electronic signatures with original copies to follow by mail or courier service.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**[Contactor]**                                          **NECEC Transmission LLC**

By: _____          By:
_____
Name: _____         Name:
_____
Title: _____         Title:
_____

\\MI - 028195/000003 - 658133 v5

**ATTACHMENT R**

CONTRACTOR'S RATE SCHEDULE

R-1 – Bid Sheet from final bid

S–1

**ATTACHMENT S**

FORM OF NOTICE OF SUBSTANTIAL COMPLETION AND FORM OF CERTIFICATE OF SUBSTANTIAL COMPLETION

[*The Attachment begins on the following page.*]

S–2

DocuSign Envelope ID: 591BDF16-4AB5-4857-A4C4-A3178BB151E2

**Exhibit S-1**

*Form of Notice of Substantial Completion*

[Letterhead of Contractor]

**Contractor's Notice of Substantial Completion**

To:          NECEC Transmission LLC
             [Address]

==**[Name of Contractor]**== ("Contractor") hereby represents and certifies to NECEC Transmission LLC ("Owner") that the Project has achieved Substantial Completion pursuant to the requirements of the Agreement (as hereinafter defined).  Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project made and entered into as of the ==[ • ]== th day of ==[ • ]==, by and between Owner and Contractor (the "Agreement").

In this regard, the Contractor represents and certifies to the Owner the following have occurred:

(1)  (A) the Project, as a whole, is Energized, or capable of being Energized, and capable of unattended operation in a safe manner in strict accordance with all Permits, Applicable Laws and Good Utility Practice; (B) the Work, to the date of the Notice of Substantial Completion has been completed in strict accordance with the requirements of the Agreement; and (C) all required irrevocable, non-appealable certifications have been obtained by the Contractor, and delivered to the Owner, indicating that the Work can be legally used for its intended occupancy or use;

(2)  all Tests (other than: (x) those that the Owner agrees should be on the Final Punchlist and (y) those necessary to achieve Project Completion) have achieved successful results;

(3)  the Contractor has delivered to the Owner the Warranty Letter of Credit, pursuant to Section 8.2 of the Agreement;

(4)  the Final Punchlist, including the schedule for the completion of the Punchlist Items thereon, has been accepted by the Owner, as provided in Section 7.3 of the

S-3

Agreement, and only Non-Critical Deficiencies remain on the Final Punchlist for the Project;

(5)  the Contractor has delivered the Notice of Substantial Completion to Owner;

(6) no Liens have been imposed, and remain outstanding, against the Materials, the Equipment, the Work, the Site or the Project, or any such Liens have been transferred to a bond, and the Owner has received all of the required waivers and releases, pursuant to Section 8.1 of the Agreement;

S-4

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB15152

(7)  all Contractor's Permits have been obtained, and such Contractor's Permits are in the name of the Owner, unless required by Applicable Law or the Owner to be in the name of the Contractor;

(8)  the Contractor has delivered, to the Owner, all Contractor Deliverables in relation to the Project, as set forth in the Specifications, including the Operations and Maintenance Manuals, except for the Record Drawings and Specifications which shall be delivered to the Owner as a condition precedent to Final Completion;

(9)  all spare parts for which Change Orders have been issued, shall have been delivered by the Contractor, pursuant to Section 3.15 of the Agreement, and are available to the Owner for use in the Project, with the exception of spare parts that have been used for the Project, provided that replacement spare parts for such used spare parts that have been ordered by the Contractor, as evidenced to the Owner by valid and binding purchase orders;

(1O)  the Contractor has paid, or the Owner has set-off, as the case may be, all amounts due and owing for Delay Liquidated Damages, if any; and

(12)  any other conditions precedent for Substantial Completion set forth in the Agreement.

The Contractor recognizes that the Owner is relying upon the Contractor's representations and certifications set forth herein.

The person executing this notice is authorized by the Contractor to do so for, and on behalf of, the Contractor.

[**Contractor**]

By:  _____
Title:  _____
Date:  _____

S–5

**Exhibit S-2**

*Form of Certificate of Substantial Completion*

[Letterhead of Owner]

To:    **[Name of Contractor]**
       [Address]

### Certificate of Substantial Completion

NECEC Transmission LLC (the "Owner"), pursuant to that certain agreement for engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project, made by and between Owner and **[Name of Contractor]** (the "Contractor") and entered into as of the **[ • ]** day of **[ • ], [ • ]** (the "Agreement"), relying upon the Contractor's Notice of Substantial Completion, given by the Contractor, dated the **[ • ]** day of **[ • ], [ • ],** including the Attachments attached thereto, hereby issues this Certificate of Substantial Completion to the Contractor, effective as of the **[ • ]** day of **[ • ], [ • ],** which is the Substantial Completion Date.  The Owner has based its decision to issue this Certificate of Substantial Completion upon information provided by the Contractor to the Owner.  In the event that any such information is later discovered not to be true, or to be incorrect, the Owner may, at any time after such discovery, revoke this Certificate of Substantial Completion, and avail itself to any and all remedies available under the Agreement, at law and in equity.

**NECEC Transmission LLC**
By:    _____
Title: _____
Date:  _____

**ATTACHMENT T**

FORM OF NOTICE OF FINAL COMPLETION AND FORM OF CERTIFICATE OF FINAL COMPLETION

[*The Attachment begins on the following page.*]

**Exhibit T-1**

*Form of Notice of Final Completion*

[Letterhead of Contractor]

**Contractor's Notice of Final Completion**

To:    **NECEC Transmission LLC**
       [Address]

**[Name of Contractor]** ("Contractor") hereby represents and certifies to NECEC Transmission LLC ("Owner") that the Project has achieved Final Completion pursuant to the requirements of the Agreement (as hereinafter defined).  Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in that certain agreement for engineering, procurement and construction of the HVDC Underground Transmission Line, as part of The New England Clean Energy Connect (NECEC) Project, made and entered into as of the **[ • ]** day of **[ • ],** by and between Owner and Contractor (the "Agreement").

In this regard, the Contractor represents and certifies to the Owner the following have occurred:

(1)   Substantial Completion shall have been achieved, and the Work, to the date of the Contractor's Notice of Final Completion, has been completed in strict accordance with the requirements of the Agreement;

(2)   all of the Contractor's and Subcontractors' personnel, except those personnel required to remain on the Site in order to fulfill the obligations of the Contractor under the Agreement, have left the Site, all surplus materials, waste materials, rubbish and construction facilities, other than those to which the Owner holds title, have been removed from the Site, and the Contractor has removed all Contractor's Equipment and Temporary Facilities from the Site, except as necessary for the Contractor to fulfill its obligations under the Agreement;

(3)   the Contractor has delivered the Notice of Final Completion to the Owner;

(4)   no Liens have been imposed, and remain outstanding, against the Materials, the Equipment, the Work, the Site or the Project or, any such Liens have been transferred to a bond, and the Owner has received all of the required waivers and releases pursuant to Section 8.1 of the Agreement;

T-2

(5)  the Contractor has delivered, to the Owner, all Contractor Deliverables in relation to the Project, as set forth in the Specifications, including the Record Drawings and Specifications;

(6)  the Contractor has paid, or the Owner has set-off, as the case may be, all amounts due and owing for Liquidated Damages, if any;

(7)  all Punchlist Items on the Final Punchlist have been completed by the Contractor, or pursuant to Section 8.1 of the Agreement, the Owner has retained a sufficient portion of the Punchlist Withholding Amount to complete any Punchlist Items on the Final Punchlist that were not completed by Contractor in accordance with the terms of the Agreement; and

(8)  any other conditions precedent for Final Completion set forth in the Agreement.

The Contractor recognizes that the Owner is relying upon the Contractor's representations and certifications set forth herein.

The person executing this proposed certificate of Final Completion is authorized by the Contractor to do so for, and on behalf of, the Contractor.

**[Contractor]**

By:    _____
Title:  _____
Date:
_____

T-3

**Exhibit T-2**

*Form of Certificate of Final Completion*

[Letterhead of Owner]

To:    **[Name of Contractor]**
      [Address]

**Certificate of Final Completion**

NECEC Transmission LLC (the "Owner") pursuant to that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of the New England Clean Energy Connect (NECEC) Project, made by and between Owner and **[Name of Contractor]** (the "Contractor") and entered into as of the [ • ] day of [ • ], [ • ] (the "Agreement"), relying upon the Contractor's Notice of Final Completion, given by the Contractor, dated the [ • ] day of [ • ], [ • ], including the Attachments attached thereto, hereby issues this Certificate of Final Completion to the Contractor, effective as of the [ • ] day of [ • ], [ • ], which is the Final Completion Date. The Owner has based its decision to issue this Certificate of Final Completion upon information provided by the Contractor to the Owner. In the event that any such information is later discovered not to be true, or to be incorrect, the Owner may, at any time after such discovery, revoke this Certificate of Final Completion, and avail itself to any and all remedies available under the Agreement, at law and in equity.

[_____]
By:    _____
Title:  _____
Date:   _____

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

**ATTACHMENT U**

FORM OF LIMITED NOTICE TO PROCEED AND FORM OF NOTICE TO PROCEED

[*The Attachment begins on the following page.*]

U-1

**Form of LIMITED Notice to Proceed**

This Limited Notice to Proceed ("**LNTP**") is made and entered into as of this [●] day of [●], 20[●] (the "**Limited Notice to Proceed Date**"), by and between **NECEC Transmission LLC**, a [ ● ] existing under the laws of the State of [ ● ] (the "**Owner**") and [ ● ], a [ ● ] existing under the laws of [ ● ] (the "**Contractor**"). The Owner and the Contractor are sometimes, individually, referred to herein as a "**Party,**" and, collectively, referred to herein as the "**Parties**."

**RECITALS**

WHEREAS, the Parties have entered into that certain agreement for engineering, procurement and construction of the HVDC Underground Transmission Line as part of the New England Clean Energy Connect (NECEC) Project, dated [●], 20[●] (the "**Agreement**"); and

WHEREAS, the Owner desires to engage the Contractor to perform the work described in Attachment A attached hereto and made a part hereof (the "**LNTP Work**") and the Contractor desires to perform the LNTP Work, all in accordance with the terms and conditions set forth in this LNTP;

NOW THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, in had paid, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  **Definitions**. All terms beginning with capital letters, not otherwise defined in this LNTP, shall have the meanings set forth in the Agreement, mutatis mutandis.

2.  **Relation to the Agreement**.

    a.  The LNTP Work to be performed or obtained in accordance with this LNTP is within the scope of Work to be undertaken by the Contractor under the Agreement.
    b.  Upon the Owner's issuance of the Notice to Proceed pursuant to Section 7.1(c) of the Agreement:
        i.  The LNTP Work will be deemed to be a part of the Work under the Agreement and the Contractor shall be liable for the performance thereof in accordance with the terms and conditions of the Agreement as though the LNTP Work had been performed by the Contractor as part of the Work under the Agreement;
        ii.  All compensation paid to the Contractor on account of the LNTP Price under this LNTP for the LNTP Work shall be credited against the Agreement Sum under the Agreement; and
        iii.  Except for this Article 2, this LNTP shall be null, void and of no further force and effect. Notwithstanding any provision in this LNTP to the contrary, this Article 2

shall survive the termination of this LNTP due to Owner's issuance of Agreement NTP, pursuant to Section 7.1(c) of the Agreement.

3. **Scope and LNTP Price.**

 a. The scope of the LNTP Work to be performed by the Contractor under this LNTP is set forth in Attachment A hereto.  The LNTP Work shall be performed in accordance with the requirements of the Agreement, *mutatis mutandis.*

 b. As compensation for the performance of the LNTP Work, the Contractor shall be entitled to receive the sum of [ ● ]  Dollars ($[ ● ])  (the "**LNTP Sum**"), payable in accordance with:  (i) the payment schedule set forth in Attachment B hereto, and (ii) Article 8 of the Agreement, *mutatis mutandis.*

 c. This LNTP is effective on the Limited Notice to Proceed Date and will expire upon the earlier of:

  i. The issuance of the Notice to Proceed under the Agreement;

  ii. The date of Contractor's receipt of payment for the final portion of the LNTP Work;

  iii. The date of termination of the Agreement pursuant to the terms thereof; or

  iv. The date on which either Party terminates this LNTP in accordance with the provisions of Section 7.1 of the Agreement, *mutatis mutandis.*

4. **Terms.**

 a. This LNTP shall be governed by the terms and conditions of the Agreement, *mutatis mutandis,* pursuant to Section 7.1 of the Agreement.

 b. The terms and conditions of the Agreement remain unchanged except as otherwise set forth in this LNTP.

  IN WITNESS WHEREOF, the Parties have caused this LNTP to be executed as of the Limited Notice to Proceed Date.

**NECEC Transmission LLC**

By:   _____

Name: _____

Title:   _____

**[Contractor]**

By:   _____

Name: _____

Title:   _____

U–3

**Attachment A**

**Scope of LNTP Work**

\\MI - 028195/000003 - 658133 v5

**Attachment B**

**Payment Schedule**

**Exhibit U-2**

[Owner's Letterhead]
[Date]

[Contractor]
[Address]

**Re:      Notice to Proceed under the Agreement (as hereinafter defined)**

Dear Sirs:

This Notice to Proceed is hereby issued for that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of The New England Clean Energy Connect (NECEC) Project**,** made by and between NECEC Transmission LLC , a [ • ] existing under the laws of the State of [ • ]  (the "**Owner**") and [ • ], a [ • ] existing under the laws of [ • ] (the "**Contractor**"), dated as of [ • ], 20[ • ], (as the same may be amended, supplemented or otherwise modified, the "**Agreement**").  The Owner hereby instructs the Contractor to commence performance of the Work (as defined in the Agreement) on [ • ], 20[ • ] (the "**Date of Commencement**").

NECEC Transmission LLC

By:      _____
Name:   _____
Title:    _____

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB161E2

**ATTACHMENT V**

FORM OF PARENT GUARANTY – Not Used

V-1

ATTACHMENT W

DEFINITION OF NECEC TRANSMISSION LINE

"**NECEC Transmission Line**" means those certain 345 kV AC transmission lines, rebuilt 115 kV AC transmission lines and other substation equipment (together with the Merrill Road substation at its northern terminus and the associated equipment, the "AC Transmission Line," and a 1,200 MW +/-320 kV HVDC transmission line extending from the U.S. Border at Beattie Township, Maine to a new direct current to alternating current converter station to be located at Merrill Road in the City of Lewiston in the State of Maine (the transmission line and converter station, the "HVDC Transmission Line")), as follows:

(1) **Core Project Elements:**

    a. **Transmission Line Equipment:**

        i. New 145.3 mile +/-320 kV HVDC Transmission Line from the Canadian Border to a new Converter Substation located on Merrill Road in Lewiston (by others)

        ii. New 1.2 mile 345kV AC Transmission Line from the new Merrill Road Converter Substation to the existing Larrabee Road Substation (by others)

        iii. Partial Rebuild 0.8 miles of 34.5 kV Section 72 AC Transmission Line outside of the Larrabee Road Substation (by others)

        iv. HVDC Underground Transmission Line

    b. **Substation Equipment (by others)**:

        i. New 345kV AC to +/-320kV HVDC 1200MW Merrill Road Converter Substation (by others)

        ii. Add 345kV AC Transmission Line Terminal at the existing Larrabee Road Substation (by others)

(2) **Network Upgrades:**

**a. Transmission Line Equipment (by others):**

    i.   New 26.5 mile 345kV AC Transmission Line from the existing Coopers Mills Substation in Windsor to the existing Maine Yankee Substation in Wiscasset

    ii.   New 0.3 mile 345kV AC Transmission Line from the existing Surowiec Substation in Pownal to a new substation on Fickett Road in Pownal (by others)

    iii.   Rebuild 9.3 mile 115kV Section 62 AC Transmission Line from the existing Crowley Road Substation in Sabattus to the existing Surowiec Substation (by others)

    iv.   Rebuild 16.1 mile 115kV Section 64 AC Transmission Line from the existing Larrabee Road Substation to the existing Surowiec Substation (by others)

    v.   Partial rebuild of 0.8 mile each of 115 kV section 88 outside Coopers Mills Substation

    vi.   Partial rebuild of 0.3 miles of 345 kV Section 392 AC Transmission Line between the Coopers Mills Road Substation and the Maine Yankee Substation and approximately 3.5 miles of reconductor work on existing double circuit lattice steel towers outside of the Maine Yankee Substation

    vii.   Partial rebuild of 0.3 miles of 345 kV Section 3025 between Coopers Mills Substation and Larrabee Road Substation

    viii.   Associated structure replacements to support construction

b.  **Substation Equipment (by others):**

i.  Replace existing Larrabee Road 345/115 kV 448MVA autotransformer with a 650MVA autotransformer

ii.  Add 345kV AC Transmission Line Terminal at the existing Maine Yankee Substation

iii.  Add 345kV AC Transmission Line Terminal and 115kV switch replacements at the existing Surowiec Substation

iv.  New 345kV Fickett Road Substation with 345kV +/-200MVAR Static Compensator (STATCOM)

v.  Add 345kV AC Transmission Line Terminal and additional 345kV +/-200MVAR STATCOM (+/-400MVAR total with the +/-200MVAR existing) at the existing Coopers Mills Substation

vi.  Add 345/115kV 448MVA Autotransformer, associated 115kV bus work and terminate existing 115kV Sections 164, 164A, and 165 into 3 new breaker-and-a-half bays at the existing Raven Farm Substation

The NECEC transmission components located in Maine are depicted geographically in relationship to the existing Owner transmission system in Figure 1 below.

W-3



**Figure 1 – Map Depicting the Components of the NECEC Transmission Line**

**ATTACHMENT X**

REAL PROPERTY RIGHTS

Johnson Mountain Twp., West Forks Plt. Moxie Gore and The Forks Plt.
Somerset County, Maine



Insert: NECEC Kennebec River Cable RTI & Access Plan1.10.24.pdf  (documents to be included in full format in PDF)



NECEC Kennebec
River Cable RTI & Ac

X-1

**ATTACHMENT Y**

DATA SECURITY RIDER

For the purposes of this Privacy and Data Security Rider (the "Rider") NECEC Transmission LLC and any of its affiliates procuring or receiving services, works, equipment or materials under the Agreement (as defined below) shall be hereinafter referred to as the "<u>CUSTOMER</u>". Campos EPC LLC shall be hereinafter referred to as the "<u>VENDOR</u>"

      (a)      Among other, the purpose of this Rider is to enable the VENDOR to Process on behalf of the CUSTOMER the Personal Data and Company Data necessary to comply with the purpose of the Agreement (as defined below), define the conditions under which the VENDOR will Process the Personal Data and Company Data to which it has access during the performance of the Agreement, and establish the obligations and responsibilities of the VENDOR derived from such Processing. Personal Data disclosed by CUSTOMER to VENDOR is provided only for limited and specified purposes as set forth in the Agreement and this Rider.

      (b)      The following definitions are relevant to this Rider:

      (i)      "<u>Personal Data</u>" means any information about an individual, including an employee, vendor, customer, or potential customer of CUSTOMER or its affiliates, including, without limitation: (A) any information that can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, biometric records, personal electronic mail address, internet identification name, network password or internet password; (B) information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household, or (C) any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information, as well as cookie information and usage and traffic data or profiles, that is combined with any of the foregoing.

      (ii)      "<u>Company Data</u>" means any and all information concerning CUSTOMER and its affiliates and their respective business in any form, or to which the CUSTOMER or its affiliates have access, that requires reinforced protection measures, including but not limited to CUSTOMER sensitive information (confidential or restricted), internal use information, Personal Data, Cardholder Data, commercially sensitive information, Critical Infrastructure Information, other information that relates to critical infrastructure, information that relates to the operation or functionality of facilities, networks, or grids, commercially sensitive information, strategic business information, credentials, encryption data, system and application access logs, or any other information that may be subject to legal or regulatory requirements.

      (iii)      "<u>Critical Infrastructure Information</u>" means engineering, vulnerability, or detailed design information about proposed or existing critical infrastructure (physical or virtual) that (A) relates details about the production, generation, transmission, or distribution of energy; (B) could be useful to a person planning an attack on critical infrastructure; (C) is exempt from mandatory disclosure under the Freedom of Information Act; and (D) gives strategic information beyond the location of the critical infrastructure.

      (iv)      "<u>Processing</u>" (including its cognate, "<u>process</u>") means any operation, action, error, omission, negligent act, or set of operations, actions, errors, omissions, or negligent acts that is performed upon Personal Data or Company Data, whether or not by automatic means, including, without limitation, collection, recording, organization, storage, access, adaptation, retrieval, consultation, retention, use, disclosure, dissemination, exfiltration, taking, removing, copying, making available, alignment, combination, blocking, deletion, erasure, or destruction.

      (v)      "<u>Data Security Incident</u>" means: (A) the loss or misuse (by any means) of Personal Data or Company Data; (B) the inadvertent, unauthorized and/or unlawful Processing, corruption, modification, transfer, sale or rental of Personal Data or Company Data; (C) any other act, omission or circumstance that compromises or may reasonably compromise the security, confidentiality, or integrity of

Personal Data or Company Data, including but not limited to incidents where Personal Data or Company Data has been damaged, lost, corrupted, destroyed, or accessed, acquired, modified, used, or disclosed by any unauthorized person, by any person in an unauthorized manner, or for an unauthorized purpose; (D) any act, omission or circumstance that compromises or may reasonably compromise the cybersecurity of the products and services provided to CUSTOMER by VENDOR or the physical, technical, administrative, or organizational safeguards protecting VENDOR's systems or, if VENDOR knows or reasonably believes, CUSTOMER's systems storing or hosting Personal Data or Company Data, or (F) VENDOR receives any complaint, notice, or communication which relates directly or indirectly to (x) VENDOR's Processing of Personal Data or Company Data or VENDOR's compliance with Technical and Organizational Measures or applicable law in connection with Personal Data or Company Data or (y) the cybersecurity of products and services provided to CUSTOMER by VENDOR.

(vi)     "Technical and Organizational Measures" means security measures, consistent with the type of Personal Data or Company Data being Processed and the services being provided by VENDOR, to protect Personal Data or Company Data, which measures shall implement industry accepted protections which may include physical, electronic and procedural safeguards to protect the Personal Data or Company Data supplied to VENDOR against any Data Security Incident, and any security requirements, obligations, specifications or event reporting procedures set forth in this Rider or in any Schedule to this Rider. As part of such security measures, VENDOR shall provide a reasonably secure environment for all Personal Data and Company Data and any hardware and software (including servers, network, and data components) to be provided or used by VENDOR as part of its performance under the Agreement.

(vii)     "Losses" shall mean all losses, liabilities, damages, and claims and all related or resulting costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements and costs of investigation, litigation, settlement, judgment, interest and penalties).

(viii)     "Agreement" shall mean the Engineering, Procurement and Construction agreement and any purchase orders, statements of work, notice to proceed and related documents issued in connection therewith.

(c)     Personal Data and Company Data shall at all times remain the sole property of CUSTOMER, and nothing in this Rider or the Agreement will be interpreted or construed as granting VENDOR any license or other right under any patent, copyright, trademark, trade secret, or other proprietary right to Personal Data or Company Data. VENDOR shall not create or maintain data which are derivative of Personal Data or Company Data except for the purpose of performing its obligations under the Agreement and this Rider and as authorized by CUSTOMER.

(d)     Regarding the Processing of Personal Data and Company Data, the parties agree that:

(i)     VENDOR shall Process Personal Data and Company Data only on behalf of CUSTOMER, on the instruction of CUSTOMER and in accordance with the Agreement, this Rider and privacy and security laws applicable to VENDOR's services or VENDOR's possession or Processing of Personal Data and Company Data. CUSTOMER hereby instructs VENDOR, and VENDOR hereby agrees, to Process Personal Data and Company Data only as necessary to perform VENDOR's obligations under the Agreement and as further described below and for no other purpose. For the avoidance of doubt and without limitation, (i) VENDOR shall not Process Personal Data or Company Data for any purpose other than providing the services specified in the Agreement nor for any purpose outside the scope of the Agreement; and (ii) VENDOR is prohibited from (w) selling, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating orally, in writing, or by electronic or other means, Personal Data and Company Data to any business or third party (x) retaining, using, or disclosing Personal Data or Company Data for any purpose other than for the purposes specified in the Agreement and this Rider, (y) retaining, using or disclosing Personal Data and Company Data outside of the direct business relationship between CUSTOMER and VENDOR pursuant to the Agreement, and (z) combining Personal Data or Company Data received from CUSTOMER with Personal Data or Company Data received from or on behalf of another person or persons or collected by VENDOR.

2

(ii)    The parties agree that:

- The Processing activities that will be carried out by VENDOR are: perform Horizontal Directional Drilling (HDD) services for the NECEC project.

- The categories of Personal Data or Company Data that will be Processed by VENDOR are: access to Company's technical manual and other design and construction standards as well as project specific information, such as detailed design drawings, project locations, and project schedule.

- The categories of Personal Data subjects whose information will be processed by VENDOR are: included in Attachment A of this Agreement.

- The instructions for the Processing of Personal Data or Company Data are: included in Attachment A of this Agreement.

(iii)    VENDOR shall immediately inform the CUSTOMER if in VENDOR's opinion a Processing instruction given by CUSTOMER may infringe the privacy and security laws applicable to VENDOR's services or VENDOR's possession or Processing of Personal Data or Company Data.

(iv)    In the event that the activities to be carried out by VENDOR under the Agreement do not require access to Personal Data, VENDOR, its employees and representatives shall be prohibited from accessing and Processing Personal Data. If they gain access to Personal Data, VENDOR shall immediately inform CUSTOMER. Notwithstanding the foregoing, any Processing of Personal Data by VENDOR shall be subject to the terms and conditions set forth in this Rider.

(e)    As a condition to starting work, VENDOR's employees and other persons authorized, pursuant to the terms of this Rider, to Process Personal Data or Company Data shall acknowledge in writing their agreement to [(i) comply with the terms of CUSTOMER's Acceptable Use Requirements set forth in Schedule C hereto, as such Acceptable Use Requirements may be modified or supplemented from time-to-time upon notice from the CUSTOMER,][1] (ii) maintain the confidentiality of Personal Data and Company Data, and (iii) comply with any applicable Technical and Organizational Measures. In addition, VENDOR's employees and other authorized persons that access CUSTOMER's premises shall abide by CUSTOMER's physical security policies, rules and procedures.

(f)    At any and all times during which VENDOR is Processing Personal Data or Company Data, VENDOR shall:

(i)    Comply with all applicable privacy and security laws to which it is subject, or that are applicable to VENDOR's services or VENDOR's possession or Processing of Personal Data and\or Company Data, and not, by act or omission, place CUSTOMER or its affiliates in violation of any privacy or security law known by VENDOR to be applicable to them;

(ii)    With regards to the Processing of Personal Data, maintain a record of Personal Data Processing activities carried out on behalf of CUSTOMER, which shall include at least:

(A) The name and contact details of the VENDOR, any subcontractor, where applicable and as previously authorized by CUSTOMER, the CUSTOMER on whose behalf the VENDOR is Processing Personal Data, their respective representatives and, where applicable, the data protection officer;

---

[1] The Acceptable Use Requirements only need to be included if the VENDOR will be using Avangrid information resources or will have access the Avangrid information technology environment.

3

(B)  The categories of Processing activities carried out on behalf of CUSTOMER;

(C)  Where applicable, international transfers of Personal Data to a third country or international organization, identifying the third country or international organization, and identification of appropriate safeguards;

(D)  A general description of the appropriate Technical and Organizational Measures that VENDOR is implementing relating to:

  -  The ability to ensure the continued confidentiality, integrity, availability and resilience of Personal Data Processing systems and services;

  -  The ability to quickly restore availability and access to Personal Data in the event of a physical or technical incident; and

  -  A process of regular verification, evaluation and assessment of the effectiveness of Technical and Organizational Measures to ensure the security of the Personal Data Processing;

  -  Pseudonymization and encryption of Personal Data;

(iii)    Have in place appropriate and reasonable Technical and Organizational Measures to protect the security of Personal Data and Company Data and prevent a Data Security Incident, including, without limitation, a Data Security Incident resulting from or arising out of VENDOR's internal use, Processing or other transmission of Personal Data and Company Data, whether between or among VENDOR's subsidiaries and affiliates or any other person or entity acting on behalf of VENDOR. Taking into account the state-of-the-art, the costs of implementation, and the nature, scope, context and purposes of the Processing as well as the risks of varying likelihood and severity for, among other, the rights and freedoms of the data subjects, VENDOR shall implement Technical and Organizational Measures to ensure a level of security appropriate to the risk. Without limiting the generality of the foregoing, the VENDOR will implement measures to:

(A)  Ensure the continued confidentiality, integrity, availability and resilience of Processing systems and services;

(B)  Quickly restore availability and access to Personal Data and Company Data in the event of a physical or technical incident;

(C)  Verify and evaluate, on a regular basis, the effectiveness of the Technical and Organizational Measures implemented;

(D)  Pseudonymize and encrypt Personal Data, where applicable; and

(E)  Safely secure or encrypt all Personal Data and Company Data, during storage or transmission;

(iv)    Except as may be necessary in connection with providing services to CUSTOMER (and provided that immediately upon the need for such Personal Data and Company Data ceasing, such Personal Data or Company Data is immediately destroyed or erased), not use or maintain any Personal Data or Company Data on a laptop, hard drive, USB key, flash drive, removable memory card, smartphone, or other portable device or unit; and ensure that any such portable device or unit is encrypted.

(v)    Notify CUSTOMER at asoc@avangrid.com or (855)548-7276[2] no later than one (1) day from the date of obtaining actual knowledge of any Data Security Incident, or from the date the VENDOR reasonable believes that a Data Security Incident has taken place, whatever is earlier, and at VENDOR's cost and expense, assist and cooperate with CUSTOMER concerning any disclosures to affected parties and other remedial measures as requested by CUSTOMER or required under applicable law. If the Data Security Incident involves Personal Data, the following information shall be provided as a minimum:

(A)    Description of the nature of the Data Security Incident, including, where possible, the categories and approximate number of data subjects affected, and the categories and approximate number of Personal Data records affected;

(B)    Contact details of the data protection officer of the VENDOR, where applicable, or other contact person for further information;

(C)    Description of the possible consequences of the Data Security Incident or violations; and

(D)    Description of the measures taken or proposed to remedy the Data Security Incident, including, where appropriate, the measures taken to mitigate possible negative effects;

(vi)    VENDOR designates the following contacts for the purposes of communications related to a Data Security Incident: Holly Davies, holly.davies@camposcompanies.com.

(vii)    Assist and cooperate with CUSTOMER to enable CUSTOMER to comply with its obligations under any applicable privacy or security law, including but not limited to maintaining Personal Data and Company Data secured, responding to Data Security Incidents, and, where applicable, ensuring the rights of data subjects and carrying out Personal Data impact assessments;

(viii)    Inform the CUSTOMER, if, where applicable, data subjects exercise their rights of access, rectification, erasure or objection, restriction of processing, data portability and not to be the subject to automated decisions by the VENDOR. The communication must be made immediately and in no case later than one (1) business day following the receipt of the request by VENDOR. VENDOR shall assist CUSTOMER, taking into account the nature of the Personal Data Processing, through appropriate Technical and Organizational Measures, and with any information that may be relevant to the resolution of the request;

(ix)    Not use independent contractors or provide Personal Data or Company Data to independent contractors or other personnel that are not full-time employees of VENDOR without CUSTOMER's prior written approval;

(x)    Not disclose Personal Data or Company Data to any third party (including, without limitation, VENDOR's subsidiaries and affiliates and any person or entity acting on behalf of VENDOR) unless with respect to each such disclosure: (A) the disclosure is necessary in order to carry out VENDOR's obligations under the Agreement and this Rider; (B) VENDOR executes a written agreement with such third party whereby such third party expressly assumes the same obligations set forth in this Rider; (C) VENDOR has received CUSTOMER's prior written consent; (D) the Processing is carried out in accordance with the instructions of CUSTOMER, and (D) VENDOR shall remain responsible for any breach of the obligations set forth in this Rider to the same extent as if VENDOR caused such breach;

(xi)    Not permit any officer, director, employee, agent, other representative, subsidiary, affiliate, independent contractor, or any other person or entity acting on behalf of VENDOR to Process

---

[2] Include Avangrid e-mail addresses and phone numbers for the purposes of notifications of a Data Security Incident.

\\MI - 028195/000003 - 656051 v6

Personal Data or Company Data unless such Processing is in compliance with this Rider and is necessary to carry out VENDOR's obligations under the Agreement and this Rider. Personal Data and Company Data shall only be accessed by persons who need access to carry out VENDOR's obligations under the Agreement and this Rider and in accordance with the instructions of CUSTOMER; VENDOR shall provide appropriate privacy and security training to its employees and those persons authorized to Process Personal Data or Company Data.

        (xii)    Establish policies and procedures to provide all reasonable and prompt assistance to CUSTOMER in responding to any and all requests, complaints, or other communications received from any individual who is or may be the subject of any Personal Data Processed by VENDOR to the extent such request, complaint or other communication relates to VENDOR's Processing of such Personal Data;

        (xiii)    Establish policies and procedures to provide all reasonable and prompt assistance to CUSTOMER in responding to any and all requests, complaints, or other communications received from any individual, government, government agency, regulatory authority, or other entity that is or may have an interest in the Personal Data or Company Data, exfiltration of Personal Data or Company Data, disclosure of Personal Data or Company Data, or misuse of Personal Data or Company Data to the extent such request, complaint or other communication relates to VENDOR's Processing of such Personal Data or Company Data;

        (xiv)    Not transfer any Personal Data or Company Data across a country border, unless directed to do so in writing by CUSTOMER, and VENDOR agrees that CUSTOMER is solely responsible for determining that any transfer of Personal Data or Company Data across a country border complies with the applicable laws and this Rider;

        (xv)    Keep Personal Data and Company Data in strict confidence;

        (g)    At the time of the execution of this Rider, and at any time, upon CUSTOMER's request, VENDOR shall provide evidence that it has established and maintains Technical and Organizational Measures governing the Processing of Personal Data and Company Data appropriate to the Processing and to the nature of the Personal Data and Company Data;

        (h)    To the extent VENDOR maintains Personal Data and Company Data at its location, CUSTOMER shall have the right to conduct onsite inspections and/or audits (with no advance notice to VENDOR) of VENDOR's information security protocols, and VENDOR agrees to cooperate with CUSTOMER regarding such inspections or audits; provided, any such inspections or audits shall be conducted during normal business hours and in a manner so as to minimize any disruptions to VENDOR's operations. VENDOR will promptly correct any deficiencies in the Technical and Organizational Measures identified by CUSTOMER to VENDOR;

        (i)    VENDOR shall keep and make accessible to CUSTOMER, at any time, upon CUSTOMER's request, documentation that evidences compliance with the terms of this Rider. CUSTOMER may conduct audits and inspections, either directly or through a third party, and VENDOR agrees to cooperate with CUSTOMER regarding such audits;

        (j)    VENDOR shall cease Processing Personal Data and Company Data and [return, or securely delete or destroy],[3] or cause or arrange for the [return, or secure deletion or destruction] of, all Personal Data and Company Data subject to the Agreement and this Rider, including all originals and copies of such Personal Data and Company Data in any medium and any materials derived from or incorporating such Personal Data and Company Data, upon the expiration or earlier termination of the Agreement, or when there is no longer any legitimate business need (as determined by CUSTOMER) to

---

[3] Personal Data and Company Data in the VENDOR's possession has to be returned or destroyed upon termination or expiration of the agreement or in any of the other scenarios contemplated herein. The business should determine in each case whether the VENDOR will be required to either return the information or destroy the information if what they have are copies.

retain such Personal Data and Company Data, or otherwise on the instruction of CUSTOMER, but in no event later than ten (10) days from the date of such expiration, earlier termination, expiration of the legitimate business need, or instruction. If applicable law prevents or precludes the return or destruction of any Personal Data or Company Data, VENDOR shall notify CUSTOMER of such reason for not returning or destroying such Personal Data and Company Data and shall not Process such Personal Data and Company Data thereafter without CUSTOMER's express prior written consent. VENDOR's obligations under this Rider to protect the security of Personal Data and Company Data shall survive termination of the Agreement.

(k)    [To the extent that VENDOR is afforded regular access in any way to "Cardholder Data" as defined below and for so long as it has such access, the following requirements shall apply with respect to the Cardholder Data; provided, that the parties do anticipate that VENDOR will have access to any Cardholder Data:

(i)    VENDOR represents that it is presently in compliance and will remain in compliance with the Payment Card Industry Data Security Standard ("PCI Standard"), and all updates to PCI Standard, developed and published jointly by American Express, Discover, MasterCard and Visa ("Payment Card Brands") for protecting individual credit and debit card account numbers ("Cardholder Data").

(ii)    VENDOR acknowledges that Cardholder Data is owned exclusively by CUSTOMER, credit card issuers, the relevant Payment Card Brand, and entities licensed to process credit and debit card transactions on behalf of CUSTOMER, and further acknowledges that such Cardholder Data may be used solely to assist the foregoing parties in completing a transaction, supporting a loyalty program, providing fraud control services, or for other uses specifically required by law, the operating regulations of the Payment Card Brands, or this Agreement.

(iii)    To the extent Cardholder Data is regularly maintained on the premises or property of VENDOR, VENDOR shall maintain a business continuity plan addressing the possibility of a potential disruption of service, disaster, failure or interruption of its ordinary business process, which business continuity plan provides for appropriate back-up facilities to ensure VENDOR can continue to fulfill its obligations under the Agreement.

(iv)    VENDOR agrees that, in the event of a Data Security Incident arising out of or relating to VENDOR's premises or equipment contained thereon, VENDOR shall afford full cooperation and access to VENDOR's premises, books, logs and records by a designee of the Payment Card Brands to the extent necessary to perform a thorough security review or to validate VENDOR's compliance with the PCI Standards; provided, that such access that be provided during regular business hours and in such a manner so as to minimize the disruption of VENDOR's operations.][4]

(l)    [To the extent that the VENDOR processes personal information of California residents as such terms are defined in the California Consumer Privacy Act of 2018, as amended (Cal. Civ. Code §§ 1798.100 to 1798.199.95), the terms and conditions set forth in Schedule D of this Rider shall apply.][5]

(m)    [To the extent that VENDOR processes personal data of Connecticut consumers as such terms are defined in An Act Concerning Personal Data Privacy and Online Monitoring (Public Act No. 22-15), the terms and conditions of Schedule E shall apply.][6]

---

[4] This section only has to be included if the VENDOR will be afforded access to Cardholder Data. If the VENDOR will not have access to Cardholder Data, this section can be deleted prior to providing the Rider to the counterparty for review.

[5] Only for Avangrid wide or Avangrid Renewables related engagements where the VENDOR will process personal information of California residents. Not applicable to Avangrid Networks only engagements.

[6] Only for agreements that involve (i) The United Illuminating Company, Connecticut Natural Gas, Southern Connecticut Gas or UIL Holdings Corporation, or (ii) Avangrid Service Company or Avangrid Management Company if services will be provided to the companies listed in (i).

(n)     VENDOR represents that the security measures it takes in performance of its obligations under the Agreement and this Rider are, and will at all times remain, at the highest of the following:  (a) Privacy & IT Security Best Practices ( including, but not limited to, National Institute of Standards and Technology ("NIST") SP 800-53, International Organization for Standardization ("ISO") 27001/27002, Control Objectives for ("COBIT") framework, Center for Internet Security ("CIS") Security Benchmarks, and Top 20 Critical Controls) and (b) any security requirements, obligations, specifications, or event reporting procedures set forth in Schedule A.

(o)     In addition to any other insurance required to be provided by VENDOR hereunder, VENDOR shall also provide the Cyber-Insurance coverage meeting the requirements specified in Schedule B, attached hereto and made part hereof. VENDOR shall also comply with the terms and conditions in Schedule B as they relate to any insurance required to be provided by VENDOR pursuant to this Agreement.

(p)     Notwithstanding anything in the Agreement or this Rider to the contrary, VENDOR shall indemnify, defend and hold CUSTOMER, its affiliates, and their respective employees, officers, representatives and contractors, harmless from and against all Losses caused by, resulting from, or attributable to VENDOR's breach or violation of applicable laws, regulations or any of the terms and conditions of this Rider. VENDOR's obligation to indemnify, defend, and hold harmless shall survive termination or expiration of the Agreement and this Rider.

(q)     Failure by VENDOR to comply with any requirement of this Rider shall constitute a material breach of the Agreement and a VENDOR default thereunder. CUSTOMER shall be allowed to terminate the Agreement, and CUSTOMER shall have all rights and remedies provided by law or equity under the Agreement and this Rider.

***

[*Signature page follows*]

---

8

IN WITNESS WHEREOF, CUSTOMER and VENDOR have caused their representatives to execute and deliver this Privacy and Data Security Rider.

CUSTOMER                                VENDOR

By: _____          By: _____
Name:                                  Name:
Title:                                 Title:
Date:                                  Date:


By: _____
Name:
Title:
Date:


[*Signature page to Privacy and Data Security Rider*]

9

<u>Schedule A</u>

## General Security Requirements

(a)     The following definitions are relevant to this General Security Requirements Schedule:

(i)     "<u>Cyber-infrastructure</u>" means electronic information and communication systems and services, as well as the information contained therein. These systems, both those housed within facilities as well as those that are cloud-based, be they proprietary or third-party, in any manner, are comprised of hardware and software for processing (creating, accessing, modifying and destroying), storing (on magnetic, electronic or other formats) and sending (shared use and distribution) information, or any combination of said elements that include any type of electronic device such as, without limitation, standard computers (desktop/laptop) with internet connections, digital storage methods used on computers (e.g. hard drives), mobiles, smartphones, personal digital assistants, data storage media, digital and video cameras (including CCTV), GPS systems, etc.

(ii)     "<u>Protected Information</u>" means Personal Data and Company Data as defined in the Rider.

(iii)     Capitalized terms not otherwise defined in this Schedule shall have the meaning set forth in the Rider.

(b)     VENDOR must, always, know the level of information protection that should be afforded to the Protected Information as well as the corresponding standards and applicable laws and regulations, and it shall adopt the Technical and Organizational Measures adequate thereto. VENDOR shall, at least, maintain Technical and Organizational Measures consistent with the type of Protected Information being processed and the services being provided by VENDOR, to secure Protected Information, which measures shall implement industry accepted protections which include physical, electronic and procedural safeguards to protect the Protected Information supplied to VENDOR against any Data Security Incident or other security incident, and any security requirements, obligations, specifications or event reporting procedures set forth in the Agreement, the Rider or this Schedule. As part of such security measures, VENDOR shall provide a secure environment for all Protected Information and any hardware and software (including servers, network, and data components) to be provided or used by VENDOR as part of its performance under the Agreement on which Protected Information is contained.

(c)     When the scope of the Agreement implies the use or connection of VENDOR's Cyber-infrastructure to that of CUSTOMER, the VENDOR shall have reasonable Technical and Organizational Measures for its protection and for the prevention of any Data Security Incident.

(i)     The connection between the CUSTOMER's and the VENDOR's network is not permitted, unless expressly agreed to in writing, in which case it must be done by establishing encrypted and authenticated virtual private networks, and the number of interconnection points between the two networks must be the minimum that is compatible with the required level of availability. The connection to the VENDOR's network shall be removed as soon as there is no need for it.

(ii)     Direct user connections from the VENDOR to CUSTOMER's network are not permitted, unless authorized in writing by CUSTOMER and only for a limited period of time.

(iii)     If the Agreement is fully or partially performed at the VENDOR's premises or property, the VENDOR must establish mechanisms and procedures for physical access to said premises or property to prevent unauthorised persons from accessing Cyber-infrastructure or Protected Information.

10

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB1F1F2

(d)    VENDOR shall establish mechanisms and procedures for identifying, authenticating and controlling logical access necessary to prevent unauthorised persons from accessing its Cyber-infrastructure elements and CUSTOMER's Protected Information, and, in particular:

(i)    VENDOR will have procedures based on the principle of least privilege when granting, assigning and withdrawing authorized access and permissions to its personnel or the personnel of its subcontractors, where applicable, including privileged users or administration taking into account the need for the use, the confidentiality of the Protected Information and the resources for the performance of their tasks;

(ii)    VENDOR will maintain an updated inventory of the access granted and will withdraw access from personnel who cease working in connection with the Agreement within a period of less than twenty-four (24) hours. Credentials must always be encrypted when stored and transmitted; and

(iii)    VENDOR shall have policies and procedures that ensure the strength of the passwords and that they are updated regularly. Passwords shall be changed during the installation processes of new hardware or software. VENDOR's default passwords shall be changed.

(e)    VENDOR shall implement Technical and Organisational Measures necessary to ensure operational continuity under applicable service level agreements (including but not limited to contingency plans, backup and recovery procedures). In particular:

(i)    VENDOR shall make backup copies of the Protected Information as frequently as is required for the services being provided by VENDOR and according to the nature of the data, establishing the appropriate procedures and mechanisms to ensure that the data can be retrieved, that only authorised VENDOR personnel can access it and that they are transferred and stored in such a way as to prevent access or manipulation by unauthorised persons; and

(ii)    The same security measures shall apply to backups as to the original Protected Information.

(f)    In the event that CUSTOMER has expressly authorized VENDOR to use its own IT equipment for accessing CUSTOMER's Cyber-infrastructure, the VENDOR shall guarantee and undertake that there are adequate security measures to protect the stationary or portable IT equipment and mobile devices used to access such Cyber-infrastructure or for storing, processing or transmitting the Protected Information, including but not limited to:

(i)    Automatic locking if the device is left unattended for a certain period of time. User authentication will be required for unlocking.

(ii)    Protection against malicious software and known vulnerabilities.

(iii)    Updating the operating system as often as the vendor requires.

The VENDOR shall maintain an action procedure should the equipment or device be lost or stolen, ensuring, to the maximum extent possible that the event be communicated promptly, Protected Information be deleted safely in accordance with recognised standards, and access to CUSTOMER's systems or systems containing CUSTOMER's Protected Information be suspended.

Before equipment is reused or replaced, the VENDOR must protect, or if applicable remove, all the Protected Information stored on it, ensuring that unauthorised personnel or third parties cannot access or recover it.

(g)    The VENDOR shall establish adequate procedures to guarantee protection against loss or unauthorised processing of files, computer media and paper documents containing Protected Information

\\MI - 028195/000003 - 656051 v6

and guarantee that they are destroyed when the reasons for their creation no longer apply. Extracting data from a file and downloading it to a server or delivering it electronically is considered equivalent to computer media for the purposes of complying with these measures.

AVANGRID may request information concerning any Processing of Protected Information by the VENDOR.

(h)     The VENDOR shall include security measures appropriate to the nature of the Protected Information Processed in developing, maintaining and testing the equipment that will be used to perform the services being provided by VENDOR. The VENDOR will adopt secure code development standards and ensure that no real data is used in test environments. If necessary, CUSTOMER's express written authorisation will be required, and the same security measures required for the work environment will be applied to these test environments.

(i)     When the scope of the Agreement includes the supply of equipment and/or materials, the VENDOR shall prove that best security practices and standards have been applied for the design, fabrication, maintenance, and, where applicable, installation of the supplied equipment and/or materials, including its components.

For any such equipment and/or materials with information processing capacity or network connectivity options:

(i)     The VENDOR shall provide evidence or certificates that guarantee design security, firmware/software updates and malware protection.

(ii)     The VENDOR shall conduct periodic analyses of vulnerabilities and inform CUSTOMER about any necessary updates, especially those that affect security.

(iii)     All internet connected devices shall be protected with adequately complex passwords that can be changed by CUSTOMER.

(iv)     The configuration of devices, equipment and materials shall be adjustable exclusively according to AVANGRID's needs, and any unnecessary functionality deactivated.  Should the VENDOR conduct any configuration, documentation to that effect shall be provided.

(j)     VENDOR should fully implement the mitigation actions available on the APTs Targeting IT Service Provider CUSTOMERS site page to protect against this malicious activity. VENDOR should implement the following specific actions:

(i)     Apply the principle of least privilege to their environment, which means customer data sets are separated logically, and access to client networks is not shared;

(ii)     Implement robust network and host-based monitoring solutions that looks for known malicious activity and anomalous behaviour on the infrastructure and systems providing client services;

(iii)     Ensure that log information is aggregated and correlated to enable maximum detection capabilities, with a focus on monitoring for account misuse; and

(iv)     Work with CUSTOMER to ensure hosted infrastructure is monitored and maintained, either by the service provider or the client.

Schedule B

## Cyber-Insurance Requirements

(a)    VENDOR shall during the term of the Agreement have and maintain the following insurance coverage:

(i)    Cyber Errors and Omissions Policy providing coverage, on a per occurrence basis, for acts, errors, omissions, and negligence of employees and contractors giving rise to potential liability, financial and other losses relating to data security and privacy, including cost of defense and settlement, in an amount of at least $5 million dollars, which policy shall include coverage for all costs or risks associated with:

1)    violations of data privacy or data security laws and regulations; and

2)    cyber risks, including denial-of-service attacks, risks associated with malware and malicious code, whether designed to interrupt a network or provide access to private or confidential information; and

3)    other risks specific to the work performed by VENDOR as shall be identified by CUSTOMER.

(ii)    Such coverage shall be furnished by an insurance company with an A.M. Best Financial Strength Rating of A- or better, and which is otherwise reasonably acceptable to CUSTOMER.

(b)    VENDOR warrants that the scope of all coverage evidenced to the CUSTOMER pursuant to this Agreement shall be the sole responsibility of the VENDOR to maintain at committed to levels required by this document and VENDOR, in any event of a loss, will take full responsibility for the payment of any policy deductible, self-insured retention, premium or retrospective premium obligation necessary to maintain coverage, and shall include coverage for any indemnification and hold harmless agreements made by the VENDOR pursuant to the Data Security Rider. VENDOR's failure to pay the applicable deductible, self-insured retention, or retrospective premium shall constitute a material breach of this Agreement, with damages equal to at least the amount of insurance lost or not provided due to such breach.

(c)    All insurance coverage(s) provided by VENDOR pursuant to this Schedule B shall be primary and non-contributing with respect to any other insurance or self-insurance which may be maintained by the CUSTOMER.

13

[Schedule C][7]

## Acceptable Use Requirements

The intent of this Schedule is to document requirements as they pertain to the Acceptable Use of the Electronic Devices and Cyber-infrastructure of Avangrid, Inc. and any of its subsidiaries (hereinafter "Avangrid") by contractors, consultants or other third parties.

Employees and other persons acting on behalf of Avangrid vendors shall be required to read, acknowledge their understanding of, and commit to comply with these Avangrid Acceptable Use Requirements.

## Definitions

- A **User** is defined as any contractor, consultant or other third parties, including any employee of an Avangrid vendor, with access to or using Avangrid Electronic Devices or Cyber-infrastructure.

- **Cyber-infrastructure** Includes electronic information and communications systems and services, and the information contained in these systems and services. Those systems and services are composed of all hardware and software that process (creation, access, modification, and destruction), store (paper, magnetic, electronic, and all other media types), and communicate (sharing and distribution) information, or any combination of these elements.

- **Electronic Devices** include standard computer (workstation desktop/ laptop) with network connections, digital storage media used in standard computers (e.g. hard drives), telephone and voicemail systems, mobile phones, smartphones, tablets, Personal Digital Assistants (PDA), End Point Storage Devices (EPSD), digital and video cameras (including CCTV), mobile navigation systems, printers, photocopiers and scanners, fax machines, and all other similar of associated devices, etc.

  - **Avangrid Electronic Devices** are Electronic Devices owned and managed by Avangrid.

  - **Personally Owned Devices (POD)** are Electronic Devices (e.g. smart phones, tablets, laptops) privately owned and managed by Users.

  - **End Point Storage Devices (EPSD)** applies to the storage of data on devices that can be connected either by a USB drive, data cable or by wireless connection direct to any computing equipment within Avangrid, e.g. USB sticks, drives, thumb nails, pen drives, flash drives, memory cards, etc.

## 1.    Requirements and Practices

## 1.1    Electronic Devices

Avangrid Electronic Devices and resources are property of Avangrid and may be provided to Users for the pursuit of their professional activity.

1.1.1    The determining authority and responsibility for issuance of an Electronic Device shall rest with the Avangrid Business Area Leader (BAL) or department hiring manager.

---

[7] Schedule C (Acceptable Use Requirements) only needs to be included if the VENDOR will have access to Avangrid information technology resources or if the VENDOR will have access to the Avangrid information technology environment.

1.1.2    Avangrid Electronic Devices shall be provided to Users configured with the required security hardware and software protections.

    a.   Compromising or interfering with the Electronic Devices' operating system, hardware, software or protection mechanisms is prohibited.

1.1.3    Users shall be responsible for the appropriate use of authorized Electronic Devices in accordance with their duties and responsibilities, including, but not limited to:

    a.   Protecting Electronic Devices from misuse.

    b.   Logging off or protecting Electronic Devices with a screen and/or keyboard locking mechanism, when unattended and when not in use.

        i.   Desktop and laptop computers shall be switched off or hibernating when unattended for a period more than one hour and always at the end of the workday.

        ii.   Desktop and laptop computer screens shall be locked by Users always when unattended.

    c.   Taking the following preventative measures to ensure that any Electronic Devices used to connect to Avangrid's Cyber-infrastructure are physically secured by:

        i.   Protecting Avangrid assets from unauthorized access and use by others,

        ii.   Leaving Electronic Devices in secured locations (e.g. locked cabinet or drawer, locked rooms in locked buildings as applicable),

        iii.   Not leaving Electronic Devices in plain view in unattended vehicles,

        iv.   Not leaving Electronic Devices in vehicles overnight,

        v.   Carrying laptops as hand luggage when traveling,

        vi.   Positioning Electronic Devices so that they (and the information displayed) are not visible from outside a ground floor window, and

        vii.   Positioning the display screen of Electronic Devices such that it cannot be viewed by others in public places (e.g. train, aircraft, restaurants, etc.).

1.1.4    Users shall follow Avangrid procedures for immediately reporting lost, compromised, or stolen Electronic Devices.

    a.   The User shall notify the Service (Help) Desk and their Avangrid contact.

1.1.5    User shall follow Avangrid procedures for the return of Avangrid owned Electronic Devices when the use of those devices is deemed no longer necessary.

    a.   Users shall return all Avangrid Electronic Devices to their Avangrid contact immediately upon separation/ termination, which shall be responsible for collecting all Avangrid Electronic Devices.

1.1.6    The use of hot desks/ shared network access equipment shall be reserved for Users who do not regularly require the use of a portable Electronic Device (e.g. laptop) for their professional activities.

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

a.  Users of hot desks/shared network access shall have a current network login.

## 1.2    Connection to Avangrid Cyber-infrastructure

**1.2.1** All Electronic Devices which connect to the Avangrid Cyber-infrastructure network shall be Avangrid approved assets which have been configured in accordance with Avangrid standard configurations.

a.  Non-Avangrid approved Electronic Devices shall not connect directly to the Avangrid Cyber-infrastructure (e.g. through Ethernet connection).

b.  Wireless connections from an Avangrid office shall only be accomplished through Avangrid Electronic Devices and the Avangrid supported wireless infrastructure.

c.  Guest wireless network accounts shall only be supplied on 'as-need-be-basis' following Avangrid approval processes.

d.  Remote desk connections shall only be supplied on 'as-need-be-basis' following Avangrid approval processes.

## 1.3    Use of Mobile Devices (for Remote Access)

**1.3.1** The determining authority and responsibility for issuance of a mobile electronic device to perform Avangrid professional activities; access the Avangrid Cyber-infrastructure or store/transmit Avangrid information/data remotely shall rest with the Avangrid Business Area Leader (BAL) or department hiring manager.

a.  Users shall remotely access Avangrid's Cyber-infrastructure utilizing only authorized hardware, software and access control standards (e.g. Avangrid approved VPN technology for Avangrid Electronic Devices or Citrix client).

b.  At no time shall a remote User initiate two simultaneous connections to different networks (e.g., no split tunneling and no multi-homed connection).

c.  Avangrid issued SIM cards shall not be swapped or used in non-Avangrid issued Electronic Devices.

d.  Configuring a non-Avangrid issued Electronic Device for connection to the Avangrid corporate email system is strictly prohibited.

e.  Users should be aware that Avangrid may monitor emails sent from and to non-Avangrid issued devices.

## 1.4    Personally Owned Devices

**1.4.1** The use of Personally Owned Devices for access to and/or handling of Avangrid information/data and Avangrid Cyber-infrastructure is prohibited.

## 1.5    Treatment of Software and Applications

**1.5.1** The acquisition and installation of software on Avangrid Electronic Devices shall be made using approved methods.

16

a. All access to company software and/or applications shall be subject to formal request and approval processes.

**1.5.2** Users shall be prohibited from introducing or installing any unauthorized software, content or material.

**1.5.3** The installation of any type of network access program peer (P2P) or similar (e.g., BitTorrent, Emule), as well as any other application for file sharing that could saturate Internet bandwidth, prevent access to other Users or slow down connections to technology and information resources is prohibited.

**1.5.4** Intellectual property, licensing and regulatory requirements shall be observed always. Downloading, obtaining, copying or redistributing materials protected by copyright, trademark, trade secret or other intellectual property rights (including software, music, video, images) is prohibited, even where such material is to be used for the pursuit of the professional activity.

a. Where materials protected by copyright, trademark, trade secret or other intellectual property rights are required for the pursuit of an Avangrid professional activity the appropriate license/permission shall be obtained prior to use.

## 1.6    Treatment of Information/Data

**1.6.1** Information/data assets obtained or created during the engagement with Avangrid are the property of Avangrid and shall be treated in accordance with the applicable Agreement and Data Security Rider.

**1.6.2** The storage of Avangrid information/data on Personally Owned Devices or non-Avangrid controlled or authorized environments, including non-authorized Electronic Devices is prohibited. Users shall not store AVANGRID owned information/data on devices that are not issued by AVANGRID unless explicitly and contractually agreed by both parties.

**1.6.3** Where access to Personal Data is part of a Users' professional role and responsibilities, access shall be treated in accordance with all applicable data protection and/or privacy law(s) and regulation(s) and under strict access and usage guidelines.

**1.6.4** Corporate storage spaces and network resources shall be used for file storage and/or exchange of professional information.

**1.6.5** Users shall store and share information/data in accordance with the terms and conditions with Avangrid and any applicable Data Security Rider.

**1.6.6** Use of an End Point Storage Device (EPSD) (e.g., USB) shall be limited to those devices acquired through the Information Technology (IT) request process (e.g. ITSM/ServiceNow).

**1.6.7** Printed information/data (hard copy) shall be:

a. Stored based on critically, e.g., hardcopy containing confidential and/or sensitive information/data shall be locked away when not required (or not in use).

b. Discarded, when no longer needed, based on criticality, e.g. confidential and/or sensitive hardcopy shall be shredded.

17

c. To be removed from printers, fax machines, copier rooms, and conference/ meeting rooms immediately.

## 1.7    User Access Credentials and Passwords

**1.7.1** Requests for access shall be made following access provisioning procedures.

**1.7.2** Applications and network resources access shall be activated\deactivated in accordance with Avangrid activation\ deactivation procedures.

**1.7.3** Users requiring duly justified privileged access rights will be assigned a specific "Privileged User ID"

a. Privileged User IDs shall be reviewed and confirmed at least semi-annually.

b. Regular professional activities shall not be performed from a privileged ID.

**1.7.4** Users shall use strong, complex passwords and securely maintain secret authentication information (e.g. passwords, cryptographic keys, smart cards that produce authorization codes), including:

a. Not sharing or disclosing their Avangrid credentials (log on IDs-user names and/or passwords) with others inside or outside the company.

b. Keeping secret authentication information confidential, ensuring that it is not divulged to any other parties, including senior management and technical support.

c. Not recording (e.g. on paper, software file or hand-held device) secret authentication information, unless this can be stored securely, and the method of storing has been approved (e.g. password vault) by Corporate Security.

d. Changing secret authentication information when there is any indication of a possible compromise.

e. Reporting any incidents or suspected compromises by following Avangrid incident reporting procedures.

## 1.8    Internet Use and Social Media

**1.8.1** Avangrid may make available internet access to users depending on their role and responsibilities.

a. Internet access shall be provided as a tool for business purposes, shall be used with moderation and shall be proportional to the work being undertaken.

b. Access to restricted websites shall be enabled at the discretion of Avangrid and shall be provisioned following the security exception process.

c. Only Avangrid approved surfing software shall be used to access the Internet.

**1.8.2** A moderate and proportional use of the internet shall be allowed for non-professional activities, although web surfing is expressly prohibited for:

a. Accessing or posting of any racist or sexual content or any material that is offensive or defamatory in nature.

18

b.  Accessing games, downloading video, music (MP3 or another format), or downloading any other files not related to the Avangrid related responsibilities.

1.8.3 Limited and occasional use of Avangrid Electronic Devices and resources to engage in Social Networking[8] and Blogging[9] is acceptable, provided that:

a.  It is done in a professional and responsible manner.

b.  It does not violate the Code of Ethics or any relevant Avangrid policy, procedure or rule.

c.  It is not detrimental to Avangrid's best interests.

d.  It does not interfere with regular work duties.

e.  There is no breach of the prohibitions identified in these requirements.

1.8.4 Avangrid reserves the right to determine which websites and social media platforms can be accessible through Avangrid Electronic Devices or Cyber infrastructure.

## 1.9    E-mail Use

1.9.1 All information created, sent, or received via Avangrid's e-mail system(s), including all e-mail messages and electronic files shall be the property of Avangrid.

1.9.2 Avangrid reserves the right to monitor, inspect and access such emails and electronic files.

1.9.3 The forwarding of Avangrid owned information/data to a personal e-mail account is prohibited.

1.9.4 Removing or circumventing any of the security controls enforced on the company email system (e.g. SPAM filtering, automatic email disclaimers, etc.) is prohibited.

1.9.5 Users shall not permit others to use their e-mail accounts. Based on user established permissions; calendars and/or mailboxes may be shared.

1.9.6 Limited use of an Avangrid e-mail account for personal purposes shall be regarded as acceptable provided that:

a.  Use does not interfere with the normal performance of professional duties.

b.  Messaging does not violate applicable laws, regulations, the Code of Ethics, or Avangrid policies.

c.  Use is moderate both in terms of frequency and amount of memory and resources consumed.

1.9.7 Avangrid e-mails or messages containing company information/ data shall not be forwarded to external parties except where there is a specific business 'need to

---

[8] Social Networking is the use of dedicated websites and applications to interact with other users or to find people with similar interests.

[9] Blogging: A blog is a website containing a writer's or group of writers' own experiences, observations, opinions, etc., Blogging is posting to that website.

know'.

**1.9.8** Avangrid electronic messaging shall not be used for transmitting, retrieving or storing any messages, files or attachments which constitute:

a.  Harassing or discriminatory messages which relate to gender, race, sexual orientation, religion, disability or other characteristics protected by applicable laws and regulations.

b.  Defamatory messages which adversely affect the reputation of a person or company.

c.  Messages that violate copyright, trademark, trade secret or other intellectual property rights.

d.  Obscene materials or images of a sexual nature.

e.  Files or documents of an indeterminate origin or that, for any reason, may include computer viruses or in any way breach the security systems of the company or the recipient of the file or document, or may damage their IT systems.

f.  Any material or images that might reasonably be expected to cause personal offense to the recipient.

g.  Messages in violation of applicable laws, regulations, the Code of Ethics, or Avangrid policies.

**1.9.9** The retention period for e-mail messages shall be 18 months. Once the retention period has been reached, emails shall be automatically eliminated from the user's mailbox.

a.  a.Users shall store messages and/or associated attachments in Avangrid provided network folders. Storage of messages and/or associated attachments on hard drives in .pst (personal mail folders) folders is prohibited.

**1.9.10**    Users shall report suspicious email messages (e.g., spam, phishing, etc.) the Service (Help) Desk and/or using the reporting tool REPORTER, available in Outlook.

## 1.10    Incident reporting

**1.10.1**    Users shall immediately report any unusual activity, incident or suspected event following Avangrid incident reporting procedures (e.g., Service (Help) Desk, REPORTER, etc.)

## 1.11    Contract Termination

**1.11.1**    Avangrid Electronic Devices assigned to or in the possession of a User shall be returned to Avangrid on or before the contract termination date or whenever it is determined that the use of the Electronic Device is no longer necessary. This includes the return of facility access badges.

**1.11.2**    Access to Cyber-infrastructure shall be deactivated (revoked) on or before a User's termination date in accordance with Avangrid access management processes.

## 2.    No Expectation of Privacy

All contents of the Avangrid Electronic Devices and Cyber-infrastructure are the property of the company. Therefore, Users should have no expectation of privacy whatsoever in any e-mail message, file, data, document, facsimile, telephone conversation, social media post, conversation, or any other kind or form of information or communication transmitted to, received, or printed from, or stored or recorded on Avangrid's Electronic Devices or Cyber-Infrastructure.

## 3.    Monitoring

3.1    Avangrid reserves the right to use monitoring controls, including software, to ensure compliance with these Acceptable Use Requirements document, and to record and/or monitor one or more Users' Electronic Devices and resources, e-mails and/or internet activity in accordance with regulatory and legal requirements.

   a.    This includes the right to monitor, intercept, access, record, disclose, inspect, review, retrieve, print, recover or duplicate, directly or through third parties designated for such purpose, any information/data contained on and any uses of the Electronic Devices and Cyber-Infrastructure. Avangrid may store copies of such information/data for a period of time after they are created and may delete such copies from time to time without notice. Users consent to such monitoring by acknowledging these requirements and using the Electronic Devices and Cyber-Infrastructure.

   b.    Accordingly, Users should not harbor any expectation of privacy in respect to the use of Avangrid Electronic Devices or Cyber-Infrastructure and should not consider the data contained on them as private.

4.2    Monitoring may take place at any time and without the need to notify or inform the User in advance, taking into consideration legal or regulatory limitations, where applicable.

## 4.    Non Compliance

Violation and non-conformance to this guidance by third party workers may result in appropriate actions, including contract termination.

[Schedule D][10]

## CCPA Contract Clauses for Service Providers

1. Definitions. The following definitions and rules of interpretation apply in this Schedule:
   a. "Agreement" has the meaning set forth in the Rider.
   b. "CCPA" means the California Consumer Privacy Act of 2018, as amended, including by the California Privacy Rights Act of 2020 (2020 Cal. Legis. Serv. Proposition 24) (Cal. Civ. Code §§ 1798.100 to 1798.199.95), the CCPA Regulations (Cal. Code Regs. tit. 11, §§ 7000 to 7102), and any related regulations or guidance provided by the California Attorney General. Terms defined in the CCPA, including personal information and business purposes, carry the same meaning in this Schedule.
   c. "Contracted Business Purposes" means the services described in the Agreement or the Rider for which the service provider receives or accesses personal information.
   d. "CUSTOMER" has the meaning set forth in the Rider.
   e. "Rider" means the Privacy and Data Security Rider to which this Schedule is appended.
   f. "VENDOR" has the meaning set forth in the Rider.
2. Scope of Application

This Schedule applies only where, and to the extent that, VENDOR processes personal information that is subject to the CCPA on behalf of CUSTOMER in connection with the Agreement.
3. Service Provider's CCPA Obligations
   a. Personal information is disclosed by CUSTOMER to VENDOR only for the specific Contracted Business Purposes. VENDOR will only collect, use, retain, or disclose personal information for the Contracted Business Purposes for which CUSTOMER provides or permits personal information access and in accordance with CUSTOMER's instructions.
   b. VENDOR will not sell or share personal information.
   c. VENDOR will not use, retain or disclose personal information for VENDOR's own commercial purposes or in a way that does not comply with the CCPA. If a law requires the VENDOR to disclose personal information for a purpose unrelated to the Contracted Business Purpose, the VENDOR must first inform the CUSTOMER of the legal requirement and give the CUSTOMER an opportunity to object or challenge the requirement, unless the law prohibits such notice.
   d. VENDOR will not use, retain or disclose personal information outside of the direct business relationship between VENDOR and CUSTOMER.
   e. VENDOR will not combine personal information that it receives from, or on behalf of, CUSTOMER with personal information it receives from, or on behalf of, another person or persons, or collects from its own interactions with the consumer.
   f. VENDOR will limit personal information collection, use, retention, and disclosure to activities reasonably necessary and proportionate to achieve the Contracted Business Purposes.
   g. VENDOR must promptly comply with any CUSTOMER request or instruction requiring the VENDOR to provide, amend, transfer, or delete the personal information, or to stop, mitigate, or remedy any unauthorized processing, including any unauthorized use, of personal information.

---

[10] Schedule D only needs to be included for Avangrid wide or Avangrid Renewables related engagements where the VENDOR will process personal information of California residents.

h. If the Contracted Business Purposes require the collection of personal information from individuals on the CUSTOMER's behalf, VENDOR will always provide a CCPA-compliant notice at collection that the CUSTOMER specifically pre-approves in writing. VENDOR will not modify or alter the notice in any way without the CUSTOMER's prior written consent.

i. If VENDOR determines that it can no longer meet its obligations under the CCPA, VENDOR must promptly notify CUSTOMER.

4. Assistance with Customer's CCPA Obligations

1. VENDOR will reasonably cooperate and assist CUSTOMER with meeting the CUSTOMER's CCPA compliance obligations and responding to CCPA-related inquiries, including responding to verifiable consumer requests, taking into account the nature of VENDOR's processing and the information available to VENDOR.

2. VENDOR must notify CUSTOMER immediately if it receives any complaint, notice, or communication that directly or indirectly relates either party's compliance with the CCPA. Specifically, VENDOR must notify the CUSTOMER within 2 working days if it receives a verifiable consumer request under the CCPA.

5. Subcontracting

a. If CUSTOMER authorizes VENDOR to engage subcontractors in accordance with the terms of the Agreement and the Rider, any subcontractor used must qualify as a service provider under the CCPA and VENDOR cannot make any disclosures to the subcontractor that the CCPA would treat as a sale or share.

b. For each subcontractor used, VENDOR will:

   i. Promptly notify CUSTOMER of the engagement.

   ii. Engage the subcontractor pursuant to a written contract binding the subcontractor to observe all the requirements set forth in the Rider and this Schedule.

   iii. Provide CUSTOMER with the following information: the subcontractor's name, address, and contact information, the type of services to be provided by the subcontractor, and the personal information categories to be disclosed to the subcontractor.

a. VENDOR remains fully liable to the CUSTOMER for the subcontractor's performance of its agreement obligations.

b. Upon the CUSTOMER written request, VENDOR will audit a subcontractor's compliance with its personal information obligations and provide the CUSTOMER with the audit results.

6. CCPA Warranties and Certification

a. When collecting, using, retaining, disclosing or, in general, processing personal information, VENDOR will comply with all applicable requirements of the CCPA and provide the same level of privacy protection as required by the CCPA.

b. VENDOR certifies that it understands this Schedule's and the CCPA's restrictions and prohibitions on selling and sharing personal information and retaining, using, or disclosing personal information outside of the parties' direct business relationship, and it will comply with them.

## APPENDIX A
### Personal Information Processing Purposes and Details

**Personal Information Categories**: The Agreement involves the following types of personal information, as defined and classified in CCPA

| Personal Information Category | Examples | Processed under this Agreement |
|---|---|---|

| A. Identifiers. | A real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security number, driver's license number, passport number, or other similar identifiers. | [YES/NO] |
|---|---|---|
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | A name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information. Some personal information included in this category may overlap with other categories. | [YES/NO] |
| C. Protected classification characteristics under California or federal law. | Age (40 years or older), race, color, ancestry, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, veteran or military status, genetic information (including familial genetic information). | [YES/NO] |
| D. Commercial information. | Records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies. | [YES/NO] |
| E. Biometric information. | Genetic, physiological, behavioral, and biological characteristics, or activity patterns used to extract a template or other identifier or identifying information, such as fingerprints, faceprints, and voiceprints, iris or retina scans, keystroke, gait, or other physical patterns, and sleep, health, or exercise data. | [YES/NO] |
| F. Internet or other similar network activity. | Browsing history, search history, information on a consumer's interaction with a website, application, or advertisement. | [YES/NO] |
| G. Geolocation data. | Physical location or movements. | [YES/NO] |
| H. Sensory data. | Audio, electronic, visual, thermal, olfactory, or similar information. | [YES/NO] |
| I. Professional or employment-related | Current or past job history or performance evaluations. | [YES/NO] |

24

| information. | | |
|---|---|---|
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | Education records directly related to a student maintained by an educational institution or party acting on its behalf, such as grades, transcripts, class lists, student schedules, student identification codes, student financial information, or student disciplinary records. | [YES/NO] |
| K. Inferences drawn from other personal information. | Profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes. | [YES/NO] |

| Sensitive Personal Information Category | Processed under the Agreement |
|---|---|
| Social security, driver's license, state identification card, or passport number. | [YES/NO] |
| Log-in, financial account, debit card, or credit card number in combination with any required security or access code, password, or credentials allowing access to an account. | [YES/NO] |
| Precise geolocation. | [YES/NO] |
| Racial or ethnic origin, religious or philosophical beliefs, or union membership. | [YES/NO] |
| Mail, email, or text messages contents not direct to CUSTOMER | [YES/NO] |
| Genetic data. | [YES/NO] |
| Unique identifying biometric information | [YES/NO] |
| Health information | [YES/NO] |

[Schedule E][11]

## Connecticut Privacy Act Clauses for Processors

1.  Definitions. The following definitions and rules of interpretation apply in this Schedule:
    a.  "Agreement" has the meaning set forth in the Rider.
    b.  "Connecticut Privacy Act" means Connecticut Act Concerning Personal Data Privacy and Online Monitoring (Public Act No. 22-15). Terms defined in the Connecticut Privacy Act, including personal data and processing, carry the same meaning in this Schedule.
    c.  "CUSTOMER" has the meaning set forth in the Rider.
    d.  "Rider" means the Privacy and Data Security Rider to which this Schedule is appended.
    e.  "VENDOR" has the meaning set forth in the Rider.
2.  Scope of Application

This Schedule applies only where, and to the extent that, VENDOR processes personal data that is subject to the Connecticut Privacy Act on behalf of CUSTOMER in connection with the Agreement.

1.  Personal data processing by VENDOR
    a.  The instructions for the processing of the personal data, the nature and purpose of the processing of the personal data, the type of personal data subject to the processing and the duration for the processing are set forth in section [(d)(ii)][12] of the Rider.
    b.  The rights and obligations of CUSTOMER and VENDOR with respect to the processing of personal data are set forth in the Rider and this Schedule.
2.  Processor's Connecticut Privacy Act Obligations
    a.  VENDOR will ensure that each person processing personal data is subject to a duty of confidentiality with respect to the data.
    b.  At CUSTOMER's direction, VENDOR shall delete or return all personal data to the CUSTOMER as requested at the end of the provision of the services, unless retention of data is required by law.
    c.  Upon reasonable request from CUSTOMER, VENDOR shall make available to CUSTOMER all information in its possession necessary to demonstrate the processor's compliance with the obligations in sections 1 to 11, inclusive, of the Connecticut Privacy Act.
    d.  VENDOR shall, allow, and cooperate with, reasonable assessments by CUSTOMER or CUSTOMER's designated assessor, or the VENDOR may, at its own cost, arrange for a qualified and independent assessor to conduct an assessment of the VENDOR's policies and technical and organizational measures in support of the obligations under sections 1 to 11, inclusive, of the Connecticut Privacy Act, using an appropriate and accepted control standard or framework and assessment procedure for such assessments, and provide a report of such assessment to CUSTOMER upon request.
3.  Subcontracting
    c.  If CUSTOMER authorizes VENDOR to engage subcontractors in accordance with the terms of the Agreement and the Rider, any subcontractor engaged by VENDOR to process personal data shall be engaged pursuant to a written contract that requires the

---

[11] Only for agreements that involve (i) The United Illuminating Company, Connecticut Natural Gas, Southern Connecticut Gas or UIL Holdings Corporation, or (ii) Avangrid Service Company or Avangrid Management Company if services will be provided to the companies listed in (i).
[12] Confirm cross reference before execution.

26

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

       subcontractor to meet the obligations of VENDOR with respect to personal data.

2.    Connecticut Privacy Act Warranties

       a.   VENDOR will comply with all applicable requirements of the Connecticut Privacy Act when processing personal data.

\\MI - 028195/000003 - 656051 v6

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

ATTACHMENT AA

PROJECT EXECUTION PLAN REQUIREMENTS

(documents to be included in full format in PDF)

\\MI - 028195/000003 - 656051 v6

ATTACHMENT BB

TESTS AND TEST PROCEDURES

(documents to be included in full format in PDF)

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-13178BB151E2

ATTACHMENT CC

CONTRACTOR BACKGROUND CHECK RIDER

[*Attachment commences on the following page.*]

\\MI - 028195/000003 - 656051 v6



Adobe Acrobat
Document

Updated Background Check Document is embedded here.  (documents to be included in full
format in PDF)

DocuSign Envelope ID: 591BDF16-4AB5-4857-A4C4-4317BBB1E1E2

### Contractor Certification Form

The undersigned agent of **Campos EPC LLC** certifies that the employees, contractors, or subcontractors listed below meet the requirements agreed above.

It is the responsibility of the vendor to notify **Avangrid Service Company** of all personnel changes to include additions as well as voluntary or involuntary terminations. Additions and voluntary terminations are to be communicated within seven (7) calendar days and involuntary terminations must be communicated immediately.

| Employee Name | Employer | Date of Last Background Check |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Further, I attest that the employees, contractors, or subcontractors listed above working for **Avangrid Service Company** are in good standing and have been in good standing since their last background check.

_____    _____
Signature                                        Date

_____
Printed Name and Position

\\MI - 028195/000003 - 656051 v6

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

[End of Schedule C – Background Check Requirements]

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-4317BB1F1F2

ATTACHMENT DD

IT COMPUTER USAGE AND PERSONALLY IDENTIFIABLE INFORMATION POLICY – Not Used

[*Attachment commences on the following page.*]

\\MI - 028195/000003 - 656051 v6

DocuSign Envelope ID: 591BDF16-1AB5-4857-A4C4-43178BB151E2

**ATTACHMENT EE**

FORM OF NOTICE OF PROJECT COMPLETION AND FORM OF CERTIFICATE OF PROJECT COMPLETION

[*The Attachment begins on the following page.*]

\\MI - 028195/000003 - 656051 v6

**Exhibit EE-1**

*Form of Notice of Project Completion*

[Letterhead of Contractor]

**Contractor's Notice of Project Completion**

To:    NECEC Transmission LLC
       [Address]

**[Name of Contractor]** ("Contractor") hereby represents and certifies to NECEC Transmission LLC ("Owner") that the Project has achieved Project Completion pursuant to the requirements of the Agreement (as hereinafter defined).   Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in that certain agreement for engineering, procurement and construction of the HVDC Underground Transmission Line, as part of The New England Clean Energy Connect (NECEC) Project, made and entered into as of the [ • ] day of [ • ], by and between Owner and Contractor (the "Agreement").

In this regard, the Contractor represents and certifies to the Owner the following have occurred:

(1)  Final Completion shall have been achieved, and the Work, to the date of the Contractor's Notice of Project Completion, has been completed in strict accordance with the requirements of the Agreement, and all Warranty Periods, and Extended Warranty Periods, if any, have expired;

(2)  the Contractor has delivered the Notice of Project Completion to the Owner;

(3)  all Liquidated Damages, if any, have been paid by the Contractor to the Owner;

(4)  no Liens have been imposed and remain outstanding against the Materials, the Equipment, the Work, the Site or the Project, and the Owner has received all of the required waivers and releases under Section 8.1(d) of this Agreement; and

(5)  any other conditions precedent for Project Completion set forth in the Agreement.

The Contractor recognizes that the Owner is relying upon the Contractor's representations and certifications set forth herein.

The person executing this proposed certificate of Project Completion is authorized by the Contractor to do so for, and on behalf of, the Contractor.

**[Contractor]**

By: _____

Title: _____

Date:

_____

37

**Exhibit EE-2**

*Form of Certificate of Project Completion*

[Letterhead of Owner]

To:     **[Name of Contractor]**
        [Address]

**Certificate of Project Completion**

NECEC Transmission LLC (the "Owner") pursuant to that certain agreement for the engineering, procurement and construction of the HVDC Underground Transmission Line as part of the New England Clean Energy Connect (NECEC) Project, made by and between Owner and **[Name of Contractor]** (the "Contractor") and entered into as of the **[ • ]** day of **[ • ], [ • ]** (the "Agreement"), relying upon the Contractor's Notice of Project Completion, given by the Contractor, dated the **[ • ]** day of **[ • ], [ • ],** including the Attachments attached thereto, hereby issues this Certificate of Project Completion to the Contractor, effective as of the **[ • ]** day of **[ • ], [ • ],** which is the Project Completion Date.  The Owner has based its decision to issue this Certificate of Project Completion upon information provided by the Contractor to the Owner.  In the event that any such information is later discovered not to be true, or to be incorrect, the Owner may, at any time after such discovery, revoke this Certificate of Project Completion, and avail itself to any and all remedies available under the Agreement, at law and in equity.

[_____]
By:     _____
Title:  _____
Date:   _____

38