UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NECEC TRANSMISSION LLC,

Plaintiff,

-v-

CAMPOS EPC, LLC, *et al.*,

Defendants.

25-CV-5351 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff NECEC Transmission LLC ("NECEC") asserts fifteen claims against

Defendants Campos EPC, LLC ("Campos") and H.D.D. Company, Inc. ("HDD")—including

violations of Section 1 of the Sherman Act, tortious interference with contract, fraud, and breach

of contract—arising out of a project to install a transmission line beneath Maine's Kennebec

River.  (ECF No. 31.)  Now before the Court are Defendants' motions to dismiss NECEC's First

Amended Complaint (the "Amended Complaint").  (ECF Nos. 42, 45.)  For the reasons that

follow, Defendants' motions to dismiss are granted in part and denied in part.

## I.    Background

The following facts are taken from NECEC's Amended Complaint and are presumed true

for the purposes of this motion.  *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir.

2013).

### A.    HDD Agreement

NECEC is a clean energy development company owned by Avangrid Networks, Inc., a

leading sustainable energy company based in Portland, Maine.  (ECF No. 31 ("FAC") ¶¶ 32-33.)

The state of Massachusetts charged NECEC with overseeing the construction of a 145-mile

transmission line from the Canadian border to Lewiston, Maine, which would connect Hydro-

1

Québec's clean power to the New England electrical grid and supply hydroelectric power sufficient to meet the demand of 1.2 million homes across New England. (*Id.* ¶¶ 45-46, 49.)

In 2021, NECEC entered an Agreement for Engineering, Procurement and Construction of the New England Clean Energy Connect HVDC Underground Transmission Line ("HDD Agreement") with HDD for $6 million, which provided that HDD would drill and install seven conduits beneath Maine's Kennebec River as part of the construction of the transmission line. (*Id.* ¶¶ 5, 62; *see* ECF No. 31-2.) HDD, in turn, hired Campos as its engineering subcontractor. (FAC ¶ 64.) In August 2021, however, a statewide referendum halted construction of the transmission line. (*Id.* ¶ 77.) While construction was paused, HDD and Campos partnered on other energy projects, lauded one another in public, and commented on the importance of their specific drilling expertise to the renewable energy sector. (*Id.* ¶¶ 79-81.)

**B.      Campos Agreement**

The stop work order was lifted in 2023, at which time NECEC and HDD discussed restarting construction. (*Id.* ¶¶ 82-83.) Before resuming work, however, HDD requested a minimum of $12 million to complete the project and proposed in the alternative a "time and materials" contract rather than a flat-fee arrangement. (*Id.* ¶ 86.) After NECEC declined these terms, HDD terminated the HDD Agreement with NECEC on February 1, 2024. (*Id.* ¶¶ 87-88.) During negotiations that continued after the termination of the HDD Agreement, HDD stated that it would not complete construction for less than $19 million. (*Id.* ¶ 93.) NECEC decided to rebid the project. (*Id.* ¶ 97.) Before HDD's termination was public, however, Campos leadership contacted NECEC and stated that Campos would be willing to take over the construction project. (*Id.* ¶ 95.) In early April 2024, Campos submitted, and ultimately won, a bid of $20 million that listed the company Cherokee Directional Drilling ("Cherokee") as its subcontractor. (*Id.* ¶¶ 98, 102.) Shortly thereafter, NECEC and Campos executed an Agreement

2

for Engineering, Procurement and Construction of the New England Clean Energy Connect HVDC Underground Transmission Line ("Campos Agreement").  (*Id.* ¶¶ 98-100; ECF No. 31-1 ("Campos Agmt.").)  The Campos Agreement was substantially the same as the HDD Agreement and required that Campos "install seven (7) ten-inch (10") conduits to cross the Kennebec River in Maine."  (Campos Agmt. at 104 (§ 3).)  On July 26, 2024, Campos informed NECEC that Cherokee was no longer able to work on the project due to scheduling conflicts, and Campos hired HDD to be its subcontractor less than a week later.  (FAC ¶¶ 103-04.)  On July 31, 2024, Campos submitted a construction plan that set a substantial completion deadline for the project for November 16, 2024.  (*Id.* ¶ 105.)

> **C.      Campos's Revised Bore Path and Performance at the Job Site**

To install the seven conduits, Campos and HDD were required to propose and drill a "bore path" within NECEC's right of way, which is the route of the underground pipeline through which the conduits would be pulled.  (*Id.* ¶ 70.)  On August 24, 2023, Campos submitted to NECEC a proposed bore path that "was specifically designed to preserve the possibility of drilling a second bore hole in the future."  (*Id.* ¶¶ 72-73.)  NECEC applied for permits for the bore path from the Maine Department of Environmental Protection ("DEP") and U.S. Army Corps of Engineers ("Army Corps").  (*Id.* ¶ 74.)  On July 15, 2024, NECEC received final approval from the DEP and Army Corps for its Site Location of Development Act Permit and Natural Resources Protection Act Permit, both of which contained the proposed bore path.  (*Id.* ¶ 75.)

Four days later, Campos proposed a different bore path.  (*Id.* ¶ 115.)  To avoid the delay associated with acquiring the necessary regulatory approvals for such a change, NECEC rejected this new bore path, and Campos agreed to abide by the original specifications.  (*Id.* ¶ 118.)  On August 29, 2024, Campos distributed an Issued for Construction ("IFC") drawing that complied

with the original specifications of the bore path.  (*Id.* ¶ 120.)  NECEC later learned, however, that Campos had in fact drilled the revised bore path that NECEC had rejected.  (*Id.* ¶ 126.)  The revised bore path precludes the possibility of drilling a second bore hole in the future, thus foreclosing opportunities to expand the transmission line.  (*Id.* ¶¶ 128, 181.)

NECEC alleges that Campos and HDD were also careless and unprofessional in carrying out the construction project.  (*Id.* ¶ 129.)  To oversee Defendants' work, NECEC hired several third-party experts to observe and make recommendations at the job site.  (*Id.* ¶¶ 130-33.)  Those third-party advisors reported, among other things, Defendants' poor mud management technique, failure to prepare complete daily report logs, and refusal to follow the Campos Project Quality Plan.  (*Id.* ¶¶ 134-36.)

### D.    Campos's Change Orders

Under the Campos Agreement, if Campos sought a change in the specifications or pricing of the project, it was required to submit a Change Order to NECEC.  (*Id.* ¶ 141; Campos Agmt. at 84 (§ 9.1).)  Over the course of its work on the project, Campos submitted several Change Orders that NECEC alleges are disallowed by the Campos Agreement.  On November 12, 2024, Campos sent NECEC a Change Order requesting an additional fifty-seven days and $8,328,327 to complete the project on account of "rock conditions with the drilling operations of the project."  (*Id.* ¶ 143; ECF No. 31-8 at 2.)  On December 18, 2024, Campos sent another Change Order requesting monthly review of additional expenses incurred as a result of winter conditions and notifying NECEC of additional delays due to those conditions.  (FAC ¶ 145; ECF No. 31-9.)  And on January 24, 2025, Campos submitted two Change Orders requesting $27,537 "to support crane operations during the pullback" (FAC ¶ 145; ECF No. 31-4) and $80,313.70 for additional

work to drill and obtain sufficient water flow (FAC ¶ 145; ECF No. 31-5).[1]  NECEC and

Campos corresponded at length about the Change Orders, but Campos did not provide sufficient

information for NECEC to determine whether to approve or deny them.  (FAC ¶ 153.)  During

these negotiations, HDD walked off the job site and shut down operations.  (*Id.* ¶ 155.)

On February 3, 2025, leaders from Campos met with NECEC executives to continue

negotiating the Change Orders.  (*Id.* ¶ 158.)  That same day, Campos issued a stop work notice,

threatening to stop work at 7:00 p.m. that evening.  (*Id.* ¶ 160.)  Campos also threatened to

remove the casing of the bore hole, which would have collapsed the bore hole such that another

contractor would have been forced to start the project from scratch.  (*Id.* ¶¶ 164, 176.)  NECEC

reiterated that it had not yet received enough supporting information to adjudicate the Change

Orders, but nonetheless offered to advance $2.5 million to Campos.  (*Id.* ¶¶ 166-67.)  Also on

February 3, Campos sent another letter, this time stating that it would stop work unless NECEC

paid it $8 million by February 7, 2025, and resolved all outstanding Change Orders by February

11, 2025.  (*Id.* ¶ 168.)  NECEC acceded to these demands the following day.  (*Id.* ¶ 170.)  On

February 12, 2025, the day after the deadline to resolve all outstanding Change Orders, Campos

again threatened to stop work unless NECEC resolved the Change Orders by 5:00 p.m. that day,

paid an additional $6.5 million to Campos, and memorialized these new financial obligations by

signing an agreement ("Change Agreement") that Campos had sent to NECEC, which increased

---

[1] The Amended Complaint alleges that Campos sought $23,175 for additional work necessary for crane access and $78,568 for additional work to drill and obtain sufficient water flow.  (FAC ¶ 145.)  The Change Orders themselves, however, which are attached to the Amended Complaint, state that those numbers were $27,537 and $80,313.70, respectively.  (ECF Nos. 31-4, 31-5.)  The Court relies on the amounts stated in the Change Orders themselves.  *See Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002) ("When allegations contained within the complaint are contradicted by documents attached to the complaint, the documents control, and the Court need not accept the allegations contained within the complaint as true."), *aff'd sub nom. Rozsa v. SG Cowen Sec. Corp.*, 165 F. App'x 892 (2d Cir. 2006).

the total amount NECEC owed for the project to $34.5 million and pushed back the substantial completion deadline to March 11, 2025.  (*Id.* ¶ 173-74, 177; ECF No. 31-15.)

### E.    Campos's Performance of the Pullback

As part of installing the seven conduits, Campos was required to perform a "pullback," during which the conduits are pulled back through the bore hole.  (FAC ¶ 183.)  Campos performed the pullback on February 23, 2025.  (*Id.* ¶ 184.)  During the process, two of the seven conduits broke.  (*Id.*)  The conduit that broke above ground was later repaired, but the second conduit, which broke inside the bore hole, could not be repaired or recovered.  (*Id.*)

On April 2, 2025, Campos sent NECEC a Notice of Substantial Completion.  (*Id.* ¶ 186.) On April 11, NECEC sent a letter to Campos (1) rejecting its Notice of Substantial Completion because only six conduits had been successfully installed, (2) notifying Campos of its various breaches of the Campos Agreement, including its failure to install seven conduits and complete construction before the substantial completion date, and (3) rescinding the Change Agreement executed in February 2025.  (*Id.* ¶¶ 187-88, 190.)

### F.    Campos's Mechanic's Lien

On June 30, 2025, Campos issued a Notice of Mechanic's Lien Claim with the Somerset County Recorder of Deeds in Maine, alleging that NECEC owes Campos at least $2,987,999.99—the remainder of the amount owed under the Change Agreement.  (*Id.* ¶¶ 197-98.)  On August 4, 2025, Campos filed an Amendment to this Notice, increasing the alleged amount owed to $3,326,387.99.  (*Id.* ¶ 198.)  That same day, Campos filed an action in Maine state court to enforce the Mechanic's Lien against NECEC and the Central Maine Power Company.  (*Id.* ¶ 199.)

## II.    Procedural History

NECEC filed suit on June 27, 2025.  (ECF No. 1.)  On August 25, 2025, NECEC filed an Amended Complaint.  (FAC.)  On October 17, 2025, HDD and Campos separately moved to dismiss the Amended Complaint and filed memoranda in support.  (ECF Nos. 42, 44-46.)[2] NECEC filed a consolidated opposition to the two motions on December 12, 2025.  (ECF No. 59 ("Opp.").)  HDD and Campos filed their replies on January 16, 2026.  (ECF Nos. 62-63.)

## III.   Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "To meet this plausibility standard, the factual allegations must permit the Court 'to infer more than the mere possibility of misconduct.'"  *Mastercraft Decorators, Inc. v. Orlando*, 356 F. Supp. 3d 259, 264 (W.D.N.Y. 2018) (quoting *Iqbal*, 556 U.S. at 679).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).  In so doing, a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an

---

[2] Campos subsequently filed word-searchable versions of its motion to dismiss and accompanying memoranda.  (ECF Nos. 48-49.)

entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation marks omitted).

## IV.    Discussion

### A.    Bid-Rigging Claims

NECEC first alleges that HDD and Campos "acted under an unlawful bid-rigging agreement to artificially inflate the price of the [construction] project," in violation of Section 1 of the Sherman Act.  (FAC ¶ 201.)  A bid-rigging scheme is one "in which contractors who are supposed to compete against each other to submit the lowest bid conspire to artificially fix the low bid and the bidder who will be awarded the contract."  *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 439 (E.D.N.Y. 1995).  Specifically, NECEC alleges that, before HDD and Campos resumed construction, they entered into an agreement in which: (1) HDD would demand $19 million from NECEC to complete the project as a "cover bid" that would make Campos's subsequent bid more palatable, (2) HDD would terminate its contract with NECEC when NECEC refused those terms, (3) Campos would submit an inflated $20 million bid, naming Cherokee as its subcontractor, to complete the project, and (4) after Campos won the bid, it would push out Cherokee and bring in HDD as its subcontractor.  (Opp. at 17-18.)  NECEC also brings claims of tortious interference with contract and breach of the implied covenant of good faith and fair dealing premised on the same bid-rigging allegations.[3]  (FAC ¶¶ 214, 327.)

In the antitrust context, "[a] plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed."  *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 360 (S.D.N.Y. 2019) (quoting

---

[3] In its consolidated opposition, NECEC withdrew its promissory estoppel claim arising from Defendants' alleged bid-rigging conspiracy (Count Eleven).  (*See* Opp. at 39 n.7.)

*Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).  To do

this, an antitrust plaintiff may allege either direct evidence of the illegal agreement or

"circumstantial facts supporting the inference that a conspiracy existed."  *Citigroup*, 709 F.3d at

136 (emphasis omitted).  "As a means of smoking out the illegal agreement, courts have required

plaintiffs to allege, with the requisite factual support, certain parallel conduct by the alleged

conspirators and some factual context suggesting agreement, as distinct from identical,

independent action."  *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 76 (2d Cir.

2025) (quotation marks omitted).

NECEC does not plausibly allege a bid-rigging scheme between HDD and Campos.  Its

allegations are pocked by incongruities that render its narrative of conspiracy difficult to credit.

NECEC states, for example, that it continued to negotiate with HDD for two months after HDD

terminated its contract, and that HDD put forth various proposals, including completing the

project for $12 million or on a "time and materials" contract, before NECEC refused those terms

and decided to re-bid the project.  (FAC ¶¶ 86, 88, 92-94.)  HDD's concerted efforts to rescue its

own contract with NECEC undermine NECEC's assertion that those negotiations were in fact

meant to serve as "cover" for Campos's subsequent bid—particularly since Campos's $20

million bid was $8 million *more* than what HDD had initially offered to complete the project.

(*Id.* ¶ 86.)  Even more puzzling is NECEC's admission that, after re-bidding the project, NECEC

accepted Campos's $20 million bid the day after it was submitted.  (*Id.* ¶¶ 98-99.)  NECEC does

not explain why, in a bid process presumably open to contractors who could easily have won out

against Campos's allegedly inflated bids, it nonetheless elected to go with Campos.[4]  Nor is it

---

[4] In its opposition, NECEC claims that it "never publicly re-bid the [construction] project, as Campos approached NECEC proposing to take over before NECEC ever had the chance."  (Opp. at 24.)  But in its Amended Complaint, NECEC states that, "[e]ager to get construction back on

clear why Campos would, as part of the alleged conspiracy, list Cherokee as its subcontractor in the bid if it always intended to swap Cherokee out for HDD.  (*Id.* ¶¶ 102-04.)

In short, NECEC's allegations do not plausibly "support[] the inference that a conspiracy existed."  *Citigroup*, 709 F.3d at 136 (emphasis omitted).  For such a conspiracy to succeed, HDD and Campos would have had to wager that (1) NECEC would accept none of HDD's proposals during their two months of negotiations, (2) no other contractors would undercut Campos's allegedly inflated bid during the re-bidding process, and (3) Cherokee would be amenable to being replaced as subcontractor after jointly winning the bid with Campos.  To support an inference of conspiracy, NECEC alleges that Campos and HDD had worked together on other projects, both offered to complete the project at prices significantly higher than NECEC's original contract, and swapped positions as primary contractor and subcontractor. (*See* Opp. at 18-19.)  But standing alone, these allegations fall short of "nudg[ing] [NECEC's] claim[] across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("It is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct was made." (cleaned up)).

---

track, NECEC began the rebidding process for the [construction] project" and that "Campos submitted a bid proposing to do the [construction] project."  (FAC ¶¶ 97-98.)  Indeed, that section of the Amended Complaint is titled, in part, "Campos Wins the Rebid," and NECEC explicitly accuses Defendants of "rigging the bidding process."  (*Id.* ¶ 215.)  NECEC may not amend its complaint through its opposition papers.  *See Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013).  But even if the Court accepts NECEC's belated allegation that it never actually rebid the project, that allegation defeats NECEC's bid-rigging claim:  There can plainly be no bid-rigging if there was no bidding process to begin with.  *Cf. In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 564 (S.D.N.Y. 2016) (dismissing bid-rigging claims because there was no bidding process).

Accordingly, NECEC's antitrust claim (Count One) is dismissed for failure to state a claim. NECEC's claims of tortious interference with contract (Count Two) and breach of the implied covenant of good faith and fair dealing (Count Twelve), which are premised on the same bid-rigging allegations, are dismissed for the same reasons.[5]

### B.    Claims Arising from the Revised Bore Path and Installation of Conduits

NECEC claims that Campos breached the Campos Agreement by failing to adhere to the original bore path and failing to install all seven conduits. To establish a claim for breach of contract under New York law,[6] a complaint must allege "the existence of an agreement, adequate performance of the contract by the plaintiff, breach of contract by the defendant, and damages." *Eternity Global Master Fund Ltd. v. Morgan Guarantee Trust Company of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (cleaned up). Campos does not dispute that an agreement existed between it and NECEC; nor does it dispute that NECEC adequately performed under the Campos Agreement.

### 1.    Failure to Adhere to Original Bore Path

NECEC argues that Campos violated § 6.4(b) of the Campos Agreement by failing to adhere to the bore path that was approved in the Site Location of Development Act Permit and Natural Resources Protection Act Permit. (FAC ¶¶ 268, 276.) Section 6.4(b) states that "[t]he Contractor shall . . . strictly comply with all Applicable Laws [and] Permits, including Permit Requirements." (Campos Agmt. at 59 (§ 6.4(b)).) Section 7.11(b)(vi) additionally states that

---

[5] Other than its antitrust claim, all of NECEC's claims arise under state law. Because NECEC alleges that there is complete diversity of citizenship between the parties and that the amount in controversy exceeds $75,000 (FAC ¶¶ 32-25, 37), this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1).

[6] The Campos Agreement contains a choice-of-law provision stating that "rights and obligations [of the parties under the agreement] shall be governed by the laws of the State of New York." (Campos Agmt. at 86 (§ 10.1).)

Campos "shall be in default" if it "fails to strictly comply with Applicable Laws." (*Id.* at 68 (§ 7.11(b)(vi)).) "Applicable Laws," in turn, are defined to include "Permit Requirement[s]" (*id.* at 7 (§ 1.8)), which include "the rights granted under any Permit" (*id.* at 16 (§ 1.97)). Those Permits, in turn, include "Owner's Permits" (*id.* (§ 1.96)), which include "the Permits identified in Attachment M" (*id.* (§ 1.94)). Attachment M includes the Site Location of Development Permit and Natural Resources Protection Act Permit. (*Id.* at 128.)

At this stage, NECEC has sufficiently alleged that Campos breached these reticulated provisions of the Campos Agreement. Campos does not dispute that it deviated from the originally specified bore path. Instead, it retorts that the IFC drawings, which are not attached to NECEC's Amended Complaint, allowed Campos's engineer "to approve an onsite deviation from the proposed bore path." (ECF No. 49 ("Campos Mem.") at 27, 29.) Campos also faults NECEC for not attaching the permits themselves and for "fail[ing] to show that it has actually suffered any financial detriment" because of the bore path deviation. (*Id.* at 29.)

Whether the IFC drawings in fact permitted Campos to stray from the original bore path without notifying NECEC, however, is an issue of fact inappropriate for resolution at the motion to dismiss stage. *See Coughtry v. Tracker Marine, LLC*, No. 08-CV-875, 2010 WL 11541908, at *2 (N.D.N.Y. Jan. 7, 2010) ("[W]hether a breach of contract has occurred is a question of fact for the jury.") (collecting cases). Nor was NECEC required to attach the permits themselves to state a claim for breach, given that "[a] plaintiff is not generally required at the pleadings stage to quote from or attach to the complaint the underlying legal documents that prove up the plaintiff's allegations." *Healthcare Just. Coal. DE Corp. v. Cigna Health & Life Ins. Co.*, No. 23-CV-1689, 2024 WL 4264391, at *3 (D. Conn. Sept. 23, 2024). Moreover, NECEC alleges that the original bore path "was specifically designed to preserve the possibility of drilling a second bore

12

hole in the future" (FAC ¶ 73)—a possibility that the rerouted bore path has now foreclosed. (FAC ¶¶ 72-73, 128, 181.)  This is adequate to make out a claim of damages at this early juncture.  *See Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99-CV-2638, 1999 WL 1277243, at *8 (S.D.N.Y. Dec. 30, 1999) ("Lost future profits may be recovered as damages for breach of contract under New York law.").

Because NECEC has stated a breach-of-contract claim based on Campos's deviation from the original bore path, Campos's motion to dismiss is denied as to Count Seven.[7]

### 2.       Failure to Install Seven Conduits

The Campos Agreement required that Campos "install seven (7) ten-inch (10") conduits to cross the Kennebec River in Maine." (Campos Agmt. at 104 (§ 3).)  It also stated that Campos "shall be in default of its obligations" if it "has failed or refused to perform any material obligation under [the Campos] Agreement."  (*Id.* at 67-68 (§ 7.11(b)(v)).)  NECEC alleges that, by failing to install all seven conduits, Campos failed to perform a "material obligation" in breach of the Campos Agreement.  (FAC ¶ 284.)  Campos counters that this claim is

---

[7] The Court dismisses, however, NECEC's other claims arising from Campos's deviation from the original bore path.  NECEC's promissory estoppel claim (Count Ten) is dismissed because "a claim [for promissory estoppel] cannot stand when there is a contract between the parties." *Susman v. Commerzbank Cap. Markets Corp.*, 945 N.Y.S.2d 5, 8 (2012).  No party disputes that an enforceable contract existed between Campos and NECEC.  NECEC's claim for breach of the implied covenant of good faith and fair dealing related to the bore path (Count Fourteen) is dismissed because "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  Finally, NECEC's fraud claim (Count Five) is dismissed because, under New York law, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quotation marks omitted).  Count Five is dismissed for the additional reason that it is not pleaded with enough specificity to satisfy Rule 9(b)'s particularity requirement. *See* Fed. R. Civ. P. 9(b); *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).

insufficiently pleaded because the Agreement does not define the term "material obligation" and that, in any event, the seventh conduit was not core to the Campos Agreement because NECEC intended to install it solely as a redundancy for future issues or upgrades.  (Campos Mem. at 30.)

Campos's arguments are unavailing.  The fact that the Campos Agreement does not define the term "material obligation" is not fatal to NECEC's breach-of-contract claim.  To hold otherwise would strip ambiguous terms in a contract of any force at all.  Rather, "[w]hen interpreting a contract under New York law, the Court should give terms that are not defined in the contract their plain and ordinary meanings." *Process Am., Inc. v. Cynergy Holdings, LLC*, No. 12-CV-772, 2014 WL 3844626, at *9 (E.D.N.Y. Apr. 30, 2014), *aff'd*, 839 F.3d 125 (2d Cir. 2016).  So interpreted, a "material obligation" may reasonably be understood to include the installation of the seventh conduit, particularly since the Campos Agreement explicitly specified that Campos was to install seven conduits.  (*See* Campos Agmt. at 104 (§ 3).)  At this stage of litigation, this is enough to state a claim for breach of contract.  *See JGB (Cayman) Newton, Ltd. v. Sellas Life Scis. Grp. Inc.*, No. 18-CV-3095, 2018 WL 5266877, at *8 (S.D.N.Y. Oct. 23, 2018) (concluding that the interpretation of an ambiguous contract "involves factual disputes . . . generally inappropriate for resolution on a motion to dismiss").

NECEC also presses an alternative theory of breach, alleging that Campos "fail[ed] to achieve Substantial Completion of the Work" (FAC ¶ 296) in violation of § 7.11(b)(x) of the Campos Agreement by installing six, rather than seven, conduits.  (Campos Agmt. at 67-69 (§ 7.11(b)(x)).)  Under the Campos Agreement, "Substantial Completion" is achieved only if "the Work . . . has been completed in strict accordance with the requirements of [the] Agreement."  (*Id.* at 18-19 (§ 1.129).).  The Campos Agreement defines "Work" to include "the Specifications and scope set forth in the RFP . . . and Contractor's Proposal attached hereto as A-

14

2" (*id.* at 20 (§ 1.141)), and defines "Specifications" to mean "the specifications set forth in Attachment A" (*id.* at 18 (§ 1.127)).  Attachment A-2, in turn, which is a subsection of Attachment A, specifies that Campos will "install seven (7) ten-inch (10") conduits to cross the Kennebec River in Maine."  (*Id.* at 104 (Attachment A-2 § 3).)  Taken together, these provisions suggest that "Substantial Completion" of the Campos Agreement can plausibly be understood as requiring installation of all seven conduits.

Campos argues that this claim should be dismissed as duplicative of NECEC's "material obligation" breach-of-contract claim.  (Campos Mem. at 31.)  But the Court construes NECEC as asserting alternative theories of breach within one overarching breach-of-contract claim, as is permitted by Rule 8 of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 8(d).  "At the pleading stage, a plaintiff is not required to guess as to the claims on which it will ultimately prevail."  *Marciano v. SJN Adjustment Grp., Inc.*, No. 18-CV-5222, 2019 WL 4888569, at *3 (E.D.N.Y. Sept. 30, 2019) (cleaned up).  To the contrary, "even if [NECEC] cannot recover damages under each claim asserted in the Complaint, [it] is still entitled to plead multiple theories of relief."  *Broadrick v. Gilroy*, 786 F. Supp. 3d 487, 496 (D. Conn. 2025); *see also Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999) (although "allegations were not specifically pleaded as 'in the alternative,' . . . Rule 8([d])(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories").

Accordingly, Campos's motion to dismiss is denied as to Counts Seven, Eight, and Nine.[8]

---

[8] Campos also asks the Court to dismiss "NECEC's claims for actual damages, consequential damages, and attorneys' fees" in Count Nine (Campos Mem. at 32) because the Campos Agreement specifies that liquidated damages are NECEC's "sole and exclusive remedy . . . for failure to achieve Substantial Completion" (Campos Agmt. at 66 (§ 7.10(a))).  Because Campos is correct as a matter of law that the Campos Agreement limits NECEC's damages solely to

15

### C.    Change Agreement

NECEC brings a slate of claims against Defendants arising from the Change Agreement executed in February 2025.  Specifically, NECEC alleges that (1) the Change Agreement should be declared invalid because NECEC signed it under economic duress, (2) Defendants were unjustly enriched under the Change Agreement, (3) Campos induced NECEC to sign the Change Agreement through fraud, and (3) Campos breached the implied covenant of good faith and fair dealing by "coercing NECEC into signing the Change Agreement and procuring NECEC's signature on the Change Agreement through fraud."  (FAC ¶¶ 222-29, 234-37, 260, 345.)

### 1.    Duress

NECEC seeks "a declaration by this Court that the Change Agreement is invalid and rescinded based on NECEC's economic duress."  (*Id.* ¶ 231.)  Under New York law, "[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will."  *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971).  The elements of an economic duress claim are: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."  *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) (quotation marks omitted).

The fact that one party drives a hard bargain from a position of economic advantage is not enough to state a claim of duress.  *See Edison Stone Corp. v. 42nd St. Dev. Corp.*, 145 A.D.2d 249, 256 (1989).  A plaintiff may demonstrate economic duress, however, "by proof that

---

liquidated damages if Campos fails to achieve Substantial Completion, the Court dismisses NECEC's claims for actual and consequential damages and attorneys' fees, as pleaded in Count Nine.

immediate possession of needful goods is threatened or . . . by proof that one party to a contract has threatened to breach the agreement by withholding goods unless the other party agrees to some further demand." *Austin Instrument*, 29 N.Y.2d at 130 (citations and quotation marks omitted). In such cases, "[i]t must also appear that the threatened party could not obtain the goods from another source of supply and that the ordinary remedy of an action for breach of contract would not be adequate." *Id.* at 130-31 (footnotes omitted).

NECEC has made out a classic claim of economic duress. NECEC alleges that, during negotiations with Campos about its outstanding Change Orders, Campos thrice threatened to stop working unless NECEC acceded to various demands, including signing a Change Agreement that increased the contract amount by $14.5 million. (FAC ¶¶ 160, 168, 173-74, 177; ECF No. 31-15.) According to NECEC, Campos also threatened to remove the casing of the bore hole, which would have collapsed the bore hole and effectively destroyed all the work thus far accomplished by Campos. (FAC ¶¶ 164, 176.) Given the expertise required to finish the project, "there was no suitable replacement for Campos and HDD" (*id.* ¶ 165), and in any event, "it [was] highly unlikely in the industry that another contractor would take ownership of the quality or performance of the work of another contractor given the complexity involved" (*id.* ¶ 164). Faced with the prospect of potentially dooming the project if Campos made good on its threats, NECEC agreed to Campos's conditions and signed the Change Agreement without negotiating its terms. (*Id.* ¶¶ 177-78.)

These facts are analogous to those in *KiSKA Construction Corporation-USA v. G & G Steel, Inc.*, No. 04-CV-9252, 2005 WL 1225944 (S.D.N.Y. May 20, 2005). After winning a bid from the City of New York to replace a bridge, a contractor (KiSKA) entered into an agreement with a subcontractor (G&G), in which the subcontractor would "fabricate and deliver" the new

17

bridge. *Id.* at *1. G&G, however, sought additional money from KiSKA that was not contemplated by their contract and threatened to withhold components necessary to make the new bridge operational unless those requests were settled. *Id.* at *2. Cowed by the expense of having to find an alternate supplier, the costs of missing the deadlines imposed by its contract with the City, and the danger and inconvenience to the public if the bridge was not completed, KiSKA agreed to settle G&G's demands. *Id.* at *2, *5. The Court held that these facts sustained a claim of economic duress. *Id.* at *5.

The same result obtains here. As in *KiSKA*, Campos allegedly demanded an additional $14.5 million from NECEC, on threat of walking away from the project and collapsing the bore hole if NECEC did not oblige. NECEC also alleges that securing a replacement for Defendants at that juncture would have been difficult, if not impossible, thus potentially condemning the project in its entirety. In these circumstances, "the ordinary remedy of an action for breach of contract would not be adequate." *Austin Instrument*, 29 N.Y.2d at 130-31. Additionally, like in *KiSKA*, NECEC's contract with Campos had a nexus to the public: NECEC had underlying contracts with Massachusetts utilities and was constructing the transmission line in collaboration with Massachusetts to supply hydroelectric energy to homes across New England. (*Id.* ¶¶ 45, 85, 225.) Courts have considered the interests of the government and the public when evaluating claims of economic duress. *See, e.g.*, *Austin Instrument*, 29 N.Y.2d at 131 (observing that plaintiff's "relationship with the Government" was "most significant" in evaluating the plaintiff's "free will"); *KiSKA*, 2005 WL 1225944, at *5 (underscoring "danger and inconvenience to the public" if the construction was not completed, as well as the "jeopardizing [of the plaintiff's] chances of being awarded future public works contracts").

In response, Campos argues that it was merely "insist[ing] upon [its] legal rights" by negotiating the Change Order, which does not amount to economic duress. (Campos Mem. at 23.) *See Cont'l Airlines, Inc. v. Lelakis*, 943 F. Supp. 300, 307 (S.D.N.Y. 1996) ("A party's threat to take action which it is legally entitled to take is not wrongful, nor is a threat to insist upon one's legal rights."), *aff'd*, 129 F.3d 113 (2d Cir. 1997). But the Campos Agreement limited the circumstances in which a Change Order could be sought, required Campos to submit a request to NECEC "sufficiently defined and detailed to give [NECEC] an adequate basis upon which to review and respond," and made clear that NECEC "may accept or reject such Request for Change Order." (Campos Agmt. at 84-85 (§ 9.1(b)-(c)).) According to NECEC, Campos's Change Orders did not fall under any of the enumerated situations that permitted a Change Order, and Campos never provided it with sufficient information to adjudicate its Change Orders. (FAC ¶¶ 141-53.) Nor was Campos legally entitled, in any event, to NECEC's acceptance of its Change Orders.

Because NECEC's allegations of economic duress are sufficient to withstand a motion to dismiss, Campos's motion to dismiss is denied as to Count Three.

### 2.    Unjust Enrichment

NECEC asserts claims of unjust enrichment against Defendants, seeking repayment of the additional $14.5 million imposed on NECEC by the Change Agreement. (*Id.* ¶¶ 237-39.) "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quotation marks omitted). NECEC alleges that the Change Agreement was unlawfully executed, that HDD and Campos benefited from it, and that restitution is justified. This is all that is required to state a claim of unjust enrichment at this stage.

19

Defendants contend that these claims should be dismissed because the existence of the Change Agreement precludes an unjust enrichment claim and because the claim is duplicative of NECEC's economic duress, antitrust, and fraud claims.  (Campos Mem. at 24; ECF No. 44 ("HDD Mem.") at 25-26.).  It is true that, as a general matter, "the existence of a valid and enforceable written contract precludes recovery on a theory of unjust enrichment." *Cornhusker Farms, Inc. v. Hunts Point Co-op. Mkt., Inc.*, 2 A.D.3d 201, 206 (2003).  But "a plaintiff may plead unjust enrichment in the alternative if there is a dispute over the existence, scope, or enforceability of the putative contract," as there is here.  *Hofmann v. Long Island Univ.*, No. 22-393, 2024 WL 3262819, at *1 (2d Cir. July 2, 2024) (summary order) (cleaned up).  NECEC is therefore entitled to plead unjust enrichment in the alternative should the Change Agreement be invalidated.

Nor are NECEC's unjust enrichment claims duplicative of its economic duress, antitrust, or fraud claims.  NECEC's economic duress claim seeks a declaration that the Change Agreement is invalid and unenforceable, whereas its unjust enrichment claims seek return of any funds already disbursed to Campos and HDD under the Change Agreement.  (FAC ¶¶ 231, 240.) *See Novartis Pharma AG v. Incyte Corp.*, No. 20-CV-400, 2024 WL 3610438, at *62 (S.D.N.Y. July 29, 2024) ("The claims seek distinct relief, so they are not duplicative." (cleaned up)).  Moreover, "[a]n unjust enrichment claim is not duplicative if a reasonable trier of fact could find unjust enrichment without establishing all the elements for one of Plaintiff's claims sounding in law." *McCracken v. Verisma Sys., Inc.*, No. 14-CV-6248, 2017 WL 2080279, at *8 (W.D.N.Y. May 15, 2017) (cleaned up).  Because a reasonable trier of fact could find that Defendants were unjustly enriched even if they did not engage in a conspiracy or make any materially false

representations, NECEC's unjust enrichment claim is not duplicative of its antitrust or fraud claims.

HDD separately argues that NECEC has not adequately alleged that HDD benefited from the Change Agreement or that equity and good conscience require restitution. (HDD Mem. at 26-27.) But the Court may reasonably infer that HDD, as Campos's subcontractor, was allocated at least some of the additional $14.5 million under the Change Agreement. *See Delvalle v. Coca-Cola Co.*, No. 24-CV-6163, 2025 WL 1489257, at *2 (S.D.N.Y. May 23, 2025) ("When considering a Rule 12(b)(6) motion to dismiss, the Court draws all reasonable inferences in the light most favorable to the plaintiff and draws on its judicial experience and common sense." (cleaned up)). And at this early stage, NECEC need not prove that equity and good conscience require restitution, so long as it plausibly alleges that they do. *Cf. Yodice v. Touro Coll. & Univ. Sys.*, 767 F. Supp. 3d 86, 94 (S.D.N.Y. 2025).

Accordingly, Defendants' motions to dismiss are denied as to Count Four.

### 3.    Fraud

NECEC's fraud claim is more difficult to parse. NECEC appears to allege that Campos committed fraud by submitting a Change Order based on unforeseen rock conditions without notifying NECEC "that any purported unforeseen conditions resulted from Campos's intentional deviation from the permitted bore path." (FAC ¶ 260; *see* ECF No. 31-8 at 2.) To state a claim of fraud under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19 (2d Cir. 1996).

Claims of fraud are subject to a heightened pleading standard. Under Rule 9(b) of the Federal Rules of Civil Procedure, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). And the Second Circuit has held that, "when a complaint charges fraud, it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014).

NECEC's allegations of fraud are too vague to meet Rule 9's heightened pleading standard. NECEC states generally that "Campos misrepresented and omitted a material fact by concealing" its deviation from the original bore path, including by restricting NECEC's access to the drilling rig control cab, but alleges no details about who from Campos was responsible for making such a disclosure to NECEC, who restricted NECEC's access to the drilling rig control cab and how, when that concealment took place, and what else Campos did to conceal its deviation from the bore path. (FAC ¶¶ 124, 261-62.) These allegations, without more, do not "give rise to a strong inference of fraudulent intent." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017); *cf. Cable First Constr., Inc. v. Lepetiuk Eng'g Corp.*, No. 24-871, 2025 WL 2016277, at *2 (2d Cir. July 18, 2025) (summary order) (affirming the dismissal of a fraud claim where the plaintiff "did not allege any specific statements, false or otherwise, or identify any specific speaker").

Accordingly, Count Six is dismissed for failure to state a claim.

### 4.    Implied Covenant of Good Faith and Fair Dealing

NECEC asserts breach of the implied covenant of good faith and fair dealing arising from Campos's use of Change Orders to strongarm NECEC into signing the Change Agreement. (FAC ¶ 345.)  "The covenant of good faith and fair dealing is implied in every contract," and "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Emmet & Co. v. Cath. Health E.*, 49 Misc. 3d 1058, 1073 (N.Y. Sup. 2015) (quotation marks omitted).

Campos argues that this claim is deficiently pleaded because it is based on conduct that took place *before* NECEC signed the Change Agreement and is duplicative of NECEC's unjust enrichment claim.  (Campos Mem. at 25-26; ECF No. 17 at 17.)  But NECEC premises this claim on the *Campos* Agreement, not the Change Agreement.  (FAC ¶ 346.)  And the claim is not duplicative, as Campos asserts.  While NECEC brings unjust enrichment claims to recover funds that it alleges were wrongfully disbursed under the Change Agreement, it brings an implied covenant claim based on implied duties that Campos owed to NECEC under the Campos Agreement.  The two theories of recovery are distinct.

NECEC alleges that the Campos Agreement contained an implied covenant that barred Campos from coercing NECEC into signing the Change Agreement.  (FAC ¶¶ 345-46.)  This is sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.  *Cf. Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 288-89 (S.D.N.Y. 2023) (sustaining a claim for breach of the implied covenant where respondents "require[d] [the complainant] to perform unexpected, uncontracted-for actions in order to receive the goods and rebate owed to it under the [agreement]").

Accordingly, Campos's motion to dismiss is denied as to Count Fifteen.

23

**D.    Unprofessional Conduct**

In its Amended Complaint, NECEC also brings an implied covenant claim on the basis that Campos "engag[ed] in unprofessional conduct," including by "creating undue delay, failing to institute proper safety measures on the job site, and failing to perform adequate mud-testing and other best drilling practices."  (FAC ¶ 335.)  But as NECEC notes in its opposition, and as the Court is entitled to consider, the Campos Agreement explicitly addresses such claims at §§ 3.1(c), 3.2(d)(i), and 10.10(a)(iii), which mandate that Campos perform its work according to "Good Utility Practice," defined as practices "consistent with good business practices, reliability, safety and expedition."  (Campos Agmt. at 12, 22-23, 27, 92 (§§ 3.1(c), 3.2(d)(i), 10.10(a)(iii)).)  *See MMP Cap., Inc. v. Punyakam, PLLC*, No. 20-CV-01755, 2022 WL 1750434, at *5 n.6 (E.D.N.Y. Apr. 5, 2022) ("When evaluating the adequacy of a complaint for breach of contract, the court may consider any written instrument attached to the complaint as an exhibit[.]" (quotation marks omitted)), *report and recommendation adopted sub nom. MMP Cap., Inc. v. Punyakam, PPLC*, No. 20-CV-1755, 2022 WL 1749825 (E.D.N.Y. May 31, 2022).

An implied covenant claim cannot stand where an express contract already addresses the subject matter at issue.  *See Socci v. JPMorgan Chase & Co.*, No. 17-CV-5469, 2024 WL 4485497, at *6 (E.D.N.Y. Aug. 13, 2024) (collecting cases), *report and recommendation adopted*, No. 17-CV-5469, 2024 WL 4344845 (E.D.N.Y. Sept. 30, 2024).  NECEC attempts to convert its implied covenant claim into a breach-of-contract claim in its opposition.  (Opp. at 32.)  Unfortunately for NECEC, however, "it is axiomatic that the Amended Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *Touchstone Rsch. Grp. LLC v. United States*, No. 18-CV-3451, 2019 WL 4889281, at *3 n.5 (S.D.N.Y. Oct. 3, 2019) (cleaned up).

Because the Campos Agreement explicitly addresses the claim that NECEC asserts under an implied-covenant theory, Count Thirteen is dismissed for failure to state a claim.

### E. Mechanic's Lien

Finally, NECEC seeks a declaratory judgment invalidating the Notice of Mechanic's Lien Claim that Campos has filed in Maine on the basis that NECEC has lawfully rescinded the Change Agreement. (FAC ¶ 356.) Campos is correct, however, that this Court lacks jurisdiction to adjudicate this claim.

Under the Declaratory Judgment Act, courts "may declare the rights and other legal relations of any interested party seeking such declaration" regarding a controversy "*within its jurisdiction*." 28 U.S.C. § 2201(a) (emphasis added). No party disputes, however, that this claim is an *in rem* action, since it seeks to invalidate Campos's efforts to obtain a security interest in real property. *See Galveston, H. & H.R. Co. v. Cowdrey*, 78 U.S. 459, 482 (1870) (defining a "mechanics' lien" as a vehicle "by which a person furnishing materials or work on a building acquires a lien on the property to secure the payment of his claim"); *Mosley v. Selip & Stylianou, LLP*, No. 25-CV-2919, 2025 WL 2614972, at *2 n.6 (E.D.N.Y. Sept. 10, 2025) ("An action *in rem* is an action involving or determining the status of a thing." (cleaned up)).

"It is axiomatic that *in rem* jurisdiction exists in an action only where the subject matter of the action . . . is within the jurisdiction of the court in which the action lies." *In re Millenium Sea Carriers, Inc.*, 275 B.R. 690, 698 (S.D.N.Y. 2002) (citing *American Bank of Wage Claims v. Registry of the District Court of Guam*, 431 F.2d 1215, 1218 (9th Cir. 1970)); *see also Rolls Royce Industrial Power (India) v. M.V. FRATZIS M.*, 905 F. Supp. 106, 107 (S.D.N.Y. 1995) ("As a general matter, a court cannot make orders relating to or in aid of an *in rem* claim unless the *res* is within the court's jurisdiction."). Because the construction project at issue in this case is located in Maine, *in rem* jurisdiction exists only in Maine.

25

NECEC underscores that, on October 29, 2025, the state court overseeing Campos's lien action stayed that proceeding pending this one, and argues that this stay "implicitly recogniz[es] this Court's authority to declare the rights and obligations of the parties." (Opp. at 49.)  But the fact of the stay does not overcome—or even purport to contradict—the case law suggesting that *in rem* jurisdiction to adjudicate the lien action exists only in the court in whose jurisdiction the property lies.  Should the Change Agreement be deemed lawfully rescinded or otherwise invalidated in this case, NECEC can always litigate the lien action separately in Maine state court.

Accordingly, Count Sixteen is dismissed on jurisdictional grounds.

## V.  Conclusion

For the foregoing reasons, Defendants' motions to dismiss NECEC's Amended Complaint are GRANTED in part and DENIED in part.  Counts One, Two, Five, Six, Ten, Twelve, Thirteen, Fourteen, and Sixteen are dismissed with prejudice.  Defendants' motions are DENIED as to all other claims.

Defendants shall file an answer to the remaining claims within 14 days after the date of this Opinion and Order.  *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to close the motions at Docket Numbers 42, 45, and 48.

SO ORDERED.

Dated: June 1, 2026
      New York, New York

_____
J. PAUL OETKEN
United States District Judge

26